UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:11-cv-24505-KAM

---

IN RE: FABRIZIO DULCETTI NEVES

FABRIZIO DULCETTI NEVES,

Appellant,

vs.

MARKWOOD INVESTMENTS, LTD.
and GOLDEN DAWN CORPORATION,

Appellees.

---

**APPELLANT'S APPENDIX**

---

On Appeal From The United States Bankruptcy Court
Southern District of Florida, Miami Division

---

Paul J. Battista, Esq.
Florida Bar No. 884162
David C. Cimo, Esq.
Florida Bar No. 775400
Carlos E. Sardi, Esq.
Florida Bar No. 781401
Joshua R. Alhalel, Esq.
Florida Bar No. 0016320
Michael L. Schuster, Esq.
Florida Bar No. 0057119
GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for Fabrizio Dulcetti Neves, Appellant*
100 Southeast Second Street, 44th Floor
Miami, Florida 33131
Tel: (305) 349-2300
Fax: (305) 349-2310

Respectfully submitted on this <u>29th</u> day of December, 2011.

GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for Fabrizio Dulcetti Neves, Appellant*
100 Southeast Second Street, 44th Floor
Miami, Florida 33131
Tel.: (305) 349-2300
Fax: (305) 349-2310

By /s/ David C. Cimo
    Paul J. Battista, Esq.
    Florida Bar No. 884162
    Email: pbattista@gjb-law.com
    David C. Cimo, Esq.
    Florida Bar No. 775400
    Email: dcimo@gjb-law.com
    Carlos E. Sardi, Esq.
    Florida Bar No. 781401
    Email: csardi@gjb-law.com
    Joshua R. Alhalel, Esq.
    Florida Bar No. 0016320
    Email: jalhalel@gjb-law.com
    Michael L. Schuster, Esq.
    Florida Bar No. 57119
    Email: mschuster@gjb-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on this <u>29th</u> day of December, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record and parties identified on the Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    /s/ David C. Cimo
    David C. Cimo

## SERVICE LIST

**NEVES v. MARKWOOD INVESTMENTS, LTD., et al.**
**CASE NO. 1:11-CV-24505-KMM**

**VIA CM/ECF**

Jose A. Casal, Esq.
Michael E. Rothenberg, Esq.
Holland & Knight LLP
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Tel: (305) 789-7401
Fax: (305) 789-7799
Email: jose.casal@hklaw.com
Email: michael.rothenberg@hklaw.com
*Counsel for Appellees*

| EXHIBIT No. | DESCRIPTION |
|---|---|
| A-1 | Second Amended Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. §523 and Objecting to Discharge of the Debtor Pursuant to 11 U.S.C. §727 |
| A-2 | Defendant's Motion to Dismiss Adversary Proceeding or, in the Alternative, for Mandatory Abstention from Plaintiffs' Request for the Entry of Money Judgments |
| A-3 | Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss Adversary Proceeding or, in the Alternative, for Mandatory Abstention from Plaintiffs' Request for the Entry of Money Judgments [D.E. #267] |
| A-4 | Debtor's Reply to Plaintiffs' Response in Opposition to Debtor's Motion to Dismiss Adversary Proceeding or, in the Alternative, for Mandatory Abstention from Plaintiffs' Request for the Entry of Money Judgments |
| A-5 | Order Denying Defendant's Motion to Dismiss Adversary Proceeding or, in the Alternative, for Mandatory Abstention from Plaintiffs' Request for the Entry of Money Judgments |
| A-6 | 11 U.S.C. § 523 |
| A-7 | 28 U.S.C. § 1334 |
| A-8 | *Hall v. Davenport*, 76 F.3d 372 (4th Cir. 1996) |
| A-9 | *Stettin v. Gibraltar Private Bank & Trust Co. (In re Rothstein Rosenfeldt Adler, P.A.)*, Case No. 11-60748-Civ-SCOLA (S.D. Fla. Nov. 28, 2011) (Scola, J.), Order Withdrawing the Reference to the Bankruptcy Court [ECF No. 19] |
| A-10 | *Stettin v. Centurion Structured Growth*, Case No. 11-60400-CIV-JORDAN (S.D. Fla. Dec. 19, 2011) (Jordan, J.), Order Granting in Part Motion to Withdraw Reference and Closing Case [ECF No. 30] |
| A-11 | Ralph Brubaker, *Bankruptcy Court Jurisdiction to enter a Money Judgment on a Nondischargeable Debt: Exposing Pacor's Deficiencies and the True Supplemental Nature of Third-Party "Related To" Bankruptcy Jurisdiction,* 29 No. 4 Bankruptcy Law Letter 1 (April, 2009) |
| A-12 | Susan Block-Lieb, *The Case Against Supplemental Bankruptcy Jurisdiction: A Constitutional, Statutory, and Policy Analysis,* 62 Fordham L. Rev. 721 (1994) |

**A-1**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
www.flsb.uscourts.gov

In re:

**FABRIZIO DULCETTI NEVES**                          **Case No. 09-33043-BKC-LMI**
Chapter 7
      **Debtor**
_____ /

**MARKWOOD INVESTMENTS LTD.**
**and GOLDEN DAWN CORPORATION,**

        **Plaintiff,**                          **Adv. Pro. No.  10-02122-LMI**

**v.**

**FABRIZIO DULCETTI NEVES,**

        **Defendant/Debtor**
_____ /

### SECOND AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. §523 AND OBJECTING TO DISCHARGE OF THE DEBTOR PURSUANT TO 11 U.S.C. §727

Plaintiffs Markwood Investments Ltd. ("Markwood") and Golden Dawn Corporation ("Golden Dawn") (collectively, the "Plaintiffs"), claimants in the above captioned Chapter 7 case, through undersigned counsel, seek a determination pursuant to 11 U.S.C. § 523(c) that certain debts owed by the defendant/debtor Fabrizio Dulcetti Neves ("Neves" or "Debtor"), to Plaintiffs be excepted from any discharge Neves may be awarded pursuant to 11 U.S.C. §§ 523(a)(2), (4) and/or (6).  Alternatively, Plaintiffs seek entry of a judgment denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A), (2)(B), (3), (4) and/or (5).

### JURISDICTION AND VENUE

1.  This is a core proceeding pursuant to 28 U.S.C. § 157.

2.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

3.    Venue is proper in this Court pursuant to 28 U.S.C. § 1409 as this action arises and relates to the case styled *In re Fabrizio Dulcetti Neves*, Chapter 7 Case No. 09-33043-BKC-LMI (the "Case"), United States Bankruptcy Court, Southern District of Florida, Miami Division.

## PARTIES

4.    Plaintiff Markwood Investments Ltd. ("Markwood") is a British Virgin Islands corporation with a principal place of business in Rome, Italy.

5.    Plaintiff Golden Dawn Corporation ("Golden Dawn") is Panamanian corporation with a principal place of business in Rome, Italy.

6.    Golden Dawn and Markwood are affiliated entities.  Salvatore Frieri ("Frieri") is the principal of Golden Dawn and Markwood.

7.    On October 23, 2009, Debtor filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code (the "Petition Date").

## INTRODUCTION

8.    Plaintiffs bring this action against the Debtor for the wrongful taking and conversion of over $30 million by fraud and false pretenses, and object to the discharge of the debts alleged herein.  As described in detail below, the Debtor and his co-conspirators swindled Plaintiffs through an elaborate scheme beginning in 2006 and culminating in late 2007.  The Debtor tricked Frieri and Markwood by fraud and false pretenses into making loans to the Debtor of over $10 million that the Debtor never intended to repay and did not repay.

9.    Later, the Debtor orchestrated a scheme to defraud Frieri by inducing him into wiring $20 million for what Frieri believed was a legitimate investment with a Panamanian broker-dealer, which in reality was a front-company for the Debtor and his co-conspirators, which funds were promptly converted.  Frieri and Markwood have never seen their $30 million again.

2

10.     The Debtor failed to disclose in his bankruptcy schedules the income generated from his fraud against the Plaintiffs, has concealed that income, and cannot explain satisfactorily the loss of assets or deficiency of assets to meet his liabilities to Plaintiffs.  The Debtor also failed to disclose in his schedules his true ownership interest in his broker-dealer, LatAm Investments, LLC, and his beneficial or equitable interests in at least six other entities.

11.     The Debtor also failed to disclose in his schedules that he received **over $6 million in post-petition transfers in the one month following the filing of his bankruptcy petition arising from pre-petition transactions**.  These facts, as fully detailed herein, warrant an avoidance and denial of discharge of all of Debtor's debts.

<u>FACTS</u>

I.     **The Debtor Failed to Disclose His Full Interest in His Broker-Dealer, LatAm Investments, LLC, the Entity He Used to Perpetrate the Frauds Against the Plaintiffs.**

12.     The Debtor has used the broker-dealer he owns and controls, LatAm Investments, LLC (formerly known as Acosta Financial Services, LLC) ("LatAm") to perpetrate frauds on Plaintiffs and to conceal and move assets through shell entities that held LatAm brokerage accounts.  Despite his sworn representation on his bankruptcy schedules that he is merely a 1% owner, the Debtor is and has been the majority owner of LatAm, and exercised complete control over LatAm, which was his alter ego.

13.     LatAm is the primary vehicle through which the Debtor facilitated his numerous fraudulent schemes and hid and moved the proceeds of those schemes.  The Debtor was the mastermind for the conspiracies described herein.

14.     In 2005 and 2006, LatAm was a small, start-up South Florida broker-dealer without any significant assets or clients.  Its owners, Maximino "Jimmy" Acosta ("Acosta") and Angelica Aguilera ("Aguilera"), were looking for an investor to grow the company.

15.     In early 2006, Markwood's principal, Frieri, a high-volume bond trader, wanted to invest in a broker-dealer in order to save money on commissions.  While visiting Miami, he met Acosta and Aguilera and explored becoming a majority owner of LatAm.

16.     Although an agreement was reached, ultimately, the deal did not close, and Frieri did not acquire any ownership stake in LatAm because Acosta and Aguilera instead sold an interest to the Debtor.  Frieri had met the Debtor in early 2006, before either of them became involved with LatAm, through a mutual business acquaintance at another broker-dealer in Miami.

17.      After the deal with Frieri to buy into LatAm fell through, the Debtor, Acosta and Aguilera intended for the Debtor to become the majority owner of LatAm.  In the Spring of 2006, they allegedly submitted such a request to LatAm's regulators.  Aguilera has testified that the regulators denied the request because the Debtor could not pass the Series 24 license examination, which the Debtor failed twice.  By not passing that test, Aguilera testified, the Debtor could own only 1% or less of the broker-dealer, which is what LatAm disclosed to the regulators.  But Neves in reality held the controlling interest in LatAm.

18.     The Debtor, Aguilera, and Acosta all have sworn under oath that the Debtor never owned more than 1% of LatAm.  They swore that Acosta owned roughly 65% and Aguilera roughly 30%.  *See* Exhibit "A".  And Debtor reported only a 1% ownership interest on his bankruptcy schedules in November 2009.  *See* Exhibit "B".

19.     But in an August 2009 Personal Financial Statement that LatAm sent on behalf of the Debtor to a bank for a loan, the Debtor (or LatAm for him) listed LatAm Investments LLC as a $1 million asset owned by him.

20.     Moreover, as early as 2007, the Debtor himself submitted letters from his own accountant and from LatAm's accounting firm, Kauffman & Rossin, in support of a loan

application confirming that the Debtor actually owned 81% of LatAm as of December 2006. The Kaufman & Rossin letter states that the Debtor owned 81% of LatAm as of December 31, 2006 based on their annual audit of LatAm. *See* Exhibit "C". In support of that same loan, the Debtor submitted a second letter, this one from his current bookkeeper, Marta Santiago, stating:

> As per the attached documents, please find information on Mr. Fabrizio Dulcetti Neves. . . . He is an active member of the financial industry ***and is Managing Director of Acosta Financial Services. LLC* [n/k/a LatAm]** . . . .Prior ***to owning his own Broker – Dealer***, Mr. Neves was employed . . . at several other broker dealers in Miami.
>
> Mr. Neves holds a Series 7 and Series 63 License and since Acosta Financial Services, LLC is a Licensed Broker Dealer, ***the President must be a License Registered Series 24 which is why Mr. Maximino Acosta appears as President and Ms. Angelica Aguilera is Vice President.*** . . . (Emphasis added).

*See* Exhibit "D". And in a May 2007 email produced by Kauffman Rossin & Co., LatAm's Angelica Aguilera confirmed that LatAm will distribute 95% of the profits in LatAm's allocation of profits to the Debtor.

21.     LatAm recently acknowledged that the Debtor's capital account held 81% of all of LatAm's capital. *See* ECF No. 256 at ¶ 10.

22.     On October 17, 2007, the Debtor apparently bought a larger interest in LatAm when he wrote a check out of the account of his alter ego entity, Acosta Realty Holdings, LLC, to Jimmy Acosta for $1.3 million. In the memo section of the check, the Debtor wrote "buying shares Acosta Financial" (now known as LatAm). *See* Exhibit "E". Thus, as of October 2007, and at the time leading up to the petition date of the Debtor's Chapter 7 filing in October 2009, the Debtor owned substantially all of LatAm.

23.     In 2009 alone, the Debtor caused LatAm to pay out to him **over $10 million** either directly or through shell companies with LatAm customer accounts for the benefit of ("FBO") Fabrizio Neves. On information and belief, the Debtor caused millions more in

5

payments to be made to himself through LatAm brokerage accounts in the names of shell entities the Debtor created and beneficially owns.

24.     Moreover, two months after he filed his Chapter 7 petition and weeks after he allegedly resigned his position at LatAm, the Debtor paid $300,000 to LatAm's lawyers, Broad & Cassel, although he attempted to mask the true source of the payment.

25.     On May 5, 2010, the Debtor permanently lost his license to engage in any business regulated by the Financial Industry Regulatory Authority ("FINRA").  Not one of the officers of LatAm is registered as a broker-dealer with FINRA any longer.  All either voluntarily withdrew their registration or had their licenses permanently revoked during an ongoing FINRA investigation.

26.     LatAm ceased operations almost immediately after the Debtor filed his Chapter 7 petition, although it continued to pay the Debtor.

27.     In the **one month *following*** the filing of the Debtor's Chapter 7 petition, LatAm transferred to the Debtor over **$6 million**.

28.     Thus, despite his ongoing attempts to separate himself from LatAm, and attempts to portray him as a 1% owner (including in his bankruptcy schedules), at all material times the Debtor completely owned and controled LatAm, and its officers and employees.  And he used his control over LatAm to effectuate the following frauds.

**II.     The Debtor Took Over $10 Million From Plaintiffs In Loans Obtained Through Fraud and False Pretenses**

29.     Soon after the Debtor bought and obtained de facto control of LatAm, the Debtor and his co-conspirators embarked on their scheme to take millions from Plaintiffs.  Calculating that Frieri would succumb to their deceptions, the Debtor set about to gain Frieri's trust and confidence, and then convince him to loan the Debtor $10.08 million through a series of

promissory notes between September 2006 and May 2007. The Debtor knew when he signed the promissory notes that he never intended to repay the loans.

30. To accomplish the scheme, the Debtor, Acosta and Aguilera first gained Frieri's trust and confidence. Among other acts to establish credibility in Frieri's eyes, the Debtor presented himself as a successful Brazilian pension fund manager and the owner of a patented, hurricane-proof roof system in Miami. In reality, the Debtor was a relatively small-time trader with moderate earnings.

31. In addition, the Debtor, Acosta and Aguilera invited Frieri to set up an office at LatAm and to use their office space and a computer to conduct his personal trades. They further invited him to use the LatAm executive apartment during his trips to Miami. And they continued to entice him with promises of a future ownership interest in LatAm.

32. The co-conspirators also had Aguilera pretend that she was romantically interested in Frieri, and she and Frieri, in fact, had a romantic relationship through 2006 and into 2007 before Aguilera ended it. Jimmy Acosta, a married man at that time, and the former lover of Aguilera, even pretended to be jealous of Frieri. In one 2007 incident, Acosta threatened Frieri that harm would come to him if he did not end the relationship with Aguilera. The Debtor then stepped in to "protect" Frieri from Acosta and thereby further gained Frieri's trust and confidence.

33. During the months between September 2006 and May 2007, Frieri, Acosta, Aguilera and the Debtor made other staged efforts to gain Frieri's trust. In one incident, the Debtor again posed as Frieri's protector when an investment deal between Frieri and a third party, Sergio Rodriguez, went sour. At a meeting to discuss the situation, at which Acosta was present, the Debtor threatened Rodriguez with a pistol in front of Frieri, and warned Rodriguez

to not cause Frieri any harm. All of this, Frieri would much later come to understand, was merely a ruse to gain his trust and steal his and Markwood's money.

34. The Debtor, Acosta and Aguilera also convinced Frieri to open a customer account for Markwood at LatAm and all of them were account managers for the Markwood account at some time.

35. Having gained Frieri's trust, the Debtor, Acosta, and Aguilera convinced Frieri to have his companies, Markwood and Golden Dawn, loan an aggregate of $10.08 million to the Debtor. These loan proceeds were reflected in a series of promissory notes, dated between September 5, 2006 and May 1, 2007.

36. In each instance, the Debtor immediately transferred the loan proceeds to third-party transferees without consideration even though he and his alter ego entity, Acosta Realty Holdings, LLC (also an obligor on most of the notes) had no business operations with which to pay back the loans. Because the Debtor had no other assets or business activities by virtue of which he might expect to meet his obligations to Plaintiffs, and because the transfers made to the various accounts described below were all made without any consideration, they were fraudulent transfers. These immediate transfers without consideration also evidence that the Debtor never intended to repay the monies he borrowed.

37. By promissory note dated September 5, 2006, Acosta Realty borrowed $500,000 from Plaintiff Golden Dawn, the proceeds of which were deposited into Acosta Realty's account at HSBC Miami. The Debtor immediately withdrew the loan proceeds from the account and wired $360,000 of the $500,000 to the LatAm customer brokerage account of an entity called Treasure on the Bay Ltd. ("Treasure on the Bay") the same day. And the next day the Debtor deposited $130,000 into his personal HSBC account, leaving the Acosta Realty account with a balance of less than $10,000 on September 16, 2006.

8

38.     By promissory note dated October 16, 2006, the Debtor borrowed an additional $200,000 from Plaintiff Golden Dawn, the proceeds of which were deposited into Acosta Realty's account at HSBC Miami.  On the same date, the proceeds were transferred out of that account to the Debtor's joint personal account with his wife at HSBC, by two transfers in the amount of $190,000 and $9,900, respectively.

39.     By promissory note dated October 17, 2006, the Debtor and his wife Laura Neves ("Laura") borrowed $2 million from Plaintiff Golden Dawn, the proceeds of which were deposited again into Acosta Realty's account at HSBC Miami through a deposit of $600,000 on October 17, 2006 and another deposit of $1,400,000 on October 18, 2006.  To effectuate the October 2006 loan, Markwood transferred the $2 million to Acosta Realty's account at HSBC Miami from its investment account at LatAm.  Again the Debtor immediately transferred the loan proceeds out of the Acosta Realty account through a $500,000 withdrawal on October 18, 2006; a $1 million check that cleared on October 20, 2006; and a $510,000 withdrawal on October 31, 2006.

40.     Both the $500,000 transfer on October 18, 2006 and the $510,000 transfer on October 31, 2006 went to Treasure on the Bay.  On information and belief, and as discussed more fully below, the Debtor beneficially owns Treasure on the Bay and used that entity and its nominal owner, Leandro Ecker, from 2006 to the present to effectuate his fraud and to conceal assets.

41.     By promissory note dated December 15, 2006, the indebtedness represented in the three earlier promissory notes (dated September 5, 2006, October 16, 2006 and October 17, 2006, respectively) was consolidated, and the Debtor borrowed an additional $1.5 million from Plaintiff Golden Dawn.  The Debtor acknowledged in the consolidated note a total consolidated indebtedness of $4,430,000.  The additional $1.5 million of loan proceeds was deposited into

9

Acosta Realty's account at HSBC Miami on December 18, 2006, by wire transfer from Markwood's investment account at LatAm and the consolidated note, by its terms, was payable to either Golden Dawn or to Markwood's account at LatAm. On the following day, the Debtor transferred the $1.5 million loan proceeds out from Acosta Realty's account to unknown transferee(s).

42.     The Debtor procured the December 15, 2006 consolidated note with the assistance of Acosta and Aguilera, who held Markwood's LatAm brokerage account hostage until Frieri agreed to make the additional loan to the Debtor. The three froze Markwood's LatAm account for trumped up regulatory reasons, but there was no legitimate reason for freezing the account, and it was done solely to pressure Frieri to make the additional loan.

43.     By promissory note dated February 5, 2007, the Debtor borrowed an additional $3 million from Golden Dawn, with the loan proceeds again coming from Markwood's LatAm account and deposited into Acosta Realty's account at HSBC Miami on February 5, 2007. The next day, the Debtor transferred $2.9 million to "Laura's personal account," according to the Debtor's handwritten note on that account statement. The Debtor moved the remaining $100,000 of loan proceeds from Acosta Realty's account on February 27, 2007. The Debtor, himself or through his wife, then moved the $2.9 million around to LatAm and straw entities, including Treasure on the Bay, in a serious of highly suspicious transfers discussed below.

44.     To induce the February 5, 2007, loan, the Debtor, through Acosta Realty, made a single $83,000 payment on the December 2006 consolidated note to mislead Frieri into believing that the Debtor intended to make good on the loans. That single payment was the only payment ever made by either the Debtor or Acosta Realty on any of the notes.

45.     The last promissory note was executed and delivered by Acosta Realty to Plaintiffs on May 1, 2007. Under that note, Acosta Realty borrowed $2,650,000 from Golden

Dawn, which loan proceeds were again wired from Markwood's LatAm account to Acosta Realty's account at HSBC Miami on May 3, 2007. The Debtor transferred the full loan proceeds out from Acosta Realty's account on May 7, 2007 to his personal HSBC account.

46.     The Plaintiffs, through Frieri, justifiably relied on the Debtor's and his co-conspirators' false pretenses and misrepresentations described above regarding the Debtor's intent and ability to repay the loans, his trustworthiness, intentions, and bona fides.

47.     The Debtor also falsely represented to Frieri that the money under the notes would be used for various investments, including real estate on which he would build homes using the hurricane-proof roof system, to fund the Debtor's pension fund management company in Brazil, to fund LatAm, and other purposes. Plaintiffs justifiably relied on these representations by the Debtor. But the Debtor had no funds to repay the loans at that time and no intention ever to repay the loans. Instead, he immediately transferred the money from Acosta Realty's bank account to either the shell company, Treasure on the Bay, which further disbursed the funds, or, more often, to the account the Debtor and Laura called "Laura's personal account" (which was a joint account in the name of the Debtor and Laura), where they spent the money on personal items.

48.     Millions from the Markwood loan funds went into building the Debtor's multi-million dollar, 13,000 square foot mansion on South Miami Avenue, and into funding the lavish lifestyle the Neveses began to lead in 2007 with Markwood's money. For example, the Debtor drove (and on information and belief *still* drives) a Rolls Royce Phantom and owns about 40 weapons, including many military-grade, semi-automatic assault rifles, some with "cop-killing" ammunition, silencers, and a .50-caliber military gauge sniper rifle.

49.     The Debtor also purchased hundreds of pieces of very expensive jewelry, including two Tiffany necklaces, one worth about $165,000 and another worth over $300,000. In addition, they owned over 50 watches between them.

## A.  *The Federal Court Litigation to Enforce the Promissory Notes*

50.     In 2008, Markwood and Golden Dawn instituted a federal court action against the Debtor and Acosta Realty to recover on the promissory notes, and with the agreement of Debtor's then-counsel, Greenberg Traurig, the district court entered judgment on the pleadings against the Debtor and Acosta Realty on the February 5, 2007 and May 1, 2007 promissory notes.  The Debtor had no defenses to the claims on those notes.  The Debtor had testified that the money was owed and unpaid, but that he no longer had enough money to repay the loans—it was tied up in deflated real estate holdings.  Exhibit "F".  The District Court entered partial final judgment on those claims on June 1, 2009.  As the litigation progressed in 2009, tens of millions of dollars began moving out of LatAm brokerage accounts and into off-shore accounts.

51.     On October 23, 2009, shortly before trial was scheduled to begin on the one remaining claim regarding the December 15, 2006 consolidated promissory note, and three days after the U.S. Marshals Service conducted a levy at the Debtor's mansion to collect on the partial final judgment, the Debtor filed his Chapter 7 petition, staying the federal action against him.

52.     Although the Debtor had no defenses to the two promissory notes that were the subject of the district court's judgment, the district court ultimately vacated the judgment because it later determined the court lacked diversity subject matter jurisdiction based on the Debtor's alleged foreign citizenship.  Records discovered later, however, reflect that the Debtor and his wife represented to a bank that they are both U.S. citizens.  Exhibit "G".  The Debtor lied to either the federal court or to the bank.

## B. *The Levy to Enforce the District Court Judgment*

53.     Before the district court vacated the judgment, Magistrate Judge O'Sullivan entered a "break order" and on October 20, 2009, the U.S. Marshals Service executed a levy on Debtor's residence in order to collect on the unpaid judgment.

54.     During the levy, a mover accidently leaned against a mirror wall and it opened to disclose the first of two hidden safes about which the Debtor had not informed the Marshals. This was a jewel-quality safe that required several locksmiths and safe experts, and over 6 hours to open.  Contrary to claims by Debtor and his wife that the hidden safe belonged to Laura, the safe contained property of the Debtor, including his jewelry, his credit card, his receipts and his personal papers. The second undisclosed safe was a large gun safe located in the basement garage.

55.     Plaintiffs and the U.S. Marshals took no documents from Debtor's home during the levy other than jewelry appraisals and check books.  But documents lawfully observed that were not taken during the search for assets include hundreds of documents in Debtor's home, mostly in his gun and jewelry safe, that establish Debtor's financial interest in, connection to, and ultimate control over tens of millions of dollars of assets, including entities, most of which are not listed in his Schedules in this Chapter 7 proceeding.  Those entities are described in more detail below.

56.     The Debtor has failed to produce in discovery in this matter most of the documents relating to these entities observed in his home.

57.     In the gun safe alone were three large plastic containers each filled with files and envelopes clearly labeled to describe the general subjects of the documents inside.  Included in

---

[1] One small box of documents relating to Lexton LLC was sent to a mediator in the Federal action because they were central to the then-impending trial but never produced by the Debtor.  The Trustee later copied and returned those to the Debtor.  No other documents were removed from the Debtor's home.

those documents were 25 to 50 pages in an envelope plainly labeled "Emerging Capital Group" or "Documents re Panama" observed inside Debtor's upstairs gun safe. Inside the files were documents relating to HSBC Panama, Jimmy Acosta, Frieri, and Emerging Capital Group. The Debtor has previously testified under oath in the Federal action that he had no knowledge of Emerging Capital Group.

58. In addition to having lied about his connections to Emerging Capital Group, Debtor also gave perjured testimony about an entity called Lexton, LLC ("Lexton"), that was at the center of the district court litigation about the February 2007 promissory note. Debtor testified that he knew *nothing* about Lexton, but that it was an entity owned by a business associate, Luis Fragali. On information and belief, Fragali, like Leandro Ecker, is another front man for the Debtor. The Debtor falsely testified that Fragali gave his interest in Lexton to Frieri in exchange for Frieri forgiving Debtor's debt under the $3 million, February 2007 promissory note. In addition to having given conflicting answers in other discovery responses in that litigation (the Debtor ultimately contended the Lexton transfer allegedly paid off the consolidated note, which was the sole issue for the trial), Debtor's gun safe contained envelopes labeled "Lexton LLC/Amicorp" containing approximately 50 to 70 pages of documents about Lexton, including original documents.

### III. The Debtor Masterminded and Directed a Scheme to Steal $20 Million from Markwood

59. In or around March 2007, the Debtor masterminded a scheme and directed his co-conspirators in launching a bold new phase of his plans to steal money from Frieri through Markwood. The Debtor received a large share of the stolen funds, and, on information and belief, distributed the rest to the co-conspirators to pay them for their respective roles.

60. Jose "Lucho" Luna, the Debtor's personal assistant and an operations manager at LatAm, suggested to Frieri that he contact two Venezuelans, Carlos Fuenmayor and Christian

14

Lovera, because he had information that they might have a bond deal in which Frieri would be interested.  On information and belief, Jose Luna made this suggestion at the Debtor's direction. Frieri was familiar with Fuenmayor and Lovera through LatAm, where the two had been foreign associate brokers in Venezuela for LatAm.  Fuenmayor owns a broker-dealer in Caracas, Venezuela called Banc Trust & Co.

61.     Frieri contacted Fuenmayor and Lovera and traveled to Caracas to meet them in or about March 2007.  Through them Markwood executed a large, but otherwise unremarkable transaction in April 2007 involving structured trades of foreign bonds.

62.     Fuenmayor and Lovera instructed Frieri to wire certain funds for this April 2007 transaction to Banc Trust's "Pershing" account.  That account was actually a customer brokerage account at LatAm, AXW 00--27.

63.     Wanting to assist those he thought to be his friends at, including his paramour Angelica Aguilera, Frieri even tried to involve LatAm in what he believed would be a profitable transaction.  But the Debtor had Aguilera email Frieri that he had called a formal meeting of LatAm to discuss the possible deal, and the Debtor decided LatAm was not interested.  Exhibit "H".  LatAm was allegedly not interested, but this was the Debtor's way of distancing himself from the Venezuelans and their dealings with Frieri to mask the Debtor's true involvement. Fuenmayor and Lovera, however, sent Frieri a letter on March 28, 2007 confirming the terms of the prospective deal, and they addressed the letter to "Acosta Financial Attn: M. Acosta, J. Luna, S. Frieri."

64.     Because the April 2007 transaction with Fuenmayor and Lovera was executed without incident, as they had planned, Fuenmayor and Lovera gained Frieri's trust with respect to business investments while simultaneously distancing the Debtor from the two Venezuelans.  In

15

retrospect, the April 2007 deal had been merely a pretext orchestrated by the Debtor to gain Frieri's trust and set him up for yet another fraudulent transaction.

65.     The Debtor had already orchestrated the next phase of the fraud, and by May 2007, the Venezuelans were already talking to Frieri about new deals for him to invest in.  They communicated with Frieri about possible deals into the fall of 2007.  Unknown to Frieri, they were working hand-in-hand with the Debtor and his other co-conspirators, who were putting the pieces in place to take $30 million or more from Frieri.

66.     After much discussion and correspondence reflected in emails between May and August 2007, the Venezuelans, directed by the Debtor and with the Debtor's complete knowledge, convinced Frieri to make a second large investment in a complex bond deal.

67.     Unbeknownst to Frieri, the Debtor and Acosta travelled to Venezuela around this time.  On information and belief, the purpose of this trip was to meet with Fuenmayor and Lovera.

68.     In discussions and email correspondence throughout August and early September 2007,  at the Debtor's direction Fuenmayor and Lovera represented to Frieri that they would form a new company in Panama to effectuate the investment.  The plan was for Frieri to make an initial deposit into an account to be opened in Markwood's name.

69.     Once the funds were deposited, a loan could be obtained for far more than the amount of the initial funds and the initial bond trades would occur.  A second deposit would occur approximately 20 days after the first deposit and the transaction would be "booked" and the notes delivered.

70.     Frieri agreed to make the initial investment of $20,000,000.00.  Exhibit "I".

71.     At the Debtor's instruction, Fuenmayor and Lovera represented to Frieri, including in email correspondence on September 11, 2007, where to wire the money, that an

16

account would be opened in Markwood's name with the funds once received, and that the funds initially would be deposited into a new HSBC Panama account in the name of Markwood. Exhibit "J".

72.     Following Fuenmayor's instructions, on September 11, 2007, Markwood ordered its HSBC Switzerland bank to transfer $20 million into HSBC Panama account number XXX-XXX070-001, reference: "Markwood Account Opening." *See* Exhibits "J" and "K".

73.     Contrary to Fuenmayor and Lovera's representation that the recipient would open a new Markwood account, no Markwood account was ever opened.

74.     Instead of the funds being deposited into a new HSBC Panama account in Markwood's name, the wire instructions provided by Fuenmayor and Lovera resulted in the funds being deposited directly into an HSBC Panama account in the name of Emerging Capital Group ("ECG"), which had only been opened two weeks earlier.

75.     As soon as Markwood transferred the funds into ECG's account, the funds were transferred out.

76.     Within three weeks, the Debtor would have his co-conspirators transfer out the entire $20 million funded by Markwood in six wire transfers, including $8.5 million wired directly to the Debtor at Acosta Realty Holdings, as fully detailed below.

77.     Frieri later learned that in September 2007, the Debtor had caused ECG to be formed in Panama as a purported broker-dealer to accomplish the fraud on Frieri and Markwood. Completely unbeknownst to Frieri, the directors and officers of ECG were the Debtor's colleagues at LatAm: Jimmy Acosta, Alicia Aguilera (Angelica's sister), and Leandro Ecker (on information and belief, Ecker is a front-man for the Debtor, he was registered as a broker at LatAm and was and is the nominal owner of entities discussed below believed to hide assets of the Debtor).

17

78.    Had Frieri known of the Debtor's involvement in ECG, Frieri would have never wired any funds, much less $20 million, to an account controlled by Acosta and his and the Debtor's acolytes, especially considering (i) Acosta's improper freezing of Frieri's account at LatAm, (ii) Acosta's extortive means to obtain additional loans from Frieri to the Debtor, (iii) Acosta's physical threats to Frieri, and (iv) the Debtor' fraudulent default on the more than $10 million promissory notes owing to Frieri through Markwood and Golden Dawn.

79.    Frieri first learned of Acosta, Alicia Aguilera and Ecker's involvement in ECG in approximately mid-October 2007, when HSBC Panama advised Markwood's bank, HSBC Switzerland, that the $20 million deposit was gone.

80.    Frieri investigated the loss and learned that the officers and directors of ECG, and the signatories on its bank account, were the Debtor' co-conspirators: Jimmy Acosta, Alicia Aguilera, and Leandro Ecker.  Frieri ultimately learned that the Debtor was at the center of the conspiracy.

### A.  *How the Debtor Disbursed Over $10 Million of the $20 Million* *He Stole in the Emerging Capital Group Fraud*

81.    Pursuant to the Debtor's plan, on September 25, 2007, Emerging Capital Group, through Jimmy Acosta, transferred $10 million out of ECG's HSBC Panama bank account in four separate wire transfers:  $4 million to Banco Canarias, Venezuela; $2.5 million to Arbitrajes Financieros; $2 million to Ontime Financial Services; and $1.5 million to Atlantic Corporate Service.  Exhibit "K" and "O".

82.    Markwood continues to investigate the ultimate destination of this $10 million but, on information and belief, it eventually made its way to LatAm and the Debtor distributed it to the co-conspirators.

83.    On October 5, 2007, ECG transferred another $8.5 million of Markwood's $20 million from ECG's HSBC Panama bank account to Acosta Realty's HSBC Miami bank account

in Miami, Florida. Acosta Realty is the entity wholly owned by the Debtor, who immediately took control of the money.

84.     On October 9, 2007, ECG wired $1.4 million (which was most of the balance of the $20 million) to an ECG account at the Debtor's broker-dealer, LatAm. From this account, on November 19, 2007, $1.363 million was wired to Leandro Ecker, the vice president of ECG and the nominal owner of Treasure on the Bay, among other entities discussed below.

85.     Just days after the Debtor received the $8.5 million wire, on October 17, 2007, the Debtor wrote two checks totaling **$2 million** to Jimmy Acosta (the president of ECG that had just transferred the $8.5 million to the Debtor), and Jimmy Acosta's wholly-owned company. One of those was a $1.3 million check to Acosta individually with a memo notation: "buying shares Acosta Financial" (n/k/a LatAm). The second check for $700,000 was issued the same day to J & A Boynton Enterprises, LLC for "investment in tanning business," of which Acosta is the sole member. Exhibit "L". There was no legitimate purpose for ECG to have made these transfers to the Debtor, Acosta and Ecker in the manner they were made.

86.     The Debtor, despite having directly received at least $8.5 million from ECG, and having in his possession at his residence original corporate formation documents for ECG, testified under oath in the Federal action that **he had never heard of Emerging Capital Group**. Exhibit "M".

87.     On September 18, 2007, one week after Markwood wired its $20 million to ECG, **the Debtor wired $250,000 from his personal account at HSBC to Christian Lovera,** one of the Venezuelan front-men at Banc Trust & Co.

88.     The day after he paid Jimmy Acosta $2 million for his role in the fraud, the Debtor distributed to himself and others the remainder of the $8.5 million he had received directly from ECG as described below.

19

89.     On October 18, 2007, the Debtor opened a brokerage account at LatAm in the name of his alter ego entity, Acosta Realty Holdings, and moved the balance of the $8.5 million (about $6.5 million) to that new account from Acosta Realty's HSBC Miami account.  Exhibit "O".

90.     The Debtor then formed Neves Realty Holdings just two weeks later, on November 1, 2007, and, on that same date, opened yet *another* customer brokerage account at LatAm for the new entity.

91.     The Debtor immediately moved $6 million of the $6.5 million from the Acosta Realty brokerage account at LatAm to this new Neves Realty brokerage account at LatAm.  The Debtor transferred the other $500,000 to his personal HSBC account.

92.     On information and belief, Neves Realty Holdings, like Acosta Realty Holdings, never conducted any business and served merely as the Debtor's alter ego and a vehicle to hide and move the stolen funds.

93.     From the Neves Realty Holdings brokerage account at LatAm, the Debtor moved $5.8 million of the $6 million in 15 transfers that can summarized as follows:

(a) **$2,582,703** to the Debtor;

(b) **$1,645,000** to the LatAm account of an entity called Gilsland Estates (*See* Exhibit P);

(c) **$750,000** to James Marx PA Trust Account (Exhibit "Y");

(d) **$600,000** to Glass Sculpture Investments, an entity nominally owned by Luis Fragali, discussed below (Exhibit "Y"); and

(e) **$246,666** to Mercedes Serruya Monteiro, the Debtor's mother-in-law, also discussed below (Exhibit "Y").

94.     Thus, within a month, the full $20 million that Markwood had wired for the ECG investment was dissipated under the Debtor's direction.   At least $10 million can be traced directly to the Debtor, Jimmy Acosta, LatAm, and their co-conspirators, and it is anticipated that

20

further discovery will establish that the whole $20 million can be traced to the Debtor (who, as the mastermind and leader of the conspiracy, distributed the proceeds of the fraud as he saw fit).

95.    To date, none of the $20 million has been returned to Markwood or Frieri.

96.    The Debtor has not produced a single record explaining the reason for his receipt of $8.5 million directly through Acosta Realty or ECG's receipt of $1.4 million directly into a brokerage account at his broker-dealer.  On information and belief, these transfers were intended to conceal assets.

97.    The Debtor has never produced documentation satisfactorily explaining the transfers or the dissipation of the assets, and on information and belief, he has concealed, destroyed, or failed to keep records about these transactions and assets.

**IV.    The Debtor Has Hidden and Failed to Disclose on His Schedules Additional Assets and Has Destroyed or Concealed Records Relating to Such Assets**

98.    As he did with the $30 million he swindled from the Plaintiffs, the Debtor has concealed and failed to disclose on his schedules his interest in the several entities discussed in this part, which, on information and belief, the Debtor beneficially owns in whole or in part.  On information and belief, the Debtor has concealed or destroyed records, has failed to keep or preserve recorded information relating to these entities and related assets, and has failed to explain satisfactorily any loss of these assets.

99.    The six entities are:

(a) Punch Development Ltd.;

(b) Treasure on the Bay Ltd.;

(c) River Consulting Inc.;

(d) JMC Financial Ltd.;

(e) Glass Sculpture Investments, Inc.; and

(f) Wealth Management International USA Ltd.

100.     Most of these entities received large sums of money from the Debtor out of the money he took from Plaintiffs.  In addition, some of these entities further transferred money to other entities with the same nominal owners; money, on information and belief, that belongs to the Debtor.  There were numerous transfers among these entities, their nominal owners, the Debtor, and/or LatAm.

101.     All but one of these shell entities had brokerage accounts at LatAm, the Debtor's alter ego, through which tens of millions of dollars was moved.

102.     Each of these entities is nominally owned by one of a few individuals who, on information and belief, serve as front-persons for the Debtor: Cristiano Arndt, Leandro Ecker, Mercedes Monteiro (the Debtor's mother-in-law), and Luis Fragali.

103.     In October 2009, the Debtor had among his personal papers in his home pre-signed checks, incorporation documents, and account statements for some of these entities, and the original corporate seal stamps for JMC Financial Ltd. and Bulrock Services.  Despite specific discovery requests, the Debtor did not produce any of the documents or corporate seal stamps in his possession.

104.     On information and belief, the Debtor has destroyed or concealed the documents and corporate seal stamps observed in his home in order to conceal his true interest in these entities and to hinder, delay and defraud his creditors, including Plaintiffs, by masking his ownership of those entities and his assets that they have hidden.

105.     These entities are described in the succeeding paragraphs with the information currently known about them, including several specific transfers that evidence the Debtor's interest in these entities.

### A. *Punch Development Ltd.*

106.    Punch Development Ltd. ("Punch Development") is a BVI entity that opened a LatAm brokerage account in November 2007, shortly after Markwood's $20 million was stolen through the Emerging Capital Group fraud.  In 2009, Punch Development received directly from LatAm just under **$18 million—over half of LatAm's total income for the year**.

107.    LatAm's bank records disclose that Punch Development received this $18 million in 13 transfers in amounts between $300,000.00 and $5,000,000.00 each.  The transfers were made into Punch Development's LatAm customer brokerage account (AXW 00—27) until July 2009, when the remaining transfers went to a Punch Development account in the Bahamas at the Winterbotham Trust Company Limited.  Five of these transfers have a notation stating "commission payout."  The last transfer to this entity was a $1 million transfer on November 12, 2007, five days before the Debtor's resignation date from LatAm.   *See* Excerpts of Bank of America records attached as Exhibit "N".

108.    On the day the Debtor filed his Chapter 7 Petition, LatAm wired $1.4 million to Punch Development.

109.    The Debtor has represented in court papers that he has no connection to LatAm's transfers to Punch Development:  He "*understands* that Punch Development was an introducing broker, and [he] *assumes* that LatAm's payments to Punch Development were referral commissions.  The only connection between [the Debtor] and the transfers by LatAm to Punch Development is that [the Debtor] *may have* worked with some of the clients Punch Development referred to LatAm." *See* ECF No. 44, at 5, ¶10 (emphasis added).

110.    Notwithstanding the Debtor's representation that the $18 million in transfers to Punch Development were for bona fide referral fees for LatAm clients that Punch Development brought to LatAm, LatAm ceased operating as a broker-dealer shortly after the Debtor filed for

23

bankruptcy protection.  Thus, it appears that even though Punch Development brought in $18 million worth of clients in 2009 alone, LatAm could not survive the Debtor's sudden departure caused by his bankruptcy filing.

111.    The Debtor's disavowal of any substantial connection to Punch Development and its $18 million in transfers from LatAm is not credible.  Upon information and belief, the Debtor had detailed knowledge of and a substantial interest in the entity allegedly owned by his partner and that received more than half of his company's income in 2009.

112.    Bank records reflect that, in 2009, the Debtor and Punch Development *together* received over **$28 million** from LatAm's Bank of America account which represented **80%** of the total $35 million deposited into LatAm's operating account in all of 2009.  Upon information and belief, these payments were not, in fact, commissions or legitimate payments, but were payments or transfers to conceal assets belonging to the Debtor.

113.    On information and belief, the Debtor had LatAm pay these large amounts to Punch Development, an offshore company, for purported referral commissions to avoid taxes in the United States and to conceal his interest in this entity and its assets.

114.    Punch Development is nominally owned by Christiano Arndt, a Brazilian national who is the Debtor's partner in his Brazilian asset management company, Atlantica Assets, Ltd. ("Atlantica").  It was Arndt who signed the letter sent from Atlantica to the Debtor, referred to in his Schedules, "suggesting that he [the Debtor] could no longer be an owner [of Atlantica] because of his bankruptcy filing."  *See* Schedule B, Item 16 & note, and Schedule B-13 & note 2.

115.    But Punch Development's LatAm account application lists as the company's address the home address in Aventura, Florida of the Debtor's long-time personal assistant and operations manager, Jose Luna.  LatAm statements in 2009 and 2010 for Punch Development

reflect the same Brickell Avenue address as Treasure on the Bay Ltd., River Consulting Inc., and JMC Financial Ltd.

116.     Moreover, LatAm listed the same telephone number for both Mr. Arndt and the Debtor.  The number listed on the Punch Development account statements for Mr. Arndt (the account's purported account executive) is (305)597-9705, which is the same telephone number listed on the LatAm account statements for the Debtor where the Debtor was the account executive, including the statements for Treasure on the Bay, Acosta Realty Holdings, Neves Realty Holdings, and the Debtor's personal LatAm accounts.

117.     Viewed in light of all the circumstances, it is reasonable to conclude that the Debtor received some or all of the benefit of the $18 million paid to Punch Development, and that he had a financial interest in Punch Development.

## B. *Treasure on the Bay Ltd.*

118.      On information and belief, the Debtor has used Treasure on the Bay, Ltd. to hide assets since 2006, shortly after he bought control of LatAm.  Treasure on the Bay is nominally owned by Leandro Ecker, who was a broker at LatAm, a broker at the Debtor's Brazilian company Atlantica, and an officer of Emerging Capital Group (the shell company the Debtor used to perpetrate the ECG fraud).

119.     The Debtor transferred to Treasure on the Bay's LatAm account over $2 million of the funds the Debtor took from Plaintiffs under the promissory notes, as the following transactions reflect.  Treasure on the Bay also transferred millions of dollars out of its LatAm account to Debtor's mother-in-law, to JMC Financial Ltd., and to an entity nominally owned by Luis Fragali.

120.    On September 5, 2006, the day he obtained $500,000 from Plaintiffs under the first promissory note, the Debtor transferred $360,000 of the loan proceeds to Treasure on the Bay's LatAm brokerage account. Exhibit "Q". A week later, Treasure on the Bay sent $150,000 of this money to an entity called Trimundial Investments, LLC, nominally owned by Luis Fragali, as explained in Paragraphs 154 to 158, below.

121.    On October 18, 2006, the day after he received $2 million from Plaintiffs under the October 17, 2006 promissory note, the Debtor transferred $500,000 in loan proceeds to Treasure on the Bay's LatAm brokerage account. Exhibit "R".

122.    Two weeks later, on October 31, 2006, the Debtor wired another $510,000 to Treasure on the Bay's LatAm brokerage account. Exhibit "R".

123.    For unknown reasons, on January 31, 2007, the same week the Debtor received $3 million from Plaintiffs under the February 5, 2007 promissory note, Treasure on the Bay paid $125,000 to Jimmy Acosta, who was the Debtor's other co-conspirator, co-owner of LatAm, and president of Emerging Capital Group. And shortly before that payment, on December 18, 2006, Treasure on the Bay made a $9,000 payment to Jose Luna, the Debtor's personal assistant and operations manager at LatAm. Although the reasons for these payments are not yet known, on information and belief, these payments to officers and employees of LatAm are further evidence of the Debtor's control of and interest in Treasure on the Bay.

124.    Then, in a highly suspicious series of transactions involving LatAm, the Debtor and his wife, Laura Neves, Treasure on the Bay received $1,050,000 from the Debtor's joint bank account. On April 2, 2007, the same week that Markwood invested $30 million in the pretext transaction that commenced the ECG fraud, the Debtor's wife transferred $1.1 million from the couple's joint HSBC account **to LatAm's** HSBC operating account. The next day, on April 3, 2007, LatAm transferred the full $1.1 million *back* to the Debtor's personal joint HSBC account.

On that same day, the Debtor's wife transferred $1,050,000 from the couple's joint HSBC account to Treasure on the Bay's LatAm brokerage account.

125.     On information and belief, these transfers among the Debtor's wholly owned entity, Acosta Realty Holdings LLC, LatAm, the Debtor's personal account, and Treasure on the Bay were intended to conceal the Debtor's ownership of the assets and are evidence of the Debtor's ownership interest in Treasure on the Bay.

126.     Treasure on the Bay also made payments to the Debtor's mother-in-law, Mercedes Monteiro, as well as to JMC Financial Ltd., the entity she nominally owns.  On information and belief, these payments were made at the Debtor's direction and evidence his interest in and control over the entities discussed herein.

127.     Treasure on the Bay wrote a check from its LatAm account on March 4, 2009 to JMC Financial Ltd.  Treasure on the Bay wrote a second check to JMC Financial on March 11, 2009, for $700,000.   Exhibit "T".

128.     Treasure on the Bay made payments from its LatAm account directly to Mercedes Monteiro, including $289,000 on June 24, 2008; and $88,872.00 on July 11, 2008.  Exhibit "U".

129.     That same week in June 2008, Treasure on the Bay *received* a transfer from the LatAm account of Emerging Capital Group (the entity used to take Markwood's $20 million in the ECG fraud).  And also that same week, Treasure on the Bay received $361,000 from the LatAm account of Glass Sculpture Investments, yet another entity discussed below, in which, on information and belief, the Debtor has an undisclosed interest.

130.     Because the Debtor, directly and through Acosta Realty Holdings, transferred money taken from Plaintiffs to Treasure on the Bay, and Treasure on the Bay, in turn, transferred funds to or received funds from JMC Financial, Mercedes Monteiro, Emerging Capital Group, Jimmy Acosta, Trimundial Investments, and others, it is reasonable to conclude that the Debtor

is hiding assets in and among these entities and concealing the extent of his interest in these entities.

131.    During the District Court litigation over the promissory notes in late 2008 and 2009, three new offshore shell entities were incorporated, all with Leandro Ecker as the nominal owner:   NEU Import Export Ltd., Greenbelt Financial Corporation, and Bulrock Services. Treasure on the Bay emptied its multi-million dollar LatAm brokerage account in several large transfers in 2009 to an off-shore Winterbotham Trust Company Limited account in the name of NEU Import Export Ltd.  This is the same bank that received millions of dollars in transfers from Punch Development's LatAm account.  Other multi-million dollar transfers from Treasure on the Bay's LatAm account went to yet another new LatAm account opened in 2009 in the name of Greenbelt Financial Corporation.

132.    Ecker reported to FINRA that NEU Import Export Ltd. was created in January 2009 and was "used as a pass through for expenses accrued in developing [his] business."  (*See* FINRA Broker Check on Mr. Ecker at: http://brokercheck.finra.org/Support/ReportViewer.aspx). It appears that the millions of dollars transferred to this entity from Treasure on the Bay's LatAm account in 2009 belies Ecker's representation that NEU Import Export is a pass-through for his business expenses.

133.    The third entity formed at this time in Ecker's name was Bulrock Services.  On information and belief, the Debtor also concealed his interest in and used Bulrock Services to hide other assets he failed to disclose on his Schedules.  Bulrock Services was formed in late 2008 and also has a LatAm brokerage account, number AXW 00—71.  Corporate records and the official corporate seal stamp for Bulrock Services were also among the Debtor's papers in his gun safe in October 2009, but in response to a specific discovery request for all documents related to Bulrock Services, the Debtor produced nothing.

134.    Approximately 60 days after the Debtor filed his Chapter 7 Petition, the Debtor, through his wife, made a **$3 million post-petition transfer to Leandro Ecker** via a London money transfer house.

## C.  *River Consulting Inc.* **and** *JMC Financial Ltd.*

135.    In addition to Arndt and Ecker, on information and belief another often-used front-person the Debtor used to conceal assets is his mother in law, Mercedes Monteiro. Monteiro is the nominal owner of two off-shore entities formed in 2009 that, on information and belief, the Debtor beneficially owns: River Consulting Inc. ("River Consulting") and JMC Financial Ltd. ("JMC Financial").

136.    **JMC Financial.**  Corporate documents for JMC Financial, including the corporate checkbook with many *pre-signed* checks, were found among the Debtor's papers in his home in October 2009 and the Trustee is now in possession of the checkbook.  Exhibit "V".

137.    On information and belief, JMC Financial is the only entity discussed herein that did *not* have a LatAm brokerage account.  LatAm, however, produced in this bankruptcy proceeding a complete set of Citibank account statements for JMC Financial's Citibank account. Regardless of whether JMC Financial Ltd. is a client of LatAm, why would LatAm possess the entity's complete bank statements?  On information and belief, it is because the Debtor, who owned and controlled LatAm, also owned and controlled JMC Financial Ltd.

138.    Those Citibank account statements reflect that JMC Financial's account was opened in February 2009 with $10,000 and had only four deposits during the eight-month life of the account: two from Treasure on the Bay and two from River Consulting.

139.    On March 4, 2009, as set forth above, the account received the $1 million deposit from Treasure on the Bay, and a week later, received the $700,000 transfer from Treasure on the

Bay.  On July 17, 2009, the account received a **$2 million** wire from River Consulting's LatAm account.  Exhibit "W".

140.    Then, on October 21, 2009, the day after the levy on Debtor's home and ***two days before he filed his Chapter 7 petition***, JMC Financial received into its Citibank account a **$5.1 million** transfer from the LatAm account of River Consulting.  Exhibit "W".

141.    On October 28, 2009, five days after the Debtor filed his petition, $5.55 million was transferred out from the JMC Financial Citibank account to a Swiss account in JMC Financial's name and the Citibank account was closed the next day.  Exhibit "W".

142.    Further tying JMC Financial to the Debtor and the other entities discussed herein, JMC Financial Ltd.'s address on its Citibank account statements is 520 Brickell Key Dr., Suite 301.  That is the same address that appears on the 2009 LatAm account statements for Treasure on the Bay, Punch Development, and River Consulting.

143.    **River Consulting.**  Also nominally owned by the Debtor's mother-in-law, this entity's LatAm brokerage account number is AXW 00—65, and in approximately March 2009 the balance in that account was roughly **$10 million**.

144.    The corporate documents for River Consulting were among the Debtor's papers in his gun safe in October 2009, including the company's official corporate seal stamp.  Despite a discovery request to the Debtor to produce all such corporate records in his possession, he produced nothing about River Consulting.

145.    Also in the Debtor's home was the corporate checkbook for this entity.  As with the JMC Financial checkbook, several blank checks in this checkbook were *pre-signed* and are now in the Trustee's possession.  Exhibit "V".

146.    In addition to the $5.1 million transfer from River Consulting to JMC Financial the week the Debtor filed his Chapter 7 petition, two other significant transfers went out of River

Consulting's LatAm account (the full records of which have yet to be produced). On September 18, 2009, after the District Court entered the partial final judgment in favor of Plaintiffs and against the Debtor regarding the promissory notes, River Consulting transferred **$10 million** out of its LatAm account in a single transfer to a Swiss account in River Consulting's name. Exhibit "X".

147. Then, on November 17, 2009, the Debtor's last day at LatAm and the day he filed his Schedules in this Court, River Consulting transferred out of its LatAm account $2,161,785.25, which on information and belief was the balance of that account. This money went to a different Swiss bank account in the same entity name. Exhibit "X".

### D. *Glass Sculpture Investments, Inc.*

148. Glass Sculpture Investments, Inc. ("Glass Sculpture") is nominally owned by another of the Debtor's front-men, Luis Fragali. Fragali was a broker at LatAm until September 2009, a broker at the Debtor's asset management company in Brazil, Atlantica, and the Debtor testified Fragali was the owner of Lexton LLC, described in paragraph 58, above.

149. The Debtor transferred substantial sums to Glass Sculpture from both the money the Debtor took from Plaintiffs through the promissory notes and the money the Debtor took from Markwood in the ECG fraud. In addition, Glass Sculpture received substantial transfers from Treasure on the Bay, as discussed above.

150. The following series of transactions that occurred on the heels of the ECG fraud strongly suggest that the Debtor used Glass Sculpture, and its brokerage account at LatAm, to conceal assets, including some of the money the Debtor stole from Plaintiffs.

151. On November 26, 2007, just two months after Markwood wired its $20 million to Emerging Capital Group, LatAm transferred to Glass Sculpture Investments' LatAm brokerage

31

account, AXW 00—35, $200,000 with a notation in the electronic transfer records stating "**Luis Fragali Signing Bonus**." The next day, LatAm transferred to that same brokerage account an additional $300,000.

152.   Then, just a week later on December 3, 2007, Glass Sculpture received $600,000 in a transfer from the LatAm account of Debtor's wholly-owned company, Neves Realty Holdings. That was money taken directly from the $20 million the Debtor stole from Plaintiffs in the ECG fraud. *See* Paragraphs 87 to 92 above and Exhibit "Y".

153.   Then, on June 6, 2008, Glass Sculpture sent *to LatAm* $260,000 *from* its LatAm brokerage account. Four days later, LatAm transferred $250,000 of that $260,000 to the Debtor's personal HSBC account for a purported "commission payment."

154.   On July 7, 2008, Glass Sculpture paid to Treasure on the Bay $361,000 for unknown reasons. Exhibit "Z".

155.   Transfers between Glass Sculpture, Treasure on the Bay, and another entity— discussed immediately below—believed to be nominally owned by Fragali, taken together with the other evidence described herein, further evidences the Debtor's interest in all these entities.

156.   The same month that the Debtor purchased control of LatAm, May 2006, Trimundial Investments, LLC was formed. The sole member of the LLC is Eduardo Frugoli Landim, which name, on information and belief, is an alias for Luis Fragali. Trimundial Investments was formed by the same lawyer, Pedro Saez, that formed or did legal work for several entities the Debtor owns, including: Cayenne Properties (which held the Debtor's Miami River Boathouse property), Turin Holdings, LLC, Rialto Diversified, LLC, and Miami River Boathouse, LLC. Saez also incorporated several entities in the Debtor's mother-in-law's name. Pedro Saez received many checks from the Debor and his wife, including one as late as April 2009.

157.    Trimundial Investments received over $400,000 from Treasure on the Bay in three wire transfers in September, October, and November 2006.  The September transfer, for $150,000, occurred one week after the Debtor sent Treasure on the Bay $360,000 out of the money he took from Plaintiffs under the first promissory note.  Exhibit "AA".

158.    On information and belief, all the transfers described above were designed to conceal the Debtor's assets, including his interest in Glass Sculpture and Trimundial Investments.


### E.  *Wealth Management International USA*

159.    Wealth Management International USA Ltd. is a BVI company, number 151--60, and is connected to New Bridgeport Corp., yet another straw entity.  On January 29, 2007, just a week before Plaintiffs transferred $3 million to the Debtor under the February 5, 2007 promissory note, the Debtor transferred $672,000 from one personal HSBC bank account into another personal HSBC account, and then immediately transferred that $672,000 to an entity called Wealth Management International USA, for further credit to New Bridgeport Corp.  On information and belief, LatAm made substantial transfers to Wealth Management International USA for the Debtor's benefit and the Debtor was the beneficial owner of this entity.

160.    Again, despite specific discovery requests for records relating to this entity and its transfers for the Debtor's benefit, none have been produced.


### V.    The Debtor's Staggering Post-Petition Transfers that Indicate Pre-Petition Income and Assets Not Disclosed on His Schedules

161.    As explained herein, the Debtor received tens of millions of dollars in post-petition transfers, which, on information and belief, represent income and assets that were earned pre-petition but not disclosed in his schedules.  To the extent the Debtor then transferred these assets, he transferred, removed or concealed property of the estate.

162. Bank records show that in the one month following the filing of the Debtor's Chapter 7 Petition on October 23, 2009, LatAm transferred to "FBO Fabrizio Neves" over **$6 million**. Individual transfer amounts were $200,000 on October 26, 2009, $2.7 million on November 4, 2009, $2.25 million on November 24, 2009, and $1.25 million on November 25, 2009. *See* Excerpts from Bank of America Records, Exhibit "N".

163. One of those transfers, just 3 days after he filed his petition, was for "Advanced Commissions." But the Debtor swore under oath that as of November 17, 2009 he had terminated his relationship with LatAm. He received two transfers totaling $3.5 million *after* the date he swore he had terminated his relationship. These transfers were made to various purported LatAm customer brokerage accounts. Bate no. BOA-0169 of Exhibit "N".

164. In addition, LatAm made payments for alleged commissions of $200,000 on October 26, 2009, to a LatAm account in the name of an entity called Dbb International Ltd. expressly for the Debtor's benefit. On November 16, 2009, the day before the Debtor filed his bankruptcy schedules, LatAm transferred to Dbb International another $350,000 without any notation about the purpose. *See* Bate no. BOA-0168 of Exhibit "N". Given the timing of these transfers and the express bank notation that one transfer was for the Debtor's benefit, on information and belief the Debtor has a financial interest in Dbb International. Dbb International is nominally owned by Andre Barbieri Perpetuo, the Debtor's second partner in his Brazilian asset management company, Atlantica. The Debtor disclosed no interest in Dbb International on the his schedules.

165. Less than two weeks after the Debtor filed his Schedules in this Court, on November 30, 2009, the Debtor and his wife opened two new Citibank accounts, one with $300,000 and a second with $5 million (taken from another new JP Morgan Chase account labeled "tenancy by the entireties" and the origins of which are still being discovered).

34

166.   Within one week of opening the accounts, Mrs. Neves wired **$3 million to Leandro Ecker,** the Debtor's front-man who nominally owns several of the straw entities discussed above, was a former broker-dealer at LatAm, and was a co-conspirator in the ECG Fraud.  Exhibit BB.  On information and belief, this was a transfer of assets belonging to the Debtor's bankruptcy estate.

167.   From the Debtor's other new Citibank account, on January 21, 2010, he paid a $300,000 retainer to LatAm's counsel in this matter.  Citibank issued a $300,000 official check to Broad & Cassel, LatAm's counsel, with the remitter listed as **Fabrizio Neves**.  The back of the check indicates it was not used for the intended purpose and was endorsed by Fabrizio Neves for credit back into the same Citibank money market account on January 27, 2010.  On information and belief, Broad & Cassel told the Debtor he could not pay LatAm's legal bills because it would expose the Debtor's true ownership and control of LatAm despite his sworn oath to a mere 1% ownership.

168.   Instead, to disguise the payment, on January 26, the Debtor wrote a **$300,000 personal check to LatAm** for a purported **"Return Loan"**.  LatAm deposited that check into its Bank of America Account No. 00367---4953 on the same day.  On January 27, 2010, LatAm transferred the $300,000 to another Bank of America account in its name, Account No. 8980265---14, via an online transfer.

169.   Then, on January 28, 2010, LatAm wired the $300,000 to Broad & Cassel out of the second LatAm Bank of America account.

170.   It is clear, then, that the Debtor funded the $300,000 retainer to LatAm and its counsel.  This series of post-petition transactions designed to hide the true source of the funds is reflected in the bank records attached as Composite Exhibit "S".

171.     The Debtor made a large, post-petition transfer to Jose Luna, the Debtor's personal assistant at LatAm and the other prior broker-dealers.  In December 2009, an entity called Matnic, Inc., was formed and Jose Luna was its president.  The company was voluntarily dissolved just a few months later, in April 2010.  But on January 12, 2010, the Debtor wrote check number 1066 from the Debtor's new Citibank account for $86,900 to Matnic, Inc. for purported "consulting."  On information and belief, these were assets of the estate.

172.     Plaintiff has had to hire counsel, Holland & Knight LLP, for representation in this matter.

173.     All conditions precedent to the filing of this Complaint have been met.

## COUNT I
### (Nondischargeability of Debt
### Pursuant to 11 U.S.C. § 523(a)(2)(A))

174.     Plaintiffs reallege the allegations contained in Paragraphs 12 through 28, 29 through 49, 50 through 58, and 59 through 97 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

175.     Section 523(a)(2)(A) of the Bankruptcy code provides in relevant part that:

> A discharge under . . . this title does not discharge an individual debtor from any debt . . . for money, property, services, or an extension, renewal, or refinancing of credit . . . obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition.

176.     The Debtor's conduct as alleged herein, including the conduct of his co-conspirators which is imputed to the Debtor, resulted in his obtaining money and property from Plaintiffs by false pretenses, false representation, and actual fraud, other than a statement respecting the Debtor's financial position.

177.     The Debtor has made material misrepresentations and material omissions, as well as implied misrepresentations to Plaintiffs.  The Debtor's course of conduct was intended to

36

create or foster, and in fact created and fostered, numerous false impressions in Plaintiffs between September 2006 and May 2007.

178.    At the time that the Debtor made his representations to or omitted material facts from the Plaintiffs, the Debtor knew them to be false.

179.    The Debtor's false representations to Plaintiffs were made with the intent and purpose of deceiving Plaintiffs, and created or fostered false impressions through various false pretenses and his conduct was intended to induce the Plaintiffs into making the loans.  Further, Debtor made false representations to Plaintiffs with the intent and purpose of deceiving Plaintiffs, and intended to create or foster false impressions and induce the Plaintiffs into transferring $20 million in the Emerging Capital Group fraud.

180.    Plaintiffs relied on Debtor's false representations, false pretenses and course of conduct.

181.    Plaintiffs reliance on the Debtor's false representations, false pretenses and course of conduct was justified, and at no point in time was the falsity of the Debtor's representations or conduct readily apparent to the Plaintiffs.

182.    Plaintiffs sustained damage as the proximate consequence of the representations having been made, the material facts omitted, and the Debtor's course of conduct.

WHEREFORE, Plaintiffs request that this Court:

(a)    Determine that Plaintiffs' claims against the Debtor are non-dischargeable under § 523(a)(2)(A) of the Bankruptcy Code;

(b)    Liquidate Plaintiffs' claim and enter a judgment in their favor and against the Debtor for sums owing; and

(c)    Grant such other relief as this Court deems just and appropriate.

## COUNT II

### (Nondischargeability of Debt
### Pursuant to 11 U.S.C. § 523(a)(4))

183.    Plaintiffs reallege the allegations Paragraphs 12 through 28, 29 through 49, 50 through 58, and 59 through 97 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

184.    Section 523(a)(4) of the Bankruptcy Code states in relevant part:

> A discharge under . . . this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

185.    The Debtor feloniously took $30 million from Plaintiffs with the intent to convert it to the Debtor's own use or benefit or deprive Plaintiffs of same.

186.    The Debtor's conduct, including the conduct of his co-conspirators which is imputed to the Debtor, constitutes actual fraud, and further constitutes embezzlement or larceny.

187.    The Debtor fraudulently misappropriated Plaintiffs' property when such property had been entrusted to the Debtor, or had lawfully come into the Debtor's hands.

188.    The Debtor fraudulently took and carried away Plaintiffs' property with the intent to convert it to his own use or deprive Plaintiffs' of the same.

189.    The Debtor converted Plaintiffs' property to the Debtor's own personal use or deprived Plaintiffs of the same.

190.    Plaintiffs sustained damage as the proximate consequence of Debtor's fraud, embezzlement, and/or larceny.

WHEREFORE, Plaintiffs request that this Court:

(a)    Determine that Plaintiffs' claim against the Debtor are non-dischargeable under § 523(a)(4) of the Bankruptcy Code;

(b)    Liquidate Plaintiffs' claim and enter a judgment in their favor and against the Debtor for sums owing; and

(c)    Grant such other relief as this Court deems just and appropriate.

## COUNT III

### (Nondischargeability of Debt
### Pursuant to 11 U.S.C. § 523(a)(6))

191.     Plaintiffs reallege the allegations contained in Paragraphs 8, 9, 12 through 28, 29 through 49, 50 through 58, and 59 through 97 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

192.     Section 523(a)(6) of the Bankruptcy Code states in relevant part:

> A discharge under . . . this title does not discharge an individual
> debtor from any debt . . . for willful and malicious injury by the
> debtor to another entity or to the property of another entity.

193.     Plaintiffs are "entities" as defined under 11 U.S.C. § 101(15).

194.     The Debtor's conduct, including the conduct of his co-conspirators which is imputed to the Debtor, constitutes willful and malicious conduct which intended, and resulted in, injury to Plaintiffs.

195.     The Debtor wrongfully intended to cause injury and harm to Plaintiffs when the Debtor converted or stole Plaintiffs' property, including $10.08 million in loan proceeds and $20 million from the Plaintiffs' investment in Emerging Capital Group.  In addition, the Debtor intended to cause injury and harm to the Plaintiffs when the Debtor fraudulently induced Plaintiffs into loaning the Debtor $10.08 million under the false pretense that the Debtor intended to pay the money back and would use the money for certain investments, and in fraudulently inducing Plaintiffs to transfer $20 million to the HSBC Panama account for ECG under the false pretense that the money would be invested in the structured notes transactions.

196.     The Debtor was the mastermind of the frauds alleged herein.

197.     Plaintiffs sustained damages as the proximate consequence of the Debtor's willful and malicious conduct toward Plaintiffs and their property.

WHEREFORE, Plaintiffs request that this Court:

(a)    Determine that Plaintiffs' claims against the Debtor are non-dischargeable under § 523(a)(6) of the Bankruptcy Code;

(b)    Liquidate Plaintiffs' claim and enter a judgment in their favor and against the Debtor for sums owing; and

(c)    Grant such other relief as this Court deems just and appropriate.

## COUNT IV

### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(2)(A))

198.    Plaintiffs reallege the allegations contained in Paragraphs 12 through 28, 98 through 160, and 161 through 171 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

199.    The Debtor has concealed the extent of his interest in and value of LatAm Investments, and has transferred or removed his equitable interest in LatAm Investments, in the one year prior to the Petition Date.

200.    The Debtor has concealed his interest in the several entities described herein and has transferred or removed his equitable interest in these entities in the one year prior to the Petition Date.

201.    The Debtor has concealed or transferred his interest in pre-petition income and assets in the one year prior to the Petition Date.

202.    The Debtor has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed his property, within one year before the date of the filing of the petition, with intent to hinder, delay, or defraud his creditors.   The Debtor's conduct is grounds for denial of discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

WHEREFORE, Plaintiffs request that this Court deny the Debtor's discharge under 11 U.S.C. § 727(a)(2)(A).

## COUNT V

### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(2)(B))

203.     Plaintiffs reallege the allegations contained in Paragraphs 161 through 165 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

204.     To the extent the Debtor transferred undisclosed pre-petition income and assets after the date of his Petition, the Debtor has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed property of the estate, after the date of the filing of the petition, with intent to hinder, delay, or defraud his creditors.  The Debtor's conduct is grounds for denial of discharge pursuant to 11 U.S.C. § 727(a)(2)(B).

WHEREFORE, Plaintiffs request that this Court deny the Debtor's discharge under 11 U.S.C. § 727(a)(2)(B).

## COUNT VI

### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(3))

205.     Plaintiffs reallege the allegations contained in Paragraphs 12 through 28, 56 through 58, 98 through 160, and 161 through 171 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein

206.     The Debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained with respect to LatAm Investments; the six described entities; those entities described that received transfers from the six entities that received Plaintiffs' funds; and the undisclosed pre-petition income and assets that the Debtor received and transferred after the filing of his Chapter 7 Petition.  The

41

Debtor's conduct is grounds for denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3).

WHEREFORE, Plaintiffs request that this Court deny the Debtor's discharge under 11 U.S.C. § 727(a)(3).

## COUNT VII

### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(4))

207.     Plaintiffs reallege the allegations contained in Paragraphs 12 through 28, 56 through 58, 98 through 160, and 161 through 171 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

208.     The Debtor knowingly and fraudulently made a false oath or account in connection with his Chapter 7 case with respect to: his undisclosed interest in LatAm Investments, LLC; his undisclosed interest in the several entities described in Part IV; the pre-petition income and assets that the Debtor received and transferred after the filing of his petition; and by failing to accurately schedule his assets and liabilities.  The Debtor's conduct is grounds for denial of Debtor's discharge pursuant to 11 U.S.C. § 727(a)(4).

WHEREFORE, Plaintiffs request that this Court deny the Debtor's discharge under 11 U.S.C. § 727(a)(4).

## COUNT VIII

### (Denial of Discharge Pursuant to 11 U.S.C. § 727(a)(5))

209.     Plaintiffs reallege the allegations contained in Paragraphs 12 through 28, 56 through 58, 81 through 96, 37 through 45, 98 through 160, and 161 through 171 of this Second Amended Adversary Complaint and incorporate them by reference as if separately set forth herein.

42

210.    The Debtor has failed to explain satisfactorily the loss of assets or deficiency of assets to meet his liabilities with respect to the loss or dissipation of: the $10.08 million taken under the promissory notes;  the $20 million taken in the Emerging Capital Group transaction; the Debtor's undisclosed interest in LatAm Investments, LLC; the Debtor's undisclosed interest in the several entities described in Part IV; and the pre-petition income and assets that the Debtor received and transferred after the filing of his petition.  The Debtor's conduct is grounds for denial of discharge pursuant to 11 U.S.C. § 727(a)(5).

WHEREFORE, Plaintiffs request that this Court deny the Debtor's discharge under 11 U.S.C. § 727(a)(5).

Dated: November  5, 2010.                          Respectfully submitted,

> **HOLLAND & KNIGHT LLP**
> *Counsel for Plaintiffs Markwood*
> *Investments and Golden Dawn*
> 701 Brickell Avenue
> Suite 3000
> Miami, FL 33131
> Tel.    (305) 374-8500
> Fax     (305) 789-7799
> E-mail: *jjalemany@hklaw.com*
>
> By:____/s/ Joaquin J. Alemany_____
>        Jose A. Casal
>        Florida Bar No. 767522
>        Joaquin J. Alemany
>        Florida Bar No. 662380

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 5, 2010 a true and correct copy of the foregoing document was served via e-mail and/or first-class postage-prepaid U.S. Mail on: **Paul J. Battista, Esq.** and **Michael Schuster, Esq.,** Genovese Joblove & Battista, Bank of America Tower, 100 S.E. 2nd Street, 44th Floor, Miami, Florida 33131, Facsimile: 305-349-2310 and **Joel L. Tabas, Esq.,** Tabas, Freedman, Soloff, Miller & Brown, P.A. One Flagler Building, 14 Northeast First Avenue, Penthouse, Miami, Florida 33132, Facsimile: 305-381-7708.

> By:____/s/ Joaquin J. Alemany_____
>        Joaquin J. Alemany, Esq.



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re                                                 CASE NO.  09-33043-BKC-LMI

                                                       CHAPTER 7

FABRIZIO DULCETTI NEVES

      Debtor.

_____/

MARKWOOD INVESTMENTS LTD.,          ADV. NO. 10-02122-BKC-LMI-A
and GOLDEN DAWN CORPORATION,

      Plaintiffs,

v.

FABRIZIO DULCETTI NEVES,

      Defendant.

_____/

**DEFENDANT'S MOTION TO DISMISS ADVERSARY PROCEEDING OR, IN THE
ALTERNATIVE, FOR MANDATORY ABSTENTION FROM PLAINTIFFS' REQUEST
<u>FOR THE ENTRY OF MONEY JUDGMENTS</u>**

      FABRIZIO DULCETTI NEVES, Debtor in the above-styled proceedings under Chapter 7 of Title 11, United States Code, and Defendant in the above-styled adversary proceeding (the "Debtor") respectfully requests that the Court enter a final order dismissing and closing this adversary proceeding or, in the alternative, granting a mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) from the Plaintiffs' requests for the entry of money judgments, and in support, states:

<u>**BACKGROUND**</u>

      1.       The Debtor commenced these proceedings by filing a voluntary petition under Chapter 7 of Title 11, United States Code (the "Bankruptcy Code") on October 23, 2009 (the "Petition Date").

1

2.      On January 25, 2010, the Plaintiffs commenced this adversary proceeding seeking: (i) to block the Debtor's discharge pursuant to Section 727 of the Bankruptcy Code; (ii) to obtain a determination of the dischargeability of the Disputed Claims pursuant to Section 523 of the Bankruptcy Code; and (iii) the entry of non-dischargeable money judgments against the Debtor individually for amounts allegedly owed.

3.      Due to numerous deficiencies in their pleadings, the Plaintiffs filed a First Amended Complaint [D.E. 74, Exh. 1] on June 1, 2010, and then a Second Amended Complaint [D.E. 151] on November 5, 2010.

4.      On December 16, 2010, the Debtor filed a waiver of discharge and a motion seeking the Court's approval thereof pursuant to Section 727(a)(10) of the Bankruptcy Code [Main Case D.E.'s 324 and 325]. On February 7, 2011, the Court entered its Order approving the Debtor's waiver of discharge pursuant to Section 727(a)(10) [D.E. 355] (collectively, the "Discharge Waiver"). Pursuant to Fed. R. Bankr. P. 8002, the Discharge Waiver became final and non-appealable on February 21, 2011.

5.      As a result of the Discharge Waiver, the Claimants' causes of action pursuant to Section 523 and Section 727 of the Bankruptcy Code are moot. *See* D.E. 265 at ¶¶ 2 and 3.

6.      Thus, the only matters which remain before the Court pertain to the allowance of the Plaintiffs' alleged claims, and in particular the Court's subject matter jurisdiction to grant the remaining relief sought in this adversary proceeding, i.e., the entry of enforceable money judgments against the Debtor.[1]

---

[1] The Court also indicated at the January 27 hearing that it would leave this adversary proceeding open for the purpose of awarding sanctions against the Debtor for his failure to appear at the December 15 deposition. The parties have agreed to and submitted a form of order awarding such sanctions, and to the extent necessary, that order would survive dismissal and closing of this

7.     This issue was briefly addressed by the Court at a hearing held on January 27, 2011.  At that time, the Court stated that: "What is not before me at this juncture, although we'll go back to the adversary proceeding, is I'm not going to preliminarily rule, but I'm not saying I won't ultimately rule, that I have, by virtue of the claim objection, the ability to enter a judgment.  That's for another day."  Transcript of Hearing Held January 27, 2011, at p. 20, lines 23-25 and p. 21, lines 1-4.  This comment was consistent with an earlier statement wherein the Court indicated that "I don't, having said that I can enter a money judgment when I have a dischargeability complaint pending, does not follow that if I grant the waiver of discharge that I will then enter the money judgment."  *Id.* at p. 7, lines 21-25.

## ARGUMENT

### A.     The Court Does Not Have Subject Matter Jurisdiction to Enter a Money Judgment By Virtue of Its Ability to Determine Whether the Plaintiffs' Claims Should be Allowed

8.     Contemporaneously with the filing of this Motion, the Debtor has filed a motion in the main proceedings seeking a determination that the Debtor is not a party in interest with standing to object to the Plaintiffs' claims pursuant to Section 502(a).  The Debtor incorporates by reference all the arguments and citations to authorities contained in that motion.

9.     Insofar as the Court determines that the Debtor does not have standing to object to the Plaintiffs' claims in the main proceeding, there is no scenario in which the allowance of the Plaintiffs' claims pursuant to Section 502(a) would provide the Court with an opportunity to convert those allowed claims into money judgments.  While the Plaintiffs could conceivably argue that the allowance of their claims is collateral estoppel as to the remaining relief sought in this adversary proceeding, that argument would fail because the Debtor's lack of standing to

---

adversary proceeding.  Therefore, liquidation of the Plaintiffs' claims to money judgment is in fact the only remaining relief sought in this adversary proceeding.

3

object to the Plaintiffs' claims deprives the Debtor of a full and fair opportunity to litigate the disputed claims. *See Allen v. McCurry*, 449 U.S. 90, 95, 101 (1980) ("[O]ne general limitation the Court has repeatedly recognized is that the concept of collateral estoppel cannot apply when the party against whom the earlier decision is asserted did not have a 'full and fair opportunity' to litigate that issue in the earlier case.") (citing *Montana v. United States*, 440 U.S. 147, 153 (1979) and *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 328-29 (1971)). *See also Werth v. First Interstate Bank of Denver, N.A.*, 54 B.R. 619, 622 (D. Colo. 1985) ("Werth did not have a full and fair opportunity to litigate because neither he nor the farm had standing to object to the bank's claim in the farm's bankruptcy proceeding.")

10.     Ultimately, as a result of the Debtor's discharge waiver, the automatic stay is presently not in effect as to proceedings other than actions against property of the estate. *See* 11 U.S.C. § 362(c)(2)(C). The Plaintiffs are free to seek money judgments against the Debtor in a court of competent jurisdiction, as they have against all of the other alleged co-conspirators identified in the Amended Complaint.

11.     Instead, the Plaintiffs believe that this Court has the authority to enter money judgments simply by virtue of its jurisdiction to decide claims against the estate. At least one court has considered and rejected this argument. In *Bell v. Financial Guild of America (In re Bell)*, 28 B.R. 9 (9th Circuit B.A.P. 1983), the bankruptcy court entered a money judgment following an evidentiary hearing where the primary issue was whether the automatic stay should be lifted to allow foreclosure of a deed of trust. That automatic stay litigation led to the money judgment because the parties had agreed "that the amount of Bell's liability had to be determined in order to decide the section 362(d) issues." *Id.* at 11. In this respect, the 9th Circuit B.A.P.

acknowledged that "the underlying facts 'are analogous to the filing of a claim in bankruptcy.'"

*Id.* at 12.  The court went on to explain that:

> The parties and the courts lost sight, it seems to us, of the fact that the bankruptcy court exists to afford statutorily defined relief to debtors and to creditors.  As a result, an unprecedented money judgment was entered against Bell, and this has shunted the appeal into a procedural thicket. . . .  At oral argument the parties could think of only one precedent for a bankruptcy court entering a money judgment for a creditor against either the debtor or the trustee (here debtor-in-possession) on a debt that arose before bankruptcy.  The bankruptcy court is authorized to enter judgment against the debtor as part of a dischargeability proceeding.  11 U.S.C. § 523(a); Bankruptcy Rule 409(b).  That exception does not lend legitimacy to the judgment under appeal for at least two reasons.  First, it was neither pleaded not tried as a dischargeability case.  Second, the parties stipulated to a separate judgment against Bell based on nondischargeability, and that judgment is not before us.  Furthermore, the complaint for relief from stay was against Bell in his capacity of debtor-in-possession (trustee in bankruptcy) and not in his separate, individual capacity.  A dischargeability judgment lies only against a debtor and not a debtor-in-possession or trustee.  Which leaves us without precedent for a money judgment against a trustee (debtor-in-possession) on a pre-bankruptcy debt.  At argument, FGA suggested that cases whereby the bankruptcy court defers to a state court for a determination of liability are analogous.  Such examples do exist . . . .  Typically, however, the bankruptcy court's function of allowing claims against the estate is not usurped on such occasions, which in our experience are extremely rare. . . .  **So far as we can discern, a bankruptcy court's sole authority to adjudicate the bankruptcy estate's liability to pre-filing creditors is found in 11 U.S.C. §§ 501 et seq., such as Section 502(b) relating to allowance of contested claims.  We know of no statutory authority for entering judgment (under §§ 501 et seq. or otherwise) against either a trustee in bankruptcy or a debtor-in-possession on such a claim.**

*Id.* at 12-13 (citations omitted) (emphasis supplied).

12.     Here, the Plaintiffs' claims against the estate (as opposed to their claims against the Debtor) are separate from the Plaintiffs' dischargeability case, and there has already been a separate determination of the Debtor's entitlement to a discharge, by virtue of the Discharge Waiver.  Although the Court indicated that Section 523 may provide jurisdiction to enter money judgments, this is no longer an action pursuant to Section 523.  The Court should find that it does

not have jurisdiction to enter money judgments against the Debtor solely by virtue of its power to allow the Plaintiffs' claims against the Debtor's estate.

13.     On the other hand, at least one court faced with analogous facts has reached the conclusion that a bankruptcy court does have jurisdiction to enter a money judgment following resolution of a claim dispute pursuant to Section 502(b).  *Porges v. Gruntal & Co., Inc. (In re Porges)*, 44 F.3d 159, 164-65 (2d Cir. 1995).  In *Porges*, the Second Circuit validated the entry of the money judgment where the debtor voluntarily dismissed his Chapter 13 proceedings after a trial on his claim objection but just before entry of a judgment, which the bankruptcy court entered notwithstanding the dismissal of the main proceedings. *Id.*

14.     On appeal, the Second Circuit acknowledged that "Section 502 . . . required the bankruptcy court to 'determine [] the validity of claim[s] and the amount allowed.'"  *Id.* at 164 (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 646 (2nd Cir. 1988)).  According to the Second Circuit, entry of a money judgment was proper because "[i]t was then but a short and logical step for the bankruptcy court to enter a money judgment against Porges, on the basis of its section 502 determination, pursuant to Federal of Civil Procedure 58 and Bankruptcy Rule 9021." *Porges*, 44 F.3d at 164.  The *Porges* court went on to state that "[t]he entry of a money judgment also finds support in the bankruptcy court's inherent equitable powers.  It has long been the rule that bankruptcy courts sit as courts of equity, and once a court sitting in equity has jurisdiction over the parties to a controversy before it, the court can decide all disputed matters and decree complete relief."

15.     However, the *Porges* court's reliance on a bankruptcy court's equitable powers goes far beyond the permissible scope of such powers as articulated by the Eleventh Circuit.  As Judge Cristol has explained with respect to Section 105(a):

6

Under this section, however, the Court is authorized to exercise its equitable jurisdiction only as a means to fulfill some specific Code provision, *See, e.g., Matter of Fesco Plastics Corp., Inc.,* 996 F.2d 152 (7th Cir.1993). **The fact that a bankruptcy proceeding is equitable, does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness.** *In re Chicago, Milwaukee, St. Paul and Pacific R. Co.,* 791 F.2d 524, 528 (7th Cir.1986). The exercise of its equitable powers must be strictly confined within the prescribed limits of the bankruptcy statutes. *Guerin v. Weil, Gotshal & Manges,* 205 F.2d 302, 304 (2nd Cir.1953). The 11th Circuit has been careful to confine 11 U.S.C. § 105 to issues of enforcement of provisions of the Bankruptcy Code, and not to allow bankruptcy courts to overuse their equitable authority. *See, In re Sanford,* 979 F.2d 1511 (11th Cir.1992); *Grant v. George Schumann Tire & Battery Co.,* 908 F.2d 874 (11th Cir.1990) (§ 105 does not authorize the court to award interest against a trustee as a penalty for tardy distribution, where the statutes otherwise specify what is to be paid).

*In re Dillon*, 194 B.R. 533, 536 (Bankr. S.D. Fla. 1996) (emphasis supplied).

16.     Here, as explained by the court in *Bell*, *supra*, there is no statutory authority for the entry of money judgments against the Debtor solely by virtue of the Court's power to resolve a claim objection.  Thus, regardless how short or logical a step it is for the court to enter such a judgment following the allowance of a claim against the estate, the Court does not have the equitable power to take that step because the Bankruptcy Code does not permit it.  Similarly, the Court does not have the power to take that step solely because it feels that doing so is fair or equitable.

17.     In sum, this Court should follow the reasoning of the court in *Bell*, reject the reasoning of the court in *Porges,* and find that   there is no circumstance under which this Court would have jurisdiction to enter money judgments in this adversary proceeding. As that is the only relief sought herein, this adversary proceeding should be dismissed and closed.

**B.    In the Alternative, the Court Must Refrain from Entering Money Judgments under the Doctrine of Mandatory Abstention**

18.    In the alternative, should the Court find that it has jurisdiction to enter money judgments, the Court is precluded from doing so pursuant to the mandatory abstention doctrine established by 28 U.S.C. § 1334(c)(2).

19.    28 U.S.C. § 1334(c)(2) enumerates the following factors which, if met, require the Court to abstain from hearing the instant adversary proceeding:

     a.    A timely motion to abstain is made by a party to the proceeding;

     b.    The proceeding is based on a state law claim or cause of action;

     c.    The proceeding is related to a case under title 11 but did not arise under title 11 or in a case under title 11;

     d.    The proceeding could not have been commenced in a court of the United States absent jurisdiction under section 1334; and

     e.    The proceeding is commenced, and can be timely adjudicated, in a state forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2); *see also Christo* v. *Padgett (In re Christo),* 223 F.3d 1324, 1331 (11th Cir. 2000); *Twyman v. Wedlo, Inc. (In re Twyman),* 204 B.R. 1006, 1018-19 (Bankr. N.D. Ala. 1996).

20.    Each of these factors is satisfied in the instant case.  First, the Debtor has timely filed its request for mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2), because this is the Debtor's first response to the Amended Complaint since the Court's approval of the Discharge Waiver.

21.    Second, now that there are no issues for the Court to decide under Sections 523 and 727, all of issues which pertain to the liquidation of the Plaintiffs' claims are governed by and arise under state law.

22.    Third, while the Debtor acknowledges that the Court's determination of allowed claims is a core proceeding, that determination is between the Plaintiffs and the estate, not the Debtor.  No benefit or detriment will be derived for the estate by the continuation of this

adversary proceeding for the sole purpose of entering money judgments against the Debtor in favor of the Plaintiff.

23.     Fourth, as set forth hereinabove, there is no jurisdictional basis for this action being heard in this Court other than 28 U.S.C. § 1334.[2]  This is particularly true because entry of money judgments in favor of the Plaintiffs will result in no benefit or detriment to the Debtor's estate.  *See, e.g., Matter of Lemco Gypsum, Inc.,* 910 F.2d 784, 789 (11th Cir. 1990) ("This dispute does not involve the identification of the debtor's property interests and cannot affect other creditors. There is no reason for the bankruptcy court's jurisdiction to linger."); *In re CLDC Management Corp.*, 58 B.R. 176, 180 (Bankr. N.D. Ill. 1985) ("Whatever the outcome of the . . . actions against the defendants within this category, the CLDC bankruptcy estate would not be affected in anyway.  The success or failure of these actions will convey no benefit nor cause any detriment to CLDC."); *In re Import & Mini Car Parts, Ltd., Inc.*, 200 B.R. 857 (Bankr. N.D. Ind. 1996) ("Enforcement of the court's judgment will have niehter benefit or detriment ot the bankruptcy estate or the creditors who will share it.  As a result, 'there is no reason for the bankruptcy court's jurisdiction to linger.'") (quoting *Lemco*, 910 F.2d at 789) (citing *Elscint, Inc. v. First Wisconsin Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127, 132 (7th Cir. 1987)).

24.     Fifth, and finally, the dispute at issue in this case is also the subject of pending state law litigation. As set forth above, the Plaintiffs are also the plaintiffs in an action presently pending before the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, Case No. 10-20591 CA 24.  The defendants in that action are the alleged co-conspirators other than the Debtor, specifically LatAm Investments, LLC, Maximino J. Acosta, Angelica Aguilera, Alicia Aguilera, Leandro Ecker, Carlos Fuenmayor, Christian Lovera, Banctrust & Co. Holdings, Emerging Capital Group, Inc., Jose Luna, Laura C. Neves, Acosta Realty Holdings,

---

[2] Of course, this assumes that the Court will find that it has any jurisdiction at all to enter money judgments.

LLC, Neves Realty Holdings, LLC, Treasures on the Bay Ltd., and Mercedes Serruya Monteiro. The Plaintiffs have the opportunity to add the Defendant as a defendant in the state court proceeding, which would have jurisdiction to timely adjudicate the Plaintiffs' entitlement to money judgments.

25.    For the foregoing reasons, the Debtor respectfully submits that the doctrine of mandatory abstention precludes this Court from taking further action in this adversary proceeding.

WHEREFORE the Debtor respectfully requests that the Court enter a final order dismissing and closing this adversary proceeding or, in the alternative, granting a mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) from the Plaintiffs' requests for the entry of money judgments, and granting such other relief as is proper.

Respectfully Submitted this 7th day of March, 2011.

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Fabrizio D. Neves
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By:  /s/  Michael L. Schuster
      David C. Cimo, Esq.
      Florida Bar No. 775400
      Michael L. Schuster, Esq.
      Florida Bar No. 57119

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF upon all parties listed below this 7th day of March, 2011.

By:  /s/  Michael L. Schuster
      Michael L. Schuster

10

## <u>SERVICE LIST</u>

Joaquin J Alemany on behalf of Counter-Defendant Golden Dawn Corporation
joaquin.alemany@hklaw.com, jose.casal@hklaw.com;michael.rothenberg@hklaw.com


Jose A Casal on behalf of Plaintiff Golden Dawn Corporation
jose.casal@hklaw.com

David C. Cimo on behalf of Defendant Fabrizio Neves
dcimo@gjb-law.com, gjbecf@gjb-law.com

Connie J Delisser on behalf of Creditor First Horizon Home Loans
connie.delisser@marshallwatson.com, Jairo.Garcia@marshallwatson.com

Michael L Schuster on behalf of Counter-Claimant Fabrizio Neves
mschuster@gjb-law.com, gjbecf@gjb-law.com

Rhett Traband on behalf of Interested Party LatAm Investments, LLC
rtraband@broadandcassel.com



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

FABRIZIO DULCETTI NEVES                         Case No. 09-33043-BKC-LMI
                                                Chapter 7

      Debtor

_____ /

MARKWOOD INVESTMENTS LTD.
and GOLDEN DAWN CORPORATION,

      Plaintiffs,                              Adv. Pro. No. 10-02122-LMI

v.

FABRIZIO DULCETTI NEVES,

      Defendant.

_____ /

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS ADVERSARY PROCEEDING OR, IN THE ALTERNATIVE, FOR MANDATORY ABSTENTION FROM PLAINTIFFS' REQUEST FOR THE ENTRY OF MONEY JUDGMENTS [D.E. #267]

Plaintiffs Markwood Investments Ltd. and Golden Dawn Corporation (collectively, "Plaintiffs"), respond in opposition to Defendant's Motion to Dismiss Adversary Proceeding or, in the Alternative, For Mandatory Abstention From Plaintiffs' Request for the Entry of Money Judgments [D.E. #267] ("Motion"), and as grounds state as follows:

## Introduction

As part of its order denying Debtor's earlier Motion to Dismiss for Lack of Subject Matter Jurisdiction,[1] the Court ordered the Debtor to either "file a response to the Second

_____

[1]    *See* D.E #172, Motion of Defendant Fabrizio Dulcetti Neves to Dismiss for Lack of Subject Matter Jurisdiction In Regard to Plaintiffs' Demand for Entry of Money Judgment as to Counts I, II and III of the Second Amended Complaint or in the Alternative Motion for More Definite Statement (the "second motion to dismiss").

Amended Adversary Complaint [D.E. #151] or to proceed with his claims objections filed in the main bankruptcy proceeding [D.E. #250] in accordance with Rule 9014." [D.E. #265]. Debtor did neither. Instead, he has filed yet another motion to dismiss this adversary proceeding and, contemporaneously, has moved for authority to withdraw his claims objection in the main proceeding. The Debtor will stop at nothing to avoid his day of reckoning. But having voluntarily waived his discharge knowing that the Court had not yet ruled whether it would enter a money judgment on Plaintiffs' claims, the Debtor must now live with the consequences of his decision. For the reasons set forth in detail below, the Court has jurisdiction to liquidate and enter a money judgment on Plaintiffs' claims.

The Debtor's current Motion to Dismiss discloses a fundamental misunderstanding of the Court's ruling on his earlier motion to dismiss. The Court, in denying Debtor's second motion to dismiss, did not, as Debtor now misapprehends, moot Plaintiffs' Section 523 claims in their entirety. The Court held that its ruling mooted *only* the dischargeability aspects of those claims.[2] It is thus incorrect to state, as the Debtor now does, that "the only matters which remain before the Court pertain to the allowance of Plaintiffs' alleged claims [in the main bankruptcy proceeding]." Motion, at ¶ 6.[3]

A bankruptcy court's jurisdiction to liquidate debts and enter money judgments in a Section 523 adversary proceeding is unaffected by either a general denial of discharge or a

---

[2]  *See* D.E. #265 at ¶2 ("On the Court's own motion, *the issues pertaining to the nondischargeability of Plaintiff's claims* in counts I through III of the Second Amended Adversary Complaint [the Section 523 claims] are now moot based on the Court's approval of the Debtor's voluntary Waiver of Discharge.") (emphases added).

[3]  In paragraph 5, Debtor states that, upon his voluntary waiver of discharge, "the Claimants' causes of action pursuant to Section 523 and Section 727 of the Bankruptcy Code are moot." [Motion at ¶ 5]. In paragraph 6, Debtor states that "the only matters which remain before the Court pertain to the allowance of Plaintiffs' alleged claims, and in particular the Court's subject matter jurisdiction to grant the remaining relief sought in this adversary proceeding, i.e., the entry of enforceable money judgments against the Debtor." [Motion at ¶ 6]. The Debtor thus conflates the claims objection proceeding with the Plaintiffs' pending adversary proceeding but ignores the Court's ruling that only the dischargeability aspects of Plaintiffs' Section 523 claims were mooted by the Debtor's waiver of discharge.

voluntary waiver of discharge under Section 727, where, as here, a creditor seeks both the non-discharge of debts and a money judgment on those debts. And Debtor, who chose this forum to adjudicate his liabilities, cites no authority to the contrary. Therefore, notwithstanding Debtor's voluntary waiver of discharge, this Court has jurisdiction to resolve the remaining aspects of Plaintiffs' Section 523 claims, liquidate Debtor's debts, and enter a money judgment on those debts if Plaintiffs' prevail.

Even if the Court had foreclosed further litigation of Plaintiffs' Section 523 claims by finding them moot in their entirety, the Court could nevertheless enter judgment on Plaintiffs' claims in a contested action. The very case Debtor cites affirms the Court's authority to enter a money judgment on Plaintiffs' allowed claims. *See Porges v. Gruntal & Co. Inc. (In re Porges)*, 44 F.3d 159 (2d Cir. 1995) (entering money judgment on allowed claims pursuant to Section 502 and the bankruptcy court's inherent equitable powers). Therefore, whether Debtor responds to this adversary proceeding on the merits, proceeds on his claims objection in a separate adversary proceeding, or withdraws his claims objection, the Court has jurisdiction to enter a money judgment on Plaintiffs' claims.

The Debtor's suggestion that abstention is mandated in this case borders on frivolous because patently no "action is commenced" against Debtor in any other forum, as 28 U.S.C. § 1334(c) requires; nor could it have been commenced since Debtor fled the country the day *before* he voluntarily waived his discharge. He thus ensured that no action can ever be commenced against him in another state court forum. There can thus also be no timely adjudication of the issues presented in this proceeding. The Court should afford complete relief to Plaintiffs here in the forum the Debtor himself chose almost a year and a half ago to adjudicate claims against him.

## Factual Background

To gain the benefits of the automatic stay and thwart his creditors, on October 23, 2009, Debtor voluntarily chose to file his chapter 7 petition in this Court, thereby consenting to this Court's jurisdiction and forcing his creditors, including Plaintiffs, to litigate their claims against him in this forum. Plaintiffs filed proofs of claim in the main proceeding and commenced this adversary proceeding seeking both determinations of nondischargeability and money judgments on Debtor's non-dischargeable debts. In response, Debtor voluntarily objected to Plaintiffs' claims in the main proceeding based on the assertion of an alleged pre-petition wrongful levy of his assets and moved to dismiss Plaintiffs' adversary proceeding in successive motions to dismiss. In his second motion to dismiss for lack of subject matter jurisdiction, Debtor argued that this Court had no jurisdiction whatsoever to enter a judgment on Plaintiffs' Section 523 claims. The Court rejected that argument and denied the motion to dismiss, holding that it does have jurisdiction to enter a money when a dischargeability complaint is pending. The Court left for another day the question whether "if I grant the waiver of discharge that I will then enter the money judgment."[4]

The Court also left open the question whether it has jurisdiction to enter a money judgment on an allowed claim. The Debtor's current motion contends that the Court has no jurisdiction to enter a money judgment on an allowed claim. But Debtor does *not* address the issue of the Court's jurisdiction to proceed with the remaining aspects of Plaintiffs' Section 523 claims (in light of Debtor's possible withdrawal of his claims objection) and to enter a money judgment on those claims. For the reasons set forth below, the Court possesses that jurisdiction and should proceed to trial on Plaintiffs' Section 523 claims.

---

[4]    *See* Hearing Transcript, 7: 21-25, Jan. 27, 2011.

## Argument

I.    **The Court has jurisdiction to proceed to trial on liability and damages and enter a money judgment on the remaining issues presented in this adversary proceeding, or, alternatively, to enter judgment on Plaintiffs' claims.**

This Court held that it has jurisdiction to enter a money judgment in dischargeability proceedings.  A debtor cannot unilaterally divest the Court of that jurisdiction by voluntarily waiving his discharge where a plaintiff seeks not only the non-discharge of debts, but also a judgment on those non-dischargeable debts.  That is, Debtor's waiver of discharge mooted only the issues of nondischargeability in this adversary proceeding, and cannot and did not resolve the remaining relief requested.  The Court indisputably retains jurisdiction to proceed to trial on those remaining issues.  Alternatively, Debtor has standing to object to Plaintiffs' claims now that he has voluntarily waived his discharge, and the Court can enter a judgment on Plaintiffs' allowed claims if Plaintiffs prevail.

   **A.  Subject matter jurisdiction to render complete relief and enter a money judgment against Debtor attached at the time Plaintiffs commenced this Section 523 adversary proceeding.**

A review of the history of Section 523, including former Rule 409(b) and § 17(c)(3), demonstrates that this Court's jurisdiction to enter a money judgment attached at the commencement of this adversary proceeding.  In *Hi-Qual Roofing & Siding Materials, Inc. v. Ridsdale (In re Ridsdale)*, the court analyzed the Interim Bankruptcy Rules and Forms in support of such jurisdiction:

> The Advisory Committee on Bankruptcy Rules very clearly spoke to this matter in 1979 in the all-but-forgotten "Interim Bankruptcy Rules and Forms." The Committee Note to Interim Rule 4003 stated that former Rule 409(b) and (c) "are unnecessary because of the expanded jurisdiction of the Bankruptcy Court and preservation of right to trial by jury where allowed by statute."

286 B.R. 238, 239 (Bankr. W.D.N.Y. 2002) (citations omitted).  Former Rule 409(b) "provide[ed] that if [a creditor's] claim has not been reduced to judgment, the creditor shall include in a complaint or answer filed in a proceeding to determine dischargeability of the debt, a statement of his claim and *demand for judgment on the debt*."  *Graham v. Comm'r*, 75 T.C. 389 (1980) (emphasis added).  As noted by the court in *Ridsdale*, however, this language was rendered superfluous due to the expanded jurisdiction afforded bankruptcy courts in the Bankruptcy Code.  *Ridsdale*, 286 B.R. at 239.

Likewise, prior versions of the Bankruptcy Act addressing dischargeability were criticized because they required the splitting of dischargeability actions into two lawsuits.  But the "provision in § 17c(3) renders unnecessary a splitting of actions or two lawsuits, which was a criticism directed to prior versions of legislation attempting to give jurisdiction to the bankruptcy courts to determine the dischargeability of debts."  *Graham*, 75 T.C. at 398.  That is, "under Section 17(c)(3) of the 1898 Bankruptcy Act, bankruptcy courts were empowered to enter such money judgments . . . The Bankruptcy Code did not specifically codify this authority upon its enactment in 1978, but, as one court noted, the Code authorized bankruptcy courts generally to hear all core proceedings, including nondischargeability complaints, and to enter appropriate orders and judgments."  *In re Morrison*, 555 F.3d 473, 479 (5th Cir. 2009) (citing 28 U.S.C. § 157(b)(1), (2)(I) and *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017-18 (9th Cir. 1997)). *See also Lang v. Lang (In re Lang)*, 293 B.R. 501 (BAP 10th Cir. 2003) (holding that under "the broad congressional grant of jurisdiction given to bankruptcy courts under 28 U.S.C. § 157, bankruptcy courts have the jurisdiction to award money damages in a Section 523(a) proceeding").  Noticeably, there was no similar criticism regarding the removal of the language from former Rule 409(b) or section 17(c)(3).

6

The absence of any debate relating to the changes in the statutory provisions illustrates Congress' intent to preserve a bankruptcy court's jurisdiction to enter judgment and not split actions into two lawsuits. *In re Morrison*, 555 F.3d at 479 ("It is not unreasonable to conclude that Congress, which intended bankruptcy courts to exercise far more expansive jurisdiction under the Code than under previous law, could not have intended to cut back on their ability to enter money judgments in the core proceedings encompassed by non-dischargeability complaints."). Accordingly, jurisdiction to enter a money judgment in this case attached at the commencement of Plaintiffs' Section 523 proceeding, and the Court has the authority to consider "[t]he whole 'ball of wax'." *Graham* at 75 T.C. at 398.

More recently, the Tenth Circuit in *Riebesell* identified three reasons supporting a bankruptcy court's jurisdiction to enter money judgments in Section 523 litigation: "1) determination of the debt lies within the equitable jurisdiction of the bankruptcy court; 2) the debtor by filing bankruptcy has consented to jurisdiction of the bankruptcy court over matters necessary to the determination of adversarial proceedings; and 3) judicial economy and efficiency require that the bankruptcy court be empowered to settle both the dischargeability of the debt and the amount of the monetary judgment." *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 793 (10th Cir. 2009).

Of these three reasons, the inherent equitable powers of bankruptcy are repeatedly highlighted. The Eight Circuit in *In re Ungar* held that a bankruptcy court has jurisdiction to enter a money judgment because "parties who voluntarily seek bankruptcy protection seek a remedy that is equitable in nature, and in entering the bankruptcy court, knowingly subject themselves to the broad equitable powers of the bankruptcy court." 633 F.3d 675, 680 (8th Cir. 2011) (citing 11 U.S.C. § 105(a)). That is, when a debtor consents to the equitable jurisdiction of

7

a bankruptcy court, he "subjects himself to all the consequences that attach to an appearance . . . ." *In re McLaren*, 3 F.3d 958, 966 (6th Cir. 1993). Thus, "allowing the bankruptcy judge to settle both the nondischargeability of the debt and the amount of the money judgment accords with the rule generally followed by courts of equity, that having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and *decree complete relief*." *Id.* at 966 (citations omitted) (emphasis added).

In addition, the Fifth Circuit in *Morrision* held that "entry of judgment for the [non-dischargeable] debt is proper because the court actually determined the existence and validity of the debt in a core proceeding," even though courts considering this issue "have paid little attention to the jurisdictional dichotomy of core and related-to jurisdiction and have instead relied principally on tradition and pragmatism." *Morrison*, 555 F.3d at 479 (citing *McLaren*, 3 F.3d at 966); *see also St. Paul Fire and Marine Ins. Co. v. Vinecki (In re Vinecki)*, 247 B.R. 327, 329 (Bankr. M.D. Fla. 2000) (holding that a bankruptcy court "has jurisdiction to enter a money judgment liquidating the claim once it is determined that the debt is within the exception of Section 523(a) . . . There is no good reason why the core characteristic of a [nondischargeability] proceeding should not extend to the determination of the exact amount of a debt which is excepted from the discharge."); *In re Blankenship*, 408 B.R. 854, 867 (Bankr. N.D. Ala. 2009) ("A state law cause of action does not change the substance of the proceeding from a core nondischargeability proceeding under 28 U.S.C. § 157(b)(2)(I). It is in substance both, as are most nondischargeability proceedings brought pursuant to sections 523(a)(2)(A), (4), and (6).").

Thus, pursuant to the history and substance of dischargeability litigation, the Court's inherent equitable powers, Debtor's consenting to this Court's jurisdiction, and judicial economy and efficiency, this Court is empowered to settle both the dischargeability of Debtor's debts and,

notwithstanding Debtor's waiver, to determine liability and damages and enter judgment on those non-dischargeable debts.

**B. A debtor cannot unilaterally divest the Court of its jurisdiction by voluntarily waiving his discharge where a plaintiff seeks not only the non-discharge of debts, but also a judgment on those non-dischargeable debts.**

"When a complaint to determine nondischargeability of debt is brought in the bankruptcy court prior to the entry of a judgment in a nonbankruptcy forum, the bankruptcy court has subject matter jurisdiction, not only to determine nondischargeability of the debt, but also to liquidate the amount of the debt and enter a nondischargeable judgment therefor." *In re Freeland*, 360 B.R. 108, 129 (Bankr. D. Md. 2006). This is because, when deciding claims brought pursuant to Section 523, a bankruptcy court is presented with two separate and distinct issues: (1) a cause of action pursuant to Section 523 to determine nondischargeability; and, (2) a cause of action on whether there is a debt owed, and if so, its amount. *See Adelson v. Smith (In re Smith)*, 389 B.R. 902 (Bankr. D. Nev. 2008) ("Intertwined with the nondischargeability determination, however, is the determination of whether there is a debt owed, and if so, its amount."); s*ee also In re Riebesell*, 586 F.3d at 793-94 ("In bankruptcy court there are two separate and distinct causes of action. One cause of action is on the debt and the other cause of action is on the dischargeability of that debt.") (quoting *RTC v. McKendry (In re McKendry)*, 40 F.3d 331, 336 (10th Cir. 1994).

Consequently, the claims in this proceeding each present two separate and distinct issues for this Court to consider. Debtor correctly concludes in his Motion that "there has already been a separate determination of the Debtor's entitlement to a discharge, by virtue of the Discharge Waiver." Motion, at ¶12. That determination, however, resolved only one aspect of this proceeding: Debtor's debts will not be discharged. But the unresolved issues relating to the

existence and amount of Debtor's debts, and this Court's authority to enter a money judgment on them, remain – there is no issue of mootness.

Debtor's voluntary waiver of discharge has not resolved this adversary proceeding; it has, as the Court recognized in its order denying Debtor's second motion to dismiss, merely rendered the dischargeability issues in Plaintiffs' Section 523 claims moot. But the aspect of those claims seeking liquidation and judgment on the specific debts is unaffected by the waiver of discharge. Those bankruptcy courts that have concluded that "the threshold issue is whether the Debtor should be denied a general discharge in bankruptcy as a denial of his discharge will render the *dischargeability issues academic and moot*," *see, e.g., Barnett Bank of Pasco County v. Decker (In re Decker)*, 105 B.R. 79, 82 (Bankr. M.D. Fla. 1989), have done so in cases where no money judgment was sought; that is, where the creditor sought relief for nondischargeability only. In that scenario, a waiver of discharge filed pursuant to Section 727(a)(10) may moot such Section 523 claims, because there would be no discharge from which a debtor's debts would be excepted and no other relief to be granted. *Hood v. Bennitt (In re Bennitt)*, Adv. Case No. 05-00164-BGC, 2010 WL 4622451 (Bankr. N.D. Ala. Nov. 4, 2010) ("A determination of dischargeability of a debt is meaningful only in the context of a discharge.").

But where, as here, a demand for judgment is also sought, Debtor's waiver of discharge did not moot Plaintiffs' request for a money judgment – that issue is left to be resolved by this Court, and the Court retains jurisdiction to proceed to trial on liability and damages relating to Debtor's nondischargeable debts.

**C. Neither a voluntary waiver of discharge nor a general denial of discharge divests a bankruptcy court of its jurisdiction to enter a money judgment on Section 523 claims.**

A denial of discharge under Section 727 does not affect a bankruptcy court's jurisdiction to liquidate debts and enter money judgments in Section 523 dischargeability litigation. Logically, then, a voluntary waiver of discharge cannot affect that jurisdiction either. In *SJM v. Korfonta* (*In re Korfonta)*, the bankruptcy court entered a money judgment in an action brought pursuant to Section 523 notwithstanding that the debtor had previously been denied a discharge pursuant to Section 727. Case No. 08-16675-SSM, 2010 WL 4259396, at *3 (Bankr. E.D. Va. Oct. 26, 2010). In determining that it had jurisdiction to hold the debtor liable for breach of contract, the court first considered the effect of the debtor's previous denial of discharge:

> Although the complaint is framed as one to determine the dischargeability of a debt, that precise issue is moot because the debtor has been denied a discharge, with the result that *all* liabilities that were or could have been scheduled in his case have been rendered nondischargeable.

*Korfonta*, at *3. The court then held that it was not divested of jurisdiction to enter a money judgment by its denial of discharge pursuant to Section 727: "[t]he court's authority to liquidate a non-dischargeable debt is unaffected by a denial of the debtor's discharge under Section 727." *Id.* That is, "**once equitable jurisdiction has been properly invoked [a bankruptcy court] will proceed to render a full and complete disposition of the controversy**." *Id.* (citing *Harris v. U.S. Fire Ins. Co.*, 162 B.R. 466, 468 (E.D. Va. 1994) (emphasis added). Consequently, the *Korfonta* court found the debtor liable for breach of contract and entered an enforceable money judgment notwithstanding the debtor's previous denial of discharge. *Id.*

Here, Debtor was not denied his discharge before this adversary proceeding began. Rather, Debtor voluntarily waived his discharge under Section 727(a)(10) the day after he fled to Brazil and more than a year after he voluntarily petitioned this Court for relief under Chapter 7.

11

Debtor's voluntary waiver of discharge, however, like the Section 727 denial of discharge in *Korfonta*, does not divest this Court of jurisdiction to liquidate Debtor's debts and enter a money judgment – "to render a full and complete disposition of the controversy."

Similarly, in *Pellegrino v. Metro Unlimited, Inc. and Dakhllalah (In re Dakhllalah)*, the Bankruptcy Court for the Middle District of Florida entered a money judgment against a debtor on a Section 523 non-dischargeable debt and also denied that debtor his discharge under Section 727. Case No. 6:09-AP-739-KSJ, 2010 WL 148457, at *1, 4 (Bankr. M.D. Fla. Jan. 7, 2010). The underlying dispute arose out of the debtor's fraudulent misrepresentations relating to a purchase contract with a creditor. *Id.* at *1. Plaintiffs, like Plaintiffs here, sought a money judgment against the debtor, a determination that the money judgment was non-dischargeable, and, among other things, a denial of discharge under Section 727. *Id.* On summary judgment, the Court entered a money judgment in favor of the plaintiffs, declared that money judgment non-dischargeable, and denied the debtor's discharge under Section 727(a)(3) and (a)(4). *Id.* The fact that the debtor was denied a discharge did not divest the court of jurisdiction to enter an enforceable money judgment.

Likewise, in *Belveal v. West (In re West)*, the court entered a $545,040 money judgment on a non-dischargeable debt in favor of a creditor while also denying the debtor's discharge under Section 727. Case No. 06-1022, 2007 WL 4563444, *5 (Bankr. W.D. Ky. Dec. 21, 2007). In *West*, the court determined that the debtor breached a Buy-Sell Agreement and that the creditor, who was fraudulently induced by the debtor into entering that agreement, was entitled to a money judgment pursuant to Section 523. *Id.* The court also denied discharge under Section 727(a)(2).

A bankruptcy court's jurisdiction to enter a money judgment on a non-dischargeable debt cannot be dependent on whether a debtor has or has not yet been denied a discharge under Section 727. Just as a bankruptcy court's denial of discharge under Section 727 does not eliminate jurisdiction to enter a money judgment on a Section 523 claim, neither does a debtor's voluntary waiver of discharge. Here, Plaintiffs seek both a determination of nondischargeability of certain debts and a money judgment against Debtor on those debts. Because Plaintiffs' request for a money judgment and a determination regarding the amount of the debts is not mooted by Debtor's waiver filed pursuant to Section 727(a)(10), this Court retains jurisdiction to liquidate and enter money judgments on those debts. Adopting Debtor's position would lead to a gross miscarriage of justice in bankruptcy proceedings like this one – any debtor faced with impending liability could simply waive discharge and escape an adverse judgment in a pending Section 523 adversary proceeding. Therefore, the Court should deny Debtor's Motion and proceed to determine liability and damages on Plaintiffs' Section 523 claims.

### D. Bankruptcy courts also have jurisdiction to enter money judgments on allowed claims.

Debtor contends in his Motion that "there is no scenario in which the allowance of the Plaintiffs' claims pursuant to Section 502(a) would provide the Court with an opportunity to convert those allowed claims into money judgments." Motion at ¶ 9. But the only applicable case cited by Debtor stands for the proposition that a bankruptcy court has jurisdiction to enter a money judgment on an allowed claim.[5] *See Porges v. Gruntal & Co. Inc. (In re Porges)*, 44 F.3d 159 (2d Cir. 1995) (entering money judgment on allowed claims following adversary proceeding

---

[5] Debtor relies on one inapposite case, *Bell v. Financial Guild of America (In re Bell)*. But the *Bell* court held that "[t]he bankruptcy court is authorized to enter judgment against the debtor as part of a dischargeability proceeding" and noted that the action there was "neither pleaded nor tried as a dischargeability case." 29 B.R. 9, 13 (BAP 9th Cir. 1983) (citing 11 U.S.C. Section 523(a); Bankruptcy Rule 409(b)). But more importantly, the court in *Bell* held that there is no authority to enter a money judgment against a *trustee* or *debtor-in-possession* – a holding that has no application to this case. *Id.* at 13.

brought pursuant to Section 502). Therefore, the Court can either proceed to trial on liability and damages on Plaintiffs' Section 523 adversary complaint or can enter judgment on Plaintiffs' allowed claims whether or not Debtor withdraws his objection.

In *In re Porges*, the Second Circuit held that a bankruptcy court has jurisdiction to enter a money judgment on allowed claims pursuant to both Section 502 and a bankruptcy court's inherent equitable powers. 44 F.3d at 164. The debtor in *Porges* dismissed his underlying bankruptcy case to escape an adverse ruling in an adversary proceeding brought pursuant to his objection to claims. *Id.* at 161. Notwithstanding the dismissal, the bankruptcy court retained its jurisdiction over the adversary proceeding and entered a money judgment in favor of the creditor on his allowed claims.[6] *Id.* The Second Circuit held that a bankruptcy court's jurisdiction to enter a money judgment on an allowed claim has two sources of authority, particularly where the adversary proceeding "was subject to the jurisdiction of the bankruptcy court when it was filed." *Id.* at 163.

First, citing to Section 502, the Second Circuit recognized that: "it is illogical to separate the function of determining the validity of a claim from the function of fixing the claim's monetary value." Accordingly, the court held that "[i]t was then but a short and logical step for the bankruptcy court to enter a money judgment against [the debtor], on the basis of its section 502 determination, pursuant to Federal Rule of Civil Procedure 58 and Bankruptcy Rule 9021." *Id.* at 164.

---

[6]     The Second Circuit affirmed the bankruptcy court's retention of jurisdiction after dismissal, recognizing that: "the dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding which was related to the bankruptcy case at the time of its commencement." *Id.* at 162.

Second, "entry of a money judgment also finds support in the bankruptcy court's inherent equitable powers." *Id*. On this point, the Second Circuit emphasized that a bankruptcy court must decree complete relief:

> It has long been the rule that bankruptcy courts sit as courts of equity, and once a court sitting in equity has jurisdiction over the parties to a controversy brought before it, the court can decide all disputed matters and decree complete relief.

*Id*. (citations omitted). And even though the debtor argued that the money judgment "violated the chief goals of bankruptcy," the Second Circuit was not persuaded: "[the debtor's] voluntary dismissal of his bankruptcy case after learning of a probable adverse decision leads one to question his concern for his other creditors, and in any case the dismissal lifted the automatic stay and rendered moot the concept of equal treatment among creditors." *Id*. at 165. Thus, the debtor's dismissal did not serve to "shield [him] from the legal consequences of a determination in a previous adversary proceeding." *Id.*

Here, Debtor's motivations in waiving his discharge and now attempting to withdraw his claims objection are strikingly similar to the debtor's tactics in *Porges*. But this Court should not be persuaded by Debtor's gamesmanship. As noted by the Second Circuit, there is no jurisdictional issue because a court's jurisdiction attaches when the adversary complaint is filed. By virtue of his proposed withdrawal of his claims objection, Debtor will simply alleviate the need for trial on his claims objection – he cannot, however, manipulate the law so as to avoid an adverse judgment by this Court. The fact that Debtor has chosen to ignore the Court's ruling on how he was required to proceed either in this proceeding or on his claims objection does not divest the Court of jurisdiction that has already attached.[7] The Court must now proceed to the

---

[7]     The supplemental case law Debtor submitted, *In re Happy Hocker Pawn Shop, Inc.*, 212 F. App'x. 811, 814 (11th Cir. 2006), has nothing to do with this case. *See* D.E. #282, Debtor's Notice of Filing Supplemental Authority in Support of Debtor's Motion to Dismiss Adversary Proceeding. In *Happy Hocker*, an adversary proceeding was filed against a trustee in his individual capacity regarding his taking possession of property that was not property of

next step and decree complete relief.  The Court can enter judgment on Plaintiffs' claims, whether or not Debtor chooses to withdraw his objection.

## II.    28 U.S.C. § 1334(c) cannot be satisfied on the facts of this case and thus abstention is improper.

Debtor's request for mandatory abstention is plainly without merit.  Mandatory abstention is required only when all four elements of Section 1334(c)(2) are satisfied: "(1) federal jurisdiction is based solely on § 1334(b); (2) the claim is a state law, non-core proceeding; (3) an action has commenced in state court; and (4) the action could be timely adjudicated in that forum.  *In re Antol Restoration, Inc.*, 08-26402-BKC-JKO, 2011 WL 476866, at *4 (Bankr. S.D. Fla. Feb. 11, 2011) (denying mandatory abstention); *see also* 28 U.S.C. § 1334(c)(2).  "With respect to mandatory abstention, one of the key elements is that an action must have been commenced and must be pending in a state forum."  *In re Air Safety Int'l, L.C.*, 336 B.R. 843, 865 (S.D. Fla. 2005).

It is undisputed, however, that no action has been commenced against Debtor in any other state court forum.  *See Alvarez v. Johnson, Blakely, Pope, Bokor, Ruppel and Burns, P.A. (In re Alvarez)*, 200 B.R. 259, 261 (Bankr. M.D. Fla. 1996) ("[B]oth the mandatory and optional abstention provisions were designed by Congress to apply to cases which are ***already filed and pending*** in a non-bankruptcy forum prior to the commencement of the case.") (emphasis added).  Mandatory abstention requires that an action be commenced against Debtor.  *See In re Summerfield Pine Manor*, 219 B.R. 637, 639 (BAP 1st Cir. 1998) ("[S]ince none of the Debtors are named as a party to the state court litigation the appellant cannot pass the threshold test of 1334(c)(2) that the district court shall abstain from hearing such proceedings if an action is

the estate.  *Id*. at 814.  The court granted the claimant leave to sue the trustee in state court after finding no subject matter jurisdiction, and the Eleventh Circuit affirmed.  *Id*. at 815.  *Happy Hocker* dealt with an adversary proceeding based solely on state law tort claims against the trustee in his individual capacity, not, as in this case, claims filed pursuant to Section 523 or Section 502 against Debtor.

commenced[] because no action has yet been commenced against these Debtors.") (citations omitted). Thus, Debtor is incorrect that a pending state court action against his co-conspirators can satisfy this requirement. Motion, at ¶ 24.

Nor can there be timely adjudication of the issues presented in this dischargeability proceeding. When Debtor fled to Brazil on December 15, 2010 – on the eve of his deposition – and then *voluntarily* waived his discharge the following day, he further ensured that no action can ever realistically be commenced in another state court forum against him. For these reasons alone, Debtor's request should be denied.

In addition, however, non-dischargeability claims against a debtor constitute a core proceeding in bankruptcy. *See First Bank v. Arafat*, Case No. H-05-4337, 2006 WL 2612746, at *3 (S.D. Tex. Sept. 11, 2006). As discussed above, Debtor's waiver of discharge does not change the core nature of this proceeding: "That is, the complaint, which requests a determination of dischargeability states a cause of action created by title 11. Since the mandatory abstention provision applies only in cases merely 'related to a case under title 11 but not arising under title 11 or arising in a case under title 11,' 28 U.S.C. § 1334(c)(2), mandatory abstention is not warranted." *In re Waugh*, 165 B.R. 450, 452 (Bankr. E.D. Ark. 1994). On this ground Debtor's request for mandatory abstention also fails.

WHEREFORE, Plaintiffs Markwood Investments Ltd. and Golden Dawn Corporation request that this Court enter an Order denying Defendant's Motion to Dismiss Adversary Proceeding or, in the Alternative, For Mandatory Abstention From Plaintiffs' Request for the Entry of Money Judgments, requiring the Debtor to file his responsive pleading within 10 days of the Order or suffer a default on all of Plaintiffs' remaining claims, and granting such further relief as this Court deems proper and just.

Dated: April 13, 2011                    Respectfully submitted,

**HOLLAND & KNIGHT LLP**
*Counsel for Plaintiffs Markwood Investments*
*Ltd. and Golden Dawn Corporation*
701 Brickell Avenue
Suite 3000
Miami, FL 33131
Tel.    (305) 374-8500
Fax    (305) 789-7799
E-mail: jose.casal@hklaw.com
E-mail: joaquin.alemany@hklaw.com

By: /s/ Jose A. Casal
        Jose A. Casal
        Florida Bar No. 767522
        Joaquin J. Alemany
        Florida Bar No. 662380

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 13, 2011 a true and correct copy of the foregoing document was served via electronic transmission on all CM/ECF registered users for this case, e-mail and/or first-class postage-prepaid U.S. Mail on: **Paul J. Battista, Esq.** and **Michael Schuster, Esq.,** Genovese Joblove & Battista, Bank of America Tower, 100 S.E. 2nd Street, 44th Floor, Miami, Florida 33131; **Joel L. Tabas, Esq.**, Tabas, Freedman, Soloff, Miller & Brown, P.A. One Flagler Building, 14 Northeast First Avenue, Penthouse, Miami, Florida 33132.

By: /s/ Jose A. Casal
        Jose A. Casal, Esq.

18



**A-4**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(MIAMI DIVISION)
www.flsb.uscourts.gov

In re                                              CASE NO.  09-33043-BKC-LMI
                                                   CHAPTER 7
FABRIZIO DULCETTI NEVES

        Debtor.

_____/

MARKWOOD INVESTMENTS LTD.,          ADV. NO. 10-02122-BKC-LMI-A
and GOLDEN DAWN CORPORATION,

        Plaintiffs,

v.

FABRIZIO DULCETTI NEVES,

        Defendant.

_____/

**DEBTOR'S REPLY TO PLAINTIFFS' RESPONSE IN OPPOSITION TO DEBTOR'S
MOTION TO DISMISS ADVERSARY PROCEEDING OR, IN THE ALTERNATIVE,
FOR MANDATORY ABSTENTION FROM PLAINTIFFS' REQUEST FOR THE
ENTRY OF MONEY JUDGMENTS**

        FABRIZIO DULCETTI NEVIS, Debtor in the above-styled proceedings under Chapter 7

of Title 11, United States Code, and Defendant in the above-styled adversary proceeding (the

"Debtor"), files this Reply to the Response [D.E. 318] (the "Response") of Plaintiffs Markwood

Investments Ltd. and Golden Dawn Corporation (collectively, the "Plaintiffs") to Debtor's

Motion to Dismiss Adversary Proceeding or, in the Alternative, for Mandatory Abstention from

Plaintiffs' Request for the Entry of Money Judgments [D.E. 267] (the "Motion"), and states:

**PRELIMINARY STATEMENT**

        1.      The Plaintiffs continue to blur the distinction between the Debtor and the Debtor's

bankruptcy estate.   Prior to the Court's approval of the Debtor's waiver of discharge, the

1

Plaintiffs had an action pending against the Debtor.  As part of their action against the Debtor under 11 U.S.C. § 523, the Plaintiffs sought additional relief against the Debtor, i.e., the entry of enforceable money judgments.  When the Court approved the waiver of discharge, it resolved the Plaintiffs' action against the Debtor under Section 523.  The remaining claims are between the Plaintiffs and the Debtor's estate, not between the Plaintiffs and the Debtor.  Nonetheless, the Plaintiffs persist in their demand for relief against the Debtor, seeking an advantage over all other creditors with respect to the Debtor's non-estate assets, effectively turning this Court of limited jurisdiction into a collection agency.

2.      The question before the Court is simple – is there a *statutory* basis for the Court to exercise subject matter jurisdiction over this adversary proceeding where the only relief Plaintiffs seek is the entry of money judgments *against the Debtor* (not the estate) based solely on claims that arise under state law?  Because the answer is "No," this action should be dismissed.[1]

## DISCUSSION

3.      The jurisdiction of the bankruptcy courts is statutorily prescribed by Congress.  In particular, Congress has granted jurisdiction to the bankruptcy courts in three categories of proceedings:  those "arising under title 11," those "arising in" cases under title 11, and those "related to" cases under title 11.  *See* 28 U.S.C. § 1334.  Where, as here, a case does not fit within one of those three statutorily enumerated categories, the bankruptcy court does not have jurisdiction.

4.      In their Response, Plaintiffs argue that the Court has jurisdiction to proceed "with the remaining aspects of Plaintiffs' Section 523 claims . . . and to enter a money judgment on those claims," (Response at p. 4), citing to cases that have found that a bankruptcy court has

---

[1]      Except to enforce this Court's order dated March 30, 2011 [D.E. 298].

jurisdiction to enter a money judgment in connection with Section 523 claims.[2]  None of those cases, however, support a finding of jurisdiction here.

5.    As an initial matter, and contrary to what Plaintiffs argue, there are no remaining aspects of Plaintiffs' Section 523 claims.  Plaintiffs' Section 523 claims were already determined by virtue of the Debtor's waiver of the discharge.  As a result of the discharge waiver, there are no more issues for the Court to decide under Section 523.  Rather, all that remains are Plaintiffs' claims against the Debtor, all of which are governed by and arise under state law, not the Bankruptcy Code.  Therefore, because this is no longer an action pursuant to Section 523, the Court does not have subject matter jurisdiction to enter money judgments against the Debtor.[3]

6.    It becomes even more apparent that the Court does not have jurisdiction when the reasons cited by the courts in support of jurisdiction to enter money judgments in Section 523 litigation are considered in the context of this case.  As discussed in the Response, the primary reasons to support jurisdiction are (i) judicial economy and efficiency, and (ii) the bankruptcy court's equitable powers.  Neither of those considerations are present here.

7.    First, judicial economy and efficiency will not be served by this Court exercising jurisdiction.  Unlike the cases cited by Plaintiffs, this is not a case where the determination of

---

[2]    While the Debtor recognizes this line of cases, as the Debtor previously argued, the Debtor does not believe that the plain language of Section 523 of the Bankruptcy Code authorizes the entry of money judgments.  [D.E. 172].  But even if a bankruptcy court has authority to enter money judgments on Section 523 claims, as discussed herein, it would be improper for the Court to enter money judgments in this case.

[3]    Nowhere in their Response do Plaintiffs argue that this action is related to a bankruptcy proceeding.  As the Eleventh Circuit has explained, the test for related to jurisdiction is "whether the outcome of the proceeding could conceivably have an effect on the estate being administered in bankruptcy. . . ."  *In re Happy Hocker Pawn Shop, Inc.*, 212 Fed. Appx. 811, 817-818 (11th Cir. 2006)  (finding that the lawsuit failed this test because the damages would not come out of the bankruptcy estate).  Here, the Plaintiffs' lawsuit against the Debtor seeks damages against the Debtor, not the bankruptcy estate, due to the alleged wrongdoing by the Debtor in his individual capacity.  Therefore, the Court does not have "related to" subject matter jurisdiction.

3

dischargeability of the debt is "intertwined" with the determination of the amount of the debt, such that it would be a "short and logical step" for the Court to enter money judgments in conjunction with the dischargeability determination. (Response at pp. 9, 14). Indeed, this Court does not have to make a determination as to dischargeability because the Debtor already waived the discharge. Absent the need for such a determination, there is no practical or logical reason for this Court to have jurisdiction to enter money judgments against the Debtor on Plaintiffs' state law claims.

8.     Second, the Court's "equitable powers" do not support a finding of jurisdiction. For starters, Plaintiffs are not seeking equitable relief; they are seeking legal relief only, *i.e.*, money damages. Nevertheless, the Court's equitable powers are not without limits. As Judge Cristol explained with respect to Section 105(a), "[t]he fact that a bankruptcy proceeding is equitable, does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness." *In re Dillon*, 194 B.R. 533, 536 (Bankr. S.D. Fla. 1996). In other words, the Court's "exercise of its equitable powers must be strictly confined within the prescribed limits of the bankruptcy statutes." *Id.*

9.     This limitation on a bankruptcy court's equitable powers was also recognized by the court in *Bell v. Financial Guild of America (In re Bell)*, 28 B.R. 9 (9th Cir. B.A.P. 1983), when it found that the court did not have authority to enter money judgments simply by virtue of its jurisdiction to decide claims against the estate. In so doing, the court in *Bell* explained, much like Judge Cristol, that "the bankruptcy courts exist to afford statutory defined relief." *Id.* at 12; *compare with In re Dillon*, 194 B.R. at 536 ("the Court is authorized to exercise its equitable jurisdiction only as a means to fulfill some specific Code provision"). Thus, as these cases make

4

clear, in the absence of statutory authority, a bankruptcy court does not have the equitable power to do that which it might otherwise deem fair or equitable.

10.      Here, as explained by the court in *Bell*, there is no statutory authority for the entry of money judgments against the Debtor.  Therefore, despite Plaintiffs' appeals to the Court's equitable powers, this Court cannot enter money judgments because the Bankruptcy Code does not permit it.

11.      In short, there are no issues left for the Court to decide under Section 523.  All of the issues pertaining to the liquidation of the Plaintiffs' claims are governed by and arise under state law, not the Bankruptcy Code.  Plaintiffs are free to pursue those state law claims against the Debtor in a state court of competent jurisdiction, much like they have already done against all of the other alleged co-conspirators identified in the Amended Complaint, but not in this Court which lacks subject matter jurisdiction.[4]

12.      Therefore, the Court should find that there are no circumstances under which the Court has jurisdiction to enter money judgments in this adversary proceeding.  Because this is the only relief sought herein, this adversary proceeding should be dismissed and closed.

## <u>REQUEST FOR CERTIFICATION</u>

13.      The determination of the Court's subject matter jurisdiction over the remaining relief sought in this adversary proceeding will fundamentally affect the parties' actions going

---

[4]      Although Plaintiffs suggest that they were somehow forced to litigate their claims in this forum, there is no reason why Plaintiffs could not have brought an action against the Debtor in state court at a time when the Debtor was amenable to personal service in this jurisdiction.  Prior to the Debtor's bankruptcy filing, Plaintiffs filed an action against the Debtor in federal district court, notwithstanding the fact that the district court did not have subject matter jurisdiction. Plaintiffs could have brought that action in state court, but due to their own error, the relief obtained against the Debtor was void.  Moreover, even after the Debtor commenced these bankruptcy proceedings, Plaintiffs could have sought relief from the automatic stay to proceed with a lawsuit against the Debtor in state court.  The Plaintiffs chose not to seek such relief.

forward.  And, because subject matter jurisdiction cannot be waived and can be raised at any time, the Debtor believes that there must be a final determination of the Court's subject matter jurisdiction before significant additional expense is incurred.  Therefore, should the Court deny the Motion and find that it has subject matter jurisdiction over the Plaintiffs' requests for entry of money judgments, the Debtor respectfully requests that the Court certify its order as final and immediately appealable pursuant to Fed. R. Civ. P. 54(b) (incorporated herein by Rule 7054 of the Fed. R. Bank. P.).

WHEREFORE, the Debtor respectfully requests that the Court enter a final order dismissing and closing this adversary proceeding or, in the alternative, granting a mandatory abstention pursuant to 28 U.S.C. § 1334(c)(2) from the Plaintiffs' request for the entry of money judgments, and granting such other relief as is proper.

Respectfully Submitted this 20th day of April, 2011.

GENOVESE JOBLOVE & BATTISTA, P.A.
Attorneys for Fabrizio D. Neves
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Facsimile : (305) 349-2310

By: /s/  Michael L. Schuster
     David C. Cimo, Esq.
     Florida Bar No. 775400
     Michael L. Schuster, Esq.
     Florida Bar No. 57119

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via CM/ECF upon all parties listed below this 20th day of April, 2011.

By: /s/  Michael L. Schuster
     Michael L. Schuster

## SERVICE LIST

Joaquin J Alemany on behalf of Counter-Defendant Golden Dawn Corporation
joaquin.alemany@hklaw.com, jose.casal@hklaw.com;michael.rothenberg@hklaw.com

Jose A Casal on behalf of Plaintiff Golden Dawn Corporation
jose.casal@hklaw.com

David C. Cimo on behalf of Defendant Fabrizio Neves
dcimo@gjb-law.com, gjbecf@gjb-law.com

Connie J Delisser on behalf of Creditor First Horizon Home Loans
connie.delisser@marshallwatson.com, Jairo.Garcia@marshallwatson.com

Michael L Schuster on behalf of Counter-Claimant Fabrizio Neves
mschuster@gjb-law.com, gjbecf@gjb-law.com

Rhett Traband on behalf of Interested Party LatAm Investments, LLC
rtraband@broadandcassel.com





**ORDERED in the Southern District of Florida on May 16, 2011.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

FABRIZIO DULCETTI NEVES                    Case No. 09-33043-BKC-LMI
                                           Chapter 7
     Debtor
_____/

MARKWOOD INVESTMENTS LTD.
and GOLDEN DAWN CORPORATION,

     Plaintiffs,                          Adv. Pro. No. 10-02122-LMI
v.

FABRIZIO DULCETTI NEVES,

     Defendant.
_____/

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS ADVERSARY
PROCEEDING OR, IN THE ALTERNATIVE, FOR MANDATORY ABSTENTION
FROM PLAINTIFFS' REQUEST FOR THE ENTRY OF MONEY JUDGMENT**

THIS MATTER came before the Court on April 27, 2011 upon the *Defendant's Motion*

*to Dismiss Adversary Proceeding or, in the Alternative, For Mandatory Abstention From*

*Plaintiffs' Request for the Entry of Money Judgment* [ECF No. 267] (the "Motion"), *Plaintiffs'*

*Response in Opposition* (the "Response") [ECF No. 318], and *Defendant's Reply* (the "Reply")

[ECF No. 322]. The Court has reviewed the Motion, the Response and the Reply, and the record

in this case, and has heard argument of counsel. As stated on the record and for the reasons

stated therein, it is

     **ORDERED** that:

     1.     The Motion is DENIED.

     2.     On the Court's own Motion, Plaintiffs shall have 21 days from the date of this

Order to amend the Second Amended Adversary Complaint [ECF No. 151].

<div align="center"># # #</div>

Submitted by:

Michael E. Rothenberg, Esq.
**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3000
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile:  (305) 789-7799

Copies to:
Michael E. Rothenberg, Esq.
*(Attorney Rothenberg is directed to serve conformed copies of this Order upon the Service List*
*attached to the original motion, immediately upon receipt hereof, and to file a certificate of*
*service with the Court confirming such service.)*



**A-6**





**Effective: December 22, 2010**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter II. Debtor's Duties and Benefits
         ➡➡ **§ 523. Exceptions to discharge**

**(a)** A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

  **(1)** for a tax or a customs duty--

    **(A)** of the kind and for the periods specified in section 507(a)(3) or 507(a)(8) of this title, whether or not a claim for such tax was filed or allowed;

    **(B)** with respect to which a return, or equivalent report or notice, if required--

      **(i)** was not filed or given; or

      **(ii)** was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition; or

    **(C)** with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax;

  **(2)** for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

    **(A)** false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

    **(B)** use of a statement in writing--

      **(i)** that is materially false;

      **(ii)** respecting the debtor's or an insider's financial condition;

      **(iii)** on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

      **(iv)** that the debtor caused to be made or published with intent to deceive; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(C)(i)** for purposes of subparagraph (A)--

    **(I)** consumer debts owed to a single creditor and aggregating more than $600 [FN1] for luxury goods or services incurred by an individual debtor on or within 90 days before the order for relief under this title are presumed to be nondischargeable; and

    **(II)** cash advances aggregating more than $875 [FN1] that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 70 days before the order for relief under this title, are presumed to be nondischargeable; and

    **(ii)** for purposes of this subparagraph--

        **(I)** the terms "consumer", "credit", and "open end credit plan" have the same meanings as in section 103 of the Truth in Lending Act; and

        **(II)** the term "luxury goods or services" does not include goods or services reasonably necessary for the support or maintenance of the debtor or a dependent of the debtor;

**(3)** neither listed nor scheduled under section 521(a)(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit--

    **(A)** if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

    **(B)** if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request;

**(4)** for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

**(5)** for a domestic support obligation;

**(6)** for willful and malicious injury by the debtor to another entity or to the property of another entity;

**(7)** to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty--

    **(A)** relating to a tax of a kind not specified in paragraph (1) of this subsection; or

    **(B)** imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition;

**(8)** unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for--

    **(A)(i)** an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(ii)** an obligation to repay funds received as an educational benefit, scholarship, or stipend; or

**(B)** any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual;

**(9)** for death or personal injury caused by the debtor's operation of a motor vehicle, vessel, or aircraft if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug, or another substance;

**(10)** that was or could have been listed or scheduled by the debtor in a prior case concerning the debtor under this title or under the Bankruptcy Act in which the debtor waived discharge, or was denied a discharge under section 727(a)(2), (3), (4), (5), (6), or (7) of this title, or under section 14c(1), (2), (3), (4), (6), or (7) of such Act;

**(11)** provided in any final judgment, unreviewable order, or consent order or decree entered in any court of the United States or of any State, issued by a Federal depository institutions regulatory agency, or contained in any settlement agreement entered into by the debtor, arising from any act of fraud or defalcation while acting in a fiduciary capacity committed with respect to any depository institution or insured credit union;

**(12)** for malicious or reckless failure to fulfill any commitment by the debtor to a Federal depository institutions regulatory agency to maintain the capital of an insured depository institution, except that this paragraph shall not extend any such commitment which would otherwise be terminated due to any act of such agency;

**(13)** for any payment of an order of restitution issued under title 18, United States Code;

**(14)** incurred to pay a tax to the United States that would be nondischargeable pursuant to paragraph (1);

**(14A)** incurred to pay a tax to a governmental unit, other than the United States, that would be nondischargeable under paragraph (1);

**(14B)** incurred to pay fines or penalties imposed under Federal election law;

**(15)** to a spouse, former spouse, or child of the debtor and not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, or a determination made in accordance with State or territorial law by a governmental unit;

**(16)** for a fee or assessment that becomes due and payable after the order for relief to a membership association with respect to the debtor's interest in a unit that has condominium ownership, in a share of a cooperative corporation, or a lot in a homeowners association, for as long as the debtor or the trustee has a legal, equitable, or possessory ownership interest in such unit, such corporation, or such lot, but nothing in this paragraph shall except from discharge the debt of a debtor for a membership association fee or assessment for a period arising before entry of the order for relief in a pending or subsequent bankruptcy case;

**(17)** for a fee imposed on a prisoner by any court for the filing of a case, motion, complaint, or appeal, or for other costs and expenses assessed with respect to such filing, regardless of an assertion of poverty by the debtor under subsection (b) or (f)(2) of section 1915 of title 28 (or a similar non-Federal law), or the debtor's status as a prisoner, as defined in section 1915(h) of title 28 (or a similar non-Federal law);

**(18)** owed to a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

414, 457, or 501(c) of the Internal Revenue Code of 1986, under--

    **(A)** a loan permitted under section 408(b)(1) of the Employee Retirement Income Security Act of 1974, or subject to section 72(p) of the Internal Revenue Code of 1986; or

    **(B)** a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

    but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title; or

**(19)** that--

    **(A)** is for--

        **(i)** the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

        **(ii)** common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

    **(B)** results, before, on, or after the date on which the petition was filed, from--

        **(i)** any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

        **(ii)** any settlement agreement entered into by the debtor; or

        **(iii)** any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

For purposes of this subsection, the term "return" means a return that satisfies the requirements of applicable nonbankruptcy law (including applicable filing requirements). Such term includes a return prepared pursuant to section 6020(a) of the Internal Revenue Code of 1986, or similar State or local law, or a written stipulation to a judgment or a final order entered by a nonbankruptcy tribunal, but does not include a return made pursuant to section 6020(b) of the Internal Revenue Code of 1986, or a similar State or local law.

**(b)** Notwithstanding subsection (a) of this section, a debt that was excepted from discharge under subsection (a)(1), (a)(3), or (a)(8) of this section, under section 17a(1), 17a(3), or 17a(5) of the Bankruptcy Act, under section 439A of the Higher Education Act of 1965, or under section 733(g) of the Public Health Service Act in a prior case concerning the debtor under this title, or under the Bankruptcy Act, is dischargeable in a case under this title unless, by the terms of subsection (a) of this section, such debt is not dischargeable in the case under this title.

**(c)(1)** Except as provided in subsection (a)(3)(B) of this section, the debtor shall be discharged from a debt of a kind specified in paragraph (2), (4), or (6) of subsection (a) of this section, unless, on request of the creditor to whom such debt is owed, and after notice and a hearing, the court determines such debt to be excepted from discharge under paragraph (2), (4), or (6), as the case may be, of subsection (a) of this section.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(2)** Paragraph (1) shall not apply in the case of a Federal depository institutions regulatory agency seeking, in its capacity as conservator, receiver, or liquidating agent for an insured depository institution, to recover a debt described in subsection (a)(2), (a)(4), (a)(6), or (a)(11) owed to such institution by an institution-affiliated party unless the receiver, conservator, or liquidating agent was appointed in time to reasonably comply, or for a Federal depository institutions regulatory agency acting in its corporate capacity as a successor to such receiver, conservator, or liquidating agent to reasonably comply, with subsection (a)(3)(B) as a creditor of such institution-affiliated party with respect to such debt.

**(d)** If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

**(e)** Any institution-affiliated party of an insured depository institution shall be considered to be acting in a fiduciary capacity with respect to the purposes of subsection (a)(4) or (11).

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2590; Pub.L. 96-56, § 3, Aug. 14, 1979, 93 Stat. 387; Pub.L. 97-35, Title XXIII, § 2334(b), Aug. 13, 1981, 95 Stat. 863; Pub.L. 98-353, Title III, §§ 307, 371, 454, July 10, 1984, 98 Stat. 353, 364, 375; Pub.L. 99-554, Title II, §§ 257(n), 281, 283(j), Oct. 27, 1986, 100 Stat. 3115 to 3117; Pub.L. 101-581, § 2(a), Nov. 15, 1990, 104 Stat. 2865; Pub.L. 101-647, Title XXV, § 2522(a), Title XXXI, § 3102(a), Title XXXVI, § 3621, Nov. 29, 1990, 104 Stat. 4865, 4916, 4964; Pub.L. 103-322, Title XXXII, § 320934, Sept. 13, 1994, 108 Stat. 2135; Pub.L. 103-394, Title II, § 221, Title III, §§ 304(e), (h)(3), 306, 309, Title V, § 501(d)(13), Oct. 22, 1994, 108 Stat. 4129, 4133 to 4135, 4137, 4145; Pub.L. 104-134, Title I, § 101[(a)][Title VIII, § 804(b)], Apr. 26, 1996, 110 Stat. 1321-74; renumbered Title I Pub.L. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327; amended Pub.L. 104-193, Title III, § 374(a), Aug. 22, 1996, 110 Stat. 2255; Pub.L. 105-244, Title IX, § 971(a), Oct. 7, 1998, 112 Stat. 1837; Pub.L. 107-204, Title VIII, § 803, July 30, 2002, 116 Stat. 801; Pub.L. 109-8, Title II, §§ 215, 220, 224(c), Title III, §§ 301, 310, 314(a), Title IV, § 412, Title VII, § 714, Title XII, §§ 1209, 1235, Title XIV, § 1404(a), Title XV, § 1502(a)(2), Apr. 20, 2005, 119 Stat. 54, 59, 64, 75, 84, 88, 107, 128, 194, 204, 215, 216; Pub.L. 111-327, § 2(a)(18), Dec. 22, 2010, 124 Stat. 3559.)

[FN1] Dollar amount as adjusted by the Judicial Conference of the United States. See Adjustment of Dollar Amounts notes set out under this section and 11 U.S.C.A. § 104.

Amendments by Pub.L. 109-8, Title XIV, effective, except as otherwise provided, on Apr. 20, 2005, and applicable only with respect to cases commenced under Title 11 on or after Apr. 20, 2005, see Pub.L. 109-8, § 1406, set out as a note under 11 U.S.C.A. § 507.

Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 112-54 (excluding P.L. 112-40) approved 11-12-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

11 U.S.C.A. § 523                                                                                    Page 6

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.







**Effective:[See Notes]**

United States Code Annotated Currentness
    Title 28. Judiciary and Judicial Procedure (Refs & Annos)
        Part IV. Jurisdiction and Venue (Refs & Annos)
            Chapter 85. District Courts; Jurisdiction (Refs & Annos)
            ➡ ➡ **§ 1334. Bankruptcy cases and proceedings**

**(a)** Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

**(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

**(c)(1)** Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**(2)** Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

**(d)** Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

**(e)** The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

    **(1)** of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

    **(2)** over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 931; Nov. 6, 1978, Pub.L. 95-598, Title II, § 238(a), 92 Stat. 2667; July 10, 1984, Pub.L. 98-353, Title I, § 101(a), 98 Stat. 333; Oct. 27, 1986, Pub.L. 99-554, Title I, § 144(e), 100 Stat. 3096; Dec. 1, 1990, Pub.L. 101-650, Title III, § 309(b), 104 Stat. 5113; Oct. 22, 1994, Pub.L. 103-394, Title I, § 104(b), 108 Stat. 4109; Apr. 20, 2005, Pub.L. 109-8, Title III, § 324(a), Title VIII, § 802(c)(2), Title XII, § 1219, 119 Stat. 98, 145, 195.)

2005 Acts. Pub.L. 109-8, Title III, § 324(b), Apr. 20, 2005, 119 Stat. 98, provided that: "This section [amending subsecs. (b) and (e) of this section] shall only apply to cases filed after the date of enactment of this Act [Apr. 20, 2005]."

Except as otherwise provided, amendments by Pub.L. 109-8 effective 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 112-54 (excluding P.L. 112-40) approved 11-12-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Westlaw.

76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.)))**

**C**

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA4 Rule 32.1.

United States Court of Appeals, Fourth Circuit.
Earnest E. HALL, Jr.; Jean T. Hall, Plain-
tiffs-Appellees,
v.
Walter W. DAVENPORT, Defendant-Appellant.

No. 95-1359.
Argued: December 7, 1995.
Decided: January 30, 1996.

W.D.Va.

AFFIRMED.

Appeal from the United States District Court for the Western District of Virginia, at Lynchburg. Jackson L. Kiser, Chief District Judge. (MC-94-7-L, BK-88-1156)
**ARGUED:** John Leyburn Mosby, Jr., J. Leyburn Mosby, Jr., P.C., Lynchburg, VA, for Appellant. Stephen Alan Chaplin, Chaplin, Papa & Gonet, Richmond, VA, for Appellees.

Before HALL and HAMILTON, Circuit Judges, and THORNBURG, United States District Court Judge for the Western District of North Carolina, sitting by designation.

OPINION
PER CURIAM:
**\*1** In November 1970, defendant Walter W. Davenport and wife purported to convey to plaintiffs by warranty deed a tract of land containing 120.7 acres. In 1987, the commissioner in chancery for Circuit Court of the County of Cumberland, Virginia, determined that the defendant was seized of only a one-half interest in the subject property at the time of conveyance. This determination was affirmed by the Circuit Court of the County of Cumberland, Virginia, in the same cause. Plaintiffs then demanded judgment

for $6,250 (one-half of the purchase price) plus interest and costs.

In October 1988, before conclusion of plaintiffs' action, defendant Davenport filed a Chapter 7 voluntary petition in bankruptcy in the United States Bankruptcy Court for the Western District of Virginia listing plaintiffs' claim of $6,250 as disputed. On January 30, 1989, plaintiffs filed a complaint to determine the dischargeability of debts pursuant to 11 U.S.C. § 523(a)(2)(A). In the "dischargeability" action, plaintiffs sought recovery of $6,250, plus interest, costs, and attorneys fees, as well as punitive damages for breach of fiduciary duty and fraud. On December 21, 1989, the bankruptcy judge in a memorandum opinion found the defendant acted fraudulently when he conveyed the property to the Halls. "Thus, the debt owed to them of $6,250 plus interest is nondischargeable." By Order of the same date it was, "Adjudged and Ordered that the debt of $6,250 plus interest at the legal rate from November 10, 1970 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). "

The foregoing order was filed as a judgment lien in the Circuit Court of Cumberland County, Virginia, on March 15, 1993.

In 1994, defendant filed in the Circuit Court for the County of Cumberland, Virginia, a bill to remove cloud on title to real estate and for declaratory judgment striking the bankruptcy court order and declaring any resulting lien to be invalid. The bill also correctly alleged that the proceeds from a land sale by defendant in the amount of $40,000 was being held in escrow by Southern Title Insurance Company pending final determination of lien status. After a December 1, 1994, hearing on the bill, the Circuit Court judge for the County of Cumberland, Virginia, entered an order on December 31, 1994, as follows:

[The order of the Bankruptcy Court Judge] is not a money judgment and not a lien upon any real property formerly, now or hereafter, owned by Walter W. Davenport.

It is further ordered that this cause is stricken from

76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
(Cite as: 76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.)))

the docket.

Based on the bankruptcy court order however, on December 19, 1994, the Clerk of the United States District Court for the Western District of Virginia, Lynchburg Division, had issued a garnishment summons to Southern Title Insurance Corporation, garnishee, for judgment principal in the amount of $6,250, interest in the amount of $13,544.50, and judgment costs of $120, for a total of $19,914.50.

After hearing on motion to quash garnishment filed by the defendant, the Chief Judge for the United States District Court for the Western District of Virginia, Lynchburg Division, found the bankruptcy court's order of December 21, 1989, to be a judgment for the payment of money sufficient to invoke Rule 69(a) of the Federal Rules of Civil Procedure, and ordered that the motion to quash garnishment summons be denied. From this order of February 13, 1995, the defendant appeals. For the reasons set forth below, we affirm the district court.

**I.**

**\*2** This court will first address the plaintiffs-appellees' contention that the district court order of February 13, 1995, was not a final order from which an appeal could be taken; and therefore, that this court has no jurisdiction to consider the lower court's ruling. This contention is without merit.

The order of the district court entered February 13, 1995, finally disposes of all matters in controversy to be adjudicated between the parties. 28 U.S.C. § 1291; *United States v. al Con Dev. Corp.*, 271 F.2d 901 (4th Cir.1959). The order "disposes of the whole subject, gives all the relief contemplated, provides with reasonable completeness for giving effect to the [judgment order of the bankruptcy court], and leaves nothing to be done in the cause save to superintend ministerially the execution of the order." *Burns v. Equitable Ass'n*, 265 S.E.2d 737, 742 (Va.1980).

On March 31, 1995, the district court did in fact enter two additional orders relating to this case. The first March 31 order was simply an order of garnishment entered by the court pursuant to its final order determining that garnishment summons was valid. The second March 31 order, agreed to by the parties, stayed execution of the garnishment order pending a decision by this court. The two orders entered by the

district court on March 31, 1995, did nothing more than "superintend ministerially the execution of the [February 13, 1995] order." *Id.* For this court to rule that either March 31 order was the "final decision" from which the appeal should have been taken would represent a technical approach to finality and ignore the practical effect and substance of the lower court's February 13, 1995, ruling.

**II.**

We next address the defendant-appellant's contention that the district court was bound by the decision of the Circuit Court for the County of Cumberland, Virginia, which held that the order of the bankruptcy court judge was not a money judgment and, therefore, not enforceable against the defendant.

In support of this contention, defendant relies on 28 U.S.C. § 1738 which provides that state "judicial proceedings ... shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such state...." In short, defendant contends the state circuit court order is entitled to full faith and credit by the federal district court. To further support his contention that this case is controlled by the full faith and credit doctrine, defendant cites a variety of state and federal cases dealing with its application. Suffice it to say that neither cited authority supports a state court's right to void the enforcement of the final judgment of a federal court.

In voicing his contention, defendant ignores the significance and consequences of the federal bankruptcy court order of December 21, 1989, which "Adjudged and Ordered that the debt of $6,250 plus interest at the legal rate from November 10, 1970," was due and owing to plaintiffs. As concluded by the district court, this order constituted an enforceable "judgment for the payment of money" entered by a federal court. Therefore, under Rule 69(a), the federal district court could and should enforce the judgment. The fact that the order lacked the word "judgment" and may not have complied with Virginia code provisions relating to recordation, Va.Code Ann. § 8.01-446 or § 8.01-466, did not oust a federal court's jurisdiction to enforce its own judgments. *Duchek v. Jacobi*, 646 F.2d 415, 418-19 (9th Cir.1981). The fact that the bankruptcy court order had initially been docketed in Cumberland County, Virginia, and was later stricken, did not preclude the supplementary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.)))**

proceedings initiated by plaintiffs in federal district court in aid of execution of that order. *Meridian Investing & Dev. Corp. v. Suncoast Highland Corp.,* 628 F.2d 370, 372 (5th Cir.1980); *Atlantic Purchasers, Inc. v. Aircraft Sales, Inc.,* 101 F.R.D. 779, 782 (W.D.N.C.1984); 12 Wright & Miller, *Federal Practice and Procedure,* § 3013. Nor is there reason to doubt that bankruptcy courts have the authority to enter money judgments. *In re Harris,* 162 B.R. 466, 468-69 (E.D.Va.1993). The order uses the word "adjudged." Adjudge means, in the context of the order, "to pass on judicially, to decide, settle or decree ... [the] judgment of a court of competent jurisdiction. Implies a judicial determination of a fact, and the entry of a judgment." *Black's Law Dictionary* 42 (6th ed.1990). The order also names the parties, recites the amount of the obligation and refers to it as Davenport's "debt," recites the interest rate and date from which interest is due, and declares the debt to be nondischargeable. Surely to be nondischargeable, the court must have found a debt to be due and owing. All of these indicia support the lower court's ruling that a final judgment has been entered. Further help may be garnered by reference to Rule 54(a) of the Federal Rules of Civil Procedure which defines judgment as "a decree and any order from which an appeal lies." Obviously, the December 21, 1989, order of the bankruptcy court could have been appealed to the district court, thus bringing the order within the rule's definition of judgment.

   **\*3** As observed in the opening paragraph of this opinion, the case had its genesis in the warranted transfer of title to real property 25 years ago. The title was defective and so declared by court order in 1987. Defendant's actions relating to the land transaction were found to be fraudulent by the bankruptcy court in 1989. The defendant has consistently refused to compensate plaintiffs for his wrongful act. The matter should be laid to rest. While the bankruptcy court's order could have been stated with more clarity, its intent is obvious. A money judgment was awarded plaintiffs. Therefore, the district court was correct in making that determination.

   *AFFIRMED*

C.A.4 (Va.),1996.
Hall v. Davenport
76 F.3d 372, 1996 WL 34674 (C.A.4 (Va.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



**A-9**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-60748-Civ-SCOLA

IN RE: ROTHSTEIN ROSENFELDT
ADLER, P.A.,

      Debtor.

_____ /

HERBERT STETTIN, as Trustee,

      Plaintiff,

v.

GIBRALTAR PRIVATE BANK
& TRUST COMPANY,

      Defendant.

_____/

## ORDER WITHDRAWING THE
## REFERENCE TO BANKRUPTY COURT

THIS MATTER is before the Court following an independent review of the record.

On July 14, 2011, the Court entered an Order [ECF No. 10] granting the Motion to Withdraw the Reference to Bankruptcy Court filed by Gibraltar Private Bank & Trust, Co. ("Gibraltar") [ECF No. 1]. The Court's Order withdrew the reference to the bankruptcy court for purposes of trial, but left in place the reference as to all other matters, including dispositive pre-trial motions. Thereafter, Gibraltar filed a motion [ECF No. 11] seeking reconsideration of the Order based upon the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), which Gibraltar contends precludes the bankruptcy court from adjudicating case dispositive motions. As such, Gibraltar sought a new order withdrawing the reference as to trial *and* pre-

trial dispositive motions.  On August 10, 2011, the Court entered an Order [ECF No. 12] vacating its prior Order [ECF No. 10] in light of the *Stern* decision and Gibraltar's request for reconsideration.  The Court did not, however, enter any superseding order resolving the question of *Stern*'s application here.  Following transfer of this case to the undersigned, the Court has carefully reviewed and considered the record, the pertinent filings, and applicable case law.

In *Stern*, "[t]he Supreme Court merely held that Congress exceeded its authority under the Constitution in one isolated instance by granting bankruptcy courts jurisdiction to enter final judgments on counterclaims that are not necessarily resolved in the process of ruling on a creditor's proof of claim."  *See In re Safety Harbor Resort & Spa*, 456 B.R. 703, 705 (Bankr. M.D. Fla. 2011).  As a number of courts have recognized recently, *Stern* issued a very narrow, case specific holding.  *See, e.g.*, *In re Peacock*, 455 B.R. 810, 812 (Bankr. M.D. Fla. 2011) ("This holding is limited to precisely those facts: 'We conclude today that Congress, in one isolated respect, exceeded that [Article III] limitation[.]' . . . The present adversary proceeding does not involve resolution of a state law counterclaim, so *Stern* does not supply the rule of decision on the Motion."); *In re Safety Harbor Resort & Spa*, 456 B.R. at 705 ("The Supreme Court's holding in *Stern* was very narrow."); *see also In re BankUnited Fin. Corp.*, 2011 WL 5884925, at *4 (Bankr. S.D. Fla. Nov. 23, 2011) ("I am not going to be one of those bankruptcy judges who seizes on, and seeks to analyze, every line in the *Stern* opinion to determine what ripples may emerge from the self-described isolated pebble dropped in the jurisdictional waters.  I agree with Judge Williamson's opinion in *In re Safety Harbor Resort and Spa*, 456 B.R. 703, 718 (Bankr. M.D. Fla. 2011) – '[t]he Supreme Court does not ordinarily decide important questions of law by cursory dicta.'  As a bankruptcy court, I will not [make decisions] based on extrapolations of what the Chief Justice took great pains to emphasize is the

narrow holding of *Stern*.").  Indeed, the Court itself was quick to emphasize that "the question presented here is a 'narrow' one" and "our decision today does not change all that much" in bankruptcy law.  *See Stern*, 131 S. Ct. at 2620.

Nevertheless, given *Stern*'s relatively new vintage and the uncertainties concerning the full extent of its applications, *see, e.g.*, *In re BankUnited Fin. Corp.*, 2011 WL 5884925, at *3 ("Since its release, a maelstrom of opinions and articles have been written about the scope of *Stern*, ranging in tone from 'much ado about nothing' to 'the end of the bankruptcy world as we know it.'"), the Court will withdraw the reference as to any case dispositive motions.  Pursuant to 28 U.S.C. § 157(c)(1), however, all such motions shall be referred to the bankruptcy court for proposed findings of fact and conclusions of law.  This procedure strikes an appropriate balance of the interests at stake, while also respecting the self-described narrowness of the Supreme Court's decision in *Stern*.  *See In re Wilderness Crossings, LLC*, 2011 WL 5417098, at *2 (Bankr. W.D. Mich. Nov. 8, 2011) ("Our common law tradition counsels in favor of hewing closely to the holdings of higher authority and although the multifarious rationales in *Stern* are quite broad, the holding is mercifully narrow."); *In re Bujak*, 2011 WL 5326038, at *2 (Bankr. D. Idaho Nov. 3, 2011) ("Despite what the majority actually said in *Stern*, some insist that the decision foretells a jurisdictional Armageddon for the bankruptcy courts.  This Court disagrees. It instead chooses to believe the Supreme Court's own assessment of the decision's impact, and discounts those who argue that the sky is falling.  While the Supreme Court in the future may explain its decision, and could conceivably expand the reach of *Stern*'s constitutional analysis, . . . this Court need not do so.  Instead of attempting to predict the future, this Court should carefully apply *Stern*'s holding in its cases, and refrain from extending that holding to facts different from those in *Stern*.").

Accordingly, it is hereby **ORDERED and ADJUDGED** as follows:

1.      The bankruptcy reference is withdrawn insofar as it includes a reference for trial on any legal or factual issues and causes of action.  If and when this proceeding becomes ready for trial, the bankruptcy court shall promptly so notify this Court.  Subsequently, once this matter has been placed on the Court's trial calendar, the bankruptcy court shall transfer the proceeding for jury trial before the undersigned United States District Judge.

2.      The bankruptcy reference is also withdrawn as to all case dispositive motions.  Pursuant to 28 U.S.C. § 157(c)(1), however, the undersigned hereby refers all such motions to the bankruptcy court for proposed findings of fact and conclusions of law.

3.      The bankruptcy court reference is affirmed in all other respects.  Therefore, the bankruptcy court shall have the authority and responsibility to conduct, hear, and rule upon all other pretrial matters.

4.      It is further ordered that this case shall be administratively **CLOSED** pending further pretrial proceedings before the bankruptcy court.

**DONE and ORDERED** in chambers at Miami, Florida, this 28th day of November 2011.

**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Bankruptcy Court
Designated Magistrate Judge
Counsel of record

**A-10**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

CASE NO. 11-60400-CIV-JORDAN

HERBERT STETTIN,                          )
                    Plaintiff             )
                                          )
vs.                                       )
                                          )
CENTURION STRUCTURED GROWTH               )
LLC, et al.,                              )
                                          )
                    Defendants            )
_____   )

**ORDER GRANTING IN PART MOTION TO WITHDRAW REFERENCE AND CLOSING CASE**

For the reasons stated below, the defendants' motion to withdraw the reference [D.E. 1] is
GRANTED IN PART.

## I. BACKGROUND

On January 25, 2010, Scott Rothstein pled guilty to various charges arising from his
involvement in a multi-million dollar Ponzi scheme operated through his law firm, Rothstein
Rosenfeldt Adler, P.A. (the law firm). Mr. Rothstein's scheme primarily involved the solicitation
of investments in and sale of fraudulent and fictitious confidential structured settlements purportedly
between the law firm's clients and third parties.

The scheme operated from 2005 through 2009. In order to pay off earlier investors, Mr.
Rothstein began soliciting investments from hedge funds and "feeder funds" in 2008. He began using
several entities, including entities under the "Banyon" umbrella (the Banyon entities), to solicit these
investments. The defendants in this proceeding are hedge funds which loaned the Banyon entities
funds to purchase the law firm's settlements.

Shortly after the scheme collapsed, on November 10, 2009, a group of creditors filed an
involuntary petition for reorganization against the law firm pursuant to Chapter 11 in the United
States Bankruptcy Court in the Southern District of Florida. By order dated November 20, 2009,
Herbert Stettin was appointed as trustee for the defunct law firm.

When the scheme collapsed, the Banyon entities defaulted on their loans with the defendants.

At the time of default, the defendants had repaid approximately $420 million of the approximately $443 million they had advanced the Banyon entities to purchase the settlements. In order to protect their collateral interest in the entities and pursuant to certain loan and security agreements entered into with those entities, the defendants, acting as attorneys-in-fact, filed proofs of claim on behalf of the respective entities against the bankruptcy estate.

On December 20, 2010, Mr. Stettin filed this adversary proceeding against the defendants seeking to avoid and recover purported fraudulent transfers and other related relief. The defendants now move to withdraw the reference of the adversary proceeding in its entirety pursuant to 28 U.S.C. § 157(d), which provides that a district court may withdraw the reference of a proceeding "for cause shown." The defendants argue that cause exists to withdraw the reference because they are entitled to a jury trial under the Seventh Amendment on the claims asserted against them in the adversary proceeding and have not consented to trial before the bankruptcy court. In response, the trustee argues that no cause exists to withdraw the reference because the defendants have by their conduct consented to proceeding before the bankruptcy court and waived their right to a jury trial. The trustee also argues that if the motion to withdraw is granted, complete withdrawal is not appropriate and that the reference should remain in place for all pretrial matters.

## II. ANALYSIS

The reference to a bankruptcy court may be withdrawn under certain circumstances:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d). Although withdrawal may be permissive or mandatory, the parties have briefed the motion solely on the basis of permissive withdrawal, which requires that "cause" be shown.

"Cause" is not defined in the statute, but the Eleventh Circuit has stated that it "is not an empty requirement" and directed that a court should consider "'such goals as advancing uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process.'" *In re Simmons*, 200 F.3d 738,

2

741 (11th Cir. 2000) (quoting *In re Parklane/Atlanta Joint Venture*, 927 F.2d 532, 536 n.5 (1991)). "Additional factors that may be considered include: (1) whether a claim is core or non-core; (2) efficient use of judicial resources; (3) a jury demand; and (4) prevention of delay." *In re Tousa, Inc.*, Case. No 10-60206, 2010 WL 1644456 at * 3 (S.D. Fla. Apr. 19, 2010). "One circumstance where courts have found good cause to withdraw a reference is where a party has a right to a jury trial as to a pending issue and refuses, as it may, to have the bankruptcy court conduct the jury trial." *Container Recycling Alliance v. Lassman*, 359 B.R. 358, 360 (D. Mass. 2007).

In *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58 (1989), the Supreme Court held that a defendant who has not submitted a claim against a bankruptcy estate has a Seventh Amendment right to a jury trial when sued by a trustee for fraudulent conveyance.. Where, however, a creditor files a claim against an estate and is later sued by the trustee in a fraudulent conveyance action, the creditor is deemed to have submitted itself to the bankruptcy court's equity jurisdiction and loses its Seventh Amendment right to a jury trial. *See Langenkap v. C.A. Culp*, 498 U.S. 42, 44 (1991). The Supreme Court reasoned that filing a claim against the estate "triggers the process of allowance and disallowance of claims" and a subsequent adversary action by the trustee against the creditor "becomes part of the claims-allowance process which is triable only in equity." *Id.* (internal quotations omitted). "In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*." *Id.* (emphasis in original).

The trustee does not dispute that the defendants are entitled to a jury trial on the claims asserted in this adversary proceeding. Instead, the trustee contends that, by filing the proofs of claim on behalf of the Banyon entities, the defendants have submitted themselves to the bankruptcy court's equity jurisdiction and the defendants are no longer entitled to a jury trial under the Seventh Amendment. I disagree.

The proofs of claim at issue were filed on behalf of the Banyon entities and were based solely on claims the Banyon entities had against the estate. Each Banyon entity was listed as the "creditor" on the respective claims and the addenda annexed to those claims expressly stated that the claim was being asserted only on behalf of that entity and was not to be construed as a claim by any other party. Indeed, any distribution made pursuant to the claims would have been made to the Banyon entity as

creditor, not to the defendant that filed the claim as attorney-in-fact. The mere fact that the defendants may be entitled to any distributions received by the Banyon entities from the estate as a result of security agreements entered between the parties before the law firm's bankruptcy does not transform a claim by a Banyon entity into one by the defendants acting on its behalf.

The defendants have neither filed nor otherwise asserted any claim against the estate or the disputed *res*. Accordingly, the trustee's fraudulent conveyance action cannot be considered part of the claims adjudication process or integral to the restructuring of debtor-creditor relations. As a result, I find that the defendants have not submitted themselves to the jurisdiction of the bankruptcy court or lost their Seventh Amendment right to a jury trial in this adversary proceeding by filing the proofs of claim on behalf of the Banyon entities.

Likewise, the trustee's argument that the defendants impliedly consented to the bankruptcy court's jurisdiction and waived their right to a jury trial by seeking other "affirmative relief" is without merit. In this regard, the trustee first argues that the defendants have consented to proceeding before the bankruptcy court by objecting to the term sheet entered between the trustee, the Banyon entities, and the Banyon entities' owners. Specifically, the defendants objected to the entry of an injunction prohibiting the Banyon entities or their owners from transferring any funds derived from the ponzi scheme on the grounds that the defendants' claims to the Banyon assets were superior to the claims of the trustee. The trustee contends that by objecting to the term sheet the defendants asserted claims against the assets of the of the bankruptcy estate. In addition, the trustee states that defendants sought relief from the bankruptcy court by objecting to the trustee's settlement with the law firm's accountant and seeking disqualification of the trustee's counsel in prosecuting the settlement with the accountant. I disagree with trustee's contention that these actions constitute claims against the bankruptcy estate or otherwise extinguish the defendants' right to trial by jury. *See In re Wolverine, Proctor & Schwartz, LLC*, 404 B.R. 1, 5 (D. Mass. 2009) (holding that defendants' prior involvement in bankruptcy proceedings did not invoke the equitable jurisdiction of the bankruptcy court so as to eliminate the right to jury trial where the prior actions could not be classified as claims against the estate).

Accordingly, cause exists for the withdrawal of the reference, *see* 28 U.S.C. § 157(d), but I do not find that complete withdrawal is appropriate at this time. The bankruptcy court will continue

4

to handle all pretrial matters. *See, e.g., Stein v. Miller*, 158 B.R. 876, 880 (S.D. Fla. 1993); *In re Nichols & Associates Tryon Properties, Inc.*, No. 93-1753, 36 F.3d 1093, 1994 WL 502026, *4 (4th Cir. 1994). However, in an abundance of caution, in light of the Supreme Court's recent opinion in *Stern v. Marshall*, 131 S.Ct. 2594 (2011), and the uncertainties concerning the extent of its application, all dispositive motions shall be referred to the bankruptcy court only for report and recommendation.

### III. CONCLUSION

This case is CLOSED. When a report and recommendation is issued or the case is ready for trial the parties shall open a new case in the district court and attach a copy of this order.

DONE and ORDERED in chambers in Miami, Florida, this 19th day of December, 2011.

Adalberto Jordan
United States District Judge

Copy to:        All counsel of record

**A-11**



Bankruptcy Law Letter
April 2009

Bankruptcy Court Jurisdiction to Enter a Money Judgment on a Nondischargeable Debt: Exposing *Pacor*'s Deficiencies and the True Supplemental Nature of Third-Party "Related To" Bankruptcy Jurisdiction

*By Ralph Brubaker*

With the Fifth Circuit's recent decision in *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, [FN1] all circuit courts of appeals to address the issue have uniformly concluded that a bankruptcy court hearing a creditor's nondischargeability action against an individual debtor not only has jurisdiction to (i) declare the debt nondischargeable pursuant to Code § 523 but also has jurisdiction to (ii) liquidate and enter a money judgment against the debtor on the underlying debt.

Given the courts of appeals' unanimity, it might seem that the *Morrison* decision hardly warrants note, let alone an extended discussion occupying an entire issue of *Bankruptcy Law Letter*. Resolution of this jurisdictional issue, though, has not proved to be such a straightforward matter for the lower courts. Moreover, the significance of these decisions lies beyond their bare holdings in what those holdings reveal for a host of other jurisdictional quandaries for which there is rampant confusion and disagreement.

As the Fifth Circuit openly acknowledged in *Morrison*, a bankruptcy court's jurisdiction to enter a money judgment on a nondischargeable debt cannot be reconciled with any of the prevailing "tests" for the existence of federal bankruptcy jurisdiction. Most notably, because the outcome of the creditor's action against the debtor on the underlying nondischargeable debt can have no conceivable effect on the debtor's bankruptcy estate, it should not be considered "related to" the debtor's bankruptcy case under the (seemingly) accepted *Pacor* test. Indeed, since bankruptcy courts' jurisdiction to enter a money judgment on a nondischargeable debt can only be explained by principles of supplemental jurisdiction, the circuit courts' uniform approval of this jurisdiction is both a sub rosa repudiation of *Pacor* and an implicit (if grudging) acceptance of the notion that third-party "related to" bankruptcy jurisdiction is simply a codification of conventional principles of supplemental jurisdiction.

### *In re Morrison*: A $550,000 Nondischargeable Fraud Debt

*Morrison* involved a dischargeability action under Code § 523(a)(2)(B) for a debt incurred through a fraudulent financial statement. David Wilson Morrison was the President and principal shareholder of Morrison Excavation, Inc. In February 2002, Morrison's accountant and financial advisor informed Morrison that his company was in serious financial trouble. Shortly thereafter, Morrison Excavation submitted a bid for an excavation subcontract to Western Builders. Contemporaneous with this subcontract bid, the Morrison Excavation bookkeeper discovered an accounting error that had overstated the company's accounts receivable by approximately $875,000, and after the appropriate downward adjustment, Morrison Excavation's own financial statements would indicate that the company was insolvent. In response to the Morrison Excavation subcontract bid, Western Builders requested a copy of Morrison Excavation's financial statements, and Morrison sent Western Builders a copy that still reflected the erroneously inflated value of accounts receivable, knowing that the stated accounts receivable figure was incorrect.

In early March 2002, Morrison Excavation and Western Builders entered into a contract for Morrison Excavation to do the specified excavation work. In late March, Western Builders began making advance payments under the contract, at the request of Morrison, to permit payment of Morrison Excavation's subcontractors and suppliers. Mor-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

rison, though, did not fully pay all of those accounts, resulting in mechanics' liens against the construction site. At this same time, Morrison used corporate funds of Morrison Excavation to pay off his personal home equity loan, and he also gave himself a substantial pay raise. By August, Morrison Excavation had abandoned the Western Builders job, leaving Western Builders to pay all amounts necessary to extinguish the mechanics' liens attributable to Morrison Excavation's work. Western Builders was also forced to hire a new contractor to finish the excavation work at a contract price in excess of half a million dollars more than the Morrison Excavation contract price.

Morrison filed an individual Chapter 7 petition in 2004. In that Chapter 7 case, Western Builders commenced an adversary proceeding against Morrison, contending that Morrison was personally liable to Western Builders for fraud and seeking to have Morrison's fraud debt to Western Builders declared nondischargeable under Code § 523(a)(2)(B). After trial, the bankruptcy court concluded that Morrison was, indeed, personally liable to Western Builders for his own fraudulent conduct, regardless of the fact that his actions were those of an agent being taken on behalf of his corporate principal, Morrison Excavation. [FN2] The bankruptcy court also concluded that Morrison's knowing submission to Western Builders of a materially false financial statement rendered his fraud debt to Western Builders nondischargeable pursuant to Code § 523(a)(2)(B). Thus the bankruptcy court entered a money judgment for Western Builders against Morrison in the amount of Western's established damages, $549,773.63. [FN3]

Both the district court and the Fifth Circuit affirmed, but the Fifth Circuit, sua sponte, raised and asked for supplemental briefing on the issue of the bankruptcy court's jurisdiction to do anything more than simply declare Morrison's fraud debt to Western Builders nondischargeable (i.e., the bankruptcy court's jurisdiction to liquidate and enter a money judgment against Morrison on the underlying debt). While ultimately affirming the bankruptcy court's jurisdiction to liquidate and enter a money judgment on the nondischargeable debt, Judge Edith Jones's opinion for the Fifth Circuit panel thoughtfully raises (but without resolving) all of the contradictions that this holding exposes in extant bankruptcy jurisdiction jurisprudence. [FN4]

**Statutory Bankruptcy Jurisdiction**

**"Arising Under," "Arising In," and "Related To" Proceedings**
Judge Jones began by noting that bankruptcy jurisdiction, like all other federal jurisdiction, is limited and must be affirmatively granted in a congressional statute. Congress's grant of bankruptcy jurisdiction to the federal courts is contained in the following provision of the Judicial Code:

(b) ...notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to [bankruptcy] cases under title 11. [FN5]
Thus the statute's three jurisdictional nexuses--"arising under," "arising in," and "related to" proceedings--collectively constitute the full measure of federal bankruptcy jurisdiction.

**A Dischargeability Declaration Is an "Arising Under" Proceeding**
The most elementary aspect of federal bankruptcy jurisdiction is the power to entertain all civil proceedings "arising under" the Bankruptcy Code. This "arising under" bankruptcy jurisdiction was designed to replicate general federal question jurisdiction where the source of federal law under which a claim is made is the federal Bankruptcy Code. [FN6]

When a particular creditor objects to discharge of its debt, asserting that the debt is one excepted from the discharge pursuant to Code § 523, the parties to that action are the creditor and the individual debtor; the bankruptcy estate is not a party. [FN7] Nonetheless, since the bankruptcy discharge is solely a creature of the federal Bankruptcy Code, the nondischargeability action is within both statutory and constitutional "arising under" jurisdiction. As Judge Jones noted in *Morrison*, then, the "arising under" statutory nexus clearly provides bankruptcy jurisdiction over a

creditor's request to have a debt declared nondischargeable:

> Western Builders' claim for a declaration of nondischargeability... "is, without question, a constitutional and statutory federal question claim 'arising under' the Bankruptcy Code, because the bankruptcy discharge is relief established by federal bankruptcy law and section 523 expressly authorizes such a declaration regarding the effect of the federal bankruptcy discharge." [FN8]

Once a particular debt is declared nondischargeable, finding an appropriate basis for federal bankruptcy jurisdiction to then liquidate and enter a money judgment on that debt, though, proves much more elusive using the dominant judicial interpretations of the scope of the statutory jurisdictional nexuses. Moreover, the need to find an express statutory jurisdictional basis for such a federal-court money judgment is nicely illustrated by the historical evolution of dischargeability determinations in federal court.

## A World Without Dischargeability Determinations in Federal Bankruptcy Court

Although a good deal, if not the bulk, of litigation to determine whether a particular debt is subject to a statutory discharge exception now occurs in federal bankruptcy court, historically, such dischargeability litigation did not and could not occur in the federal bankruptcy court granting the debtor a discharge. "The rule was that the bankruptcy court which granted a discharge had no residuary power to adjudge its effect upon any particular claim which might later be asserted against the debtor." [FN9] Rather, the discharge merely provided the debtor with an affirmative defense to be pled in any creditor's subsequent action to enforce a discharged debt in a nonbankruptcy court, typically a state court.

It was only in that collateral litigation, then, that the debtor or a creditor could obtain a judicial determination as to whether the debt was subject to a statutory discharge exception. The established practice with respect to such dischargeability issues was that "this question was for the determination of the court," typically a state court, "where an action upon the debt is brought." [FN10] "The lower federal courts were clear that... once the discharge was granted its effect on any particular creditor's claim was to be determined by the non-bankruptcy court in which the creditor attempted to enforce the claim." [FN11] Thus neither the debtor nor a creditor could "pray, in the bankruptcy, for a determination of the question of whether [a] particular debt will be barred by the discharge." [FN12]

## The Origins of Dischargeability Determinations in Federal Bankruptcy Court: From *Local Loan Co. v. Hunt* to the 1970 Discharge Amendments

### After Local Loan Co. v. Hunt: No Jurisdiction to Enter a Money Judgment on a Nondischargeable Debt

Federal bankruptcy courts' authority to make individualized dischargeability determinations was ushered in (indirectly) by the Supreme Court's 1934 decision in *Local Loan Co. v. Hunt*. [FN13] *Local Loan* authorized federal bankruptcy courts, in "unusual circumstances," to affirmatively enjoin creditors' collection actions in violation of a debtor's discharge decree. Moreover, and as an incident thereto, many federal courts found in the doctrine of *Local Loan* the authority to issue declarations as to the dischargeability of particular debts as a necessary prerequisite to such an injunction. [FN14] These same courts, though, refused to liquidate nondischargeable debts and enter money judgments against debtors for lack of federal jurisdiction. [FN15]

Thus the federal courts have always considered the dischargeability issue to be an independent jurisdictional "claim" distinct from the creditor's claim on the underlying debt. Therefore, a federal bankruptcy court's entry of a money judgment on the underlying debt can only be premised upon an affirmative grant of jurisdiction therefor and cannot be considered part and parcel of federal jurisdiction over the dischargeability determination. Such a jurisdictional grant was forthcoming in the 1970 discharge amendments to the Bankruptcy Act of 1898.

### After the 1970 Discharge Amendments: Specific Express Jurisdiction to Enter a Money Judgment on a Nondischargeable Debt

In 1970, Congress amended the Bankruptcy Act of 1898 to expressly codify not only a statutory discharge injunction but also the authority of federal bankruptcy courts to "determine the dischargeability of debts." [FN16] Moreover, in order to address concerns about multiplicity of suits in state and federal court, [FN17] those amendments further provided that "if any debt is determined to be nondischargeable, [the court] shall determine the remaining issues, render judgment, and make all orders necessary for the enforcement thereof." [FN18]

**After the 1978 Reform Act: ??**

The jurisdictional grant of the Bankruptcy Reform Act of 1978 providing for federal bankruptcy jurisdiction over all "arising under," "arising in," and "related to" proceedings was variously characterized as: "pervasive," [FN19] "complete," [FN20] "comprehensive," [FN21] "as broad [a] jurisdiction as possible," [FN22] and "as broad as can be conceived." [FN23] While not expressly providing authority for federal bankruptcy courts to render money judgments on nondischargeable debts, Congress clearly intended such authority to continue under the aegis of the Reform Act's pervasive federal bankruptcy jurisdiction.

The 1973 Commission's proposed bill would have explicitly provided for federal bankruptcy jurisdiction over "complaints requesting determination of the effect of a discharge, and seeking judgment on a debt excepted from discharge." [FN24] The Reform Act's simplified pervasive jurisdiction was designed to subsume "all items listed by the Bankruptcy Commission in its proposed bill... as well as all items that the bankruptcy courts are now able to bear [sic] under [1898] Act § 2a," including "determination of dischargeability of debts [and] liquidation of non-dischargeable debts." [FN25]

Judge Jones found this history persuasive as to congressional intent: "It is not unreasonable to conclude that Congress, which intended bankruptcy courts to exercise far more expansive jurisdiction under the Code than under previous law, could not have intended to cut back on their ability to enter money judgements in the... proceedings encompassed by non-dischargeability complaints." [FN26]

**Entering a Judgment on a Nondischargeable Debt Is Not an "Arising Under" or "Arising In" Proceeding**

Notwithstanding Congress's desire that the federal courts should have bankruptcy jurisdiction under the current statute, if we apply the prevailing jurisdictional tests to a creditor's request for a money judgment on a nondischargeable debt, we come to the inescapable conclusion that there is no federal bankruptcy jurisdiction. A nonbankruptcy/state-law claim on which a creditor seeks a money judgment obviously does not "arise under" the Bankruptcy Code. Furthermore, it does not "arise in" the bankruptcy case under the standard test for "arising in" proceedings.

An "arising in" proceeding has come to be considered one "that, by its nature, could arise only in the context of a bankruptcy case" or that "would have no existence outside of bankruptcy." [FN27] A creditor's claim on a nondischargeable debt cannot be an "arising in" proceeding under this test because the creditor's underlying claim against the debtor would exist in exactly the same form even in the absence of the debtor's bankruptcy filing. "Indeed, that is precisely the upshot of the determination of nondischargeability." [FN28] Thus if the claim on the underlying debt is within federal bankruptcy jurisdiction at all, it is because it is "related to" the debtor's bankruptcy case.

**Entering a Judgment on a Nondischargeable Debt Is Not a "Related To" Proceeding Under the Pacor Test**

"Related to" proceedings are of two types: (1) *Marathon*-like state-law actions by the bankruptcy estate against a third party are "related to" a debtor's bankruptcy case; [FN29] (2) third-party nonbankruptcy/state-law actions to which the bankruptcy estate is not party are also "related to" a debtor's bankruptcy case in certain circumstances. [FN30]

A creditor's request that the bankruptcy court, in addition to declaring a debt nondischargeable, also liquidate the debt and enter a money judgment on the debt against the individual debtor personally is "related to" the debtor's bankruptcy case only if it falls within the second category of "related to" proceedings. Although less obvious than

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

other third-party disputes, a state-law claim by or against an individual debtor personally is analytically identical to any other third-party state-law claim to which the federal bankruptcy estate is not a party. Any such third-party state-law dispute falls within federal bankruptcy jurisdiction only if it is "related to" the debtor's bankruptcy case in the necessary sense. [FN31]

The dominant test for the existence of third-party "related to" bankruptcy jurisdiction comes from the Third Circuit's (in)famous *Pacor* opinion: "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*." [FN32] Utilizing this *Pacor* test, we would have to conclude that a creditor's request for a money judgment on a nondischargeable debt is not "related to" the debtor's bankruptcy case.

Because the estate is not a party to the dischargeability proceeding, *Pacor* "teaches" us that the estate has no interest in the outcome of the creditor's claim against the debtor, as the estate would not be bound by any money judgment against the debtor [FN33] and could fully relitigate the creditor's claim against the estate in claims objection proceedings. [FN34] The only conceivable outcome-oriented effect on the estate from the creditor's claim against the debtor would be if the creditor is able to collect from the debtor personally before any bankruptcy distribution. This would reduce the creditor's claim against the estate to the benefit of all other creditors. [FN35] Yet, even this *Pacor*-like rationale for jurisdiction will usually be unavailable, as the vast majority of individual Chapter 7 filings are "no-asset" cases in which the filing and adjudication of creditors' claims against the estate is futile. [FN36] Moreover, even in asset cases, the remote contingency of collecting from a co-liable entity, thereby reducing a creditor's claim against the bankruptcy estate, does not perforce establish "related to" bankruptcy jurisdiction over the creditor's action against the co-debtor under *Pacor*. [FN37]

Thus the only demonstrable effect of any money judgment against the individual debtor would be to enhance the creditor's future ability to collect the nondischargeable debt from the debtor's postbankruptcy income and assets, with no evident effect at all on property of the bankruptcy estate or creditors' claims against the estate. Judge Jones in *Morrison* agreed:

> [T]he rendition of a monetary judgment in favor of the creditor on that debt... is not clearly related to the bankruptcy case or administration of the debtor's estate. Indeed, that portion of the judgment has, in the usual case, no bearing on the bankruptcy case because it requires the debtor to pay a single debt outside of, apart from, and even after the completion of bankruptcy, and it frees the creditor thereafter from limiting its collection efforts to those afforded by the bankruptcy system. [FN38]

Viewed through the lens of the *Pacor* test, then, a creditor's request to liquidate and enter a money judgment on a nondischargeable debt cannot be considered "related to" the debtor's bankruptcy case. Indeed, the courts that actually have confronted the jurisdictional issue with the announced standards have come to the same conclusion--there is no federal bankruptcy jurisdiction to enter a money judgment against an individual debtor on a nondischargeable debt. [FN39] Yet, the vast majority of bankruptcy courts routinely entertain creditor requests for money judgments on nondischargeable debts. [FN40] Moreover, every circuit to address the issue, including the Fifth Circuit in *Morrison*, has held that there is federal bankruptcy jurisdiction to liquidate and enter a judgment on a nondischargeable debt. [FN41] How could that be?

## Entering a Judgment on a Nondischargeable Debt Is a Proper Exercise of Supplemental Jurisdiction

The courts of appeals have, to date, uniformly concluded that there is federal bankruptcy jurisdiction to liquidate and enter a money judgment on a nondischargeable debt--not because of any effect on the bankruptcy estate à la *Pacor* but because of the close factual and logical relationship between the dischargeability proceeding and any proceeding on the underlying debt. Judge Jones's reasoning in *Morrison* is illustrative:

> The pragmatic reasoning adopted by most circuit courts is hard to contradict. Logically, the litigation to

prove nondischargeability also proves the basis for and amount of the debt. There would be no judicial effi-
ciency in requiring the beneficiary of a nondischargeability judgment to pursue a separate lawsuit in state or
federal court in order to secure a money judgment against the debtor... [E]ntry of judgment for the debt is proper
because the court actually determined "the existence and validity of the debt" in [the nondischargeability]
proceeding. [FN42]

This is, of course, quite unmistakably a conventional supplemental jurisdiction rationale which premises federal
jurisdiction over a claim for which there is no independent, freestanding basis for federal jurisdiction (i.e., the credi-
tor's underlying state-law claim against the debtor personally) upon a "common nucleus of operative fact" [FN43]
shared with another claim before the court for which there is an independent, freestanding basis for federal jurisdiction
(i.e., the creditor's nondischargeability claim). In fact, the circuit courts' opinions contain many veiled references to
principles of supplemental jurisdiction, [FN44] including reliance on one of the earliest progenitors of modern sup-
plemental jurisdiction principles, *Alexander v. Hillman*, [FN45] and the accompanying equitable maxim in which
principles of supplemental jurisdiction are rooted: complete disposition of an entire controversy. [FN46] As one
bankruptcy court decision, heavily relied upon in circuit court opinions, noted, "the well-known maxim that once
equitable jurisdiction has been properly invoked it will proceed to render a full and complete disposition of the con-
troversy," like supplemental jurisdiction, is grounded in notions of judicial economy and procedural convenience,
"prevent [ing] a duplication of effort and a multiplicity of suits." [FN47]

In other words, the rationale for federal jurisdiction is the same as that precipitating the 1970 discharge amend-
ments. It would be inconvenient and inefficient to require a separate action in state court to obtain a money judgment
on a debt declared nondischargeable, so the federal bankruptcy court has supplemental jurisdiction to entertain the
action on the underlying debt as an incident to its independent federal question jurisdiction over the dischargeability
action. [FN48] The action on the underlying debt is not "related to" the debtor's bankruptcy case because of any effect
on the debtor's bankruptcy estate; the action on the debt is "related to" the dischargeability proceeding, through a
conventional supplemental nexus. Indeed, the Ninth Circuit is now quite explicit in attributing bankruptcy jurisdiction
to enter judgment on a nondischargeable debt to "related to" jurisdiction and its fundamental character as a grant of
supplemental jurisdiction: "the bankruptcy court's 'related to' jurisdiction also includes the district court's supple-
mental jurisdiction." [FN49]

The immense judicial economy from adjudication of the creditor's underlying claim by the court hearing the
nondischargeability action is, of course, meaningless according to *Pacor*. Indeed, *Pacor* was quite emphatic that
third-party "related to" bankruptcy jurisdiction is not a form of supplemental jurisdiction: "[T]he mere fact that there
may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not
bring the matter within the scope of [third-party "related to" bankruptcy jurisdiction]. Judicial economy itself does not
justify federal jurisdiction." [FN50] The dischargeability decisions, therefore, are a tremendous embarrassment not
only for the *Pacor* test but also for *Pacor*'s disavowal of any role for supplemental jurisdiction principles in construing
the reach of "related to" bankruptcy jurisdiction. Both of these revealed *Pacor* flaws, of course, have implications well
beyond the dischargeability decisions themselves.

Recognizing the latter incongruity implicit in the Fifth Circuit's holding in *Morrison*, Judge Jones noted:

This court has... rejected supplemental jurisdiction for bankruptcy courts, *see Walker v. Cadle Co. (In re
Walker)*, 51 F.3d 562, 569 (5th Cir. 1995)... *Walker*, however, involved the question of supplemental jurisdic-
tion over a third-party claim, rather than what is considered here, the jurisdiction to enter complete relief be-
tween two parties on a claim. [FN51]

If "related to" bankruptcy jurisdiction is a grant of supplemental jurisdiction, though, which the dischargeability
decisions clearly suggest, this attempt to distinguish *Walker* fails because "related to" jurisdiction unquestionably
encompasses third-party claims, as the Supreme Court has acknowledged. [FN52]

As this Contributing Editor argued in the March 2007 issue of *Bankruptcy Law Letter*, [FN53] the only recon-
ciliation consistent with the terms of the jurisdictional statute and the legislative history regarding its purposes is to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

simply recognize that *Pacor* was wrong; third-party "related to" bankruptcy jurisdiction is supplemental jurisdiction, and there is "related to" bankruptcy jurisdiction over any third-party dispute sharing a conventional supplemental relationship with a claim before the court (1) "arising under" the Bankruptcy Code or (2) to which the federal bankruptcy estate is a party. Indeed, the Eleventh Circuit has now accepted this supplemental-jurisdiction interpretation of third-party "related to" bankruptcy jurisdiction, even outside the context of the dischargeability decisions, by affirming [FN54] Bankruptcy Judge Bonapfel's jurisdictional analysis in the *Hospitality Ventures/La Vista* case, [FN55] discussed in the March 2007 Bankruptcy Law Letter.

**Entering a Judgment on a Nondischargeable Debt Is a Proper Exercise of Core Jurisdiction**

The circuit cases on nondischargeable money judgments also reveal another odd anomaly in extant bankruptcy jurisdiction jurisprudence, distinct from the jurisdictional scope issue discussed above. There is also embedded in the statute's jurisdictional nexuses a separate, wholly unrelated issue growing out of the Supreme Court's famous *Marathon* decision [FN56] and the subsequent Bankruptcy Amendments and Federal Judgeship Act (BAFJA) of 1984, enacted to cure the constitutional deficiency identified in *Marathon*, through the present core/noncore division of federal bankruptcy jurisdiction. Because the jurisdictional statutes now employ the same jurisdictional nexuses to simultaneously determine both (wholly unrelated) issues--both jurisdictional scope and core/noncore--it turns out (not surprisingly) that crafting useful "tests" that rationally define the content of each jurisdictional nexus (for both purposes simultaneously) is actually impossible, and the nondischargeable money judgment cases illustrate this nicely.

*Marathon* and the 1984 BAFJA amendments were concerned with an issue of separation of powers, and *Marathon*'s proscription, at its most basic level, was that the entirety of the 1978 Reform Act's pervasive federal bankruptcy jurisdiction cannot be assigned to non-Article III bankruptcy courts. [FN57] That separation-of-powers holding speaks solely to the proper allocation of federal bankruptcy jurisdiction as between Article III and non-Article III federal tribunals. *Marathon* and BAFJA, however, say nothing about the issue analyzed above, which is the issue of the scope of federal bankruptcy jurisdiction. [FN58] Irrespective of the type of federal judicial officer that will exercise it (Article III or non-Article III), what is the full extent of federal bankruptcy jurisdiction?

The scope of federal bankruptcy jurisdiction is, of course, a judicial federalism issue going to the allocation of judicial power as between the federal courts and the state courts. What disputes can we essentially take from the state courts and place before the federal courts through our pervasive federal bankruptcy jurisdiction? The principal bone of contention in the nondischargeable money judgment cases concerns judicial federalism and the scope of federal bankruptcy jurisdiction--is there any federal bankruptcy jurisdiction to enter a money judgment on a nondischargeable debt in federal court, or must we relegate the creditor to state court for entry of a money judgment?

Once we decide, though, that there is federal bankruptcy jurisdiction to liquidate and enter a money judgment on a nondischargeable debt (as all circuits, to date, have), the immediate follow-up inquiry is the separation-of-powers inquiry necessitated by *Marathon* and BAFJA. After *Marathon* and the ensuing 1984 BAFJA amendments, we are left with federal bankruptcy jurisdiction that is divided between the non-Article III bankruptcy courts and the federal district courts. Bankruptcy judges have unrestricted jurisdiction over "core" bankruptcy proceedings "arising under" the Bankruptcy Code and "arising in" a bankruptcy case. [FN59] In noncore proceedings "related to" a bankruptcy case, however, unless the parties consent to adjudication in the bankruptcy court, any final order must be entered by a federal district court judge. [FN60]

The statute's jurisdictional nexuses thus have evolved into catachrestic compartments that mark the boundaries between the limited jurisdiction of non-Article III bankruptcy judges and the residual authority of the Article III district courts. They could not have been designed for such purpose, however, since their original function was to vest the entirety of this federal jurisdiction in non-Article III bankruptcy judges. As Bankruptcy Judge Leif Clark correctly noted: "Obviously, then, Congress did not select these terms in 1978 to assure that it would be able to allocate the exercise of jurisdiction the way it did six years later in the 1984 amendments." [FN61]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

As the analysis above revealed, federal bankruptcy jurisdiction to liquidate and enter a money judgment on a nondischargeable debt is not properly considered either an "arising under" or "arising in" proceeding. This is true whether one interprets the content of the "arising in" nexus in accordance with its most plausible original meaning (considering only jurisdictional scope before *Marathon*) [FN62] or using the prevailing "arising in" test formulated under the separation-of-powers influence of *Marathon*. [FN63] Thus if there is federal bankruptcy jurisdiction to liquidate and enter a money judgment on a nondischargeable debt, it can only be "related to" bankruptcy jurisdiction. If we mechanically transferred this result into the core/noncore dischotomy, we would then conclude that jurisdiction to liquidate and enter judgment on a nondischargeable debt is noncore "related to" jurisdiction.

The circuit cases on nondischargeable money judgments, though, have all held that bankruptcy courts have "core" jurisdiction to entertain an action on the underlying debt and enter a final judgment against the debtor. Like the in-explicable finding of "related to" jurisdiction using the *Pacor* test, this result also defies the beguiling formula for core "arising in" proceedings. [FN64] As Judge Jones noted in *Morrison*, "[c]ircuit courts that have approved the entry of money judgments by bankruptcy courts in nondischargeability cases have paid little attention to the jurisdictional dichotomy of core and related-to jurisdiction." [FN65] How, then, can we justify core jurisdiction in the non-Article III bankruptcy courts to enter a money judgment on a nondischargeable debt?

## The Case Against Core Jurisdiction: Traditional State-Law Action Not Involving Adjustment of the Debtor-Creditor Relation

The adjunct bankruptcy courts created by the 1978 Reform Act exercised all of the expanded, pervasive federal bankruptcy jurisdiction, yet the Reform Act bankruptcy judges were not given Article III status, with its protections of lifetime tenure and undimished compensation. In *Marathon*, the Court held that jurisdictional design violated Article III as applied to the case before it, a suit by a Chapter 11 debtor to recover damages from a third party for breach of contract. Under the predecessor 1898 Act, such a suit would have been a plenary action against an adverse party, outside the summary jurisdiction of a non-Article III bankruptcy referee, requiring a plenary suit in state court or a federal district court. Under the Reform Act, however, this suit fell within the broad jurisdiction of the new bankruptcy courts.

A plurality of the *Marathon* Court concluded that this grant of jurisdiction to bankruptcy judges had "impermissibly removed most, if not all, of 'the essential attributes of the judicial power' from the Art. III district court, and ha[d] vested those attributes in a non-Art. III adjunct." [FN66] The concurring justices agreed that jurisdiction to adjudicate the debtor's action, which would exist in essentially the same form even if the debtor had not filed bankruptcy, could only be vested in an Article III judge. [FN67] Perhaps the broadest proposition on which both the plurality and concurrence agreed was this: "It is clear that, at the least, the new bankruptcy judges cannot constitutionally be vested with jurisdiction to decide this state-law contract claim against [defendant] Marathon." [FN68] The Court subsequently characterized the *Marathon* holding as "establish[ing] only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." [FN69]

Restricting the adjudicatory jurisdiction of bankruptcy courts to "core" proceedings through 1984 BAFJA amendments was obviously an attempt to cure the constitutional infirmities of the Reform Act. The terminology of "core" bankruptcy proceedings has no statutory ancestors and is apparently taken from Justice Brennan's plurality opinion in *Marathon*, wherein he said that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case." [FN70] Nowhere does the statute define a "core" proceeding. The closest thing to a definition comes through a nonexclusive list of matters included within core proceedings, including the catch-all categories of "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship." [FN71] The second catch-all core category, like the "core" terminolgy itself, also apparently has its origins in the just-quoted passage from Justice Brennan's *Marathon* opinion.

Nearly all of these cues would lead one to believe that liquidation and entry of a money judgment on a nondischargeable debt cannot be considered a core proceeding, as indicated by the prevailing post-*Marathon* test for core "arising in" proceedings. The action on the underlying debt, like the action at issue in the *Marathon* case itself, is a traditional state-law action that would exist in precisely the same form even if the debtor had not filed bankruptcy. While the dischargeability claim does involve the potential for adjustment of the debtor-creditor relation, the action on the underlying debt, should it be declared nondischargeable, does not involve any adjustment of the debtor-creditor relationship; it simply confirms and adjudicates the rights that prevail between the creditor and the debtor outside of bankruptcy. Likewise, the action on the underlying debt is totally unrelated to administration of the debtor's bankruptcy estate and liquidation of the assets of that estate.

**The Case for Core Jurisdiction: Summary Jurisdiction Under the 1898 Act**

There is one significant difference between a nondischargeable money judgment and the action at issue in the *Marathon* case that legitimizes the circuit courts' conclusion that there is core bankruptcy jurisdiction over the former. Under the jurisdictional provisions of the 1898 Act, the contract action at issue in *Marathon* would have been outside the summary jurisdiction of non-Article III referees to enter a final order in a summary proceeding, absent consent of the litigants. Under the 1970 discharge amendments, though, bankruptcy referees were specifically given summary jurisdiction to "determine the dischargeability of debts, and render judgments thereon." [FN72]

Notwithstanding much of the language of the *Marathon* plurality and concurring opinions, it seems that the most objectionable aspect of the 1978 Reform Act, in the eyes of the Court, was that it simply went beyond the 1898 Act in the jurisdictional authority entrusted to a non-Article III adjunct--a point made by Justice White in his dissent. [FN73] Thus the Court essentially constitutionalized the 1898 Act's divide between summary and plenary proceedings, not only in *Marathon* but also in subsequent decisions regarding the right to a jury trial in bankruptcy proceedings. [FN74]

If this is an appropriate interpretation of the essence of the *Marathon* holding, and if the statutory content of core proceedings under the 1984 BAFJA amendments simply codifies the constitutional line between that which is and that which is not appropriate for final adjudication by a non-Article III adjunct--both of which appear to be the case--then the circuit courts' uniform conclusion that there is core jurisdiction in the bankruptcy courts to liquidate and enter a money judgment on a nondischargeable debt seems entirely appropriate. Core jurisdiction to enter a money judgment on a nondischargeable debt is best explained as consistent with the historical summary jurisdiction of bankruptcy referees under the 1898 Act. Judge Jones's opinion for the Fifth Circuit in *Morrison*, with her principal reliance on "tradition" and the reach of summary referee jurisdiction under the 1898 Act, confirms this.

[FN1]. In re Morrison, 555 F.3d 473, 51 Bankr. Ct. Dec. (CRR) 23, Bankr. L. Rep. (CCH) P 81399 (5th Cir. 2009).

[FN2]. A corporate agent who engages in wrongful conduct, such as fraud, is directly responsible as a tortfeasor and is not shielded from liability by virtue of the fact that the agent's fraudulent conduct was taken on behalf of a corporate principal. See Restatement (Second) of Agency § 343 (1958) ("[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal"). Because a corporation (a fictional person) cannot "do" anything except through the actions of its corporate agents (real people), the corporation's fraud liability is purely a vicarious liability through which the corporation (i.e., the corporate property) is also subjected to liability for the corporate agent's fraudulent conduct. See Restatement (Second) of Agency § 257.

[FN3]. In re Morrison, 361 B.R. 107 (Bankr. W.D. Tex. 2007), subsequently aff'd, 555 F.3d 473, 51 Bankr. Ct. Dec. (CRR) 23, Bankr. L. Rep. (CCH) P 81399 (5th Cir. 2009).

[FN4]. See also Ralph Brubaker, On the Nature of Federal Bankruptcy Jurisdiction: A General Statutory and Constitutional Theory, 41 Wm. & Mary L. Rev. 743, 910-21 (2000); Hon. Randolph J. Haines, Old Rules Reveal *Pacor*'s

Shortcomings, Norton Bankr. L. Adviser Jan. 2003, at 1; In re Lockridge, 303 B.R. 449, 453-56 (Bankr. D. Ariz. 2003).

[FN5]. 28 U.S.C.A. § 1334(b).

[FN6]. See H.R. Rep. No. 95-595, at 445 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6401.

[FN7]. See In re Brady, 101 F.3d 1165, 1170, 30 Bankr. Ct. Dec. (CRR) 15, 37 Collier Bankr. Cas. 2d (MB) 218, Bankr. L. Rep. (CCH) P 77202, 1996 FED App. 0379P (6th Cir. 1996) (noting that "a trustee may not file a nondischargeability complaint"); Matter of Farmer, 786 F.2d 618, 620-21, 14 Collier Bankr. Cas. 2d (MB) 467, Bankr. L. Rep. (CCH) P 71047 (4th Cir. 1986) (rejected by, In re Brady, 101 F.3d 1165, 30 Bankr. Ct. Dec. (CRR) 15, 37 Collier Bankr. Cas. 2d (MB) 218, Bankr. L. Rep. (CCH) P 77202, 1996 FED App. 0379P (6th Cir. 1996)) (same); 1 Thomas J. Salerno et al., Bankruptcy Litigation and Practice § 8.55, at 472, 474 (2d ed. 1995).

[FN8]. Morrison, 555 F.3d at 478 (quoting Brubaker, 41 Wm. & Mary L. Rev. at 911). Either the creditor or the debtor may request a declaration as to the dischargeability of any debt. See Fed. R. Bankr. P. 4007(a). Code § 523(c)(1), in effect, gives the bankruptcy court exclusive jurisdiction to determine the applicability of certain discharge exceptions, including the 523(a)(2) exception, whereas other discharge exceptions can be litigated collaterally. See 11 U.S.C.A. § 523(c)(1); Fed. R. Bankr. P. 4007 advisory committee note. See generally Ralph Brubaker, The Impact of the Discharge Injunction on State-Court Dischargeability Determinations, 22 Bankr. L. Letter, No. 8, Aug. 2002, at 7; Ralph Brubaker, Criminal Prosecutions, Statutory Bankruptcy Injunctions, and the Preclusive Effect of State-Court Determinations, 20 Bankr. L. Letter, No. 5, May 2000, at 1. As the Bankruptcy Code itself contemplates dischargeability declarations in federal court, the problems surrounding anticipation of a federal defense that plague the general federal question statute are avoided. See generally Matter of National Gypsum Co., 118 F.3d 1056, 1062-64, 31 Bankr. Ct. Dec. (CRR) 237, 38 Collier Bankr. Cas. 2d (MB) 722 (5th Cir. 1997) (rejecting an argument that a federal declaratory action regarding the collateral effects of the discharge was an improper attempt to premise federal question jurisdiction upon anticipation of a federal defense). Moreover, as discussed below, the bankruptcy discharge has itself become more than a mere affirmative defense to a creditor's state-law claim.

[FN9]. Garrard Glenn, Effect of Discharge in Bankruptcy: Ancillary Jurisdiction of Federal Court, 30 Va. L. Rev. 531, 532 (1944).

[FN10]. Glenn, 30 Va. L. Rev. at 532, 533.

[FN11]. Vern C. Countryman, The New Dischargeability Law, 45 Am. Bankr. L.J. 1, 2-3 (1971).

[FN12]. Glenn, 30 Va. L. Rev. at 537.

[FN13]. Local Loan Co. v. Hunt, 292 U.S. 234, 54 S. Ct. 695, 78 L. Ed. 1230, 93 A.L.R. 195 (1934).

[FN14]. See Countryman, 45 Am. Bankr. L.J. at 2-10.

[FN15]. See, e.g., In re Borek, 180 F. Supp. 567, 571 (D.N.J. 1960) (finding no independent federal jurisdiction over a nondiverse state-law claim and noting that "entering judgment against the individual bankrupt in no way aids the administration of the bankrupt's estate... but only aids the individual creditor in pursuing his individual rights against the bankrupt"); In re Anthony, 42 F. Supp. 312, 316 (E.D. Ill. 1941) (even in cases where *Local Loan* permits a federal bankruptcy court to determine dischargeability of a debt, the court "cannot carry through and render a judgment upon a creditor's unreleased claim upon which execution may issue against the bankrupt's after-acquired assets").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN16]. Bankruptcy Act of 1898 § 2a(12).

[FN17]. See 1A Collier on Bankruptcy ¶ 17.28A[4], at 1742.4 (James Wm. Moore et al. eds., 14th ed. 1978); Coun-tryman, 45 Am. Bankr. L.J. at 19, 21-22, 31-32 (tracing and summarizing the legislative history of the 1970 discharge amendments).

[FN18]. Bankruptcy Act of 1898 § 17c(3); see also Bankruptcy Act of 1898 § 2a(12) (providing for jurisdiction to "determine the dischargeability of debts, and render judgments thereon").

[FN19]. 124 Cong. Rec. 34,010 (1978) (statement of Sen. DeConcini); 124 Cong. Rec. at 32,419 (statement of Rep. Butler); 124 Cong. Rec. at 32,410 (statement of Rep. Edwards); 124 Cong. Rec. at 28,258 (statement of Sen. Wallop).

[FN20]. H.R. Rep. No. 95-595, at 14 n.84, 48 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 5976 n.84, 6010.

[FN21]. H.R. Rep. No. 95-595, at 46, reprinted in 1978 U.S.C.C.A.N. at 6007.

[FN22]. Bankruptcy Reform Act of 1978: Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 95th Cong. 544 (1977) (statement of Griffin Bell, At-torney General).

[FN23]. Bankruptcy Court Revision: Hearings on H.R. 8200 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 95th Cong. 217 (1977) (statement of Griffin Bell, Attorney General).

[FN24]. Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, pt. II, § 2-201(a)(4), at 30 (1973); see also H.R. Doc. No. 93-137 § 4-506(d), at 137 ("If the court determines a debt to be nondischargeable in a proceeding commenced under this section, it shall determine any remaining issues concerning liability on the debt unless, for cause shown and in the interest of justice, the court suspends or declines the exercise of its jurisdiction"). Recognition of "the appropriateness of suspension or declination of jurisdiction" would permit "litigation in another court [that] has proceeded to a point where it would be wasteful of judicial resources and ine-quitable to one or more of the parties to require reintroduction of evidence and reargument of issues in the bankruptcy court." H.R. Doc. No. 93-137 § 4-506(d), at 142.

[FN25]. H.R. Rep. No., 95-595, at 446, 49 (1977) (footnote referencing 1898 Act § 17c omitted), reprinted in 1978 U.S.C.C.A.N. 5963, 6401, 6010; see also H.R. Rep. No., 95-595, at 363 (noting that "the comprehensive grant of jurisdiction prescribed in the proposed [statute]... is adequate to cover the full jurisdiction that the bankruptcy courts have today over dischargeability and related issues under Bankruptcy Act § 17c"), reprinted in 1978 U.S.C.C.A.N. at 6319; S. Rep. No. 95-989, at 77 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5863.

[FN26]. Morrison, 555 F.3d at 479.

[FN27]. Matter of Wood, 825 F.2d 90, 97, 17 Collier Bankr. Cas. 2d (MB) 743, Bankr. L. Rep. (CCH) P 71955 (5th Cir. 1987).

[FN28]. **In re Cambio, 353 B.R. 30, 34, 52 Collier Bankr. Cas. 2d ( MB) 1711, Bankr. L. Rep. ( CCH) P 80162 ( B.A.P. 1st Cir. 2004)** (quoting Brubaker, 41 Wm. & Mary L. Rev. at 914-15).

[FN29]. See Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858, 73 L. Ed. 2d 598, 6 Collier Bankr. Cas. 2d (MB) 785, Bankr. L. Rep. (CCH) P 68698 (1982).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN30]. See Celotex Corp. v. Edwards, 514 U.S. 300, 307-08 n.5, 115 S. Ct. 1493, 131 L. Ed. 2d 403, 27 Bankr. Ct. Dec. (CRR) 93, 32 Collier Bankr. Cas. 2d (MB) 685, Bankr. L. Rep. (CCH) P 76456, 31 Fed. R. Serv. 3d 355 (1995).

[FN31]. See generally Brubaker, 41 Wm. & Mary L. Rev. at 910-21.

[FN32]. Pacor, Inc. v. Higgins, 743 F.2d 984, 994, 12 Bankr. Ct. Dec. (CRR) 285, Bankr. L. Rep. (CCH) P 70002 (3d Cir. 1984). For an exhaustive critique of *Pacor* and its multiple manifest missteps, see Brubaker, 41 Wm. & Mary L. Rev. at 869-940.

[FN33]. In finding no "related to" bankruptcy jurisdiction over the third-party claim before it, the *Pacor* court emphasized that "the outcome of that [third-party] action would in no way bind [the debtor's bankruptcy estate]... [s]ince [the estate] is not a party" and "could not be bound by res judicata or collateral estoppel." Pacor, 743 F.2d at 995.

[FN34]. See generally James N. Duca & Cori Ann C. Yokota, The Role of *Res Judicata* in Bankruptcy Claim Allowance Proceedings, 17 U. Haw. L. Rev. 1 (1995); Jeffrey T. Ferriell, The Preclusive Effect of State Court Decisions in Bankruptcy (pt. 2), 59 Am. Bankr. L.J. 55, 80-86 (1985); James Wm. Moore, Res Judicata and Collateral Estoppel in Bankruptcy, 68 Yale L.J. 1, 28-29, 39-50 (1958).

[FN35]. See Bass v. Denney, 1998 WL 59486, at *2 & n.4 (N.D. Tex. 1998), judgment rev'd, 171 F.3d 1016 (5th Cir. 1999).

[FN36]. See Matter of Kubly, 818 F.2d 643, 644-45, Bankr. L. Rep. (CCH) P 71803 (7th Cir. 1987) (finding no "related to" jurisdiction over a third-party dispute in a no-asset case, even if it could affect the amount of a creditor's unsecured claim).

[FN37]. Compare Quattrone Accountants, Inc. v. I.R.S., 895 F.2d 921, 926-27 & n.4, 20 Bankr. Ct. Dec. (CRR) 168, 22 Collier Bankr. Cas. 2d (MB) 427, Bankr. L. Rep. (CCH) P 73256, 90-1 U.S. Tax Cas. (CCH) P 50103, 65 A.F.T.R.2d 90-580 (3d Cir. 1990) (the possibility of collection from a third party reducing a creditor's claim against the bankruptcy estate was insufficient to establish "related to" jurisdiction over the creditor's claim against the third party), with Halper v. Halper, 164 F.3d 830, 837-38, 33 Bankr. Ct. Dec. (CRR) 906, Bankr. L. Rep. (CCH) P 77909 (3d Cir. 1999) (reaching precisely the opposite conclusion); In re Celotex Corp., 124 F.3d 619, 626-27 (4th Cir. 1997) (same).

[FN38]. Morrison, 555 F.3d at 479.

[FN39]. See, e.g., **Cambio, 353 B.R. at 33-35**; In re Losanno, 291 B.R. 1 (Bankr. D. Mass. 2003); In re Hamilton, 282 B.R. 22, 39 Bankr. Ct. Dec. (CRR) 265, 48 Collier Bankr. Cas. 2d (MB) 1419 (Bankr. W.D. Okla. 2002); In re Thrall, 196 B.R. 959, 968-69, 36 Collier Bankr. Cas. 2d (MB) 521 (Bankr. D. Colo. 1996); In re Barrows, 182 B.R. 640, 653, 100 Ed. Law Rep. 1075 (Bankr. D. N.H. 1994); In re Marlar, 142 B.R. 304, 307, Bankr. L. Rep. (CCH) P 74735 (Bankr. E.D. Ark. 1992); cf. In re Bass, 171 F.3d 1016, 1019-23 (5th Cir. 1999) (finding no bankruptcy jurisdiction to entertain a garnishment action to collect on a bankruptcy court's money judgment on a nondischargeable debt); In re McAllister, 216 B.R. 957, 964-69 (Bankr. N.D. Ala. 1998) (same); In re Sieger, 200 B.R. 636, 637-40 (Bankr. N.D. Ind. 1996) (same). Likewise, Professor Block-Lieb, without citation of authority, concluded that a creditor's request for a money judgment on a nondischargeable debt has no effect on the estate and thus cannot be within third-party "related to" bankruptcy jurisdiction. See Susan Block-Lieb, The Case Against Supplemental Bankruptcy Jurisdiction: A Constitutional, Statutory, and Policy Analysis, 62 Fordham L. Rev. 721, 749 n.173 (1994).

[FN40]. Thus, for example, the Supreme Court's decision in *Cohen v. De La Cruz* addressing only a dischargeability issue nonetheless affirmed a bankruptcy court's entry of a money judgment against an individual debtor on debts determined to be nondischargeable. See In re Cohen, 185 B.R. 171 (Bankr. D. N.J. 1994) (holding the debts nondi-

schargeable), and In re Cohen, 185 B.R. 180 (Bankr. D. N.J. 1995), aff'd, 191 B.R. 599 (D.N.J. 1996), aff'd, 106 F.3d 52, 30 Bankr. Ct. Dec. (CRR) 389, 37 Collier Bankr. Cas. 2d (MB) 666, Bankr. L. Rep. (CCH) P 77265 (3d Cir. 1997), judgment aff'd, 523 U.S. 213, 118 S. Ct. 1212, 140 L. Ed. 2d 341, 32 Bankr. Ct. Dec. (CRR) 400, 38 Collier Bankr. Cas. 2d (MB) 1891, Bankr. L. Rep. (CCH) P 77644 (1998) (affirming liquidation and entry of a money judgment on the nondischargeable debts).

[FN41]. See In re Sasson, 424 F.3d 864, 867-70 (9th Cir. 2005); In re Kennedy, 108 F.3d 1015, 1017-18, 30 Bankr. Ct. Dec. (CRR) 635, 37 Collier Bankr. Cas. 2d (MB) 980, Bankr. L. Rep. (CCH) P 77316 (9th Cir. 1997), as amended, (Mar. 21, 1997); Hall v. Davenport, 76 F.3d 372 (4th Cir. 1996) (unpublished table decision); In re McLaren, 3 F.3d 958, 965-66, 29 Collier Bankr. Cas. 2d (MB) 969, Bankr. L. Rep. (CCH) P 75430, 39 Fed. R. Evid. Serv. 495 (6th Cir. 1993); Abramowitz v. Palmer, 999 F.2d 1274, 1275-77, Bankr. L. Rep. (CCH) P 75364 (8th Cir. 1993); In re McLaren, 990 F.2d 850, 853-54, 24 Bankr. Ct. Dec. (CRR) 205 (6th Cir. 1993); Samuel v. Edd, 961 F.2d 220 (10th Cir. 1992) (unpublished table decision); Matter of Hallahan, 936 F.2d 1496, 1508, Bankr. L. Rep. (CCH) P 74066 (7th Cir. 1991); cf. In re Porges, 44 F.3d 159, 163-65 & n.7, 32 Collier Bankr. Cas. 2d (MB) 1354, Bankr. L. Rep. (CCH) P 76342 (2d Cir. 1995) (holding that in adjudicating a creditor's claim against a Chapter 13 bankruptcy estate, there is bankruptcy jurisdiction to enter a money judgment against the debtor personally after dismissal of the debtor's bankruptcy case, analogizing to the aforecited cases); In re Thomas, 765 F.2d 926, 927-30 & n.3 (9th Cir. 1985) (finding an action to collect on the bankruptcy court's money judgment on a nondischargeable debt from the California Real Estate Recovery Fund was "related to" the debtor's bankruptcy case).

[FN42]. Morrison, 555 F.3d at 479.

[FN43]. See United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 16 L. Ed. 2d 218, 61 L.R.R.M. (BNA) 2561, 53 Lab. Cas. (CCH) P 11135, 10 Fed. R. Serv. 2d 361 (1966).

[FN44]. "[E]quitable jurisdiction attaches to the entire cause of action." Kennedy, 108 F.3d at 1018; see also McLaren, 3 F.3d at 966 (same). The "cause of action" once marked the apparent limits of the pendent-claim variety of supplemental jurisdiction, after the Supreme Court's opinion in Hurn v. Oursler, 289 U.S. 238, 245-48, 53 S. Ct. 586, 77 L. Ed. 1148, 17 U.S.P.Q. 195 (1933). In Gibbs, though, the Court repudiated Hurn's cause-of-action test as unduly confusing in its application and "unnecessarily grudging" with respect to the scope of federal jurisdiction. See Gibbs, 383 U.S. at 722-24, 725.

[FN45]. Alexander v. Hillman, 296 U.S. 222, 56 S. Ct. 204, 80 L. Ed. 192 (1935). See generally Brubaker, 41 Wm. & Mary L. Rev. at 784-88, 844-52.

[FN46]. See Porges, 44 F.3d at 164-65; McLaren, 3 F.3d at 966; Hallahan, 936 F.2d at 1508.

[FN47]. In re Devitt, 126 B.R. 212, 215, Bankr. L. Rep. (CCH) P 73912 (Bankr. D. Md. 1991).

[FN48]. See In re Lang, 293 B.R. 501, 516-17 & nn. 18-19 (B.A.P. 10th Cir. 2003); Matter of Kinney, 114 B.R. 670, 671-72, 671, 60 Ed. Law Rep. 824 (Bankr. D. Neb. 1990) (holding that federal "courts have jurisdiction over cases and controversies in their entirety," and "the court has jurisdiction to decide [the dischargeability] controversy and as an incident thereto has jurisdiction to enter judgment in favor of [the creditor] on the underlying debt"); In re Aerni, 86 B.R. 203, 205-06, 207-08, 47 Ed. Law Rep. 203, 11 Fed. R. Serv. 3d 623 (Bankr. D. Neb. 1988) (opining that the bankruptcy jurisdiction statute contains a grant of ancillary and pendent jurisdiction, thus permitting a federal judgment on a nondischargeable debt as part of the dischargeability proceedings); William T. Plumb, The Tax Recommendations of the Commission on the Bankruptcy Laws--Tax Procedure, 88 Harv. L. Rev. 1360, 1397 & n.203 (1975) (noting that "jurisdiction to render personal judgment on the claim is only ancillary to the issue of discharge" and is not an "independent power to render personal judgments on debts apart from the issue of nondischargeability").

[FN49]. Sasson, 424 F.3d at 869.

[FN50]. Pacor, 743 F.2d at 994.

[FN51]. Morrison, 555 F.3d at 480 n.4.

[FN52]. See Celotex, 514 U.S. at 307-08 n.5.

[FN53]. Ralph Brubaker, Supplemental Bankruptcy Jurisdiction, 27 Bankr. L. Letter, No. 3, Mar. 2007, at 1.

[FN54]. See In re Hospitality Ventures/Lavista, 265 Fed. Appx. 779 (11th Cir. 2008).

[FN55]. In re Hospitality Ventures/LaVista, 358 B.R. 462 (Bankr. N.D. Ga. 2007).

[FN56]. Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S. Ct. 2858, 73 L. Ed. 2d 598, 6 Collier Bankr. Cas. 2d (MB) 785, Bankr. L. Rep. (CCH) P 68698 (1982).

[FN57]. See Marathon, 458 U.S. at 87 n.40 (Brennan, J., plurality opinion) ("It is clear that, at the least, the new bankruptcy judges cannot constitutionally be vested with jurisdiction to decide this state-law contract claim against [defendant] Marathon").

[FN58]. Indeed, all of the opinions in the *Marathon* case unceremoniously assumed that there would be no statutory or constitutional bar to an Article III federal court entertaining the Chapter 11 debtor's state-law breach of contract action. See Marathon, 458 U.S. at 72 n.26, 84 n.36 (Brennan, J., plurality opinion) (stating that the debtor's state-law contract action "may be adjudicated in federal court on the basis of its relationship to the petition for reorganization," even though "Congress has not purported to prescribe a rule of decision for the resolution of [debtor's] contractual claims"); Marathon, 458 U.S. at 89 (Rehnquist, J., concurring opinion) (stating that if the lawsuit "is to be resolved by an agency of the United States, it may be resolved only by an agency which exercises '[t]he judicial power of the United States' described by Art. III of the Constitution"); Marathon, 458 U.S. at 92 (Burger, C.J., dissenting) (opining that with respect to "a 'traditional' state common-law action, not made subject to a federal rule of decision and related only peripherally to an adjudication of bankruptcy under federal law," all of the "problems arising from today's judgment can be resolved simply by providing that ancillary common-law actions, such as the one involved in these cases, be routed to the United States district court"); Marathon, 458 U.S. at 95 (White, J., dissenting) (reasoning that "if the Court is correct that such a state-law claim cannot be heard by a bankruptcy judge," then "cases such as these would have to be heard by Art.III judges").

[FN59]. See 28 U.S.C.A. § 157(b).

[FN60]. See 28 U.S.C.A. § 157(c).

[FN61]. In re Simmons, 205 B.R. 834, 844 n.22 (Bankr. W.D. Tex. 1997).

[FN62]. "[I]f we remove the separation of powers influence from the bankruptcy jurisdiction statute, 'arising under' and 'arising in' bankruptcy jurisdiction can be seen as grants of federal jurisdiction over all constitutional federal questions that arise in a bankruptcy case--those involving bankruptcy causes of action and those involving the bankruptcy estate." Brubaker, 41 Wm. & Mary L. Rev. at 861.

[FN63]. See supra notes 27-28 and accompanying text.

[FN64]. See In re Narciso, 146 B.R. 792, 793 (Bankr. E.D. Ark. 1992) (holding that liquidation and entry of money judgment on nondischargeable debt is noncore "related to" proceeding).

[FN65]. Morrison, 555 F.3d at 479.

[FN66]. Marathon, 458 U.S. at 87 (Brennan, J., plurality opinion).

[FN67]. See Marathon, 458 U.S. at 89-92 (Rehnquist, J., concurring opinion).

[FN68]. Marathon, 458 U.S. at 87 n.40 (Brennan, J., plurality opinion); see also Marathon, 458 U.S. at 92 (Burger, J., dissenting) (describing narrow basis of concurrence as holding of the Court).

[FN69]. Thomas v. Union Carbide Agr. Products Co., 473 U.S. 568, 584, 105 S. Ct. 3325, 87 L. Ed. 2d 409, 22 Env't. Rep. Cas. (BNA) 2033, 15 Envtl. L. Rep. 20698 (1985); see also Commodity Futures Trading Com'n v. Schor, 478 U.S. 833, 838-39, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986) (quoting Thomas v. Union Carbide, 473 U.S. at 584).

[FN70]. Marathon, 458 U.S. at 71 (Brennan, J., plurality opinion).

[FN71]. 28 U.S.C.A. § 157(b)(2)(A) & (O).

[FN72]. Bankruptcy Act of 1898 § 38(4).

[FN73]. See Marathon, 458 U.S. at 99 (White, J., dissenting) ("I take it that the Court does not condemn as inconsistent with Art. III the assignment of these functions--i.e., those within the summary jurisdiction of the old bankruptcy courts--to a non-Art. III judge, since as the plurality says, they lie at the core of the federal bankruptcy power").

[FN74]. See Douglas G. Baird, Bankruptcy Procedure and State-Created Rights: The Lessons of *Gibbons* and *Marathon*, 1982 S. Ct. Rev. 25, 42-47; Ralph Brubaker, Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten *Callaway v. Benton* Case, 72 Am. Bankr. L.J. 1, 42 & n.184 (1998); Brubaker, 41 Wm. & Mary L. Rev. at 776-77 & n.111; S. Elizabeth Gibson, Jury Trials and Core Proceedings: The Bankruptcy Judge's Uncertain Authority, 65 Am. Bankr. L.J. 143, 170 (1991) ("It appears that the Court might have in mind the bankruptcy court's old summary jurisdiction when it considers what Congress could permissibly commit to bankruptcy court jurisdiction"); Thomas S. Marrion, Core Proceedings and the "New" Bankruptcy Jurisdiction, 35 Depaul L. Rev. 675, 683 (1986) ("The scope of summary jurisdiction under the Act of 1898 serves as a helpful guideline to determine what matters can be considered at the 'core' of bankruptcy administration, making possible an exercise of full judicial power by a non-Article III officer").

29 No. 4 Bankruptcy Law Letter 1

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A-12**



62 FDMLR 721                                                                Page 1
62 Fordham L. Rev. 721

**C**

Fordham Law Review
February, 1994

**\*721** THE CASE AGAINST SUPPLEMENTAL BANKRUPTCY JURISDICTION: A CONSTITUTIONAL, STATUTORY, AND POLICY ANALYSIS

Susan Block-Lieb [FNa1]

Copyright (c) 1994 by the Fordham Law Review; Susan Block-Lieb

*In this Article Professor Block-Lieb critically examines the power of a federal district or bankruptcy court to adjudicate jurisdictionally insufficient claims which arise out of a common nucleus of operative fact with a proceeding which "arises under" the Bankruptcy Code, or "arises in" or "relates to" a bankruptcy case. After considering Article III of the United States Constitution, relevant statutory provisions--including the newly enacted supplemental jurisdictional provision (28 U.S.C. § 1367)-- and the conflicting policy objectives of these statutory provisions, the Article concludes that a district court's adjudication of supplemental claims related to a "related to" proceeding may be unconstitutional, unauthorized by statute, and inconsistent with the primary purpose of bankruptcy jurisdiction--the efficient administration of a bankruptcy estate. As to a district court's exercise of jurisdiction over supplemental claims related to an "arising under" or "arising in" proceeding, it proposes that a balancing approach be adopted. It also contends that additional constitutional concerns are raised when a non-Article III bankruptcy court exercises any form of supplemental bankruptcy jurisdiction, and advocates limiting the power of bankruptcy courts accordingly.*

TABLE OF CONTENTS

Introduction                723

I.Overview                  731

A.Bankruptcy Jurisdiction   731

1. Bankruptcy Amendments and Federal Judgeship Act of 1984   731

62 FDMLR 721
62 Fordham L. Rev. 721

2. Bank-ruptcy Reform Act of 1978 .... 737

B. Supple-mental Jurisdic-tion .... 739

1. Ancillary Jurisdiction .... 739

2. Pen-dent-Claim Ju-risdiction .... 740

3. Pen-dent-Party or Ancillary Juris-diction for Claims by Plain-tiffs .... 741

4. The Judi-cial Improve-ments Act of 1990 .... 743

II. The Exer-cise of Supple-mental Bank-ruptcy Jurisdic-tion Under the Bankruptcy Code .... 744

A. A Review of the Case Law Supporting Sup-plemental Bankruptcy Ju-risdiction .... 744

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721
62 Fordham L. Rev. 721

1. Courts of Appeals — 744

2. District Courts — 746

3. Bankruptcy Courts — 746

a. Ancillary Jurisdiction — 747

b. Pendent-Party Jurisdiction — 752

2. A Review of the Case Law Rejecting Supplemental Bankruptcy Jurisdiction — 754

III. The Case Against Supplemental Bankruptcy Jurisdiction — 757

A. The Constitutional Questions — 758

1. Constitutional Questions Surrounding the Exercise of Supplemental Ba — 758

62 FDMLR 721
62 Fordham L. Rev. 721

nkruptcy Juris-
diction by a Dis-
trict Court

a. Supple-           759
mental Jurisdic-
tion, Rather
Than Pendent
Jurisdiction

b. Bank-            761
ruptcy Jurisdic-
tion, Rather
Than Federal
Question Juris-
diction

(i) Substan-        763
tiality

(a) Bank-           769
ruptcy Jurisdic-
tion as 'Arising
Under' Jurisdic-
tion

(b) Bank-           779
ruptcy Jurisdic-
tion as Supple-
mental Jurisdic-
tion

(ii) Related-       784
ness

2. Constitu-        791
tional Questions
Surrounding the
Exercis of Sup-
plemental Ba
nkruptcy Juris-

diction by
Non-Article III
Bankruptcy
Courts

a.                                                       791
Non-Article III
Bankruptcy
Courts

(i) Bank-                                              791
ruptcy Act of
1898

(ii) Bank-                                             792
ruptcy Reform
Act of 1978

(iii) 1984                                            795
Amendments

b. Supple-                                            797
mental Jurisdic-
tion as an Essen-
tial Attribute of
Judicial Author-
ity

B. Did Con-                                           799
gress Expressly
Intend To Confer
Supplemental
Bankruptcy Ju-
risdiction?

1. 'Except . . .                                      800
as Expressly
Provided Other-
wise by Federal
Statute'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. 'In Any Civil Action of Which the District Courts Have Original Jurisdiction, the District Courts Shall Have Supplemental Jurisdiction' .......... 804

3. 'Related to Claims in the Action Within Such Original Jurisdiction' .......... 804

a. Section 1367(a)'s Use of the Phrase 'Original Jurisdiction' May Refer to Statutory Grants of 'Original Jurisdiction' .......... 805

b. Section 1367(a)'s Use of the Phrase 'Original Jurisdiction' May Refer to the Categories of Cases and Controversies Enumerated in Article III of the United States Constitution .......... 807

c. Section 1367(a)'s Use of the Phrase .......... 808

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721                                                                                                              Page 7
62 Fordham L. Rev. 721

'Original Juris-
diction' May
Refer to
'Non-Supplemen
tal Jurisdiction'
of District Courts

4. 'The Dis-          809
trict Courts Shall
Have Supple-
mental Jurisdic-
tion'

IV.Policy             811
Considerations
Favoring a Li-
mitation of Sup-
plemental
Bankrupt-
cy  Jurisdiction

A. A Prin-            811
cipal Purpose of
Bankruptcy Ju-
risdiction is to
Facilitate the
Resolution of an
Estate

B. Policy            826
Justifications
Generally Fa-
voring an Exer-
cise of Supple-
mental Jurisdic-
tion Are Subject
to Countervail-
ing Policy Con-
cerns in the
Context of a
Bankruptcy Case

C. Congress          829
Should Amend §

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721
62 Fordham L. Rev. 721

1367(c)'s Factors to Reflect Concerns Unique to Bankruptcy

    1. An Exclusive List     829

    2. The List is Peculiarly Applicable to the Nonbankruptcy Context     830

Conclusion     831

## *723 INTRODUCTION

Complex bankruptcy cases [FN1] breed complex litigation-- proceedings [FN2] involving multiple claims [FN3] among multiple parties. As to each *724 claim and party, subject matter jurisdiction must exist for a court to have the power to adjudicate the proceeding. Although the scope of bankruptcy jurisdiction [FN4] is broad, it is not without limits. A creature of statute, [FN5] bankruptcy jurisdiction is defined to include [FN6] civil proceedings *725 which either "arise under" title 11, [FN7] or "arise in" [FN8] or are "related to" a title 11 case. [FN9]

What of proceedings which neither "arise under title 11" nor "arise in" or "relate to" a title 11 case, but which arise out of the same nucleus of facts as a proceeding over which bankruptcy jurisdiction clearly exists? Do either district courts or bankruptcy courts have the power to adjudicate a jurisdictionally insufficient proceeding which is factually related to an "arising under," "arising in," or "related to" proceeding? [FN10] If so, under what circumstances should this power be exercised?

As an example, [FN11] consider first an avoidance action brought by the trustee in bankruptcy [FN12] against several defendants alleged to have received fraudulent [FN13] and preferential transfers. [FN14] The trustee's suit "arises *726 under" 11 U.S.C. §§ 548 and 547, and thus bankruptcy jurisdiction clearly exists. [FN15] Assume further that the defendants bring a third-party complaint in which they seek contribution from their former lawyers and accountants. They claim that if their transaction with the debtor is avoidable as a preference or fraudulent transfer, then these professionals committed malpractice and are liable to the defendants to the extent of the defendant's liability to the trustee. Because the third-party action is predicated solely on state law, it does not "arise under title 11." [FN16] Nor is it likely that the defendants' malpractice action "arose in" the debtor's bankruptcy case. [FN17] Finally, resolution of the third-party suit may not be "related to" the bankruptcy case as it may have no conceivable effect on distributions to creditors in, or the administration of, the debtor's bankruptcy estate. Thus, if there is jurisdiction over the third-party action it must exist only because it shares "a common nucleus of operative fact" [FN18] with the trustee's avoidance action sufficient to create supplemental bankruptcy jurisdiction.

Consider a different scenario in which a creditor files a proof of claim [FN19] against the debtor's bankruptcy estate. [FN20] In the claim, the creditor seeks a distribution from the estate based on an alleged loan agreement with the debtor. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

debtor timely objects to the claim and defends [FN21] against contractual liability on the grounds that the loan agreement violated *727 state usury law. [FN22] Although the merits of the creditor's claim will be determined solely with respect to state contract and usury laws, the litigation between the debtor and creditor on the proof of claim is a proceeding that "arises in the title 11 case," and thus bankruptcy jurisdiction exists to resolve the dispute in federal court. [FN23] Assume further that the creditor brings a third-party complaint against its attorneys, alleging that if the debtor's usury objections to its claim are upheld then its attorneys are liable to it in an equal amount in malpractice. The malpractice action neither "arises under title 11," [FN24] nor "arises in" [FN25] or "relates to" the title 11 case. [FN26] Thus, federal jurisdiction exists, if it exists at all, because the malpractice action arises out of "a common nucleus of operative fact" [FN27] with the proof of claim litigation.

Consider a final example involving litigation between two creditors-- Bank A and Bank B--who both claim a first priority security in the same collateral. [FN28] Because the collateral is not valuable enough to repay both creditors and leave something for the holders of unsecured creditors or the debtor, the trustee in bankruptcy has abandoned it. [FN29] As a result of the abandonment, the property is no longer property of the estate. [FN30] Despite this seeming lack of connection between the estate and the creditors' litigation, bankruptcy jurisdiction exists over this proceeding if one of the creditors is undersecured on the theory that it is "related to" the *728 bankruptcy case. [FN31] Where either Bank A or Bank B is undersecured, the result of the litigation between them will "affect[ ] the amount of property available for distribution or the allocation of property among creditors" [FN32] because a determination that the undersecured creditor holds a first priority security interest in the collateral will reduce the unsecured portion of its claim against the estate and, as a result, increase distributions to other creditors of the debtor. [FN33] Assume further that Bank A brings a third-party complaint against its attorneys, alleging that if it is found not to hold a first priority security interest in the collateral then its attorneys have committed malpractice in documenting and recording the financing transaction. This malpractice action neither "arises under title 11," [FN34] nor "arises in" [FN35] or "relates to" [FN36] the debtor's bankruptcy case. Federal jurisdiction exists over the malpractice action, if it exists at all, because the creditors' priority dispute and the malpractice action arise out of "a common nucleus of operative fact." [FN37]

There exists ample precedent for the assertion of jurisdiction supplemental to other grants of federal jurisdiction in general non-bankruptcy civil litigation. [FN38] Further, with its enactment of the Judicial Improvements Act of 1990, Congress expressly provided in 28 U.S.C. § 1367(a) for a broad grant of supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." [FN39] But did Congress intend that § 1367(a) *729 would apply in the bankruptcy context and support an assertion of jurisdiction supplemental to a proceeding "arising under" title 11, or "arising in" or "related to" a title 11 case?

Courts of appeal, [FN40] district courts, [FN41] and bankruptcy courts [FN42] have nearly uniformly [FN43] concluded that there exists jurisdiction supplemental to bankruptcy jurisdiction. This uniformity of decision exists whether the decision involved former Bankruptcy Acts [FN44] or the current Bankruptcy Code, [FN45] and whether or not the decision pre-dated enactment of 28 U.S.C. § 1367, the supplemental jurisdiction provision enacted with the Judicial Improvements Act of 1990. [FN46]

This Article contends that neither 28 U.S.C. § 1367 nor Article III of the United States Constitution authorize the exercise of jurisdiction supplemental to the grant of bankruptcy jurisdiction granted by 28 U.S.C. § 1334(b). [FN47] It also argues that because courts have exceeded these limitations,*730 Congress should enact express limitations to the exercise of supplemental bankruptcy jurisdiction.

Part I of this Article begins with general discussions of the historical development of both bankruptcy jurisdiction and supplemental jurisdiction. Part II analyzes the decisions in which courts have found supplemental bankruptcy jurisdiction under the current Bankruptcy Code. [FN48]

Part III criticizes this case law, presenting constitutional and statutory arguments against the exercise of supplemental bankruptcy jurisdiction by federal district courts. This section concludes, first, that where jurisdictionally deficient proceedings have "a common nucleus of operative fact" [FN49] with state law proceedings [FN50] between non-diverse citizens [FN51] that merely "arise in" or "relate to" a title 11 case, [FN52] an exercise of supplemental jurisdiction may exceed the limits of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Article III of the United States Constitution. [FN53] Moreover, irrespective of the nature of the primary claim, [FN54] where a non-Article III bankruptcy judge exercises supplemental bankruptcy jurisdiction, additional constitutional concerns exist. [FN55] Second, § 1367(a) is ambiguous as to its application to bankruptcy proceedings. Ambiguities in the bankruptcy [FN56] and supplemental [FN57] jurisdictional provisions should be resolved, if at all possible, to avoid reaching these constitutional questions. [FN58]

Even assuming that supplemental bankruptcy jurisdiction is both constitutionally and statutorily authorized, part IV argues on policy grounds that Congress should amend either 28 U.S.C. § 1334 (the bankruptcy jurisdictional provision), or 28 U.S.C. § 1367 (the supplemental jurisdictional*731 provision), or both, to preclude the exercise of supplemental bankruptcy jurisdiction except when necessary to expedite resolution of a bankruptcy case. [FN59]

I. OVERVIEW

A. *Bankruptcy Jurisdiction*

The scope of bankruptcy jurisdiction was expanded with the enactment of the current bankruptcy jurisdictional provisions first enacted in 1978 [FN60] and reenacted in 1984. [FN61] This section discusses the breadth of these bankruptcy jurisdictional provisions.

1. Bankruptcy Amendments and Federal Judgeship Act of 1984

Currently, 28 U.S.C. § 1334 provides three distinct grants of bankruptcy jurisdiction. [FN62] First, "district courts . . . have original and exclusive*732 jurisdiction of all cases under title 11." [FN63] It also provides that district courts have "exclusive jurisdiction" over all of the debtor's property, "wherever located . . . and . . . of the estate." [FN64] Finally, it provides that "district courts . . . have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." [FN65]

"Arising under" jurisdiction [FN66] is the narrowest form of bankruptcy jurisdiction. [FN67] Legislative history defines "arising under" bankruptcy jurisdiction as extending to

any matter under which a claim is made under a provision of title 11. For example, a claim of exemptions under 11 U.S.C. 522 would be cognizable by the bankruptcy court, as would a claim of discrimination in violation of 11 U.S.C. 525. Any action by the trustee under an avoiding power would be a proceeding arising under title 11, because the trustee would be claiming based on a right given by one of the sections in . . . title 11. [FN68]

Courts have interpreted "arising under" jurisdiction as extending to matters based solely on rights created under title 11. [FN69] Examples of "arising under" jurisdiction include proceedings to avoid transfers pursuant to the federal preference or fraudulent transfer provisions, [FN70] to enforce or request relief from the automatic stay, [FN71] to object to the grant of a discharge*733 to the debtor or to the dischargeability of a particular debt, [FN72] to resolve the scope of property of the estate, [FN73] or to request authority to reject or assume an executory contract or unexpired lease. [FN74]

Courts have defined "arising in" bankruptcy jurisdiction by applying a "but for" test. [FN75] According to this test, proceedings are said to "arise in" a title 11 case "if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case[,]" [FN76] even though it is not based on any right expressly created under title 11. [FN77] Some examples of "arising in" proceedings include administrative matters, [FN78] determinations as to the validity and amount of claims asserted against the estate, [FN79] "counterclaims*734 by the estate against persons filing claims against the estate," [FN80] "orders to turn over property of the estate," [FN81] "determinations of the validity, extent, or priority of liens," [FN82] proceedings to enforce prior orders of the bankruptcy court, [FN83] and proceedings involving the post-petition*735 operation of the estate. [FN84]

"Related to" jurisdiction is the broadest of the three types granted by 28 U.S.C. § 1334(b), [FN85] yet appellate courts

disagree as to the breadth of the test for determining whether a proceeding is "related to" the bankruptcy case. The First, [FN86] Second, [FN87] Third, [FN88] Seventh, [FN89] and Tenth [FN90] Circuits*736 limit "related to" jurisdiction to those proceedings having a direct legal effect upon administration of the bankruptcy estate. [FN91] Alternatively, the Fifth, [FN92] Sixth, [FN93] Ninth, [FN94] and Eleventh [FN95] Circuits have adopted *737 a broader standard of "related to" jurisdiction [FN96]--a standard that requires only "that the activity have some conceivable impact on the bankruptcy reorganization or estate" [FN97] and does not require that this impact be either direct or legal. [FN98]

"Related to," "arising under," and "arising in" jurisdiction are three distinct bases for bankruptcy jurisdiction. These jurisdictional bases overlap and are not mutually exclusive. [FN99] If any one test is satisfied, bankruptcy jurisdiction exists.

2. Bankruptcy Reform Act of 1978

The jurisdictional provisions enacted in 1984 are substantially identical with those of the Bankruptcy Reform Act of 1978, differing only as to *738 the scope of bankruptcy jurisdiction that the non-Article III bankruptcy courts can exercise. [FN100] With the enactment of the jurisdictional provisions of the Bankruptcy Reform Act, Congress hoped to create a single forum for the resolution of all matters and proceedings related to a bankruptcy case, and to avoid the endless jurisdictional disputes that had characterized litigation under the former Bankruptcy Act. [FN101]

*739 B. *Supplemental Jurisdiction*

Supplemental jurisdiction is the phrase currently used to describe the doctrines of ancillary and pendent jurisdiction. [FN102] These doctrines are relied upon by federal courts, for reasons of federalism, judicial economy and fairness, to adjudicate jurisdictionally insufficient state law claims related to claims over which federal jurisdiction exists.

1. Ancillary Jurisdiction

Ancillary jurisdiction finds its origins in the notion that, once property comes within the jurisdiction of a court of equity, the court has jurisdiction to resolve all claims related to the property. "Under the doctrine of ancillary jurisdiction, defendants, intervenors as of right and, under certain limited circumstances, plaintiffs [are] allowed to assert related claims in an ongoing lawsuit, even though no independent basis for federal subject matter jurisdiction existed as to these claims." [FN103] Early Supreme Court decisions limited the exercise of ancillary jurisdiction to instances in which the federal court was in possession of property. [FN104] Ancillary jurisdiction has since been expanded to apply to compulsory counterclaims, [FN105] cross-claims, claims against additional parties joined to a compulsory*740 counterclaim or cross-claim, third party impleader claims and claims by intervenors as of right, [FN106] that arose out of the same transaction as the plaintiff's primary claim. [FN107] In addition, "transaction" was defined flexibly to "comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." [FN108] Under this "same transaction" test, the doctrine of ancillary jurisdiction was broad, applying not only to a defendant's jurisdictionally deficient claims against the plaintiff (or co-defendants) but also to jurisdictionally deficient claims against additional parties joined by a defendant or intervenor of right. [FN109]

2. Pendent-Claim Jurisdiction

The doctrine of pendent jurisdiction similarly derives from notions of judicial economy, those peculiar to our federal system. "Under the doctrine of pendent-claim jurisdiction, a plaintiff asserting a 'federal law' or 'federal question' claim could join with it a related state law claim against the same defendant, even though the state law claim was itself jurisdictionally insufficient." [FN110]

The first Supreme Court decision to embrace the doctrine of pendent jurisdiction, *Osborn v. Bank of United States,* [FN111] rejected the argument that the presence of issues of state law destroyed federal question jurisdiction since "[t]here is scarcely any case, every part of which depends on the constitution, laws or treaties of the United States." [FN112] In *Siler v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Louisville & Nashville R.R.,* [FN113] the Court held that whenever the assertion of federal question jurisdiction was "colorable" a court had the "right to decide all the questions in the case, even [where] it decided the Federal questions adversely to the party raising them, or even if it omitted to decide them at all, but decided the case on local or state questions only." [FN114]

Neither *Osborn* nor *Siler,* however, determined the extent to which the **741** state and federal claims were required to be related. Initially, the Supreme Court adopted a "single cause of action" test, [FN115] but in *United Mine Workers v. Gibbs* [FN116] the Court rejected this "unnecessarily grudging" standard in favor of a three-part test for pendent-claim jurisdiction. [FN117] It held that

> [p]endent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ," and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he will ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, their is *power* in federal courts to hear the whole. [FN118]

### 3. Pendent-Party or Ancillary Jurisdiction for Claims by Plaintiffs

In a trilogy of opinions, the Supreme Court declined to find that plaintiffs were authorized to join jurisdictionally deficient parties under either the doctrines of ancillary or pendent jurisdiction. [FN119]

**742** In *Owen Equipment & Erection Co. v. Kroger,* [FN120] the Court rejected a plaintiff's attempt to assert a claim against a non-diverse third-party defendant. Although the doctrine of ancillary jurisdiction clearly would permit the defendant to implead a third-party defendant whose residence is not diverse from that of the plaintiff and defendant, [FN121] the Court declined to extend this doctrine to permit a similar joinder by the plaintiff, reasoning that the statute rather than the Constitution prohibited the extension. The Court concluded that the diversity jurisdiction provision, 28 U.S.C. § 1332, requires complete diversity between the parties and that the doctrine of ancillary jurisdiction should not permit a plaintiff to evade the requirement "by the simple expedient of suing only those defendants who were of diverse citizenship and waiting for them to implead non-diverse defendants." [FN122]

In *Aldinger v. Howard,* [FN123] the Court rejected a similar request to extend the doctrine of pendent jurisdiction to permit a plaintiff to assert non-federal claims against a party as to whom federal jurisdiction did not otherwise exist, again concluding, for statutory rather than constitutional reasons, that the doctrine should not be extended. In this case, the plaintiff brought a § 1983 civil rights action [FN124] against several individual defendants. Despite having no right to bring a federal civil rights action against a municipal corporation, [FN125] the plaintiff sought to join a related state law claim against the County of Alameda. The Court noted that the federal question jurisdiction [FN126] derived from 42 U.S.C. § 1983(b), and that § 1983 prohibited direct suit against the County. As a result, it concluded that the plaintiff should not be able "indirectly" to reach the same result through the use of the doctrine of pendent jurisdiction. Yet, the Court expressly limited its holding to the peculiar facts of the case, noting that "[o]ther statutory grants and other alignments of parties and claims might call for a different result." [FN127] The Court noted, for example, that a grant of exclusive federal subject matter jurisdiction, "as in the prosecution of tort claims against the United States under 28 U.S.C. § 1346," [FN128] might produce a different result because claims related to the grant of exclusive jurisdiction must either be tried together in a federal court or divided between the state and federal courts. [FN129]

Despite this invitation to find pendent-party jurisdiction in certain circumstances,**743** which many courts of appeals accepted after *Aldinger* by permitting the joinder of jurisdictionally deficient parties, [FN130] the Supreme Court in *Finley v. United States* [FN131] held that an assertion of pendent-party jurisdiction is inappropriate absent express congressional authorization. In *Finley,* the plaintiff filed a complaint under the Federal Torts Claims Act, claiming that the Federal Aviation

Administration had been negligent in its "operation and maintenance of the runway lights and performance of air traffic control functions." [FN132] The complaint under the FTCA was later amended to include state law negligence claims against the city of San Diego and the San Diego Gas and Electric Company. [FN133] There existed no independent basis for federal jurisdiction as to the claims added with the amendment. The Court declined to extend *Gibbs* to permit the assertion of pendent-party jurisdiction absent explicit congressional direction. [FN134] The Court noted that the FTCA permits the federal government to be sued *only* in a federal court. Further, the court acknowledged that its holding that private parties to claims related to a claim under the FTCA could not be joined to the federal action absent an independent basis for federal jurisdiction "means that the efficiency and convenience of a consolidated action will sometimes have to be foregone in favor of separate actions in state and federal courts." [FN135] Nonetheless, the Court found this hardship and circuity "of no consequence since 'neither the convenience of the litigants nor considerations of judicial economy can suffice to justify extension of the doctrine[s] of ancillary [and pendent] jurisdiction.'" [FN136]

### 4. The Judicial Improvements Act of 1990

With its enactment of the Judicial Improvements Act of 1990, Congress fulfilled the directive in *Finley* that Congress expressly permit an assertion of pendent-party jurisdiction and, more generally, codified the judicially-created doctrines of ancillary and pendent jurisdiction, which together it referred to as "supplemental jurisdiction." Section 1367(a) provides for "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." [FN137] In neither the statute nor its legislative history does Congress attempt to define the constitutional limits of this grant of **\*744** supplemental jurisdiction--a task that Congress felt the courts were better able to fulfill. The legislative history indicates that Congress' reference in § 1367(a) to the constitutional limits of the doctrine was intended to codify "the scope of supplemental jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs*." [FN138]

### II. THE EXERCISE OF SUPPLEMENTAL BANKRUPTCY JURISDICTION UNDER THE BANKRUPTCY CODE

Although 28 U.S.C. § 1334(b) limits bankruptcy jurisdiction to proceedings "arising under title 11, or arising in or related to cases under title 11," [FN139] numerous courts have found that they also have jurisdiction either ancillary, pendent, or, since enactment of the Judicial Improvements Act, supplemental to this grant of bankruptcy jurisdiction. [FN140]

#### A. *A Review of the Case Law Supporting Supplemental Bankruptcy Jurisdiction*

##### 1. Courts of Appeals

In *Publicker Industries v. United States (In re Cuyahoga Equip. Corp.),* [FN141] the Second Circuit held that a federal district court [FN142] had jurisdiction supplemental to its bankruptcy jurisdiction. The court was therefore able to approve an agreement dividing among several claimants [FN143] the proceeds received in a sale of real property by the consolidated chapter 11 estate and agreeing to hold harmless a lender [FN144] from **\*745** further environmental liability related to the property. The debtor's predecessor in ownership appealed from the order approving the settlement on the grounds that the district court did not have subject matter jurisdiction, and that the terms of the settlement were neither fair nor reasonable. [FN145]

The Second Circuit stated that the district court had "related to" jurisdiction over the respective claims of the EPA, the debtors' lender, and the bankruptcy trustee to the proceeds of the sale. [FN146] It then stated that the environmental claims asserted against the debtors and their lender were supplemental to these "related to" proceedings. [FN147] The court had **\*746** little difficulty in concluding that 28 U.S.C. § 1367, the supplemental jurisdictional provision, applied to proceedings "related to" a title 11 case, and that there existed a sufficient nexus between the bankruptcy claims and the environmental claims to support an exercise of supplemental jurisdiction. [FN148]

##### 2. District Courts

A recent district court decision, *Wieboldt Stores, Inc. v. Schottenstein,* [FN149] found ancillary jurisdiction over a third-party complaint brought by the defendants in a fraudulent transfer suit which had been commenced by the trustee in bankruptcy. [FN150] In *Wiebolt,* the court stated that it need not determine whether the claims against the third-party defendants were "related to" the debtor's chapter 11 case because the negligent misrepresentation and breach of contract claims asserted in the third-party complaint were sufficiently related to the bankruptcy trustee's fraudulent transfer claims in the primary complaint. The court, however, did not otherwise address the third-party defendants' contention that § 1334(b) "provides the sole basis for this court's ancillary jurisdiction and does not confer jurisdiction here." [FN151]

3. Bankruptcy Courts

Numerous bankruptcy courts also have found jurisdiction supplemental to their bankruptcy jurisdiction. [FN152]

***747** a. *Ancillary Jurisdiction*

Several bankruptcy courts have found ancillary bankruptcy jurisdiction. In *Hawkins v. Eads (In re Eads),* [FN153] the bankruptcy court held, in the alternative, that it had supplemental jurisdiction [FN154] to consider third-party malpractice actions [FN155] brought by the non-debtor defendants [FN156] against their counsel and financial planner because they arose out of the same "common nucleus of operative facts" as the trustee's avoidance action [FN157] against the debtor and non-debtor defendants. [FN158] Similarly, in *Jones v. Woody (In re W.J. Services, Inc.),* [FN159] the court found supplemental jurisdiction over a legal malpractice action brought by former chapter 11 debtors against their former attorneys in state court and removed to the bankruptcy court. [FN160] The court reasoned that the removed action arose out of a common nucleus of operative facts with an interim fee application that had been granted by the bankruptcy court prior to the dismissal of the debtors' chapter 11 cases. [FN161] The bankruptcy court went ***748** on to conclude, however, that the malpractice action was barred by res judicata because the fee award implicitly included a finding that malpractice had not occurred. The award was also rendered final by dismissal of the case. [FN162]

Bankruptcy courts' findings of ancillary jurisdiction have not been limited to malpractice actions. *National Westminster Bancorp N.J. v. ICS Cybernetics, Inc. (In re ICS Cybernetics, Inc.)* [FN163] involved compulsory counterclaims and cross-claims brought in an interpleader action. [FN164] The court held that the interpleader action was a core proceeding [FN165] that "arose under" title 11 because the action invoked various provisions of title 11 for a declaration as to whether escrowed proceeds were property of the estate, [FN166] and thus, involved "causes of action created and determined by Title 11's statutory provisions." [FN167] The court also held that the lender's compulsory counterclaims and cross-claims, which alleged a perfected security interest in the rental proceeds, and, alternatively, entitlement to the proceeds pursuant to a "hell or high water" clause, were ***749** themselves core. [FN168] The court reasoned that "under the doctrine of ancillary jurisdiction . . . [these claims were] logically dependent on the original complaint." [FN169]

In *Aerni v. Columbus Federal Savings (In re Aerni),* [FN170] the court found that a lender's counterclaim for determination of the non-dischargeability of a debt [FN171] and entry of a judgment as to the amount of the loans was, in the case of the non-dischargeability action, a core proceeding, [FN172] and, in the case of the request for a judgment, a proceeding ancillary [FN173] to the debtor's adversary proceeding for a declaration to determine the dischargeability of her student loans. In rejecting the debtor's contention that the doctrine of ancillary jurisdiction ought not apply to adversary proceedings in bankruptcy, the court noted that the Advisory Committee Note to Federal Rules of Bankruptcy Procedure 7014 explicitly leaves this question open. [FN174] It concluded that it had ancillary jurisdiction on policy grounds:

The absence of ancillary jurisdiction would make it virtually impossible for bankruptcy courts to implement a modern system of procedural rules. Absent ancillary jurisdiction, the court could not adjudicate compulsory counterclaims, cross-claims, third party claims, and other claims permitted to be asserted under the Federal Rules of Civil Procedure, unless each claim independently qualified for adjudication in federal court. The interest of judicial economy and principles of res ***750** judicata and collateral estoppel mandate that the bankruptcy and district courts have ancillary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and pendent jurisdiction . . . . [FN175]

*Aerni* was decided before the Supreme Court's decision in *Finley v. United States* [FN176] and thus did not benefit from the Court's remarks that hardship and circuity were "of no consequence" to a determination of the scope of statutory authority to exercise supplemental jurisdiction. [FN177] According to the Court, "'neither the convenience of the litigants nor considerations of judicial economy can suffice to justify extension of the doctrine[s] of ancillary [and pendent] jurisdiction.'" [FN178] Interests of judicial economy alone are not determinative as to the scope of a federal court's power to adjudicate otherwise jurisdictionally insufficient state law claims.

The bankruptcy court in *Cook v. United States (In re Earl Roggenbuck Farms, Inc.)* [FN179] found supplemental jurisdiction over both a cross-claim for tortious misrepresentation brought by the Commodity Credit Corporation ("CCC") against the debtor's principal shareholder and a counterclaim which attempted to establish a constructive trust over collateral used by the debtor's principal shareholder to secure its loan from the CCC. [FN180] The court determined that both the cross-claim and counterclaim involved the same common nucleus of facts as the trustee's avoidance action against the CCC. [FN181] Furthermore, the court concluded that it was empowered to exercise ancillary jurisdiction on several grounds. [FN182] First, it noted that in the order of reference [FN183] the district court referred "all of its jurisdiction but for that which it explicitly withheld and that which it may not constitutionally delegate." [FN184] Since the reference order did not specifically exclude ancillary jurisdiction, the court concluded that ancillary jurisdiction had been referred. [FN185] Moreover, the court considered whether its exercise of ancillary jurisdiction was constitutional. **751** It opined that 28 U.S.C. § 157(c) "is, in effect, a statutory grant of ancillary jurisdiction," [FN186] which extends to all controversies having "some reasonable nexus" to the title 11 case. [FN187] It then asserted that a sufficient nexus existed between the cross-claim and the bankruptcy case. [FN188]

In *In re Wood,* [FN189] the Alabama Surface Mining Commission filed a proof of claim for a civil penalty that had been assessed against the various coal companies in which the debtor was part owner. The trustee in bankruptcy objected to the Commission's proof of claim and asserted a counterclaim to it. [FN190] Partners in the coal companies in which the debtor was part owner intervened in the trustee's action, seeking a declaration that the debtor's share of certain partnership tax indebtedness was non-dischargeable. [FN191] The bankruptcy court found core jurisdiction over the Commission's proof of claim and the trustee's objection and counterclaim. The court also found that the intervenors' actions were not "core" proceedings, [FN192] but were non-core "related to" proceedings because "the claims of the Intervenors [were] so entertwined [sic] with those of the Trustee and because the Intervenors propose[d] to use the collateral fund, when released, to pay a partnership tax indebtedness." [FN193] In the alternative, the court held that it had ancillary jurisdiction over the intervenors' claims because of the factual nexus between those claims and the trustee's actions. [FN194] It found support for its assertion of ancillary jurisdiction in legislative history. The court noted that during congressional debate of the current jurisdictional provisions, Senator Dole generally expressed doubts as to the constitutionality of a non-Article III court hearing state law claims, but qualified his remarks as follows:

Ancillary jurisdiction questions are unrelated to this issue. Federal courts certainly retain authority to adjudicate a State claim arising out of the same facts giving rise to the Federal claim. [FN195]

**752** Despite the court's reference in *Wood* to Senator Dole's remarks, they were probably not persuasive. [FN196] Although such references are not unprecedented, courts generally have given little credence to remarks made by a single legislator. [FN197]

### b. *Pendent-Party Jurisdiction*

Although bankruptcy courts have relied most frequently on the doctrine of ancillary jurisdiction to permit defendants to assert jurisdictionally insufficient claims against the plaintiff or third-parties, at times they also have permitted the plaintiff or defendant to assert jurisdictionally insufficient claims under the doctrine of pendent jurisdiction. In *Goger v. Merchants Bank of Atlanta (In re Feifer Industries),* [FN198] the bankruptcy court assumed that it was empowered to exercise supplemental jurisdiction in appropriate circumstances pursuant to 28 U.S.C. § 1367. [FN199] In this case, however, the court declined to exercise pendent-party jurisdiction over the third-party complaint, [FN200] not because it thought it did not have the power, but rather because it found that the third-party complaint did not arise out of the same factual nexus as the primary action which "arose under" title 11. [FN201]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*753** By contrast, in *Dechert Price & Rhoads v. Direct Satellite Communications, Inc. (In re Direct Satellite Communications, Inc.),* [FN202] the bankruptcy court exercised pendent-party jurisdiction over a third-party claim. [FN203] After stating that it could "perceive no reason why a bankruptcy court can not exercise pendent jurisdiction and hear non-federal claims raised in a proceeding before it, in the same fashion as any other federal court[,]" the court adopted the *Gibbs* three-part test. [FN204] It first found that the "substantiality test" was satisfied in this instance because "the federal claim is a core proceeding over which we unquestionably have jurisdiction." [FN205] It next found that the core proceeding and third-party action "'derive from a common nucleus of operative fact,' and [are] of the sort normally triable in the same proceeding as the federal claim." [FN206] The court cited Federal Rules of Bankruptcy Procedure 7014 [FN207] in support of this conclusion, although the Advisory Committee Note to the rule explicitly "does not purport to deal with questions of jurisdiction." [FN208] Finally, the court concluded that the exercise of its jurisdiction over the pendent-party claim would be appropriate in light of "judicial economy, convenience, and fairness to litigants." [FN209]

**\*754** In *Petrolia Corp. v. Elam (In re Petrolia Corp.),* [FN210] the bankruptcy court found supplemental jurisdiction over claims brought by the debtor's principal and the corporation with which the debtor was to have merged because the debtor's identical causes of action were "related to" its reorganization case. [FN211] In *Total Petroleum, Inc. v. Coral Petroleum, Inc. (In re Coral Petroleum, Inc.),* [FN212] the bankruptcy court held that settlement of claims against the debtor-defendants did not mandate dismissal of the remaining claims against the non-debtor-defendant. [FN213] Although the court held that the claims against the non-debtor-defendant would not "necessarily" affect the administration of the estate or distributions to creditors, [FN214] it found pendent-party jurisdiction over the claims that may have been time-barred if dismissed. [FN215] The court went on to conclude that judicial economy did not require it to retain jurisdiction; it recommended that the reference of this proceeding be withdrawn, with consideration of the proper venue to be determined after withdrawal. [FN216]

### B. *A Review of the Case Law Rejecting Supplemental Bankruptcy Jurisdiction*

Not all courts that have considered the issue have concluded that supplemental**\*755** bankruptcy jurisdiction exists. The following cases reject the exercise of supplemental bankruptcy jurisdiction for a variety of reasons.

In *Southtrust Bank of Dothan v. Alpha Steel Co. (In re Alpha Steel Co.),* [FN217] a district court declined to find that the bankruptcy court below was entitled to exercise either ancillary or pendent jurisdiction over a creditor's state law counterclaims to another creditor's declaratory action filed in the bankruptcy court. Noting that "[j]udicial economy itself does not justify federal jurisdiction[,]" [FN218] the court contended in dicta [FN219] that the breadth of the bankruptcy jurisdictional provision limits application of the supplemental jurisdiction doctrine to bankruptcy courts.

First, the exercise of ancillary and pendent jurisdiction by bankruptcy courts could subsume the more restrictive "relate to" and "arising in" jurisdiction, such that the latter would be rendered substantially, if not entirely, superfluous. Second, to the extent that ancillary and pendent jurisdiction could be viewed as supplementing rather than supplanting "related to" and "arising in" jurisdiction, a bankruptcy court exercising the former could hear claims which, in effect, merely relate to claims which themselves have only a relate-to connection with the primary case. Finally, the recent Congressional amendments codifying and merging the doctrines of ancillary and pendent jurisdiction expressly apply only to district courts. [FN220]

*Alpha Steel* did not explicitly limit statutory analysis of 28 U.S.C. § 1334(b) to the power of a non-Article III bankruptcy court to exercise supplemental bankruptcy jurisdiction, and thus is equally applicable to Article III district courts. [FN221]

In *Marine Iron & Shipbuilding Co. v. City of Duluth (In re Marine Iron & Shipbuilding Co.),* [FN222] a district court declined to exercise pendent-party jurisdiction over a state law breach of contract action brought by the holder of a right of first refusal granted by the debtor against an alleged contracting party. [FN223] That the debtor was co-plaintiff in the suit was not persuasive to the court because the non-debtor's claim was, in practical effect, the main claim. [FN224] Because this case predated the effective date of the Judicial Improvements Act, the court turned to *Finley v. United* **\*756** *States* [FN225] as the governing law, noting that the Supreme Court cautioned district courts that they should "not assume that the full constitutional

62 FDMLR 721                                                                                                    Page 17
62 Fordham L. Rev. 721

power has been congressionally authorized [in the case of pendent-party jurisdiction], and [should] not read jurisdictional statutes broadly." [FN226] Thus, the *Marine Iron* court reviewed the bankruptcy jurisdictional provision and concluded that it neither explicitly nor implicitly suggested Congress' intent to confer pendent-party jurisdiction in the context of a bankruptcy case. [FN227]

The bankruptcy court in *Official Creditors' Committee of Products Liability & Personal Injury Claimants v. International Insurance Co. (In re Pettibone Corp.)* [FN228] found the factual connection between the cross-claims and the underlying adversary proceeding insufficient to create supplemental jurisdiction. [FN229] Moreover, the court stated in dicta that, "except to enter a dollar judgment in actions to bar dischargeability," [FN230] it doubted that it had "general ancillary jurisdiction under *United Mine Workers v. Gibbs,* and its progeny." [FN231]

In sum, the majority of courts that have addressed the issue have concluded that both district courts and non-Article III bankruptcy courts are empowered to exercise supplemental bankruptcy jurisdiction. In these decisions, courts have not addressed the substantial constitutional issues surrounding the exercise of federal jurisdiction over state law supplemental claims sharing a factual nexus with state law "arising in" or "related to" proceedings [FN232] or the distinct constitutional concern raised by the exercise of such jurisdiction by a non-Article III bankruptcy court. [FN233] In addition, very few of these decisions post-date the enactment of 28 U.S.C. § 1367 and none addresses the language of that statute in any detail. [FN234] Moreover, much of the language in the case law discussing the power of a district or bankruptcy court to exercise *757 bankruptcy jurisdiction is dicta--the conclusion that supplemental bankruptcy jurisdiction exists is often an alternative ground upon which the court justifies an exercise of federal jurisdiction. [FN235] And in several of these statements of dicta, the court would not have needed to address the issue of supplemental jurisdiction if it had applied more expansively the "related to" jurisdictional standard. [FN236]

### III. THE CASE AGAINST SUPPLEMENTAL BANKRUPTCY JURISDICTION

This part considers the interplay of §§ 1334(b) and 1367(a) from constitutional and statutory perspectives. It first contends that the exercise of supplemental jurisdiction by a federal district court over claims related to [FN237] an "arising in" or a "related to" proceeding [FN238] may exceed Article III of the Constitution. It next argues that any exercise of supplemental bankruptcy jurisdiction by a non-Article III bankruptcy court also may exceed constitutional limitations.

 *758 As a result of these substantial constitutional concerns, this part contends that these statutes should not be read together to authorize the exercise of supplemental bankruptcy jurisdiction by either district or bankruptcy courts. [FN239]

#### A. *The Constitutional Questions*

The Supreme Court has long held that "two things are necessary to create [[[federal] jurisdiction . . . . The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it . . . . " [FN240] If 28 U.S.C. §§ 1334 and 1367 are construed to grant supplemental bankruptcy jurisdiction, they may contravene Article III of the Constitution. The exercise of jurisdiction over claims related to an "arising in" or a "related to" bankruptcy proceeding by a federal district court may be inconsistent with the requirement that it hear only an Article III "case or controversy." Further, any exercise of supplemental bankruptcy jurisdiction by a bankruptcy court may violate Article III's requirement that such a case be heard by a life-tenured federal judge.

##### 1. Constitutional Questions Surrounding the Exercise of Supplemental Bankruptcy Jurisdiction by a District Court

Perhaps the best place to start a constitutional analysis of an exercise of supplemental bankruptcy jurisdiction by a district court is, as suggested by the legislative history of § 1367, [FN241] the three-part test set forth in *United Mine Workers v. Gibbs:* [FN242] (i) the federal claim must be sufficiently substantial as to confer subject matter jurisdiction; (ii) the federal and state law claims must "derive from a common nucleus of operative fact;" [FN243] and (iii) the plaintiff's federal and state law claims must be such that the plaintiff "would ordinarily be expected to try them all in one judicial proceeding." [FN244] Nevertheless,

62 FDMLR 721                                                                                                   Page 18
62 Fordham L. Rev. 721

application of a *Gibbs*-type analysis to an exercise of supplemental bankruptcy jurisdiction does not provide a district court with any clear guidance. [FN245]

**\*759** a. *Supplemental Jurisdiction, Rather Than Pendent Jurisdiction*

While, *Gibbs* involved an assessment of the constitutionality of an exercise of pendent jurisdiction, § 1367 applies to pendent-claim, pendent-party and ancillary jurisdiction. [FN246] Assertions of supplemental bankruptcy jurisdiction may be any of these three types of supplemental jurisdiction, depending upon the circumstances of the assertion, and are least likely to be an assertion of pendent-claim jurisdiction. [FN247] Where pendent-claim jurisdiction is not involved, a question remains as to how related the primary claim [FN248] must be to the supplemental claim. [FN249]

Extension of *Gibbs*'s constitutional analysis from its pendent-claim context to other types of supplemental jurisdiction is not an issue peculiar to bankruptcy, however, and commentators have wrestled with this issue outside the bankruptcy context. These commentators note that case law had developed distinct standards for the proper scope of pendent-claim and ancillary jurisdiction. [FN250] With respect to ancillary jurisdiction, the Supreme Court, in *Moore v. New York Cotton Exchange*, [FN251] did not consider whether claims arose out of "a common nucleus of operative fact." [FN252] Instead, it validated an assertion of ancillary jurisdiction where the jurisdictionally deficient claims arose out of the same transaction or occurrence [FN253] as the primary claim, [FN254] although it did not make clear whether the source of this standard was constitutionally based. [FN255]

**\*760** Despite the semantic differences in these standards, courts [FN256] and commentators [FN257] have suggested that § 1367(a) should be interpreted as applying a single standard for the assertion of supplemental jurisdiction, for there would appear to be no constitutional basis for applying distinct standards to the various forms of supplemental jurisdiction. These commentators disagree as to what that standard ought to be, however.

Denis McLaughlin argues in this context that the Court should "hold that a constitutional 'case or controversy' under Article III consists of all claims that bear some 'logical relationship' to the original jurisdiction claim sufficient to justify joinder of the claims in a single action, irrespective of the precise nature of the nexus that establishes the logical relationship." [FN258] He criticizes a broader constitutional test proposed prior to the **\*761** enactment of § 1367 by Richard Matasar. [FN259] Matasar had argued that supplemental jurisdiction fulfills Article III of the Constitution "whenever the rules governing federal procedure permit the joinder in one action of jurisdictionally insufficient nonfederal claims or parties with a jurisdictionally sufficient federal claim." [FN260]

Notwithstanding this academic debate, courts have interpreted § 1367(a) to require application of *Gibbs*'s "common nucleus of operative fact" test when deciding whether supplemental bankruptcy jurisdiction exists and should be exercised, irrespective of whether, prior to the enactment of § 1367, the supplemental claim would have been viewed as an assertion of ancillary or pendent jurisdiction. [FN261] Outside the context of bankruptcy, courts have similarly interpreted § 1367(a) and applied a *Gibbs* test. [FN262]

b. *Bankruptcy Jurisdiction, Rather Than Federal Question Jurisdiction*

Reference to *Gibbs* may not resolve the constitutionality of an exercise of supplemental bankruptcy jurisdiction by a district court for another reason. In *Gibbs*, the "primary claim" was a "federal claim" which "arose under" federal labor law. [FN263] The primary claim in a bankruptcy context may be either a "federal claim" or a "state law claim," depending upon whether the proceeding "arises under" title 11, or "arises in" or **\*762** "relates to" a title 11 case. Only "arising under" proceedings can unequivocally be termed "federal claims" in the sense used in *Gibbs*. [FN264] Where the primary claim involves either an "arising in" or a "related to" proceeding, however, the primary claim may not be a "federal claim," in the sense that the cause of action may derive from state law. [FN265] These distinctions create uncertainty as to the constitutionality of an exercise of jurisdiction supplemental to a "related to" or "arising in" proceeding. This uncertainty pertains to both the "substantiality" and "relatedness" tests set forth in *Gibbs*. [FN266]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*763** (i) Substantiality

Outside the context of bankruptcy, commentators have argued that the first prong of *Gibbs,* the so-called "substantiality test," does not state an independent standard for determining the constitutionality of an assertion of supplemental jurisdiction, but rather involves no more than a restatement of the requirement that the court indeed must have subject matter jurisdiction over the primary claim, a determination that involves a statutory analysis. [FN267] Courts that have considered the issue appear to have concluded that this insight is equally applicable to the bankruptcy context. For example, one court applied the "substantiality" test to an assertion of supplemental bankruptcy jurisdiction, and concluded that the test was satisfied because "the federal claim [was] a core proceeding over which [it] unquestionably ha[d] jurisdiction." [FN268]

Application of this first prong of *Gibbs* to an exercise by a district court of jurisdiction supplemental to an "arising in" or "related to" proceeding is more complex, however. Does it require a determination that the "arising in" or "related to" proceeding is itself substantial? [FN269] Or does it require a determination that the federal element, the whole title 11 case, is substantial? [FN270] Or, finally, does it require a determination that the nexus between the "related to" proceeding and the title 11 filing is substantial? And, if the latter construction is to be favored, how substantial must this relationship be? Is this requirement distinct from the requirement that the primary claim and the supplemental claim enjoy either "a common nucleus of operative fact" or a "logical relationship"? [FN271]

**\*764** Application of the "substantiality" test to an assertion of jurisdiction supplemental to an "arising in" or "related to" proceeding is complicated because the federal interest in these proceedings is indirect. With a primary claim involving federal question jurisdiction, the substantiality of the federal ingredient in the primary claim follows naturally. Even with a primary claim involving diversity or alienage jurisdiction, the federal ingredient follows easily from its inclusion among the categories of "cases or controversies" enumerated in Article III of the Constitution. With a primary claim involving bankruptcy jurisdiction, however, the substantiality of the federal ingredient is less clear because the sources of bankruptcy jurisdiction are less clear.

Except in dicta, the Supreme Court has had little occasion to explain why Article III empowers Congress to confer to district courts bankruptcy jurisdiction over "arising in" [FN272] and "related to" [FN273] proceedings, **\*765** or similarly broad grants of jurisdiction, although it clearly views the **\*766** grant as constitutional. A number of district and bankruptcy courts have upheld the constitutionality of § 1334(b)'s grant of federal jurisdiction over proceedings "related to a title 11 case" on the grounds that "related to" proceedings constitute valid exercises of supplemental jurisdiction. [FN274] Some bankruptcy courts have alternatively upheld the grant as authorized by the section in Article III empowering Congress to confer federal jurisdiction over cases or controversies "arising under" federal law. [FN275]

Commentators have more explicitly debated these sources of jurisdiction, but have not agreed. Thomas Galligan, Jr. contends that "related to" bankruptcy jurisdiction, "when considered in connection with the discretionary and mandatory abstention provisions of the 1984 Bankruptcy Amendments and Federal Judgeship Act, appears to be a constitutional effort to protect the federal interest in efficient bankruptcy administration, and at the same time preserve the states' interests in interpreting, applying, and developing state law." [FN276] He would characterize**\*767** "related to" jurisdiction as a form of protective jurisdiction. [FN277]

John Cross instead contends that "related to" bankruptcy jurisdiction is best explained as ancillary jurisdiction. He claims that once an expanded definition of ancillary jurisdiction is accepted--one which employs a logical relationship, rather than a factual nexus, standard for "relatedness"-- jurisdiction over "related to" proceedings is best characterized as a grant of ancillary jurisdiction; the "related to" proceedings share a logical relationship with the title 11 case and together constitute a "case" within the meaning of Article III. [FN278] Both Galligan and Cross reject the characterization of "related to" bankruptcy jurisdiction as a **\*768** type of "arising under" jurisdiction, but their conclusion in this regard depends upon a narrower reading of Supreme Court precedent than is proposed below. [FN279]

The distinction is relevant to more than academic debate. If "related to" jurisdiction is a species of "arising under" jurisdiction, then it may satisfy the *Gibbs* "substantiality" test because the federal ingredient in the primary claim (the "related to" proceeding) is sufficiently substantial to support the supplemental claim. Yet, if "related to" jurisdiction is best described as either supplemental or protective jurisdiction, then *Gibbs*'s "substantiality" test may not be satisfied because the federal ingredient **769** in the primary claim is indirect, and therefore arguably insufficient to support the supplemental claim.

(a) *Bankruptcy Jurisdiction as "Arising Under" Jurisdiction*

Can bankruptcy jurisdiction over "arising in" and "related to" proceedings be characterized as "arising under" jurisdiction? The answer depends upon how narrowly or broadly one reads *Osborn v. Bank of the United States,* [FN280] an early Supreme Court decision interpreting the contours of Congress' power under Article III of the Constitution to confer to federal courts jurisdiction of cases "arising under" federal law.

In *Osborn,* the Bank of the United States sought an injunction against enforcement by Ralph Osborn, Auditor of the State of Ohio, [FN281] of an Ohio statute assessing an annual tax upon the Bank. [FN282] The Court ruled, as a threshold matter, [FN283] on the constitutionality of a federal statute that gave federal courts jurisdiction over actions by or against the Bank of the United States, a federally chartered corporation. [FN284] The Bank of the United States commenced the action in a federal court pursuant to this grant of authority. [FN285]

Referring to the "arising under" jurisdictional provision of Article III, the Court concluded that the grant of federal jurisdiction in the Bank's **770** charter [FN286] was constitutional even though "several questions may arise in [the bank's suit], which depend on the general principles of the law, not on any act of Congress." [FN287] In often quoted language, Chief Justice Marshall, writing for the Court, rejected the argument that only purely federal questions are constitutionally within the jurisdiction of federal courts, because "[t]here is scarcely any case, every part of which depends on the constitution, laws or treaties of the United States." [FN288] The Court surmised that such a construction of the Constitution would reduce the grant of "arising under" jurisdiction in Article III "to almost nothing." [FN289]

What is most interesting about *Osborn* in this context is not its text-book statement that an actions's combination of federal and state law issues does not render unconstitutional an assertion of federal question jurisdiction. What is enlightening about *Osborn* is the breadth of its language in this regard, especially in light of its factual context. The Court in *Osborn* considered the circumstances under which an exercise of "arising under" jurisdiction would be rendered unconstitutional by the presence of questions depending on general principles of state law. [FN290] It concluded that "when a question to which the judicial power of the Union is extended by the constitution, forms an *ingredient* of the original cause, it is in the power of congress to give the circuit courts jurisdiction of that cause, although other questions of fact or of law may be involved in it." [FN291]

The Court's application of the standard it established in *Osborn* to the facts of that case is perhaps most telling of all:

The case of the Bank is, we think, a very strong case of this description. The charter of incorporation not only creates it, but gives it every faculty which it possesses. The power to acquire rights of any description, to transact business of any description, to make contracts of any description, to sue on those contracts, is given and measured by its charter, and that charter is a law of the United States. This being can acquire no right, make no contract, bring no suit, which is not authorized **771** by a law of the United States. It is not only itself the mere creature of a law, but all its actions and all its rights are dependant on the same law. Can a being, thus constituted, have a case which does not arise literally, as well as substantially, under the law?

Take the case of contract, which is put as the strongest against the Bank. When a Bank sues, the first question which presents itself, and which lies at the foundation of the cause, is, has this legal entity a right to sue? Has it a right to come, not into this Court particularly, but into any Court? This depends on a law of the United State. [sic] The next question is, has this being a right to make this particular contract? If this question be decided in the negative, the cause is determined against the plaintiff; and this question, too, depends entirely on a law of the United States. These are important questions, and they exist in every possible case. [FN292]

The breadth of the standard in *Osborn* is evident from its facts, as Osborn and the other defendants in the action did not question the Bank's power to act, only the constitutionality of the grant of federal jurisdiction. [FN293] The court found the mere possibility of this federal issue sufficient for jurisdiction, however, for "[w]hether [the federal question of the Bank's power to act] be, in fact, relied on or not, in the defen[s]e, it is still a part of the cause, and may be relied on." [FN294] Moreover, the true breadth of **772** *Osborn* is apparent in the subsequent cases brought by or against the Bank; once resolved by the Supreme Court, similar objections to the Bank's power to act could not be raised. [FN295] The dissent in *Osborn* took issue with the broad constitutional standard set forth by the majority, [FN296] complaining that Article III did not sanction the assertion of jurisdiction "merely on the ground that a question might possibly be raised in it, involving the constitution, or constitutionality of a law of the United States." [FN297] Nonetheless, *Osborn* continues to be cited by the Supreme **773** Court as good law. [FN298]

Cross reads *Osborn* broadly enough to support the contention that § 1334(a)'s grant of jurisdiction over title 11 cases constitutes a permissible grant of "arising under" jurisdiction. [FN299] Under this construction, the "title 11 case" is a constitutional "case" within the meaning of Article III because its commencement is authorized by federal law [FN300] and because certain federal rights, such as the automatic stay, flow from this commencement. [FN301]

Applying *Osborn*, "arising in" proceedings can also be said to fit within constitutional "arising under" jurisdiction on several grounds. **774** First, by definition, "arising in" proceedings would not exist in the absence of the federal bankruptcy case. Courts have defined "arising in" jurisdiction to exist "if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." [FN302] Consequently, in a broad sense, "arising in" proceedings can be said to "arise under" the federal statutes and procedural rules which authorize the filing of a bankruptcy petition. [FN303] Second, most "arising in" proceedings involve either litigation on a disputed proof of claim or a claim arising out of the post-petition administration of the bankruptcy estate. [FN304] In the first class of cases, the proceeding can broadly be viewed as "arising under" 11 U.S.C. § 501(a), which authorizes the filing of a proof of claim. [FN305] In the second class of cases, the proceeding can be said to "arise under" 11 U.S.C. §§ 721 and 1108, [FN306] which authorize the trustee or debtor-in-possession [FN307] to operate the business of the debtor following the filing of a bankruptcy petition, and 28 U.S.C. § 959(a), which provides that trustees and other enumerated representatives of the bankruptcy estate may be sued "with respect to any of their acts or transactions in carrying on business connected with such property [of the estate]." [FN308] Finally, where the bankruptcy trustee, debtor-in-possession, or possibly even an official committee of creditors or equity security holders, [FN309] is a party to an "arising in" proceeding, as often is the case, there also inevitably lurk **775** federal-law issues relating to the authority of these actors to sue or be sued, to enter into contracts, and otherwise to administer the estate. [FN310]

The factual circumstances in *Osborn* are distinguishable from most "arising in" proceedings, but none of these factual distinctions seem sufficient to alter the constitutional analysis. First, unlike the federal statute at issue in *Osborn*, neither the Bankruptcy Code nor its companion jurisdictional provisions explicitly enable the trustee and others to sue and be sued in federal courts. [FN311] Although there is a statute which expressly provides that a trustee in bankruptcy may "sue and be sued," that statute does not specifically mention the federal courts and, moreover, expressly limits this authority to suits relating to post-petition operations. [FN312] Still, § 1334(b)'s jurisdictional grant is clearly broader than that at issue in *Osborn*. Thus, § 1334(b)'s failure to provide explicitly that a trustee and other representatives of the estate can sue and be sued in federal courts would not seem to carry constitutional significance.

Second, the suits which could be brought by or against the federally chartered bank at issue in *Osborn* necessarily would involve the actions or inactions of the federally chartered bank. Suits brought by or against a trustee might involve the actions or inactions of the trustee in his capacity as representative of the estate. [FN313] By contrast, however, suits might just as easily involve the actions or inactions of the debtor prior to the filing of the bankruptcy petition and creation of the estate, which the trustee asserts or raises as a defense in his capacity as representative of the debtor. [FN314] Thus, "arising in" proceedings involving pre-petition conduct are distinct from the conduct at issue in *Osborn*. Suits involving post-petition conduct of the estate arguably involve two distinct federal ingredients, however--the estate's power to enter into the transaction and its capacity to sue or be sued. Suits involving pre-petition events involve at least the latter issue of capacity.

Finally, the threshold federal issues referred to in *Osborn* involved the power of Congress to charter the Bank under federal

62 FDMLR 721                                                                                                Page 22
62 Fordham L. Rev. 721

law and the scope of this federal charter. The federal issues in an "arising in" proceeding will differ depending on the cir-cumstances of the suit. Where the suit arises out of the post-petition operation of the estate, such as with a suit to enforce a post-petition contract made by the estate, there inevitably *776 exist threshold issues relating to the power of Congress to create a bankruptcy estate authorized to carry on the business of the debtor. Where the "arising in" proceeding involves litigation on a pre-petition claim against the estate, such as with a claim on a pre-petition contract with the debtor, the underlying federal issue instead involves the power of Congress to create a bankruptcy estate against which recovery on prepetition claims is limited. In some instances, however, the federal issues involved in an "arising in" proceeding will involve nothing more than standing issues--determinations as to whether the trustee is a proper party to the action. For example, where the trustee is authorized to bring a suit against the debtor's shareholders seeking recovery on the theory that the shareholders acted as mere alter egos of the debtor-corporation, courts have viewed the cause of action as "arising in" the title 11 case, because, but for the filing of the bankruptcy petition and the appointment of the bankruptcy trustee, the alter ego action would have been commenced by some party other than the trustee. [FN315] The only implicit federal issue in such an action is the standing of the trustee. Because there is no express provision in the Bankruptcy Code authorizing the trustee to bring alter ego actions, the trustee's standing to bring the suit turns on an issue of state law: If, under state law, the debtor-corporation could have commenced the alter ego action, then, as representative of the estate, the trustee has the exclusive right to bring such an action on behalf of the estate; alternatively, if state law defines creditors of the debtor as the proper parties to commence an alter ego action, then the trustee may not have standing to bring the action because the trustee is not empowered to act on behalf of individual creditors. [FN316] An alternative way to view this issue, however, is that the trustee's ability to bring suit turns on whether the proceeds of re-covery would constitute property of the debtor's estate, a federal question informed by state law concepts. [FN317]

Under a broad reading of *Osborn,* even "related to" proceedings can be said to "arise under" federal law within the meaning of Article III, although here the scope of constitutionally permissible grants of "arising under" jurisdiction would be strained to its limits. Where the "related to" proceeding is brought by or against the trustee, debtor-in-possession, or other representative of the estate, there exists an implicit federal issue *777 involving the authority of such entity to sue or be sued. [FN318] In addi-tion, the federal issue underlying every proceeding "related to" a title 11 case is Congress' power to create the federal remedy of bankruptcy and permit the commencement of a bankruptcy case, for if Congress does not have this power there can be no title 11 case for the proceeding to affect. [FN319] This is especially true where "related to" jurisdiction is narrowly defined to include only those proceedings affecting distributions from the estate or administration of the estate. [FN320]

The contention that all "arising in" and "related to" proceedings are a form of constitutional "arising under" jurisdiction is a controversial one. Galligan and Cross agree that *Osborn* validates the constitutionality of "arising in" and "related to" pro-ceedings [FN321] that are brought by or against a trustee in bankruptcy, [FN322] but contend that *Osborn* extends no further. [FN323] They describe this argument as the "original ingredient" theory*778 of constitutional "arising under" jurisdiction, [FN324] a reference to Justice Marshall's statement in *Osborn* that Article III extends to Congress the power to confer federal jurisdiction whenever "a question to which the judicial power of the Union . . . forms an ingredient of the original cause." [FN325] Galligan and Cross reject the notion that proceedings involving a debtor-in-possession satisfy *Osborn* because "[i]f all Congress has to do to grant federal jurisdiction, without providing a rule of decision, is to 'create' a federal juridical entity, then whenever it wanted a federal court to hear a case Congress could so legislate by engaging in semantics." [FN326] This narrow reading of *Osborn* has been refuted by more recent Supreme Court precedent, however. In *American Red Cross v. S.G.,* [FN327] the Court viewed the constitutionality of a federal statute empowering the Red Cross to "sue or be sued" in federal courts as long resolved, [FN328] citing *Osborn.*

Moreover, both Galligan and Cross narrowly read *Osborn* to uphold a grant of federal jurisdiction whenever there exists a "federal party" to a suit, such as a trustee in bankruptcy, [FN329] although they admit that others have construed the case more broadly to validate jurisdictional grants in which a federal question is an "original ingredient" of the case. [FN330] Galligan defines an "original ingredient" for these purposes as "one that the court must resolve, either implicitly or explicitly, in plain-tiff's favor for plaintiff to win its case." [FN331] Thus, an "original ingredient" in every "arising in" and "related to" pro-ceeding, irrespective of whether a trustee, debtor-in-possession, or other representative of the estate is a party to the *779 proceeding, is the power of Congress to authorize the remedy of bankruptcy, including the debtor's eligibility to seek that remedy.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Put so broadly, however, an "original ingredient" theory of Article III may be difficult to distinguish from the theory of protective jurisdiction. [FN332] But even the narrowest definition of protective jurisdiction requires only that Congress grant federal jurisdiction pursuant to "an articulated and active federal policy regulating a field." [FN333] Once it is shown that the state law claim relates to an articulated and active federal policy, this definition of protective jurisdiction would permit a federal court to hear the state law claim standing alone. Bankruptcy jurisdiction over "arising in" and "related to" proceedings does not work independently from the grant of jurisdiction over title 11 cases. "Arising in" and "related to" proceedings exist only in the context of the title 11 case, and thus the title 11 case forms an "original ingredient" of any form of bankruptcy relief, including "arising in" and "related to" proceedings occurring in the case. [FN334]

### (b) Bankruptcy Jurisdiction as Supplemental Jurisdiction

"Related to" proceedings can also be viewed as a form of supplemental jurisdiction. [FN335] Cross contends that, under the doctrine of ancillary jurisdiction, "related to" jurisdiction involving purely state law claims between**780 non-diverse parties satisfies Article III. [FN336] Defining "related to" jurisdiction as "limited to those state claims that must be resolved in order to define the shape of the eventual bankruptcy relief," Cross describes all these "related to" proceedings as "logically related to the federal cause of action in bankruptcy," thus, forming "part of a single federal bankruptcy 'case' for purposes of Article III." [FN337]

Characterization of § 1334(b)'s grant of jurisdiction over "related to" proceedings as a form of supplemental jurisdiction is also supported by the statute's plain language, especially when that language is taken in its historical context. [FN338] The phrase "related to" consistently indicates a **781 grant of supplemental jurisdiction in other federal statutes. In 28 U.S.C. § 1338(b), district courts are empowered to hear "any civil action asserting a claim of unfair competition when joined with a substantial and *related* claim under the copyright, patent, plant variety protection or trademark laws." [FN339] Courts have described § 1338(b)'s grant of jurisdiction as "supplemental" to the patent, copyright and trademark federal question jurisdiction granted in § 1338(a). [FN340] Similarly, 28 U.S.C. § 1367(a), which expressly grants supplemental jurisdiction to the district courts, defines that jurisdiction as extending to all claims "so *related to* claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." [FN341] Thus, reading the statutory grants of federal jurisdiction *in pari materia,* [FN342] the grant of jurisidiction over proceedings "related to" a title 11 case constitutes a grant of supplemental jurisdiction.

Moreover, courts historically have recognized exercises of supplemental bankruptcy jurisdiction. Congress can be assumed to have been aware of this practice and to have intended to codify it, [FN343] when, in 1978, and again in 1984, it enacted a bankruptcy jurisdictional provision conferring on district courts jurisdiction over civil proceedings "arising under title 11, or arising in or related to cases under title 11." [FN344]

In this instance, legislative history [FN345] does not specifically refer to decisions under the Bankruptcy Act of 1898 in which ancillary [FN346] and pendent**783 [FN347] bankruptcy jurisdiction were exercised, but does, in general, indicate Congress' intent to replicate and possibly exceed the grants of jurisdiction under the Bankruptcy Acts of 1841 [FN348] and 1867, [FN349] and specifically cites *Lathrop v. Drake,* [FN350] a case validating an exercise of ancillary**784 jurisdiction under the 1867 Bankruptcy Act. [FN351] Congress can be presumed to have been familiar with courts' reliance on the doctrines of ancillary and pendent jurisdiction in the bankruptcy context, at least under the 1867 Bankruptcy Act. [FN352]

Thus, there may be more to the "substantiality" test than courts or commentators have previously concluded. The "substantiality" test may indeed impose a test of constitutional significance only apparent when applied to an exercise of supplemental bankruptcy jurisdiction, rather than an exercise of jurisdiction supplemental to federal question or diversity jurisdiction. It may require that the federal ingredient in the primary claim be "substantial." And where the primary claim is an "arising in" or a "related to" proceeding this requirement may not be satisfied, depending upon the constitutional sources of this jurisdiction. If it is a form of "arising under" jurisdiction, its federal ingredient may be viewed as sufficiently "substantial" to serve as the basis of an exercise of supplemental jurisdiction. If it is a form of supplemental jurisdiction, however, the "substantiality" requirement may not be met.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

<center>(ii) Relatedness</center>

*Gibbs* also provides that an exercise of pendent jurisdiction is constitutionally authorized when "the relationship between [a claim arising under the Laws of the United States] and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.'" [FN353] As applied to an assertion of supplemental bankruptcy jurisdiction, this language does not clearly describe the focus of this "relatedness" test. To what must the supplemental claim relate? Is it sufficient that the supplemental claim shares a logical or factual relationship with the primary claim, if the primary claim derives from state law?

Some commentators restate the *Gibbs* "relatedness" test slightly differently.**785** [FN354] They contend that the dictates of Article III are satisfied only if the constitutional "category" or "case" tests are satisfied with respect to both the primary and supplemental claims. [FN355]

According to this analysis, an assertion of jurisdiction over a primary claim complies with the constitutional "category" test if it falls within one of the nine categories of "cases or controversies" enumerated in Article III, Section 2. [FN356] For example, in *Gibbs,* the primary claim involved a federal question "arising under" the National Labor Relations Act. Thus, because Article III, Section 2, includes among its categories "Cases . . . arising under . . . the Laws of the United States," the assertion of primary jurisdiction in *Gibbs* satisfies the constitutional "category" test. [FN357]

By definition, therefore, an assertion of supplemental jurisdiction, standing alone, cannot comply with the constitutional "category" test. [FN358] For example, in *Gibbs,* the state law pendent-claim at issue did not fit within the categories listed in Article III because it neither arose under federal law nor involved litigants of diverse citizenship. Instead, under this analysis, an assertion of supplemental jurisdiction is constitutional if it satisfies the constitutional "case" test [FN359]--that is, if the supplemental claim is so related to the primary claim as to form a single "case or controversy." And in *Gibbs,* the Court found the constitutional "case" test satisfied only where the primary claim and the supplemental claim arose out of a common nucleus of fact. [FN360]

This two-part test for the constitutionality of an assertion of supplemental jurisdiction sharpens the focus of the "relatedness" test as applied to the bankruptcy context, but, depending upon the breadth of the constitutional "category" test, may lead to the conclusion that the Constitution can support assertions of supplemental bankruptcy jurisdiction only where the primary claim "arises under" title 11.

Under a narrow application of the constitutional "category" test, **786** "arising under" bankruptcy proceedings clearly comply with this requirement. Proceedings that "arise under" title 11 satisfy the constitutional "category" test because they are "arising under . . . the Laws of the United States," [FN361] one of the categories listed in Article III. Thus, an assertion of jurisdiction supplemental to an "arising under" proceeding would satisfy this two-step analysis if the supplemental claim is sufficiently related [FN362] to the "arising under" proceeding to satisfy the constitutional "case" test.

Whether proceedings that "arise in" or "relate to" a title 11 case satisfy the constitutional "category" test is much more complicated, however. Article III [FN363] does not expressly enumerate these sorts of cases or controversies within its list of categories. [FN364] Supreme Court precedent is unclear as to the constitutional sources of this jurisdiction. [FN365] Courts and commentators agree that an assertion of jurisdiction over proceedings that "arise in" or "relate to" a title 11 case is constitutional, but disagree as to whether this is because these proceedings independently fulfill the constitutional "category" test ("arising under" jurisdiction) or because they fulfill the constitutional "case" test (supplemental jurisdiction). [FN366]

But if jurisdiction over "arising in" and "related to" proceedings is constitutional only under the constitutional "case" test, then an assertion of jurisdiction over a claim supplemental to such a proceeding is constitutionally suspect. Under this construction, neither the primary nor the supplemental claim satisfies the constitutional "category" test, for the federal element--the title 11 case--is not once, but twice, removed from the supplemental claim: the supplemental claim is so related to the

"arising in" or "related to" proceeding as to form a single "case or controversy" with that proceeding, and the "arising in" or "related to" proceeding is so related to the title 11 case as to form a single "case or controversy" with the title 11 case. This separation between satisfaction of the constitutional "category" and "case" test may be too great. Thus, the requirements of Article III of the Constitution may not be satisfied *787 where the assertion of supplemental jurisdiction involves a proceeding which is related to a proceeding "arising in" or "related to" a title 11 case.

It is far from clear, however, that the "category" of "Cases arising under . . . the Laws of the United States" set forth in Article III, Section 2, should be construed so narrowly. [FN367] As discussed above, *Osborn* may be read to characterize all of § 1334(b)'s jurisdictional grants as within the grant of authority in Article III, Section 2, to vest district courts with original jurisdiction over cases that "arise under" federal law. [FN368] Once *Osborn* facilitates a broad construction of the constitutional "category" test, one could argue that § 1367(a)'s grant of jurisdiction supplemental even to "related to" proceedings satisfies the constitutional "case" test so long as the supplemental claim is sufficiently "related to" the primary claim.

If the statutory grants of "arising in" and "related to" jurisdiction are viewed as satisfying the constitutional "category" test because *Osborn* permits so broad an interpretation of constitutional "arising under" jurisdiction, the analysis returns to the scope of the constitutional "case" test. *Osborn* says nothing about the constitutionality of a grant of jurisdiction that is supplemental to a federal question because, although it defines the limits of constitutional "arising under" jurisdiction, it assumes the existence of a constitutional "case." [FN369] And the only precedent purporting to define the limits of the constitutional "case" in this context is *Gibbs.*

In the abstract, the argument that *Gibbs's* constitutional "case" test is satisfied whenever the primary claim is logically or factually related to *788 the supplemental claim is an appealingly simple one. The contention becomes more suspect when related to facts, however. Recall the hypothetical involving an assertion of jurisdiction supplemental to a "related to" proceeding--the malpractice action supplemental to the priority dispute between two secured creditors of the debtor. [FN370] In this scenario, a broad reading of *Osborn* permits the conclusion that the constitutional "category" test is satisfied because the secured creditors' priority dispute (a "related to" proceeding based solely on questions of state law) "aris[es] under . . . the Laws of the United States" within the meaning of the Constitution. [FN371] Application of *Gibbs* permits the conclusion that the constitutional "case" test is satisfied because the priority dispute and the malpractice action enjoy a "common nucleus of operative fact." [FN372]

But step back and consider that this analysis has led us to conclude that the title 11 case, the proceeding "related to" the title 11 case, and the claim related to the "related to" proceeding are one constitutional "case." [FN373] No court [FN374] and no commentator [FN375] has expressly advocated so broad a definition of a constitutional "case." [FN376]

*789 This reconciliation of *Gibbs* and *Osborn* is troubling in its acceptance of an indirect relationship between the supplemental claim and the federal ingredient as constitutionally sufficient. Once it is agreed that this relationship can be satisfied even indirectly, there is little to limit the standard. Under this broad a construction of Article III, what constitutional principle would preclude the assertion of jurisdiction supplemental to the supplemental claim related to the "related to" proceeding? Under this analysis, so long as a claim can trace a chain of logical relationships to the commencement of a title 11 case, no matter how long the chain and how attenuated the relationship between the ultimately supplemental claim and the federal ingredient, the entire chain of claims would constitute a "single case or controversy under Article III of the United States Constitution" and, thus, the exercise of jurisdiction over this chain of claims would be viewed as constitutionally permissible. [FN377]

A constitutional analysis which rejects exercises of jurisdiction that are supplemental to "related to" bankruptcy proceedings is also supported by the realization that supplemental jurisdiction exists as a result of the distinctions between statutory and constitutional jurisdiction. [FN378] Supplemental jurisdiction exists to resolve the tension between constitutional authority for, and congressional grants of, federal jurisdiction. The Supreme Court has historically found that Congress has not conferred by statute the full extent of federal jurisdiction authorized by Article III of the Constitution. [FN379] For example, the Court has defined constitutional *790 "arising under" jurisdiction much more broadly than its statutory counterpart. [FN380] Once this schism exists, however, as a practical matter, it may be impossible for a federal court to resolve questions

62 FDMLR 721
62 Fordham L. Rev. 721

involving only an interpretation of federal law. [FN381] Thus, as early as 1824, the Supreme Court has held that the presence of issues of state law do not prevent a federal court from exercising a statutory grant of jurisdiction, [FN382] concluding that to hold otherwise would "reduce[ ] to almost nothing" [FN383] the authority to confer federal jurisdiction over "cases . . . arising under . . . the Laws of the United States," [FN384] for "[t]here is scarcely any case, every part of which depends on the constitution, laws or treaties of the United States." [FN385] If Congress were to enact a statute conferring original federal jurisdiction to the full extent permitted by Article III--to the full extent permitted by *Osborn*-- then there would be no need for supplemental jurisdiction. Supplemental jurisdiction exists only because Congress has not granted original federal jurisdiction to the full extent permitted by Article III.

Courts appear tempted to conclude that for every statutory grant of non-supplemental jurisdiction, § 1367 provides an additional grant of supplemental jurisdiction. But this conclusion views Article III as an ever-expanding reservoir of jurisdiction, with supplemental jurisdiction **791 expanding at the same rate as statutory grants of original jurisdiction. [FN386] This limitless vision of Article III is surely flawed. *Gibbs* tells us that supplemental jurisdiction may not exceed the notion of a constitutional "case." Surely, the Constitution refers to but one constitutional "case," not to two distinct definitions of "case" depending upon whether the reference is to original or supplemental jurisdiction.

2. Constitutional Questions Surrounding the Exercise of Supplemental Bankruptcy Jurisdiction by Non-Article III Bankruptcy Courts

Except during the four-year period between enactment of the 1978 bankruptcy jurisdictional provisions and the ruling of the Supreme Court that this broad delegation of the "'essential attributes' of the judicial power of the United States" exceeded the limits of Article III, [FN387] the exercise of bankruptcy jurisdiction has been divided between district courts and bankruptcy courts. Under Article III of the Constitution, only a life-tenured judge may exercise the "'essential attributes' of judicial power," except as to controversies falling within three narrow historical exceptions. [FN388] The exercise of supplemental jurisdiction may be among these "'essential attributes' of judicial power." [FN389] For this reason, any exercise of supplemental bankruptcy jurisdiction by non-Article III bankruptcy courts may be unconstitutional. [FN390]

a. *Non-Article III Bankruptcy Courts*

(i) Bankruptcy Act of 1898

Under the former Bankruptcy Act of 1898, bankruptcy judges (who prior to 1972 were called "referees") were entitled to exercise only limited**792 bankruptcy jurisdiction. [FN391] Under the 1898 Act, they had only summary jurisdiction over (i) matters involving the administration of the bankruptcy case, (ii) disputes involving property in the actual or constructive possession of the bankruptcy court, (iii) proceedings in which the parties had consented to bankruptcy court jurisdiction (expressly, impliedly by failing to object in time, or impliedly by filing a proof of claim or otherwise participating in the bankruptcy case), and (iv) a few limited matters over which the statute expressly granted jurisdiction to bankruptcy courts. [FN392] In all other instances, only a state court or federal district court was said to have plenary jurisdiction over the dispute. [FN393]

The division of summary and plenary jurisdiction over bankruptcy matters was severely criticized because, in some cases, litigants were able to dispute the bankruptcy court's jurisdiction for years before any court ever reached the merits of the suit. [FN394] This undesirable jurisdictional litigation and the attendant cost and delay caused Congress in 1978 to increase substantially the grant of bankruptcy jurisdiction which bankruptcy courts were entitled to exercise. [FN395]

(ii) Bankruptcy Reform Act of 1978

The 1978 bankruptcy jurisdictional provision did not directly confer its pervasive jurisdiction on bankruptcy courts, but instead vested federal district courts with broad-ranging jurisdiction and at the same time authorized bankruptcy courts to exercise nearly all of that jurisdiction. [FN396] Legislative history confirmed Congress' intent to confer broad jurisdictional authority to the bankruptcy courts. [FN397]

**\*793** In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* [FN398] the Supreme Court held that "the broad grant of jurisdiction to the bankruptcy courts contained in 28 U.S.C. § 1471 [violates Article III of the Constitution]." [FN399] It held constitutionally invalid Congress' 1978 grant of power which gave bankruptcy courts jurisdiction to make final determinations in matters involving purely private state law disputes--that is, matters merely "related to" the bankruptcy case.

Under the jurisdictional provisions enacted in 1978, Congress had "vest[ed] all 'essential attributes' of the judicial power of the United States in the . . . bankruptcy court." [FN400] The Court held that such judicial power could not constitutionally be exercised by a court whose judges lacked the attributes of life tenure and salary protection set forth in Article III. The plurality [FN401] concluded that the bankruptcy jurisdictional provision at issue violated Article III because it did not fit within any of the three exceptions previously crafted by the Court to the general rule that federal judicial power is to be exercised only by Article III judges. [FN402] The plurality described the two most relevant exceptions as those involving the adjudication of "public rights" and those in which the non-Article III decision-maker acted as an "adjunct" to an Article III court. [FN403]

The public rights doctrine finds its origin in a group of cases in which **\*794** the Supreme Court had upheld the constitutionality of legislative and administrative courts. The plurality in *Marathon* described the public rights doctrine as limited to matters arising "between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments" and which "historically could have been determined exclusively by those departments." [FN404] The *Marathon* plurality declined to uphold the jurisdictional statute at issue under the public rights doctrine because the suit there involved two private parties litigating liability under state law. [FN405] However, the plurality noted that some bankruptcy proceedings might fall within the public rights exception:

[T]he restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not. [FN406]

The *Marathon* plurality derived the adjunct court exception to Article III from two cases, *Crowell v. Benson* [FN407] and *United States v. Raddatz.¢* [FN408] *YCrowell* validated the statutory grant of authority to a federal administrative agency to make initial factual determinations pursuant to a federal statute requiring employers to compensate their employees for work-related injuries occurring upon the navigable waters of the United States. [FN409] In *Raddatz* the Supreme Court upheld the practice, authorized by the 1978 Federal Magistrates Act, of referring certain pre-trial motions in criminal cases to a magistrate for initial determination. [FN410] From these cases, the plurality derived two principles relevant in determining the extent to which Congress constitutionally may vest judicial power in adjuncts to Article III courts. First, it suggested that Congress, when it creates a substantive federal right, possesses substantial discretion to prescribe the manner in which that right may be adjudicated--including the right to delegate judicial functions to the non-Article III adjunct. The second principle that the plurality inferred from these cases is that the adjunct must be limited in such a way that the "essential attributes" of judicial power are retained in the Article III court.

In applying this analysis, the *Marathon* plurality found that the first principle--Congress' discretion to prescribe the manner in which federally created rights are adjudicated--was of no assistance to the plaintiff, because its suit was predicated on state, not federal, law. [FN411]

**\*795** The *Marathon* plurality also determined that the delegation of jurisdiction to bankruptcy judges under the 1978 legislation was far greater than that approved of in either *Crowell* or *Raddatz.* [FN412] In reaching this conclusion, the plurality noted that under the 1978 jurisdictional provision, bankruptcy courts exercised all ordinary powers of federal district courts, including the powers to preside over jury trials, issue declaratory judgments, issue writs of habeas corpus, and issue any other order necessary or appropriate to enforce the provisions of the Code. [FN413] Additionally, bankruptcy courts exercised the power to make conclusive findings of fact and conclusions of law, subject to review by Article III courts only under ordinary appellate review, which upholds findings of fact made by bankruptcy courts unless clearly erroneous. [FN414]

The Supreme Court declined in its decision in *Marathon* to rework the jurisdictional provisions of the 1978 Bankruptcy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Reform Act so as to separate the functions that constitutionally could be allocated to the bankruptcy court from those that could only be exercised by Article III district courts. [FN415] It left that task for Congress. In July 1984, Congress enacted the current bankruptcy jurisdictional provisions.

<div align="center">(iii) 1984 Amendments</div>

In the current bankruptcy jurisdictional provisions, Congress has divided bankruptcy jurisdiction between that which can be "heard and determined" by non-Article III bankruptcy courts, and that which can only be "heard" by bankruptcy courts but must be finally determined by district courts. Under 28 U.S.C. § 157(a), district courts "may provide that any or all cases . . . and . . . proceedings . . . shall be referred to the bankruptcy judges." [FN416] Once a proceeding is referred, the power of the bankruptcy judge will depend upon whether the proceeding "arises under" title 11 or "arises in" a title 11 case--that is, whether it is a "core" proceeding or whether the proceeding is merely related to the title 11 case. Although the language of § 157(a) merely authorizes this reference, district courts uniformly have adopted local rules referring jurisdiction to bankruptcy courts.

"Core" proceedings are defined in 28 U.S.C. § 157(b) to include the following types of proceedings: administrative; claim allowances; counterclaims by the estate against claimants; financing orders; turnovers; preference; stays; fraudulent transfers; discharge and dischargeability; *796 lien priority and validity; confirmation of plans; leases and property sales; and "other proceedings affecting . . . the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims." [FN417] That a claim involves state law is not determinative of whether a proceeding is "core" or not. [FN418] And it is the bankruptcy court, not the district court, which initially determines whether a proceeding is "core" or not. [FN419]

A bankruptcy judge may, subject to ordinary appellate review, hear, determine, and enter judgment in all proceedings "arising under" title 11 or "arising in" a title 11 case. [FN420] Bankruptcy courts are not authorized to determine proceedings that are merely "related to" a title 11 case, however. [FN421] Moreover, personal injury and wrongful death tort claims are not triable in the bankruptcy courts. [FN422]

"Non-core" proceedings include proceedings against persons who have not filed claims against the estate. As to these "non-core" proceedings, a bankruptcy court may hear, but may not enter a final order, without the parties' consent. [FN423] And, upon timely and specific objection, the district judge is required to review *de novo* proposed findings of fact and conclusions of law made by the bankruptcy judge in these "related to" proceedings. [FN424]

<div align="center">*797 b. <em>Supplemental Jurisdiction as an Essential Attribute of Judicial Authority</em></div>

Many courts have construed the judicial power of non-Article III bankruptcy courts narrowly in order to avoid the conclusion that the power delegated to them involves the "essential attributes of judicial authority" and exceeds the limits of Article III of the Constitution. [FN425] For example, courts of appeals, although divided, generally have concluded that non-Article III bankruptcy courts are not authorized by statute to conduct jury trials in core proceedings; in reaching this conclusion, these courts were influenced by concerns that any statute that conferred such power on bankruptcy courts would be unconstitutional. [FN426] In analogous cases courts of appeal are divided on whether the Bankruptcy Code vests bankruptcy courts with contempt power and, if so, whether the exercise of such power by these non-Article III courts would be unconstitutional. [FN427] Similarly, courts of appeal have held that non-Article III bankruptcy*798 courts are not empowered to enter an unreviewable order under 11 U.S.C. § 305 to dismiss or abstain from jurisdiction over an entire bankruptcy case. [FN428]

Related to the question of whether bankruptcy courts enjoy broad judicial power, courts of appeal are also divided on whether bankruptcy courts are entitled to sanction the government pursuant to certain non-bankruptcy provisions although they are not Article III "courts of the United States." [FN429] In addition, courts have construed statutes referring to a power of the "district courts" as exclusive of the power of non-Article III bankruptcy courts. [FN430]

*799 Like the power to conduct a jury trial, exercise contempt power, and render decisions subject only to ordinary ap-

pellate review or, in limited instances set forth by statute, subject to no review, the power to exercise supplemental jurisdiction clearly should be counted among the "'essential attributes' of judicial authority." [FN431] Although the Supreme Court has cautioned that the scope of Article III involves practical considerations and a complex balancing of competing interests, [FN432] it seems clear that the grant of supplemental jurisdiction to non-Article III bankruptcy courts creates questions of constitutional dimension. [FN433]

### B. *Did Congress Expressly Intend To Confer Supplemental Bankruptcy Jurisdiction?*

*Finley* requires Congress to authorize expressly the exercise of pendent-party jurisdiction. [FN434] Some courts inter-preted *Finley* to require Congress to authorize expressly other types of supplemental jurisdiction as well. [FN435] In 28 U.S.C. § 1367(a), Congress explicitly and broadly **800** grants supplemental jurisdiction to district courts exercising original juris-diction in a civil action. [FN436] "Except . . . as expressly provided otherwise by Federal statute," [FN437] § 1367(a)'s grant of supplemental jurisdiction extends to "claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." [FN438] Thus, § 1367 confers supplemental bankruptcy jurisdiction (i) unless "expressly provided otherwise by Federal statute," (ii) unless the grant of original jurisdiction to the district court does not involve a "civil action," or (iii) unless the assertion of supplemental jurisdic-tion exceeds the limitations of Article III of the United States Constitution. [FN439] Moreover, § 1367's grant of supplemental jurisdiction is limited to "the district courts."

### 1. "Except . . . as Expressly Provided Otherwise by Federal Statute"

One commentator opines that the "[e]xcept . . . as expressly provided otherwise" language was intended to mark "the statute's departure from the former *Aldinger* test of 'expressed or implied negation.'" [FN440] Under this commentator's analysis, a statute must expressly, rather than merely impliedly, "provide otherwise" in order for it to preclude a district court from exercising supplemental jurisdiction.

Section 1367(a)'s language, however, fails to identify the quality of the express statement which will suffice to negate supplemental jurisdiction. One interpretation is to conclude that, by a federal statute other than § 1367, Congress must ex-pressly provide that the supplemental jurisdiction granted by § 1367(a) may not be exercised. For example, if a federal statute contained language similar to the express prohibition in § 1367(b)--which provides that, where jurisdiction over the original claim is based on the diversity of the litigants' citizenship, district courts **801** shall not have pendent-party supplemental ju-risdiction [FN441]--such a provision would clearly satisfy the language of § 1367(a). Further, a federal statute limiting sup-plemental jurisdiction in a manner similar to § 1367(c)--which permits district courts to decline to exercise supplemental ju-risdiction after considering statutorily specified factors--would constitute an express statement that limits, rather than prohibits, the exercise of supplemental jurisdiction and would also seem to satisfy the proviso found in § 1367(a). [FN442]

Another interpretation of the language of § 1367(a) is that the other federal statute need not expressly prohibit or limit supplemental jurisdiction, but merely "provide otherwise" than § 1367(a) for an exercise of supplemental jurisdiction. There are two federal statutes--28 U.S.C. §§ 1338(b) and 1334(b)--which arguably fall into this category.

First, 28 U.S.C. § 1338(a) grants to district courts original jurisdiction over civil actions "arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks." [FN443] Subsection (b) of § 1338 also grants to district courts original jurisdiction over "any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws." [FN444] The § 1338(b) express grant of supplemental jurisdiction only extends to claims of unfair competition, and thus can be viewed as "providing other-wise" than § 1367 by conferring a narrower grant of supplemental jurisdiction than the much broader grant in § 1367. [FN445]

**802** A similar argument can be constructed with respect to 28 U.S.C. § 1334(b). Section 1334(b) grants to district courts original jurisdiction over "civil proceedings arising under title 11, or arising in or related to cases under title 11." [FN446] The grant of jurisdiction over civil proceedings "related to" a title 11 case has been described as a grant of supplemental jurisdiction.

[FN447] If that characterization is accurate, then § 1334(b)--like § 1338(b)--contains an express grant of supplemental juris-diction which is narrower than that in § 1367. Thus, § 1334(b) also can be viewed as a federal statute which "provides other-wise" than, and thus overrides, the broad general grant found in § 1367.

The limited case law that exists on the issue does not support this alternative interpretation, however. As noted above, courts have nearly uniformly concluded that § 1367 authorizes the exercise of supplemental bankruptcy jurisdiction. [FN448] In addition, courts also have viewed §§ 1338(b) and 1367(a) as separate, rather than mutually exclusive, grants of supplemental jurisdiction. [FN449] Courts have not, however, explicitly considered the "expressly provided otherwise" language in § 1367(a).

The statutory argument against an exercise of jurisdiction supplemental to a proceeding "related to" a title 11 case is even stronger than that against the exercise of supplemental patent, copyright, and trademark **803 jurisdiction. In decisions that seek to reconcile §§ 1338(b) and 1367(a), a claim arising under a patent, copyright, or trademark statute had been joined with a claim arising under state law but not involving a claim of unfair competition; in these decisions, the courts viewed §§ 1338(b) and 1367(a) as distinct and alternative grants of supplemental jurisdiction. Decisions reconciling §§ 1334(b) and 1367(a) are very different, however, involving a much more expansive assertion of supplemental jurisdiction. [FN450] In many of these deci-sions the complaint had joined a civil proceeding "related to" a title 11 case with one related to the "related to" civil proceeding. Thus, in upholding these assertions of supplemental bankruptcy jurisdiction, the courts viewed §§ 1334 and 1367 as *cumulative* grants of jurisdiction; they viewed § 1334(b)'s grant of original jurisdiction as primary and § 1367(a)'s grant of jurisdiction as supplemental to it. [FN451] If supplemental trademark jurisdiction were construed as broadly as supplemental bankruptcy jurisdiction has been, courts would have sanctioned an exercise of jurisdiction over jurisdictionally insufficient state law claims factually related to a state law unfair competition claim that is, in turn, related to the federal trademark claim. [FN452] Court have not construed § 1338(b) this broadly. Nor should they.

Additional evidence can be found elsewhere in § 1367(a) that Congress understood § 1334(b)'s grant of bankruptcy ju-risdiction to "expressly provid[e] otherwise" than the supplemental jurisdiction provision. Thus, § 1367(a) is inapplicable to bankruptcy jurisdiction.

**804 2. "In Any Civil Action of Which the District Courts Have Original Jurisdiction, the District Courts Shall Have Sup-plemental Jurisdiction"

Bankruptcy litigation does not involve the commencement of "civil actions," unlike litigation commenced in the non-bankruptcy context. Rule 2 of the Federal Rules of Civil Procedure--which provides that "[t]here shall be one form of action to be known as 'civil action'"--is inapplicable in bankruptcy. [FN453] Instead, the units of litigation that occur in the context of a bankruptcy "case" [FN454] are defined either as an "adversary proceeding" [FN455] or a "contested matter." [FN456] And while an adversary proceeding is commenced by the filing of a complaint, [FN457] a contested matter is not. Contested matters are instead commenced by the filing of a motion. [FN458] Thus, the premise of § 1367(a)--original juris-diction over a "civil action"--is unfulfilled in the bankruptcy context.

3. "Related to Claims in the Action Within Such Original Jurisdiction"

Section 1367(a) appears to divide the universe of permissible assertions of jurisdiction between claims within the "original jurisdiction" of the district court and claims within its "supplemental jurisdiction" [FN459]-- requiring that the supplemental claim be sufficiently related to "claims in the action within such original jurisdiction." [FN460] Three definitions of the phrase "original jurisdiction" in § 1367(a) are plausible: (i) a claim may **805 be within the "original jurisdiction" of the district courts for this purpose if there exists a statutory grant of federal jurisdiction explicitly referred to as "original;" (ii) a claim may be within the "original jurisdiction" of the district courts for purposes of § 1367(a) if it is among the enumerated categories of cases and controversies found in Article III of the Constitution; or (iii) a claim may fulfill this requirement of § 1367(a) if it constitutes a permissible exercise of "non-supplemental jurisdiction." Surprisingly, the first construction permits the broadest interpretation of the scope of supplemental bankruptcy jurisdiction permitted by § 1367(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In virtually all of the other provisions of title 28 that use the term "original jurisdiction," it is used to distinguish original jurisdiction from appellate jurisdiction. [FN461] An interpretation of § 1367(a) that defines the phrase "original jurisdiction" as used in that provision to refer to the "non-supplemental jurisdiction" of the district courts would thus be anomalous. Moreover, the dichotomy between "original" or "non-appellate" jurisdiction on one hand and "appellate" jurisdiction on the other finds support not only in the statutory grants of jurisdiction found in title 28, but also in Article III of the Constitution. [FN462]

   a. *Section 1367(a)'s Use of the Phrase "Original Jurisdiction" May Refer to Statutory Grants of "Original Jurisdiction"*

Numerous provisions of title 28 grant federal jurisdiction to district courts. [FN463] Many of these provisions are phrased in terms of grants of **806 "original jurisdiction" to the district courts. [FN464] In the limited instances in which a provision of title 28 grants "appellate jurisdiction" to the district courts, the phrase "original jurisdiction" is absent. [FN465] **807Section 1367(a)'s requirement that supplemental claims be sufficiently related to "claims in the action within such original jurisdiction of the district courts" may, thus, require that the jurisdiction of the primary claim derive from some statutory grant of "non-appellate jurisdiction" other than § 1367. Under this construction of § 1367(a), assertions of supplemental bankruptcy jurisdiction are statutorily authorized without regard to whether the primary claim "arises under" title 11, or "arises in" or "relates to" a title 11 case, because 28 U.S.C. § 1334(b) grants district courts "original but not exclusive jurisdiction" of all three types of proceedings. [FN466]

   b. *Section 1367(a)'s Use of the Phrase "Original Jurisdiction" May Refer to the Categories of Cases and Controversies Enumerated in Article III of the United States Constitution*

   Section 1367(a)'s use of the phrase "original jurisdiction" may refer to the nine categories of cases and controversies enumerated in Article III, Section 2, Clause 1 of the Constitution. [FN467] Courts have interpreted these categories of cases and controversies as referring to the "original jurisdiction"--that is, the "non-appellate jurisdiction"--of the "inferior" federal courts. [FN468]

Under this construction, § 1367 clearly would authorize an assertion of supplemental jurisdiction where bankruptcy jurisdiction under § 1334(b) exists over the primary claim because it involves a proceeding "arising under" title 11. Article III, Section 2 enumerates "Cases . . . arising under . . . the Laws of the United States" as within the original jurisdiction of the district courts. [FN469] Whether, under this construction, **808 § 1367 also would sanction an assertion of supplemental jurisdiction when the primary claim is subject to § 1334(b) bankruptcy jurisdiction as a proceeding "arising in" or "related to" a title 11 case depends on the breadth of Article III, Section 2. [FN470]

   c. *Section 1367(a)'s Use of the Phrase "Original Jurisdiction" May Refer to "Non-Supplemental Jurisdiction" of District Courts*

Alternatively, § 1367(a)'s use of the phrase "original jurisdiction" may be *sui generis*. This language may indicate Congress' intent to describe a dichotomy different from the "appellate/non-appellate" distinction found in the Constitution and in statutory grants of federal jurisdiction other than that in § 1367(a). [FN471] It may indicate an intent to describe a dichotomy between supplemental and "non-supplemental" jurisdiction. A definition of the term "original jurisdiction" as "non-supplemental jurisdiction" works backward from a definition of "supplemental jurisdiction." [FN472]

Under this construction of § 1367(a), it is unclear whether Congress intended to confer supplemental bankruptcy jurisdiction to the extent courts have exercised this jurisdiction. [FN473] One could argue that the "non-supplemental" jurisdiction granted in a bankruptcy context is limited to that of "cases under title 11" [FN474] and "proceedings arising under title 11." [FN475] It may also be possible to view "arising in" jurisdiction as "non-supplemental jurisdiction." [FN476] Characterization of "related to" jurisdiction as "non-supplemental jurisdiction" in this sense may be much more difficult, however. [FN477]

One difficulty with this construction is that it may permit too broad a reading of § 1367(a). For example, if § 1367(a)

defines "original jurisdiction" to mean "non-supplemental jurisdiction" then it may codify the judicially created doctrine of pendent appellate jurisdiction, [FN478] although there is no indication in legislative history that Congress intended to cast **809 so broad a net. [FN479] Another difficulty is that it requires the awkward conclusion that Congress meant "non-appellate jurisdiction" when it refers to the "original jurisdiction" of district courts in most of title 28, but meant "non-supplemental jurisdiction" when it refers to the "original jurisdiction" of district courts in 28 U.S.C. § 1367(a). [FN480] This construction is most awkward as applied to 28 U.S.C. § 1338(b), which grants supplemental jurisdiction over "a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws" but which refers to this grant as "original jurisdiction." [FN481]

### 4. *"The District Courts Shall Have Supplemental Jurisdiction"*

The plain language of § 1367(a) refers only to the authority of the district courts to exercise supplemental jurisdiction. [FN482] It does not expressly grant this power to the bankruptcy courts. [FN483]

The plain language of 28 U.S.C. § 157(a) also supports a construction which disallows bankruptcy courts from exercising supplemental jurisdiction. [FN484] That section permits district courts to "provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district." [FN485] Although extremely broad, this reference of jurisdiction to bankruptcy courts does not expressly include jurisdiction supplemental to proceedings "arising under" title 11, or "arising in" or "related to" a title 11 case. Thus, read together with 28 U.S.C. § 157(a), the reference to "the district courts" in § 1367(a) should be viewed as intentionally exclusive of the bankruptcy courts. [FN486]

In addition, 28 U.S.C. § 157(c) supports this conclusion. Section 157(c)(1) permits a bankruptcy judge to "hear a proceeding that is not a **810 core proceeding but that is otherwise related to a case under title 11." [FN487] Absent the consent of the parties, the bankruptcy judge's power in "related to" proceedings is severely limited. [FN488] Legislative history and case law both indicate that constitutional concerns explain the limited power of a bankruptcy court to "hear" a "related to" proceeding but not enter the final order in the proceeding. [FN489] Given that there exist similar constitutional issues relating to the exercise of supplemental jurisdiction by a non-Article III bankruptcy court, [FN490] it seems likely that Congress would have similarly limited the power of bankruptcy courts to "hear" and not "determine" supplemental claims, and yet § 157(c)(1) speaks only of "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." [FN491] It is silent with regard to the power of a bankruptcy court to "hear" or "determine" a supplemental claim--a proceeding that is neither core nor related to the title 11 case. A proceeding requiring supplemental jurisdiction for the court to have the power to act would not be "related to" the title 11 case; if it were, resort to supplemental jurisdiction would not be necessary. Since § 157(c) grants to bankruptcy courts the more limited power to "hear" proceedings "related to" a title 11 case, without mention of their power to act in instances where this relationship is absent, it should not be expanded to include the power to exercise supplemental jurisdiction.

Did Congress intend, in § 1367, to grant to district courts jurisdiction supplemental to the bankruptcy jurisdiction conferred by § 1334(b)? Did it intend to grant supplemental jurisdiction to bankruptcy courts? Section 1367 is ambiguous. If Congress did intend to confer supplemental bankruptcy jurisdiction on these courts, it may have exceeded the limitations which Article III of the Constitution places upon Congress' power to bestow jurisdiction upon federal courts. Given the substantial constitutional**811 questions surrounding such an exercise of jurisdiction, these ambiguities should be resolved to avoid a finding of unconstitutionality. Section 1367 should be construed to preclude the exercise of jurisdiction supplemental to "arising in" and "related to" proceedings by a district court. It also should be construed as inapplicable to bankruptcy courts, conferring no supplemental jurisdiction on these non-Article III courts.

## IV. POLICY CONSIDERATIONS FAVORING A LIMITATION OF SUPPLEMENTAL BANKRUPTCY JURISDICTION

This part argues that, even if authorized by the Constitution and by statute, supplemental bankruptcy jurisdiction should be limited by Congress to include only supplemental claims related to an "arising under" or "arising in" proceeding, and possibly

62 FDMLR 721
62 Fordham L. Rev. 721

to include supplemental claims related to a "related to" proceeding that involves property of the estate. It concludes that the policies and purposes of supplemental jurisdiction are best reconciled with the purposes of the bankruptcy jurisdictional provision when district courts are precluded from exercising supplemental bankruptcy jurisdiction over claims related to "related to" proceedings, and statutorily permitted to decline other assertions of supplemental bankruptcy jurisdiction when the exercise would contravene important bankruptcy policies.

Bankruptcy jurisdiction exists to facilitate the efficient resolution of a debtor's estate, including litigation that "affects the amount of property available for distribution or the allocation of property among creditors," [FN492] but does not exist to facilitate the resolution of litigation unrelated to the estate. [FN493] An assertion of jurisdiction supplemental to a "related to" proceeding may be consistent with the efficient resolution of complex litigation, a single claim of which "might have a conceivable effect" on the estate, and yet actually hinder resolution of the bankruptcy case. [FN494] Moreover, the policies generally favoring an exercise of supplemental jurisdiction in ordinary civil litigation are not wholly applicable in the context of bankruptcy. [FN495]

A. *A Principal Purpose of Bankruptcy Jurisdiction Is to Facilitate the Resolution of an Estate*

Congress should prohibit the exercise of supplemental bankruptcy jurisdiction when the exercise would be inconsistent with the fundamental purpose of a broad grant of bankruptcy jurisdiction: the efficient resolution of claims against and distributions from a bankruptcy estate. The **\*812** exercise of supplemental bankruptcy jurisdiction could hinder closure of a given bankruptcy case depending upon the factual circumstances.

When Congress determined to expand bankruptcy jurisdiction with the enactment of the Bankruptcy Reform Act of 1978, it indicated that it was motivated by a desire to facilitate the resolution of an estate:

> A comprehensive grant of jurisdiction to the bankruptcy courts over all controversies arising out of any bankruptcy or rehabilitation case would greatly diminish the basis for litigation of jurisdictional issues which consumes so much time, money, and energy of the bankruptcy system and of those involved in the administration of debtors' affairs. [FN496]

It understood that its broad grant of jurisdiction was not without limits, in that questions regarding the scope of any statutory grant of federal jurisdiction are inescapable. [FN497] When discussing the parameters of those limitations, Congress repeatedly referred to them as relating to the resolution of a bankruptcy case. [FN498]

Congress justified this expansive grant of jurisdiction by reference to the jurisdictional provisions of the Bankruptcy Acts of 1841 [FN499] and **\*813** 1867, [FN500] which were "almost as extensive" [FN501] and upheld by the Supreme **\*814** Court as constitutional. [FN502] Further, in upholding the broad grants of jurisdiction under the Bankruptcy Acts of 1841 and 1867, the Supreme Court noted that the "manifest object" of these jurisdictional provisions

> was to provide speedy proceedings, and the ascertainment and adjustment of all claims and rights in favor of or against the bankrupt's estate, in the most expeditious manner. [FN503]

Nonetheless, policy arguments favoring an expansive grant of bankruptcy jurisdiction apply only to those proceedings "arising under title 11, or arising in or related to cases under title 11." [FN504] The exercise of jurisdiction over these proceedings facilitates the goal of expeditious administration of bankruptcy cases. [FN505] Yet, these strong policy arguments may not be present for an assertion of jurisdiction over a supplemental claim which relates only to the "arising under," "arising in" or "related to" proceeding, and not to the title 11 case itself. An assertion of such supplemental bankruptcy jurisdiction may hinder rather than facilitate resolution of the title 11 case because, by definition, the supplemental proceeding has no conceivable effect on distributions from the estate or the administration of the estate. [FN506] Resolution of the supplemental claim may delay closure of the case [FN507] if it distracts the court, trustee, debtor-**\*815** in-possession, creditors' committee or other interested parties from completing necessary tasks in a timely fashion.

This is not to say that judicial economies never flow from an exercise of supplemental bankruptcy jurisdiction. They do.

Because the supplemental proceeding involves a common factual nexus with the primary proceeding, litigation in a single forum would be more efficient than requiring the parties to litigate the primary claim in federal court and the supplemental claim in state court. The efficiencies, however, relate to the resolution of the proceedings between the litigants rather than to the resolution of the bankruptcy case as a whole. The economies to the litigants may be offset by diseconomies to the bankruptcy case as a whole. Whether an exercise of supplemental bankruptcy jurisdiction presents an impediment to the completion of a bankruptcy case differs depending upon the factual circumstances.

This argument against exercise of supplemental bankruptcy jurisdiction, which follows from the purposes of bankruptcy jurisdiction, is strongest as applied to an assertion of jurisdiction of a claim supplemental to a "related to" proceeding between non-debtor third parties. Recall the hypothetical involving the priority dispute between secured creditors of the debtor and the related third-party malpractice action brought by one of the lenders against its attorneys. [FN508] Because the priority dispute might conceivably affect distributions to creditors from the estate, it is sufficiently "related to" the title 11 case to justify an assertion of bankruptcy jurisdiction, even though the property in dispute is no longer property of the estate. Thus, an exercise of jurisdiction over the priority dispute is consistent with the bankruptcy policy favoring an expeditious resolution of the debtor's bankruptcy case. [FN509] In contrast, an exercise of supplemental bankruptcy jurisdiction over the malpractice action sharing a "common nucleus of operative fact" with the "related to" proceeding is inconsistent with this bankruptcy policy because it can only slow down resolution of the debtor's estate.

By contrast, when an assertion of jurisdiction supplemental to an "arising under" or "arising in" proceeding is considered in light of the bankruptcy policy favoring speedy resolution of the case, the result differs **816 depending on the circumstances. For example, courts [FN510] otherwise uncertain as to the propriety of an exercise of supplemental bankruptcy jurisdiction have indicated in dicta that they would exercise jurisdiction over a request for a declaratory judgment establishing the validity and amount of a debt which is supplemental to an objection to the debtor's discharge [FN511] or the dischargeability of the debt at issue. [FN512]

A proceeding objecting to discharge or the dischargeability of an obligation clearly "arises under" title 11, as the bases for these claims [FN513] derive from 11 U.S.C. §§ 727 or 523. A claim seeking a declaration as to the validity and amount of the debt at issue in this "arising under" proceeding will undoubtedly involve "a common nucleus of operative fact" between the supplemental and primary claims. Moreover, resolution of this sort of supplemental claim may be viewed as consistent with expeditious resolution of the bankruptcy case, even though arguably outside the scope of "related to" jurisdiction. In a case in which there will be distributions to creditors, [FN514] the declaratory action can be viewed as assisting in the resolution of the case because the Bankruptcy Code generally has not been interpreted to prevent non-dischargeable claims from receiving distributions from the estate. [FN515] Thus, the declaratory action can be **817 viewed as tantamount to a proof of claim. [FN516]

Even in a "no-asset" case [FN517] the declaratory action might be viewed as consistent with efficient resolution of the case, because the Code provides for the possibility that the trustee discovers assets after the case is closed. [FN518] In this event, the debtor's bankruptcy case would be reopened [FN519] and creditors notified of the need to file proofs of claim against the estate. [FN520] Even the creditor whose claim was held to be non-dischargeable would be entitled to file a proof of claim and receive distributions from the reopened estate. Judgment on the declaratory action could be viewed as streamlining this process, although only marginally. [FN521]

**818 Nothing, however, requires a creditor holding a non-dischargeable claim to file a proof of claim against the estate and seek distributions from the estate. [FN522] Indeed, tactical considerations may lead the creditor to waive this right. [FN523] Under these circumstances, the exercise of supplemental bankruptcy jurisdiction over the declaratory action may hinder rather than assist the resolution of the bankruptcy case. [FN524] The only economy that judgment in the declaratory action would provide is to the creditor collecting on the obligation in a non-bankruptcy context.

If the trustee, debtor-in-possession, or other representative of the estate is a party to the action, the exercise of supplemental bankruptcy jurisdiction might be justified as fostering an efficient resolution of the administration of the bankruptcy estate. Consider a series of hypotheticals. First, imagine that in response to an action brought by the trustee to avoid a transaction as

preferential or fraudulent the defendant raises counterclaims alleging breach of contract. These counterclaims are likely to be viewed as "related to" the title 11 case, even if, for tactical reasons, [FN525] the defendant has not filed a proof of claim against the *819 estate. [FN526]

If, on the other hand, the state law counterclaims are raised in an avoidance action brought by the debtor, rather than the trustee, [FN527] they may not be viewed as "related to" the title 11 case. [FN528] The case for exercise of supplemental bankruptcy jurisdiction is concomitantly weak. The debtor's estate can be administered without resolution of the supplemental counterclaim, thus, it seems likely that an exercise of supplemental jurisdiction over the counterclaim will stall that resolution. [FN529]

 *820 The notion that an exercise of supplemental bankruptcy jurisdiction may assist in, rather than hamper, the administration of an estate, however, is heightened when the counterclaims occur in an action involving the bankruptcy trustee. Assume in this instance that a suit is brought against the trustee, alleging that the trustee should be held personally liable for some malfeasance which occurred during her representation of the estate. [FN530] For example, the plaintiffs, attorneys to the trustee during the pendency of the bankruptcy case, may allege that the trustee should be held personally liable for their attorneys' fees, which previously were disallowed by the bankruptcy court on the grounds that the plaintiffs were not "disinterested," [FN531] because the trustee fraudulently misrepresented to them the factual circumstances leading to their conclusion that they were sufficiently "disinterested." In response, the trustee defends against the attorneys' claim, arguing that even if she had misrepresented the facts to the attorneys, she should not be held liable because the plaintiffs had themselves committed malpractice. Here, the plaintiffs' suit against the trustee should be viewed as "arising in" the title 11 case since, but for the bankruptcy filing, the trustee would not have been appointed, the plaintiffs would not have been employed by the trustee and the entire situation would not have occurred. The trustee's counterclaim to the "arising in" proceeding may not "relate to" the title 11 case in that resolution of the counterclaim will have no conceivable effect on distributions to creditors or the administration of the estate. [FN532] The only effect of success in her counterclaim would be to reduce the trustee's personal liability to the plaintiffs. Still, an exercise of supplemental bankruptcy jurisdiction might assist the trustee in a speedy resolution of the estate because it may provide her the convenience of a single forum for resolution of both the personal liability action and the counterclaim. If supplemental*821 bankruptcy jurisdiction were not exercised, the trustee would face the choice of abandoning her claim or bringing it against the debtor's former attorneys in a nonbankruptcy forum. Forcing the trustee to sue the attorneys outside the bankruptcy court would distract her from administering the estate and possibly delay its resolution. Moreover, the court may decline to close the bankruptcy case until the supplemental claim is resolved because cessation of the case may alter the capacity of the trustee to assert the counterclaim. [FN533]

Finally, an assertion of supplemental jurisdiction against non-parties is difficult, but not impossible, to reconcile with the bankruptcy policy favoring expeditious resolution of an estate. [FN534] Recall the hypothetical involving the preference and fraudulent transfer actions brought by the trustee against various defendants, but in this instance, assume that the defendants also bring a third-party complaint against their attorneys and accountants for malpractice. [FN535] Because the trustee is not a party to the third-party action, it is more difficult to justify the exercise of supplemental jurisdiction out of a concern for the convenience to the trustee, because it does not seem as though it would be inconvenient for the trustee if the avoidance action (to which the trustee is a party) were resolved in a bankruptcy forum and the malpractice action (to which the trustee is not *822 a party) were resolved in a nonbankruptcy forum. [FN536] Where there is a *823 substantial overlap between the factual basis for the avoidance action and that of the third-party malpractice action, [FN537] however, the resolution of both the primary and supplemental claims in the same bankruptcy forum may make discovery and other procedural developments in the related cases easier for the trustee. [FN538] In addition, the exercise of supplemental bankruptcy jurisdiction over the malpractice action may work to the advantage of the trustee in negotiating a settlement of the avoidance action. These judicial economies may outweigh any possible delay in administration of the estate.

Where the trustee or other representative of the estate is a third-party defendant, these convenience arguments are substantially weakened. Consider, in this instance, a suit brought by an individual against a drug manufacturer. [FN539] The plaintiff alleges that the defendant is liable to her under state tort law. Federal jurisdiction is based on the diversity of *824 citizenship of the parties. [FN540] The defendant brings a third-party contribution and indemnification action against another drug manufacturer. The third-party defendant files a bankruptcy petition, and as a result, the third-party action is stayed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN541] Because the automatic stay only relates to proceedings against the debtor, however, the primary claim is not stayed. [FN542] The third-party plaintiff then seeks to remove [FN543] the entire action to the district court for the district in which the third-party defendant's bankruptcy case is pending, claiming that the third-party action constitutes a "related to" proceeding and that the diversity action between the plaintiff and defendant derives from "a common nucleus of operative fact."

In this instance, resolution of the debtor's estate may well be hampered by an exercise of supplemental bankruptcy jurisdiction over the removed action. [FN544] If the court were to decline to exercise supplemental jurisdiction, litigation of the primary claim would continue in bankruptcy court while litigation of the third-party action in the nonbankruptcy forum would be stayed. The third-party plaintiff could file a proof of claim against the debtor's estate based on the same allegations of reimbursement or contribution made in the third-party action, but unless the primary claim is resolved in the nonbankruptcy forum before the conclusion of the debtor's bankruptcy case that contingent proof of claim likely to be disallowed. [FN545]

When supplemental jurisdiction is asserted by the plaintiff against an additional party, [FN546] convenience arguments may be plausible, so long as a **825** trustee, debtor-in-possession, or other representative of the estate is a party to the primary proceeding. For example, consider a proof of claim asserting breach of a pre-petition contract to sell property of the estate. Assume also that the trustee defends against the claim on the grounds that the buyer's former chief executive officer misrepresented material facts to the debtor, thus entitling the debtor to rescind the contract. [FN547] The plaintiff-buyer then amends its complaint to join the former CEO as a defendant. As noted above, the proof of claim "arises in" the title 11 case. [FN548] The action between the buyer and the debtor's principal may not "relate to" the title 11 case, however, in that any recovery in this suit would not be from property of the estate. If the estate and former CEO are found to be severally liable, then the CEO's liability to the buyer may not affect the estate's liability to the buyer. Nonetheless, the two actions clearly arise out of a "common nucleus of operative fact." Moreover, the trustee has every interest in the two claims being determined in a single forum. Trials in separate forums may lead to inconsistent results, and there may be additional practical benefits to a single forum. [FN549]

Notice, however, that arguments favoring an exercise of supplemental bankruptcy jurisdiction because it would provide legal and practical benefits to the estate are equally applicable to a "related to" proceeding brought by or against a trustee or other representative of the estate. Consider a "related to" proceeding brought by a trustee or debtor-in-possession against an entity that has not filed a proof of claim against the estate, alleging, for example, breach of contract and other state law claims. [FN550] The proceeding "relates to" the title 11 case in that any proceeds from its recovery constitute property of the estate. [FN551] Assume further that the defendant asserts a third-party action for indemnification or contribution of some sort. As in the previous hypotheticals, the third-party action probably does not "relate to" the title 11 case because the proceeds from recovery on the third-party complaint belong to the defendant and not the estate. Still, as in the other hypotheticals, the exercise of supplemental bankruptcy jurisdiction may assist the trustee in administering the estate because of the practical and other considerations raised above. The policy arguments seem indistinguishable. Still, constitutional concerns may cause courts to question the wisdom of such an exercise, and **826** stimulate Congress to enact clear statutory limitations. [FN552]

In sum, the policies favoring a broad grant of bankruptcy jurisdiction also support a limited grant of supplemental jurisdiction because, in many circumstances, such an exercise delays the administration of the bankruptcy estate. Whether an exercise of supplemental bankruptcy jurisdiction is consistent with, or contradicts, Congress' goal to facilitate an expeditious resolution of an estate differs depending on the circumstances, and thus generally should be left to a case by case consideration. Bankruptcy policies are not the only policies at work, however. Policies generally supporting an exercise of supplemental jurisdiction also require examination.

### B. Policy Justifications Generally Favoring an Exercise of Supplemental Jurisdiction are Subject to Countervailing Policy Concerns in the Context of a Bankruptcy Case

Doctrines of supplemental jurisdiction traditionally have been justified by considerations of federalism, [FN553] fairness, and judicial economy. [FN554] Absent an ability to assert supplemental jurisdiction, a plaintiff having a jurisdictionally sufficient claim and a related jurisdictionally insufficient claim would face undesirable choices.

First, a plaintiff could split the claims, bringing the primary claim in federal court and the supplemental claim in state court. By splitting the claims, the plaintiff would cause inconvenience and waste the time of both the litigants and the federal and nonfederal judicial systems, as well as create the possibility that res judicata and collateral estoppel issues would arise in the later-concluded action. Second, the plaintiff could proceed only on the federal claim in federal court, and abandon the supplemental claim--an unfair result in the event the supplemental claim is substantial. Finally, the plaintiff could join the primary and supplemental claims in a state-court action, if permitted under the state's procedural rules, but this would undercut Congress' fundamental purpose in creating a federal court system--the provision of a federal forum for the resolution of the "cases or controversies" enumerated within Article III of the Constitution. [FN555]

**\*827** Similar interests are protected when defendants seek to exercise supplemental jurisdiction. Absent the doctrine of supplemental jurisdiction, a defendant to a federal claim would be required to either abandon or seek redress in a separate state-court action for counterclaims, cross-claims and third-party claims having no independent basis for federal jurisdiction. Abandonment of the defendant's supplemental claims is unfair because a separate action involving the supplemental claims raises the specter of inconsistent verdicts.

The doctrine of supplemental jurisdiction is consistent with, and necessary to an effectuation of, one of the primary purposes of the Federal Rules of Civil Procedure: the elimination of technical, procedural barriers to the joinder of related claims. [FN556]

The important policy purposes favoring an assertion of supplemental jurisdiction in an ordinary civil action find substantial counter-arguments, however, when the exercise of supplemental jurisdiction occurs in the context of a bankruptcy case. First, and probably most important, the judicial economies of an assertion of supplemental bankruptcy jurisdiction are often doubtful. On one hand, the litigants to the supplemental proceeding may claim that federal adjudication of the jurisdictionally deficient claim promotes fairness and efficiencies to the parties to the litigation who are not thereby required to split the action or abandon the nonfederal claim. In the context of bankruptcy, however, the judicial economies the parties to the litigation may derive from an exercise of supplemental jurisdiction must be balanced against the inefficiencies the exercise may exact upon resolution of the bankruptcy case. By definition, the supplemental proceeding will have no conceivable effect on distributions from the estate or administration of the estate and could delay final resolution of the estate. [FN557]

Second, distinct from Congress' goal to provide a federal forum for the resolution of federal claims--with its enactment of the jurisdictional provisions of the 1984 Amendments to the Bankruptcy Code--Congress equivocated as to the need to provide a federal forum for the resolution **\*828** of all claims relating to a title 11 case. [FN558] Legislative history is replete with support for the proposition that in 1984 Congress was concerned not only with the constitutionality of an exercise of the essential judicial powers by non-Article III bankruptcy courts, but also with comity with state courts. [FN559] It added a provision in 1984 that directs district courts to abstain from hearing a "related to" proceeding which was pending in a state court at the time of the filing of the bankruptcy petition, which could not have been heard in a federal court but for the filing, and which can be timely adjudicated in the state court. [FN560] Congress also retained a provision permitting district courts to abstain from hearing a proceeding "arising under" title 11, or "arising in" or "related to" a title 11 case, "in the interest of justice, or in the interest of comity with State courts or respect for State law." [FN561] Explicit concern for comity in the exercise of federal bankruptcy jurisdiction stands in contrast to the discretion allowed to courts in the exercise of other grants of federal jurisdiction. [FN562] To be sure, a concern for comity is not unique to federal bankruptcy jurisdiction. What is distinct about Congress' concern for comity in the context of an assertion of federal bankruptcy jurisdiction is that it has been made explicit in the grant of jurisdiction, rather than left to judicial determination. [FN563]

Moreover, many of the arguments focusing on the unfairness of a failure to exercise supplemental jurisdiction may be inapplicable in a bankruptcy context. The broad grant of bankruptcy jurisdiction in 28 U.S.C. § 1334(b) is original and not exclusive. [FN564] Thus, nothing precludes litigants from enjoying the economies which follow from joint litigation of the primary and supplemental proceedings in a nonbankruptcy forum. [FN565] Additionally, although the doctrine of collateral estoppel clearly applies **\*829** in a bankruptcy context, [FN566] principles of res judicata may not attach in "related to" proceedings. [FN567] Thus, concerns about the fundamental unfairness of requiring litigants to separately litigate the supple-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

mental claim and the "related to" proceeding may not exist.

C. *Congress Should Amend § 1367(c)'s Factors to Reflect Concerns Unique to Bankruptcy*

Section 1367(c) provides that, in limited circumstances, district courts may decline to exercise supplemental jurisdiction, despite the grant of such jurisdiction by § 1367(a). [FN568] It permits courts to decline to exercise supplemental jurisdiction if:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. [FN569]

The discretionary factors listed in § 1367(c) appear to be exclusive and do not reflect factors unique to bankruptcy. If § 1367(a) is interpreted to confer supplemental bankruptcy jurisdiction, § 1367(c) should be amended so that it clearly covers the bankruptcy context. [FN570]

### 1. An Exclusive List

After *Finley* [FN571] and § 1367, it would be difficult to describe the doctrine of supplemental jurisdiction as a doctrine of judicial discretion. **\*830** Supplemental jurisdiction has become a creature of statute. [FN572] One could argue that if Congress did not intend to codify all of supplemental jurisdiction, it would not have specified in § 1367(c) the discretionary factors to be considered in declining to exercise supplemental jurisdiction. It would have left these equitable considerations to judicial discretion.

After viewing the source of supplemental jurisdiction as statutory, it is not difficult to conclude that the factors enumerated in § 1367(c) are exclusive. Moreover, this view is supported by the grammatical construction of § 1367(c) itself, in that it does not use the term "including" when describing the circumstances under which supplemental jurisdiction can be declined. [FN573]

### 2. The List Is Peculiarly Applicable to the Nonbankruptcy Context

Most of the factors set forth in § 1367(c) can be restated to establish more general factors to be balanced against the policy objectives of an exercise of supplemental jurisdiction. As a result of the absence of bankruptcy terms used in § 1367(c), however, the factors set forth in this section are of little assistance to a district court seeking to determine whether to exercise an assertion of supplemental bankruptcy jurisdiction. [FN574]

For example, § 1367(c)(2) permits a district court to decline to exercise **\*831** supplemental jurisdiction where "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." [FN575] More generally stated, this factor permits the court to balance the judicial economy of an exercise of supplemental jurisdiction as compared to a refusal to exercise the assertion of such jurisdiction. If § 1367(c)(2) were restated to comport with a balance of similar interests involved in a bankruptcy context, it would permit the court to weigh the effect of an exercise of supplemental jurisdiction on the efficient administration of the bankruptcy estate, as well as its effect on an efficient resolution of the litigation between the parties.

Section 1367(c)(3) is similarly directed to a nonbankruptcy balancing of equities. It permits a district court to decline to exercise supplemental jurisdiction when "the district court has dismissed all claims over which it has original jurisdiction," [FN576] but appears not to permit the district court to consider the affect of a dismissal, close, or conversion of a title 11 case. [FN577] A simple restatement of § 1367(c)(3) would clarify this consideration.

Section 1367(c)(4) purports to provide to district courts generalized authority to decline to exercise supplemental juris-

diction. It, however, exacts a heightened standard for consideration of factors other than those identified in § 1367(c)(1) through (3), only permitting consideration of other factors "in exceptional circumstances," and then limiting the factors that may be considered to those which constitute "compelling reasons for declining jurisdiction." [FN578] If § 1367(a) is applicable in the bankruptcy context, Congress should amend § 1367(c)(1) through (3) to reflect this decision, rather than leave district courts with § 1367(c)(4) as the exclusive basis for declining to exercise supplemental bankruptcy jurisdiction.

<div align="center">CONCLUSION</div>

Courts of appeals, district courts, and bankruptcy courts have too readily accepted assertions of supplemental bankruptcy jurisdiction as proper without recognizing that both the constitutional and statutory authority for such assertions are uncertain. By raising these statutory and constitutional questions, this Article seeks to create judicial dialogue. In addition, it concludes that the exercise of supplemental bankruptcy jurisdiction should be curtailed, if not by courts for reasons of constitutional and statutory infirmity, then by Congress for policy reasons. Most exercises **832** of supplemental bankruptcy jurisdiction conflict with Congress' primary objectives for enactment of the current bankruptcy jurisdictional provision.

Congress should resolve this conflict by prohibiting district courts from exercising jurisdiction supplemental to proceedings merely "related to" a bankruptcy case, and by clarifying the circumstances under which district courts should decline to exercise jurisdiction over claims related to proceedings "arising under" the Bankruptcy Code or "arising in" a bankruptcy case. In addition, Congress should prohibit bankruptcy courts from exercising any supplemental jurisdiction at all.

[FNa1]. Associate Professor, Seton Hall University School of Law; B.A. and J.D., University of Michigan. Many thanks to John Gibbons, Gene Gressman, Ed Hartnett, Dick Lieb, Denis McLaughlin, and Charlie Sullivan for their helpful comments on prior drafts. Thanks are also due to Mollie O'Brien, who provided tireless research assistance.

[FN1]. The terminology used to refer to litigation that occurs in the context of bankruptcy differs from that used to refer to general civil litigation. This inconsistency of defined terms can be quite confusing. In a bankruptcy context, for example, a "'[c]ase' comprises the entire Chapter 7, 9, 11, [12], or 13 case that is commenced pursuant to section 301, 302, or 303 . . . by the filing of a 'petition.'" Lawrence P. King, *Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984*, 38 Vand. L. Rev. 675, 676-77 (1985). On the other hand, a constitutional "case or controversy" refers to the litigation unit over which Congress is constitutionally empowered to confer jurisdiction upon the federal courts. *See* U.S. Const. art. III, § 2. Article III, Section 2, Clause 1 of the Constitution states:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;--to all Cases affecting Ambassadors, other public Ministers and Consuls;--to all Cases of admiralty and maritime Jurisdiction;--to Controversies to which the United States shall be a Party;--to Controversies between two or more States;--between a State and Citizens of another State;--between Citizens of different States;-- between Citizens of the same State claiming Lands under the Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

U.S. Const. art. III, § 2, cl. 1.
[FN2]. "Disputes often arise during the pendency of a . . . case that require judicial resolution. Section 1334(b) refers to these disputes as 'proceedings.' There may, therefore, be numerous proceedings within a case." King, *supra* note 1, at 676-77 & n.8 (citing Fed. R. Bankr. P. 1002 for the distinction between "case" and "proceeding").

[FN3]. The term "claim" has different meanings in the bankruptcy and non-bankruptcy contexts. Moreover, the term "claim" appears to have two meanings in bankruptcy, depending upon whether the reference is intended as substantive or procedural.
    Outside of bankruptcy, the term "claim" refers to a "claim for relief" and includes "an original claim, counterclaim, cross-claim, or third-party claim." Fed. R. Civ. P. 8(a). Together, the Federal Rules of Civil Procedure refer to factually related claims permitted to be, and actually, joined together as a "civil action." *See* Fed. R. Civ. P. 2 ("There shall be one form of action to be known as 'civil action.'"); Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court.").
    By contrast, the Bankruptcy Code defines "claim" to mean "right to payment, whether or not such right is reduced to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (Supp. IV 1992). The term "claim" appears to have a second meaning when used in a procedural context in bankruptcy, however. The Federal Rules of Bankruptcy Procedure refer generally to "adversary proceedings" and "contested matters" as the litigation units which occur in the context of a title 11 case. See Fed. R. Bankr. P. 7001 (defining adversary proceeding); Fed. R. Bankr. P. 9014 (defining contested matters). Although the bankruptcy procedural rules do not explicitly state whether "adversary proceedings" or "contested matters" are intended to parallel the terms "civil action" or "claim" used in a non-bankruptcy context, they impliedly correlate bankruptcy "proceedings"--whether "adversary proceedings" or "contested matters"--with non-bankruptcy "civil actions." First, they do incorporate Fed. R. Civ. P. 2 to bankruptcy procedure. See Fed. R. Bankr. P. 7002 (containing no reference to Fed. R. Civ. P. 2, although other rules in Part VII incorporate civil procedural rules having same number as last digit of bankruptcy procedural rule). Second, they do incorporate Fed. R. Civ. P. 8 to bankruptcy procedure, including the distinction drawn between an "[original] complaint, counterclaim, cross-claim, or third-party complaint." Fed. R. Bankr. P. 7008 (incorporating Rule 8 with additions not relevant here).

To avoid confusion, this Article uses "claim" in its procedural context to refer to units of litigation existing within a "civil action" (in a non-bankruptcy context) or "proceeding" (in a bankruptcy context). When referring to "a right of payment," this Article either uses the phrase "proof of claim," see infra note 19 (defining "proof of claim"), or characterizes the "claim" as being either unsecured or secured.

[FN4]. See 28 U.S.C. § 1334 (1988 & Supp. IV 1992). Throughout this Article, "bankruptcy jurisdiction" is referred to as the jurisdiction over bankruptcy cases and the litigation they involve which Congress has granted by statute to the federal courts. See 28 U.S.C. § 1334 (1988 & Supp. IV 1992) (conferring bankruptcy jurisdiction in district courts). Intertwined with, but distinct from, any discussion of the scope of bankruptcy jurisdiction, is the issue of which federal court is empowered to exercise this jurisdiction--most recently, whether bankruptcy jurisdiction is to be exercised by Article III district courts or non-Article III bankruptcy courts. See 28 U.S.C. § 157 (1988); see also infra part III.A.2 (describing allocation of jurisdiction between non-Article III bankruptcy courts and Article III district courts under § 157).

[FN5]. Like all federal jurisdiction, bankruptcy jurisdiction is limited by its statutory grant, found in 28 U.S.C. § 1334. See, e.g., FDIC v. Majestic Energy Corp. (In re Majestic Energy Corp.), 835 F.2d 87, 89 (5th Cir. 1988) ("Bankruptcy courts are courts of limited jurisdiction, with their scope defined by statute.").

[FN6]. In addition to the grant of bankruptcy jurisdiction over proceedings "arising under title 11," and "arising in and related to cases under title 11," found in 28 U.S.C. § 1334(b), § 1334(a) also grants "exclusive jurisdiction of all cases under title 11," and § 1334(d) grants "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(a), (b), (d) (1988 & Supp. IV 1992).

[FN7]. For a proceeding to "arise under" title 11, the proceeding must derive from a provision of the Bankruptcy Code, which comprises title 11 of the United States Code. See infra notes 66-74 and accompanying text.

[FN8]. A proceeding "arises in" a title 11 case if it could not have been brought had the liquidation or reorganization case not been commenced. See infra notes 75-84 and accompanying text.

[FN9]. A proceeding is sufficiently "related to" a title 11 case for purposes of satisfying the bankruptcy jurisdictional requirements if it "affects the amount of property available for distribution or the allocation of property among creditors." Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics, Inc.), 813 F.2d 127, 131 (7th Cir. 1987). See infra notes 85-98 and accompanying text.

[FN10]. The power to adjudicate jurisdictionally insufficient state law claims or proceedings factually related to jurisdictionally sufficient claims or proceedings refers to the doctrine of supplemental jurisdiction. Supplemental jurisdiction is the term currently used to describe the doctrines of ancillary and pendent jurisdiction. See infra notes 102-38 and accompanying text (discussing historical development of ancillary, pendent-claim, and pendent-party jurisdiction, and codification of these doctrines by supplemental jurisdictional provision--28 U.S.C. § 1367).

[FN11]. For a case involving similar allegations, see Wieboldt Stores, Inc. v. Schottenstein, 111 B.R. 162 (N.D. Ill. 1990); *see also infra* notes 149-51 and accompanying text (discussing *Wieboldt* in detail); Spaulding & Co. v. Buchanan (*In re* Spaulding & Co.), 131 B.R. 84 (N.D. Ill. 1990) (with similar facts, district court held that third-party action did not "relate to" chapter 11 case, but did not address possibility of exercise of supplemental jurisdiction).

[FN12]. A bankruptcy trustee is appointed in each chapter 7, 12, and 13 case. *See* 11 U.S.C. §§ 701, 702, 703, 1202(a), 1302(a) (1988). A trustee may be appointed in a chapter 11 case, but only "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management," or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(1), (2) (1988). The duties of a trustee include an "investigat[ion of] the financial affairs of the debtor." 11 U.S.C. § 704(4) (1988). *See also* 11 U.S.C. § 1106(a)(3) (1988) (incorporating similar duties of investigation "except to the extent that the court orders otherwise"); § 1202(b)(2) (1988) (incorporating similar duties of investigation but only if, after requested by a party in interest, the court so orders "for cause"); § 1302(b)(1) (1988) (generally incorporating duty of investigation).

[FN13]. *See* 11 U.S.C. § 548 (a) (1988) (permitting trustee to avoid transfer made, or obligation incurred, by debtor within year before date of filing of petition if (1) transfer was made, or obligation incurred, "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted" or (2)(A) debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and (B) was insolvent, insufficiently capitalized or intended to incur debts beyond its ability to repay either at the time of the transfer or as a result of the transfer).

[FN14]. *See* 11 U.S.C. § 547(b) (1988) (permitting trustee to avoid transfers of "an interest of the debtor in property" made "to or for the benefit of a creditor" and "on account of an antecedent debt;" debtor must have been insolvent at time of transfer, and transfer must have occurred within 90 days before filing of bankruptcy petition, unless transferee is an insider, in which case, a one year reach back period applies; transfer must enable creditor to receive more than it would have if the "case were a case under chapter 7 of this title," transfer had not been made and "creditor [had] received payment of such debt to the extent provided by the provisions of this title").

[FN15]. The question of which court--the district or bankruptcy court--will hear and determine the proceeding is a distinct one, governed by 28 U.S.C. § 157 (1988). *See supra* note 4; *infra* notes 416-24 and accompanying text. Under this statute, the trustee's avoidance action clearly constitutes a "core proceeding," 28 U.S.C. § 157(b)(2)(F) and 157(b)(2)(H), which the non-Article III bankruptcy judge can "hear and determine." 28 U.S.C. § 157(b)(1) (1988).

[FN16]. *See infra* notes 66-74 and accompanying text.

[FN17]. *See infra* notes 75-84 and accompanying text.

[FN18]. *See* United Mine Workers v. Gibbs, 383 U.S. 715 (1966); *see also infra* notes 116-18 and accompanying text (discussing *Gibbs's* common nucleus of fact standard).

[FN19]. *See* 11 U.S.C. § 501(a) (1988) (enabling creditor or indenture trustee to file proof of claim); *see also* Fed. R. Bankr. P.3001(a) (defining proof of claim as "written statement setting forth a creditor's claim"); Official Forms No. 19 (general proof of claim); Official Forms No. 20 (proof of claim for wages, salary, or commissions); Official Forms No. 21 (proof of multiple claims for wages, salary, or commissions); *see generally,* 11 U.S.C. § 101(5) (Supp. IV 1992) (defining "claim" as "right to payment," irrespective of form or nature).

[FN20]. *See* 11 U.S.C. § 541(a) (1988) (providing that commencement of a case creates an estate comprised of all "legal or equitable interests of debtor in property as of" such commencement).

[FN21]. *See* Fed. R. Bankr. P. 3007 (setting forth procedure for objections to a claim and providing that "[i]f an objection to a

claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding").

[FN22]. *See* 11 U.S.C. § 502(b)(1) (1988) (providing that a claim shall be disallowed to the extent that the claim is unenforceable under "applicable law for a reason other than because such claim is contingent or unmatured").

[FN23]. Even if the debtor's usury contentions are structured as a counterclaim to the proof of claim, the debtor's counterclaim will likely be viewed as "arising in" the title 11 case. *See* 28 U.S.C. § 157(b)(2)(C) (1988) (defining "core proceedings" as including "counterclaims by the estate against persons filing claims against the estate"); *see also infra* notes 75-84 and accompanying text (discussing "arising in" jurisdiction in greater detail).

[FN24]. The malpractice action does not "arise under" title 11 because it derives from state law, rather than federal bankruptcy law. *See infra* notes 66-74 and accompanying text.

[FN25]. The malpractice action does not "arise in" the bankruptcy case because the lender might have brought a malpractice action outside the context of the debtor's bankruptcy case. *See infra* notes 75-84 and accompanying text.

[FN26]. The malpractice action does not "relate to" the debtor's bankruptcy case because it will have no conceivable effect on distributions to creditors or the administration of the bankruptcy estate. *See infra* notes 85-98 and accompanying text. Whether the creditor's attorneys committed malpractice or not, the estate's liability to the creditor will turn solely on the validity of the lending agreement in light of state usury laws.

[FN27]. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966); *see also infra* notes 116-18 and accompanying text (discussing *Gibbs's* common nucleus of fact standard).

[FN28]. This hypothetical is loosely based on the facts of Elscint, Inc. v. First Wis. Fin. Corp. (*In re* Xonics, Inc.), 813 F.2d 127 (7th Cir. 1987). In *Xonics,* however, neither lender brought a third-party malpractice action.

[FN29]. *See* 11 U.S.C. § 554 (1988) (permitting trustee to "abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate").

[FN30]. *See, e.g.,* Killebrew v. Brewer (*In re* Killebrew), 888 F.2d 1516, 1520 (5th Cir. 1989) (defining abandonment as "irrevocable removal of property from the estate").

[FN31]. The term "undersecured" is used to refer to a claim secured by collateral insufficient in value to repay the claim in full. *See* 11 U.S.C. § 506(a) (1988) (defining "claim of a creditor secured by a lien on property in which the estate has an interest" as secured "to the extent of the value of such creditor's interest in the estate's interest in such property" and unsecured "to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim").

[FN32]. Elscint, Inc. v. First Wis. Fin. Corp. (*In re* Xonics), Inc., 813 F.2d 127, 131 (7th Cir. 1987).

[FN33]. *See id.*

[FN34]. *See infra* notes 66-74 and accompanying text.

[FN35]. *See infra* notes 75-84 and accompanying text.

[FN36]. *See infra* notes 85-98 and accompanying text.

[FN37]. *See* United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966); *see also infra* notes 116-18 and accompanying text

(discussing *Gibbs's* common nucleus of fact standard).

[FN38]. *See infra* notes 102-38 and accompanying text.

[FN39]. 28 U.S.C. § 1367(a) (Supp. IV. 1992). Section 1367 provides in its entirety as follows:
    (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

    (b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

    (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if --
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

    (d) The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

    (e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

[FN40]. *See infra* notes 141-48, 346-47 and accompanying text.

[FN41]. *See infra* notes 149-51 and accompanying text; *see also* Ram Const. Co. v. Port Authority, 49 B.R. 363, 365-66 (W.D. Pa. 1985) (analogy to pendent jurisdiction drawn in upholding constitutionality of assertion of bankruptcy jurisdiction over state law claim).

[FN42]. *See infra* part II.A.3; *see also* Sonnyco Coal, Inc. v. Bartley (*In re* Sonnyco Coal, Inc.), 89 B.R. 658, 665-68 (Bankr. S.D. Ohio 1988) (supporting constitutionality of exercise of "related to" jurisdiction by non-Article III bankruptcy court with analogy to doctrines of supplemental jurisdiction).

[FN43]. *See infra* notes 217-31 and accompanying text.

[FN44]. *See infra* notes 346-47 and accompanying text.

[FN45]. *See infra* part II.A.

[FN46]. *See infra* note 234 and accompanying text.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN47]. *See infra* note 240 and accompanying text (noting that Supreme Court has long required two things "to create [federal] jurisdiction . . . . The Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it. . . . ") (quoting Finley v. United States, 490 U.S. 545, 548 (1989)).

[FN48]. For cases in which courts have exercised supplemental bankruptcy jurisdiction under the former Bankruptcy Acts, see *infra* notes 346-47.

[FN49]. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966); *see also infra* notes 116-18 and accompanying text (discussing *Gibbs's* common nucleus of fact standard).

[FN50]. By "state law proceedings," this Article means proceedings which are predicated on state law and which do not "arise under" any federal law sufficient to satisfy the requirements of 28 U.S.C. § 1331 (1988 & Supp. IV 1992).

[FN51]. The citizenship of the parties determines whether the requirements of diversity jurisdiction have been fulfilled. *See* 28 U.S.C. § 1332 (1988 & Supp. IV 1992) (diversity jurisdiction provision).

[FN52]. *See* 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992).

[FN53]. U.S. Const. art. III. *See infra* part III.A (constitutional analysis of supplemental bankruptcy jurisdiction).

[FN54]. The phrase "primary claim" is used throughout this Article to refer to the non-supplemental claim in a civil action. In United Mine Workers v. Gibbs, 383 U.S. 715 (1966), the Court referred to the primary claim as the "federal claim," probably because 28 U.S.C. § 1331 (statutory grant of federal question jurisdiction) provided the jurisdiction for the primary claim.

[FN55]. *See* Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 87 (1982) (holding bankruptcy jurisdictional provision enacted with Bankruptcy Reform Act of 1978 unconstitutional because it delegated "essential attributes of the judicial power" to bankruptcy judges who did not enjoy life-tenure as required by Article III, § 1); *see also infra* notes 398-415 and accompanying text (extensive discussion of *Marathon*).

[FN56]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992).

[FN57]. 28 U.S.C. § 1367(a) (Supp. IV. 1992).

[FN58]. *See infra* note 239 (discussing this rule of statutory construction).

[FN59]. *See infra* part IV.

[FN60]. *See* 28 U.S.C. § 1471(b) (repealed). For quotation of former § 1471 in its entirety, see *infra* note 100.

[FN61]. *See* 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992). In its entirety, 28 U.S.C. § 1334 provides as follows:
    (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

    (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

(2) Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction. Any decision to abstain or not to abstain made under this subsection is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. This subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

(d) The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all of the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate.

28 U.S.C. § 1334 (1988 & Supp. IV 1992).

[FN62]. Which court exercises bankruptcy jurisdiction is a question distinct from the scope of bankruptcy jurisdiction, and is governed by a separate statute. *Compare* 28 U.S.C. § 1334 (1988 & Supp. IV 1992) (granting bankruptcy jurisdiction to district courts) *with* 28 U.S.C. § 157 (1988) (authorizing referral of bankruptcy jurisdiction from district courts to bankruptcy courts); *see also infra* notes 416-24 and accompanying text.

[FN63]. 28 U.S.C. § 1334(a) (1988 & Supp. IV 1992). For a definition of a "title 11 case," see *supra* note 1.

[FN64]. 28 U.S.C. § 1334(d) (1988 & Supp. IV 1992).

[FN65]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992). For a definition of "proceedings," see *supra* note 2.

[FN66]. The concept of "arising under" bankruptcy jurisdiction is derived from "arising under" Constitutional, statutory, and treaty jurisdiction. *Compare* 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992) *with* 28 U.S.C. § 1331 (1988 & Supp. IV. 1992) (28 U.S.C. 1334(b) refers to jurisdiction under title 11, and 28 U.S.C. 1331 refers to jurisdiction under the Constitution, laws, and treaties of the United States). Indeed, legislative history indicates Congress' understanding that "arising under" bankruptcy jurisdiction would be easy to identify because "[t]he phrase 'arising under' has a well defined and broad meaning in the jurisdictional context." H.R. Rep. No. 595, 95th Cong., 1st Sess. 445 (1977).

[FN67]. *See* Wood v. Wood (*In re* Wood), 825 F.2d 90, 96, 97 (5th Cir. 1987) (narrowly defining "arising under" jurisdiction, and comparing it to other broader grants of bankruptcy jurisdiction).

[FN68]. H.R. Rep. No. 595, 95th Cong., 1st Sess. 445 (1977).

[FN69]. *See In re Wood,* 825 F.2d at 96-97 (stating that, for example, a suit to avoid a preferential transfer "arises under" title 11 because the suit is based solely on 11 U.S.C. § 547).

[FN70]. *See* 11 U.S.C. §§ 547, 548 (1988); *see also supra* notes 13, 14 (defining preference and fraudulent transfers).

[FN71]. *See* 11 U.S.C. § 362 (1988 & Supp. IV 1992). Courts have found that motions, under 11 U.S.C. §§ 105 or 362, for injunctive relief are "core" proceedings within the meaning of subsections (A) and (O). *See, e.g.,* National Union Fire Ins. Co. v. Titan Energy, Inc. (*In re* Titan Energy, Inc.), 837 F.2d 325, 328-29 (8th Cir. 1988) (proceeding by debtor's insurer to enjoin,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

pursuant to §§ 105 and 362, state court action is "core" proceeding because product liability insurance policy between insurer and debtor is property of estate); Manville Corp. v. Equity Security Holders Comm., A.F. (In re Johns-Manville Corp.), 801 F.2d 60, 63-64 (2d Cir. 1986) (proceeding brought by debtor-in-possession to enjoin Equity Committee and its members from pursuing state court action to compel meeting of debtor's shareholders was "core" proceeding because meeting might interfere with debtor's reorganization).

[FN72]. See 11 U.S.C. §§ 523 (1988 & Supp. IV 1992), 727 (1988) (objections to dischargeability of certain debts and objections to discharge respectively).

[FN73]. See 11 U.S.C. § 541 (1988 & Supp. IV 1992); see also, e.g., Plaza at Latham Assocs. v. Citicorp N.A., 150 B.R. 507, 513-14 (N.D.N.Y. 1993) (characterizing order as resolving claims to proceeds of debtor's insurance policy which constituted property of estate and concluding that order approving settlement providing that debtor's insurer be released from liability to any entity relating to claims arising out of fire at debtor's premises was "core proceeding").

[FN74]. See 11 U.S.C. § 365 (1988 & Supp. IV 1992).

[FN75]. A leading treatise defines "arising in" jurisdiction as "the residual category of civil proceedings, including those which do not arise under title 11, and those which are not related to title 11 cases." 1 Collier on Bankruptcy § 3.01[1][c][v], at 3-32 (Lawrence P. King ed., 15th ed. 1993).

[FN76]. Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987). Accord Silverman v. General Ry. Signal Co. (In re Leco Enters., Inc.), 144 B.R. 244, 248-49 (S.D.N.Y. 1992); Acolyte Elect. Corp. v. City of New York, 69 B.R. 155, 173 (Bankr. E.D.N.Y. 1986) ("To be a core proceeding, an action must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment . . . . ").

[FN77]. See In re Wood, 825 F.2d at 97 (noting that litigation surrounding creditor's proof of claim filed in bankruptcy case as example of "arising in" jurisdiction, although claim based on state law).

[FN78]. See 28 U.S.C. § 157(b)(2)(A), (O) (1988) (including, among definition of "core proceedings," those "matters concerning the administration of the estate" and "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship"). Courts have held a wide variety of proceedings to be "core" proceedings within the scope of § 157(b)(2)(A) and (O). See generally Bankruptcy Litigation Manual 83-84 (Michael L. Cook ed., 1992-93) (describing the following as "core" proceedings within scope of catch-all provisions: proceedings to establish administrative priority; motions for substantive consolidation; motions for change of venue, remand, or abstention; proceedings for violation of § 362 automatic stay; motions to disqualify counsel for debtor; estimations of personal injury claims in order to confirm chapter 11 plan; counterclaims for bad faith filing of creditor's petition; fixing attorneys' fees under § 506(b); and appointment of additional creditors' committees); 10 Norton Bankruptcy Law and Practice 2d § 5.16, at 108 (1993) (describing disputes concerning employment of attorneys and award of professional compensation out of estate as "core" within meaning of subsection (A), as well as questions concerning eligibility and qualification of bankruptcy trustee and compensation of trustees).

[FN79]. See 28 U.S.C. § 157(b)(2)(B) (1988) (defining "core proceedings" as including "allowance or disallowance of claims against the estate"); see also Canal Corp. v. Finnman (In re Johnson), 960 F.2d 396, 401 (4th Cir. 1992)(adversary proceeding seeking distribution of funds held by debtor in constructive trust held "core" as either involving turnover of property of estate, validity and priority of liens, or sale, use or lease of property); In re Parque Forestal, Inc., 949 F.2d 504, 510 (1st Cir. 1991)(estoppel claim brought by residents in debtor's housing development held "core" because district court affirmed bankruptcy court's decision based on 11 U.S.C. § 506(c), thus, action "arose under" title 11 or "arose in" title 11 case); Southeastern Sprinkler Co. v. Meyertech Corp. (In re Meyertech Corp.), 831 F.2d 410, 418 (3d Cir. 1987)(creditor's breach of warranty action against debtor was "core" proceeding because it fell within Code definition of "claim").

    Not all actions against the debtor are "core proceedings." At least one court has held that, in order to constitute a "core"

determination on a claim, the proceeding must involve the question of allowance or disallowance of the claim and not merely the existence of the right to payment under state law. *See* Christensen v. Tucson Estates, Inc. (*In re* Tucson Estates, Inc.), 912 F.2d 1162, 1168 (9th Cir. 1990).

Expressly excepted from this definition of "core," however, are proceedings for "the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11." 28 U.S.C. § 157(b)(2)(B) (1988). This exception has been narrowly construed. *See, e.g., In re* UNR Industries, Inc., 45 B.R. 322, 326 (N.D. Ill. 1984) (subsection (B) "does not exclude from the definition of core proceedings estimation of personal injury and wrongful death claims for *all* purposes, but only 'for purposes of distribution.' Estimation of such claims for other purposes, such as 'confirming a plan' . . . apparently remains a core proceeding for the bankruptcy judge.").

[FN80]. *See* 28 U.S.C. § 157(b)(2)(C) (1988) (including within definition of "core proceedings" those "counterclaims by the estate against persons filing claims against the estate"); *see also infra* note 526 (discussing division among courts in interpreting breadth of this provision).

[FN81]. *See* 28 U.S.C. § 157(b)(2)(E) (1988) (defining "core proceedings" as including "orders to turn over property of the estate"). Courts differ as to whether actions by a trustee or debtor-in-possession to enforce disputed obligations are "core" proceedings or not, such as an action to collect on an account owed to the debtor, although these actions are framed as proceedings to turn over property of the estate. *Compare* Craig v. McCarty Ranch Trust (*In re* Cassidy Land & Cattle Co.), 836 F.2d 1130, 1132-33 (8th Cir. 1988) (proceeding to foreclose on note secured by mortgage, constituting sole asset of estate, was "core" proceeding because proceeding amounted to action to turn over matured debt that was property of estate), *cert. denied,* 436 U.S. 1033 (1988) *with* F&L Plumbing & Heating Co. v. New York University (*In re* F&L Plumbing & Heating Co.), 114 B.R. 370, 376-77 (E.D.N.Y. 1990) (proceeding merely "related to" the debtor's bankruptcy case) *and* Howison v. Country Hills Assocs. (*In re* W.G.M.C., Inc.), 96 B.R. 5, 6 (Bankr. D. Me. 1989) (same); *see also* 1 *Collier on Bankruptcy* § 3.01[2][b][iv], at 3-51 (Lawrence P. King ed., 15th ed. 1993) ("[A]ctions to collect pre-petition accounts receivable are straightforward *Marathon*-type contract actions, and are thus not core proceedings."); *but see* Galucci v. Grant (*In re* Galucci), 931 F.2d 738, 744 (11th Cir. 1991) (trustee's action for turnover of property which had never belonged to debtor but which third party had quitclaimed to trustee to compromise trustee's concededly baseless claim against him was non-core, unrelated matter over which no bankruptcy jurisdiction existed).

[FN82]. *See* 28 U.S.C. § 157(b)(2)(K) (11th Cir. 1988) (defining "core proceedings" as including "determinations of the validity, extent, or priority of liens").

[FN83]. *See, e.g., In re* Memorial Estates, Inc., 950 F.2d 1364, 1369-70 (7th Cir. 1991) (order sanctioning attorney and client under bankruptcy equivalent of Rule 11 is "core proceeding," even though sanctions relate to actions in hearing on proceeding as to which bankruptcy court enjoyed only "related to" jurisdiction and even though bankruptcy case had already been dismissed), *cert. denied,* 112 S. Ct 2969 (1992); Mountain Am. Credit Union v. Skinner (*In re* Skinner), 917 F.2d 444, 448 (10th Cir. 1990) (civil contempt proceedings arising out of core matters are themselves core matters); Budget Serv. Co. v. Better Homes of Virginia, Inc., 804 F.2d 289, 292 (4th Cir. 1986) (sanction of punitive damages for violation of automatic stay under § 362(h) is core proceeding); TCL Investors v. Brookside Sav. & Loan Ass'n (*In re* TCL Investors), 775 F.2d 1516, 1517 (11th Cir. 1985) (proceeding by purchaser of property of estate to compel debtor to comply with sale agreement that had been approved and authorized by bankruptcy court held "core"); *but see* Gower v. Farmers Home Administration (*In re* Davis), 899 F.2d 1136, 1138-40 (1990) (trustee's request for attorney's fees under the EAJA not a "core" proceeding); I.R.S. v. Brickell Inv. Corp. (*In re* Brickell Inv. Corp.), 922 F.2d 696, 701 (11th Cir. 1991) (debtor's motion to assess costs and attorney's fees against IRS pursuant to 26 U.S.C. § 7430 is not "core," even if action arises out of core proceeding to determine debtor's tax liability); Plastiras v. Idell (*In re* Sequoia Auto Brokers, Ltd.), 827 F.2d 1281, 1289 (9th Cir. 1987) (civil contempt action not core even if it arises out of core proceeding).

[FN84]. The Eleventh, Second, and First Circuits expansively define "core" jurisdiction to exist whenever the state law claim arises out of a contract entered into after the petition has been filed. *See, e.g.,* Olympia & York Fla. Equity Corp. v. Bank of N.Y. (*In re* Holywell Corp.), 913 F.2d 873, 881 (11th Cir. 1990) ("[T]his is a 'core proceeding' under 28 U.S.C. § 157(b), as it is a 'matter concerning the administration of the estate.'") (citing 28 U.S.C. § 157(b)(2)(A) (1988)); *In re* Ben Cooper, 896 F.2d

1394, 1400 (2d Cir.), *vacated and remanded,* 111 S. Ct. 425 (1990) (holding that bankruptcy court has core jurisdiction over state law contract claims when contract was entered into post-petition, as adjudication of such claims is essential part of administering estate), *reinstated,* 924 F.2d 36 (2d Cir. 1991), *cert. denied,* 111 S. Ct. 2041 (1992); Arnold Print Works, Inc. v. Apkin (*In re* Arnold Print Works, Inc.), 815 F.2d 165, 166 (1st Cir. 1987) (action by debtor-in-possession to collect account receivable arising out of a post-petition contract is "core proceeding"); *but see* Wood v. Wood (*In re* Wood) 825 F.2d 90, 97 (5th Cir. 1987) (cause of action under state law is not core although it arose out of post-petition dispute).

[FN85]. *See, e.g.,* Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (*In re* Wolverine Radio Co.), 930 F.2d 1132, 1141 (6th Cir. 1991) ("related to" jurisdiction is broadest grant of bankruptcy jurisdiction); *In re Wood,* 825 F.2d at 93 (same); F.D.I.C. v. Majestic Energy Corp. (*In re* Majestic Oil Corp.), 835 F.2d 87, 90 (5th Cir. 1988) (same).

[FN86]. *See In re* G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991) (adopting narrow standard of "related to" bankruptcy jurisdiction); Austin v. Unarco Indus., Inc., 705 F.2d 1, 4-5 (1st Cir. 1983) (implying that it would narrowly construe "related to" jurisdiction over non-debtor third parties), *cert. dismissed,* 463 U.S. 1247 (1983).

[FN87]. *See* Turner v. Ermiger (*In re* Turner), 724 F.2d 338, 341 (2d Cir. 1983) (requiring "significant connection" to debtor's bankruptcy).

[FN88]. *See* Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (initially defining "related to" jurisdiction as existing over bankruptcy proceeding if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy" and later qualifying this standard by stating that "related to" jurisdiction exists "if the outcome [of the proceeding] could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate") (emphasis deleted).

[FN89]. *See* Elscint, Inc. v. First Wis. Fin. Corp. (*In re* Xonics, Inc.), 813 F.2d 127, 131 (7th Cir. 1987) (holding that "related to" jurisdiction encompasses only disputes that affect the payments to the bankrupt's other creditors or the administration of the bankrupt's estate; it exists only when the outcome of the proceeding "affects the amount of property available for distribution or the allocation of property among creditors"); *see also* Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749 (7th Cir. 1989) ("Overlap between the bankrupt's affairs and another dispute is insufficient unless its resolution also affects the bankrupt's estate or the allocation of its assets among creditors. Although the [proceeding at issue on appeal] has a nexus with the bankruptcy--in the sense that it would be convenient, and promote consistency, to resolve all questions concerning the [insurance] policy at one go--it does not necessarily have a financial effect on the estate (or the apportionment among its creditors).").

[FN90]. *See* Gardner v. United States (*In re* Gardner), 913 F.2d 1515, 1518 (10th Cir. 1990) (holding that "bankruptcy court lacks related jurisdiction to resolve controversies between third party creditors which do not involve the debtor or his property unless the court cannot complete administrative duties without resolving the controversy") (citation omitted).

[FN91]. Some courts have expanded upon the statement that bankruptcy jurisdiction exists where the proceeding would affect the administration of the estate, to conclude that "related to" jurisdiction exists where the proceeding would "affect the estate." *See, e.g.,* Otero Mills, Inc. v. Security Bank & Trust (*In re* Otero Mills, Inc.), 21 B.R. 777, 778 (Bankr. D. N.M.) (test for "related to" jurisdiction is whether "failure to enjoin would affect the bankruptcy estate"), *aff'd,* 25 B.R. 1018 (D. N.M. 1982); *In re* Sondra, Inc., 44 B.R. 205, 207 (Bankr. E.D. Pa. 1984) (same); Crown Cent. Petroleum Corp. v. Wechter (*In re* General Oil Distribs., Inc.), 21 B.R. 888, 892 n.13 (Bankr. E.D.N.Y. 1982) (same). The latter standard is clearly much broader than the former, and possibly exceeds the statutory mandates of 28 U.S.C. § 1334(b). *See, e.g.,* Holland Indus., Inc. v. United States (*In re* Holland Indus., Inc.), 103 B.R. 461, 466 (Bankr. S.D.N.Y. 1989) ("The desires of every Chapter 11 debtor are affected by a myriad of external indirect effects created by the circumstances in which it operates. Whether they arise from the ebbs and flows of commerce, the effects of governmental action or the acts of third parties with respect to property of non-debtors, their impact on a debtor's attempt to reorganize does not afford the bankruptcy courts with jurisdiction to determine the dispute merely because of that impact."); *see also* Howard C. Buschman III & Sean P. Madden, *The Power and Propriety of Bank-*

*ruptcy Court Intervention in Actions Between Nondebtors,* 47 Bus. Law. 913, 944 (1992) ( "*Otero Mills* and its progeny, for example, would conclude that jurisdiction exists over actions that merely could 'pressure' the debtor. Any number of actions, however, may have the effect of pressuring or distracting the individuals that manage the debtor. Consequently, courts should require debtors to make a strong showing that the effect upon the estate from such actions is potentially devastating.").

[FN92]. *See e.g.,* Wood v. Wood (*In re* Wood), 825 F.2d 90, 93 (5th Cir. 1987) (determining that "related to" jurisdiction turns on "'whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy'") (citation omitted).

[FN93]. *Compare In re* Salem Mortgage Co., 783 F.2d 626, 634-35 (6th Cir. 1986) (criticizing *Pacor* test as too strict in that it may be read to limit "related to" jurisdiction to circumstances in which debtor would be bound by res judicata or collateral estoppel) *with* Robinson v. Michigan Consol. Gas Co., 918 F.2d 579, 583-84 (6th Cir. 1990) (embracing *Pacor,* without rejecting standard articulated in *Salem Mortgage,* because it read *Pacor* as adopting a more liberal test than the *Salem Mortgage* court thought *Pacor* had done); *see also* Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (*In re* Wolverine Radio Co.), 930 F.2d 1132, 1143 (6th Cir. 1991) (distinguishing *Pacor* on grounds that Wolverine was contractually obligated to indemnify non-debtor third party, whereas in *Pacor* Manville would not have been automatically liable).

[FN94]. *See* American Hardwoods, Inc. v. Deutsche Credit Corp. (*In re* American Hardwoods, Inc.), 885 F.2d 621, 623 (9th Cir. 1989) (adopting *Pacor's* "any conceivable effect" language without *Pacor's* subsequent reference to alteration of debtor's options or to impact upon administration of bankruptcy estate); *In re* Fietz, 852 F.2d 455, 457 (9th Cir. 1988) (same).

[FN95]. *See* Miller v. Kemira, Inc. (*In re* Lemco Gypsum, Inc.), 910 F.2d 784, 788 & n.19 (11th Cir. 1990) (adopting *Pacor* court's "conceivable effect" standard as definitive of "related to" jurisdiction without reference to qualifying language that appears in next sentence of *Pacor*).

[FN96]. *See also* 1 *Collier on Bankruptcy* § 3.01[1][c][iv] (Lawrence P. King ed., 15th ed. 1993) (noting that some courts interpret the "related to" standard as "whether the outcome of the proceeding could conceivably have any effect on the bankruptcy estate").

[FN97]. Cardinal Indus., Inc. v. Buckeye Fed. Sav. & Loan Ass'n (*In re* Cardinal Indus., Inc.), 109 B.R. 743, 746 (Bankr. S.D. Ohio 1989) (citation omitted).

[FN98]. *See* Buschman & Madden, *supra* note 91, at 946-47 (criticizing "some courts' virtually limitless standards for defining the scope of the bankruptcy court's jurisdiction" as creating "potential for abuse"). Buschman and Madden argue that "related to" jurisdiction should be determined to exist only when the proceeding could:

> (1) increase or decrease the debtor's liabilities or distributable assets, (2) impair the integrity of the automatic stay, (3) affect the debtor's options or freedom of action (*e.g.,* through the effect of collateral estoppel), or (4) interfere with the bankruptcy court's 'handling and administration of the estate.' This latter factor includes substantial threats to estate administration posed by diverting the debtor's principals from reorganization efforts and can justify only limited injunctive relief, carefully tailored to account for both the perceived threat to the estate and the court's jurisdictional limitations. Issuing an injunction or exercising related jurisdiction simply to enhance or preserve the value of an estate asset is an illegitimate exercise of the bankruptcy court's power.

*Id.* at 947. For an example of a case in which bankruptcy jurisdiction was held to permit the injunction of non-debtor third parties from taking actions to control property of estate in violation of 11 U.S.C. § 362(a)(3), see Old Orchard Inv. Co. v. A.D.I. Distrib., Inc. (*In re* Old Orchard Inv. Co.), 31 B.R. 599, 602-03 (W.D. Mich. 1983). For broader examples of bankruptcy jurisdiction to enjoin third party nondebtors, see Menard-Sanford v. Mabey (*In re* A.H. Robins Co.), 880 F.2d 694, 701-02 (4th Cir.), *cert. denied,* 110 S. Ct. 376 (1989) (explaining that bankruptcy jurisdiction exists to approve plan of reorganization permanently enjoining nondebtors from bringing actions against debtor's insurers as a part of settlement between debtor and insurers by which insurers agreed to contribute fund for distribution to debtor's tort claimants); MacArthur Co. v.

Johns-Manville Corp. (*In re* Johns-Manville Corp.), 837 F.2d 89, 94 (2d Cir.), *cert. denied,* 109 S. Ct. 176 (1988) (same).
[FN99]. *See* H.R. Rep. No. 595, 95th Cong. 1st Sess. 445 (1977) ( "[B]ecause title 11, the bankruptcy code, only applies once a bankruptcy case is commenced, any proceeding arising under title 11 will be in some way 'related to' a case under title 11.").

[FN100]. *See infra* notes 397-415 and accompanying text. Former 28 U.S.C. § 1471, which governed bankruptcy jurisdiction until the Supreme Court held in Northern Pipeline Constr. Co., v. Marathon Pipe Line Co., 458 U.S. 50, 87 (1982), that its broad delegation of jurisdiction to non-Article III bankruptcy courts violated Article III of the Constitution, defined bankruptcy jurisdiction as follows:

 (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

 (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.

 (c) The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

 (d) Subsection (b) or (c) of this section does not prevent a district court or a bankruptcy court, in the interest of justice, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11. Such abstention, or a decision not to abstain, is not reviewable by appeal or otherwise.

 (e) The bankruptcy court in which a case under title 11 is commenced shall have exclusive jurisdiction of all of the property, wherever located, of the debtor, as of the commencement of such case.

28 U.S.C. § 1471 (repealed).
[FN101]. For a discussion of this legislative history, see *infra* notes 496-503 and accompanying text. Prior to enactment of the Bankruptcy Reform Act in 1978, parties often squandered scarce estate assets litigating jurisdictional issues because the Bankruptcy Act of 1898 divided bankruptcy jurisdiction among state and federal courts.

 Section 2a of the former Act broadly granted district courts "with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this Act." 1898 Act, § 2a. The Act appeared to limit this broad grant of federal bankruptcy jurisdiction by listing specific proceedings over which this jurisdiction existed. *See id.* Some of these enumerated proceedings were narrow, while others were broad. The broadest permitted district courts to "[c]ause the estates of bankrupts to be collected, reduced to money, and distributed, and determine controversies in relation thereto, except as herein otherwise provided." *Id.* § 2a(7). The proviso in this section referred to § 23 of the 1898 Act, which severely qualified this broad grant of bankruptcy jurisdiction to district courts. It limited the plenary jurisdiction that they could exercise by providing in the clause governing the district courts that generally, absent the consent of the defendant, "suits by the receiver and the trustee shall be brought or prosecuted only in the courts where the bankrupt might have brought or prosecuted them if proceedings under this Act had not been instituted." *Id.* § 23. This section was amended to permit plenary suits under §§ 67e, 60b, and 70e to be brought in district courts without regard to the defendant's consent or other ground for federal jurisdiction. *See* Williams v. Austrian, 331 U.S. 642, 649 (1947). This provision, even as amended, severely limited the plenary bankruptcy jurisdiction that district courts could exercise, and, except in the context of a Chapter X reorganization, directed most of these suits to the state courts. *See id.*

[FN102]. *See* 28 U.S.C. § 1367 (Supp. IV. 1992) (entitled "supplemental jurisdiction"); *see also* Richard D. Freer, *A Principled Statutory Approach to Supplemental Jurisdiction,* 1987 Duke L.J. 34, 34 [hereinafter Freer, *Principled Statutory Approach*]; Richard D. Freer, *Compounding Confusion and Hampering Diversity: Life After* Finley *and the Supplemental Jurisdiction Statute,* 40 Emory L.J. 445, 447 (1991) [hereinafter Freer, *Life After* Finley]; Richard A. Matasar, *A Pendent and Ancillary Jurisdiction Primer: The Scope and Limits of Supplemental Jurisdiction,* 17 U.C. Davis L. Rev. 103, 104 (1983) [[[hereinafter Matasar, *Jurisdiction Primer*]; Richard A. Matasar, *Rediscovering "One Constitutional Case": Procedural Rules and the*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Rejection of the* Gibbs *Test for Supplemental Jurisdiction,* 71 Cal. L. Rev. 1399, 1401 (1983) [[hereinafter Matasar, *One Constitutional Case*]; Denis F. McLaughlin, *The Federal Supplemental Jurisdiction Statute--A Constitutional and Statutory Analysis,* 24 Ariz. St. L.J. 849, 852 (1992);* Thomas M. Mengler, *The Demise of Pendent and Ancillary Jurisdiction,* 1990 B.Y.U. L. Rev. 247, 247 n.3;* David D. Siegel, *Changes in Federal Jurisdiction and Practice Under the New (Dec. 1, 1990) Judicial Improvements Act,* 133 F.R.D. 61, 61 (1991);* Arthur D. Wolf, *Codification of Supplemental Jurisdiction: Anatomy of a Legislative Proposal,* 14 W. New Eng. L. Rev. 1, 3 (1992).

[FN103]. McLaughlin, *supra* note 102, at 874.

[FN104]. *See* Fulton Nat'l Bank v. Hozier, 267 U.S. 276, 280 (1925) ("The general rule is that when a federal court has properly acquired jurisdiction over a cause it may entertain, by intervention, dependent or ancillary controversies; but no controversy can be regarded as dependent or ancillary unless it has direct relation to property or assets actually or constructively drawn into the court's possession or control by the principal suit.") (citation omitted); Freeman v. Howe, 65 U.S. 450, 460 (1860) ("[A] bill filed on the equity side of the court to restrain or regulate judgments or suits at law in the same court, and thereby prevent injustice, or an inequitable advantage under mesne or final process, is not an original suit, but ancillary and dependent, sup-plementary merely to the original suit, out of which it had arisen, and is maintained without reference to the citizenship or residence of the parties.").

[FN105]. *See* Moore v. New York Cotton Exch., 270 U.S. 593, 609-10 (1926) (relying on Equity Rule 30, a predecessor to Fed. R. Civ. P. 13(a), which now governs compulsory counterclaims).

[FN106]. *See* McLaughlin, *supra* note 102, at 876; *see also* Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 375 (1978) (stating in dictum "that the exercise of ancillary jurisdiction over non-federal claims has often been upheld in situations involving impleader, cross-claims or counterclaims").

[FN107]. Unlike the doctrine of pendent jurisdiction, for purposes of ancillary jurisdiction, the primary claim can rely on any grant of federal jurisdiction. *See infra* notes 110-36 and accompanying text (discussing pendent-claim and pendent-party ju-risdiction).

[FN108]. Moore v. New York Cotton Exch., 270 U.S. 593, 610 (1926).

[FN109]. *Cf.* Moor v. County of Alameda, 411 U.S. 693, 714-15 (1973) (acknowledging in dictum the "well established doc-trine of ancillary jurisdiction" permitting defendants to join additional parties to ongoing lawsuits pursuant to Fed. R. Civ. P. 13(a), 13(h), and 14(a), despite lack of independent basis for subject matter jurisdiction over additional parties).

[FN110]. McLaughlin, *supra* note 102, at 868-69.

[FN111]. *See* 22 U.S. 738 (1824) (Marshall, C.J.); *see also infra* notes 280-334 and accompanying text (discussing *Osborn* in greater detail).

[FN112]. *Osborn,* 22 U.S. at 820.

[FN113]. 213 U.S. 175 (1909).

[FN114]. *Id.* at 191.

[FN115]. *See* Hurn v. Oursler, 289 U.S. 238, 242-45 (1933).

[FN116]. 383 U.S. 715 (1966).

[FN117]. *See id.* at 725-27.

[FN118]. *Id.* at 725 (alterations in original) (emphasis in original) (citations omitted). According to Denis F. McLaughlin:
      The first requirement of *Gibbs,* that the federal law claims be of sufficient substance to confer subject matter jurisdiction, is the same jurisdictional requirement that applies generally to all federal question claims. The substantiality doctrine requires that the federal court dismiss a federal law claim for lack of subject matter jurisdiction if the claim is "obviously without merit or if 'previous decisions of this court . . . foreclose the subject or leave no room for the inference that the question sought to be raised can be the subject of controversy . . . . '" The second requirement of *Gibbs,* that the federal law claims and state law claims "derive from a common nucleus of operative fact," is the heart of the *Gibbs* test . . . .

      McLaughlin, *supra* note 102, at 871-73 (citations omitted).

[FN119]. *See* Finley v. United States, 490 U.S. 545 (1989); Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365 (1978); Aldinger v. Howard, 427 U.S. 1 (1976).

[FN120]. 437 U.S. 365 (1978).

[FN121]. *See supra* notes 103-09 and accompanying text.

[FN122]. *Owen Equip.,* 437 U.S. at 374.

[FN123]. 427 U.S. 1 (1976).

[FN124]. *See* 42 U.S.C. § 1983 (1988) (Civil Rights Act of 1871).

[FN125]. At the time *Aldinger* was decided, municipal entities such as the County of Alameda were not viewed as "persons" for purposes of the Civil Rights Act. *See* Monroe v. Pape, 365 U.S. 167, 187-91 (1961). This precedent was overruled, two years after *Aldinger,* by *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690-95 (1978).

[FN126]. 28 U.S.C. § 1331 (1988 & Supp. IV 1992).

[FN127]. Aldinger v. Howard, 427 U.S. 1, 18 (1976).

[FN128]. *Id.*

[FN129]. *See* McLaughlin, *supra* note 102, at 863-64.

[FN130]. *See* Wendy C. Perdue, Finley v. United States: *Unstringing Pendent Jurisdiction,* 76 U. Va. L. Rev. 539, 550 nn.76-77 (1990) (citing circuit decisions construing *Aldinger;* all but the Ninth Circuit permit pendent-party jurisdiction in some form); *see also* McLaughlin, *supra* note 102, at 884 (same).

[FN131]. 490 U.S. 545 (1989).

[FN132]. *Id.* at 546.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN133]. *Id.*

[FN134]. *See id.* at 549-51.

[FN135]. *Id.* at 555.

[FN136]. *Id.* at 552.

[FN137]. 28 U.S.C. § 1367(a) (Supp. IV. 1992).

[FN138]. H.R. Rep. No. 734, 101st Cong., 2d Sess. at 28-29 & n.15 (1990); *see supra* notes 116-18 and accompanying text (discussing *Gibbs's* three-part test).

[FN139]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992). The bankruptcy jurisdictional provision enacted in 1978 under 28 U.S.C. § 1471(b) contained a nearly identical grant of bankruptcy jurisdiction. *See supra* notes 100-01 and accompanying text.

[FN140]. *See infra* part II.A (discussing this case law in detail).

[FN141]. 980 F.2d 110 (2d Cir. 1992).

[FN142]. *Cuyahoga* addresses the bankruptcy jurisdiction of the district court because, in that case, the district court had withdrawn the reference of the proceeding from the bankruptcy court. *See id.* at 113; *see also* 28 U.S.C. § 157(d) (1988) (permitting district court to withdraw reference "for cause").

[FN143]. These claimants included: the United States on behalf of the Environmental Protection Agency, the debtor's lender, Freedom Savings & Loan Association, the Pennsylvania Department of Environmental Resources, the National Oceanographic and Atmospheric Administration, the Department of the Interior, and the trustee in bankruptcy. *See Cuyahoga,* 980 F.2d at 112-13. The basis for these claims differed. The EPA had claimed an entitlement to the proceeds of the sale under CERCLA § 9607(a)(2) and 11 U.S.C. § 506(c). *See id.* Freedom Savings' claim to the proceeds of the sale followed from its mortgage against the real property and security interest in the personal property sold in the debtors' bankruptcy case. *See id.* at 113. The PDEP's claim related to costs it incurred by cleaning up the site. *See id.* The claim of the Department of Interior and the National Oceanographic and Atmospheric Administration arose out of liability for natural resource damage. *See id.* NOAA and the Interior also agreed to release Freedom Savings from liabilities under these laws. *See id.* The trustee claimed a portion of the proceeds of the sale pursuant to 11 U.S.C. § 506(c). *See id.*

[FN144]. In the settlement agreement, the EPA, the Department of the Interior, the National Oceanographic and Atmospheric Administration, and the Pennsylvania Department of Environmental Protection agreed to release not only Freedom Savings from further environmental liability related to the site, but also Freedoms Savings' receiver and its related federal banking regulatory agencies. *See id.*

[FN145]. As a practical matter, Publicker objected to the settlement because it was left as the only remaining responsible party for clean-up costs. *See id.* at 118.

[FN146]. *See id.* at 114. The court of appeals stated that the district court had "related to" jurisdiction, but the implication of its decision was that the district court had "arising in" jurisdiction over the settlement agreement. *See id.* Although the court did not explicitly assert that these proceedings arose under title 11 or arose in a title 11 case, the court did state that "[b] eyond merely having any 'conceivable effect,' or 'any significant connection' with the bankrupt estate--either of which would establish § 1334(b) jurisdiction--these claims bring into question the very distribution of the estate's property and its allocation between a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

party asserting the status of constructive trustee and a first priority secured creditor." *Id.* (citations omitted). Moreover, the court cited *In re* Parque Forestal, Inc., 949 F.2d 504, 510 (1st Cir. 1991), in support of its conclusion that there existed "related to" jurisdiction over the claims against the sale proceeds. *See* Cuyahoga, 980 F.2d at 114. But the court in *Parque Forestal* held that an action to enforce 11 U.S.C. § 506(c) "arises under" title 11, leaving undecided the difficult question of whether a state law estoppel claim would constitute a "core proceeding." 949 F.2d at 510.

The court's holding in *Cuyahoga* that these claims were "related to" proceedings is not technically wrong, however, in that "related to" jurisdiction is broader than "arising under" or "arising in" jurisdiction; any proceeding "arising under" title 11 or "arising in" a title 11 case usually is also "related to" the title 11 case. *See supra* note 99 and accompanying text. In addition, the distinction between these grants of jurisdiction may have seemed to be only of academic interest to the court of appeals, since courts have referred to the differences among the several grants of bankruptcy jurisdiction as relevant only when a non-Article III bankruptcy court is asserting subject matter jurisdiction over the proceeding. Here, the Article III district court had with-drawn the reference and entered the order approving the settlement agreement as an exercise of its original jurisdiction. But where a district court is also asserting supplemental bankruptcy jurisdiction over claims related to the proceeding, the propriety of this assertion may well depend upon whether the supplemental jurisdiction is related to an "arising under" or "arising in" proceeding on one hand or related to a "related to" proceeding on the other. *See infra* parts III-IV (discussing constitutional, statutory, and policy based arguments relating to this distinction).

[FN147]. *See* Cuyahoga, 980 F.2d at 115. The court's statement that supplemental bankruptcy jurisdiction existed sufficient to enable the district court to order the release of liability between non-debtor third parties was dictum, however, in that the court of appeals went on to note that "[t]he district court did not need to rely solely on its supplemental jurisdiction to approve the settlement, because additional authority arises from CERCLA's jurisdictional grant vesting the power in all district courts to approve agreements compromising potential CERCLA claims asserted by the government." *Id. See* 42 U.S.C. § 9613(b) (1988) ("[T]he United States district courts shall have exclusive original jurisdiction over all controversies arising under [CER-CLA].").

[FN148]. *See* Cuyahoga, 980 F.2d at 115 ("In the case at hand, the environmental causes form part of the same case with the bankruptcy claims because all of them, resolved in the settlement agreement, concern the government's attempts to remedy hazardous substance releases at the Publicker site and they remain intertwined in the competing parties' efforts to secure a share of the proceeds of the option sale.").

[FN149]. 111 B.R. 162, 164 (N.D. Ill. 1990) (district court sat as trial court, rather than as appellate tribunal). *See also* 28 U.S.C. § 157(d) (1988) (permitting district court to withdraw a reference of jurisdiction in non-Article III bankruptcy cases "for cause"); *see also infra* note 424 (discussing withdrawal of reference provision).

[FN150]. *See* Wieboldt, 111 B.R. at 164. The fraudulent transfer suit arose out of a leveraged-buyout ("LBO") through which WSI Acquisition Corporation acquired Wieboldt Stores, Inc. *See id.* For a detailed discussion of the facts of the Wieboldt LBO, see Wieboldt Stores, Inc. v. Schottenstein, 94 B.R. 488, 493-496 (N.D. Ill. 1988). *See also* Laganella v. Braen (*In re* Braen), Case No. 86-06421 DV, Adv. No. 86-0286, 1991 WL 7701 at *8 (D. N.J., Jan. 23, 1991) (upholding dismissal of counterclaim and third-party complaint on grounds that bankruptcy court had not abused discretion in declining to exercise pendent juris-diction over these claims: "This Court concurs with Judge Tuohey's analysis of the lack of factual overlap of the fraudulent conveyance action on the one hand and [counterclaim and third-party complaint alleging] . . . '[p] laintiffs' wrongful and ma-licious actions in the course of obtaining the execution levies.'").

[FN151]. *See* Wieboldt, 111 B.R. at 166.

[FN152]. *See, e.g.,* Official Creditors' Comm. of Prods. Liab. & Personal Injury Claimants v. International Ins. Co. (*In re* Pettibone Corp.), 135 B.R. 847, 849-50 (Bankr. N.D. Ill. 1992) (factual connection between cross claims and underlying ad-versary proceeding insufficient to create supplemental jurisdiction). Whether § 1367--which on its face governs the supple-mental jurisdiction of district courts--should govern the exercise of supplemental jurisdiction by bankruptcy courts at all is subject to question. *See infra* part III.B.4 (discussing statutory construction issues). Moreover, the exercise of supplemental jurisdiction by a non-Article III bankruptcy court raises distinct constitutional concerns. *See infra* part III.A.2 (discussing these

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

constitutional issues).

[FN153]. 135 B.R. 387 (Bankr. E.D. Cal. 1991).

[FN154]. The court also found that it had "related to" bankruptcy jurisdiction over the third-party claims because, "the possibility of recovery on the third-party complaint enhances the collectability of any judgment against the [non-debtor] defendants." *Id. at 393.* It went on to note, however, that its assertion of "related to" jurisdiction over "[i]ndemnity claims between nondebtors, one of whom is indebted to the estate," was a conclusion as to which courts have disagreed. *See id. at 393 n.9* (citing Scott v. Equitable Fed. Sav. & Loan Assoc. (*In re* German), 97 B.R. 373, 375 (Bankr. S.D. Ohio 1989), to the contrary); *accord* Spaulding & Co. v. Buchanan (*In re Spaulding & Co.) 131 B.R. 84, 88-89 (N.D. Ill. 1990)* (holding that "related to" jurisdiction does not exist over a claim which has only a remote possibility of effecting the allocation of the estate).

[FN155]. The third-party complaint alleged not only malpractice, but also indemnification, breach of contract and fraud. *See Hawkins,* 135 B.R. at 391 & n.6.

[FN156]. The non-debtor defendants were purchasers of assets from the debtors' chapter 11 estate in a scheme alleged to have been fraudulent. *See id. at 390-91.*

[FN157]. The primary complaint brought by the trustee in bankruptcy against the debtor and third parties alleged "an age-old fraud--that defendants siphoned a secret profit by selling property of the bankruptcy estate through a strawman at a fictitiously low price." *Id. at 390* (footnote omitted).

[FN158]. The court held that it had "arising under" bankruptcy jurisdiction over the trustee's avoidance action. *See id. at 392* ("proceedings based on causes of action created by sections 363(n), 549, and 550 'arise under' title 11").

[FN159]. 139 B.R. 824 (Bankr. S.D. Tex. 1992).

[FN160]. *See id. at 826.*

[FN161]. *See id.* Peculiarly, in *W.J. Services,* the malpractice action was found to have been ancillary to the fee application although the malpractice action was *not* brought as a counterclaim to the fee application and indeed was not even commenced until after the fee application had been granted and the chapter 11 cases dismissed. *See id.* "As a general rule, the dismissal of a bankruptcy case should result in the dismissal of 'related proceedings' because the court's jurisdiction of the latter depends, in the first instance, upon the nexus between the underlying bankruptcy case and the related proceedings." Smith v. Commercial Banking Corp. (*In re* Smith), 866 F.2d 576, 580 (3d Cir. 1989); *see also,* American Hardwoods, Inc. v. Deutsche Credit Corp. (*In re* American Hardwoods, Inc.), 885 F.2d 621, 624-27 (9th Cir. 1989) (bankruptcy court lacked power to enjoin enforcement of guarantee after confirmation of reorganization plan); Tsafaroff v. Taylor (*In re* Taylor), 884 F.2d 478 (9th Cir. 1989) (bankruptcy court lacked jurisdiction to grant request for relief from automatic stay after entry of order dismissing petition); Cimo v. Petty (*In re* Petty), 848 F.2d 655 (5th Cir. 1988) (after dismissal of petition, bankruptcy court lacked jurisdiction over motion under § 365(d)(4)). Although three courts of appeals have held that a bankruptcy court may in its discretion retain jurisdiction over related proceedings after termination of the bankruptcy case, they all held that jurisdiction was only proper if retention would further judicial economy, would be fair and convenient to the litigants, and was merited by the degree of difficulty of the related legal issues involved. *See* Carraher v. Morgan Elects., Inc. (*In re* Carraher), 971 F.2d 327, 328 (9th Cir. 1992); Fidelity & Deposit Co. v. Morris (*In re* Morris), 950 F.2d 1531, 1535 (11th Cir. 1992); Smith v. Commercial Banking Corp. (*In re* Smith), 866 F.2d 576, 580 (3d Cir. 1989). The court in *W.J. Services* made no such determination. Moreover, *W.J. Services* ancillary jurisdiction holding would be strange even if the chapter 11 cases had been pending at the time the malpractice action was brought because the fee application and malpractice action were independently commenced causes of action. Under the *W.J. Services* test for ancillary jurisdiction, the bankruptcy court would be free to peruse the entirety of the docket in a given title 11 case in the hopes of finding an action that involves the same factual nexus. Of course, if a chapter 11 case had not been dismissed, and possibly even after the dismissal of the case, the malpractice action probably could have been

viewed as "arising in" the title 11 case because but for the debtors' chapter 11 case their attorneys would not have committed malpractice.

[FN162]. *See In re W.J. Servs., Inc.,* 139 B.R. at 826-27.

[FN163]. 123 B.R. 467 (Bankr. N.D.N.Y. 1989).

[FN164]. The debtor-lessor had assigned its interests in the equipment schedules to a master lease to two separate lenders, both of whom claimed rental proceeds which accrued post-petition. After placing the rental proceeds in escrow, the lessee of the debtor-equipment lessor brought the interpleader action and named the debtor, the creditors' committee, and the two lenders as defendants. 123 B.R. at 469-470.

[FN165]. The phrase "core proceeding" is a term of art to bankruptcy jurisdiction that refers to jurisdiction that the non-Article III bankruptcy judge is authorized both to "hear and determine." *See* 28 U.S.C. § 157(b)(1) (1988) ("Bankruptcy judges may hear and determine all case under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.").

[FN166]. The provisions invoked are 11 U.S.C. §§ 362, 541, 542, 544, 547, 548, 549, and 550. *See ICS Cybernetics,* 123 B.R. at 471.

[FN167]. *Id.* at 471.

[FN168]. *See id.* By calling a proceeding core because it satisfies the test for ancillary jurisdiction, the court seems to mix metaphors. If the court is relying on the doctrine of ancillary jurisdiction, by definition it admits there exists no statutory grant of original jurisdiction. If there exists no grant of original jurisdiction, then the proceeding cannot be a "core proceeding."

[FN169]. *Id.* at 472. The court's reference to ancillary jurisdiction seems unnecessary here. The lender's counterclaims and cross-claims amounted, in effect, to a request for a declaration of the perfection and validity of its security interest, an action which either "arises under" 11 U.S.C. § 506, or "arises in" a bankruptcy case as "but for" the case the lender would not be seeking such a determination. Moreover, the lenders had previously filed proofs of claim in the case asserting claims substantially similar to those presented by the counterclaims and cross-claims. *See id.* at 473 n.4. Litigation involving a proof of claim also "arises in" a bankruptcy case. *See also supra* notes 75-84 and accompanying text (discussing "arising in" jurisdiction in greater detail).

[FN170]. 86 B.R. 203 (Bankr. D. Neb. 1988).

[FN171]. *See* 11 U.S.C. § 523(c) (1988) (permitting party in interest to object to discharge of particular debt on grounds listed therein).

[FN172]. The non-dischargeability action was a core proceeding because it "arose under" 11 U.S.C. § 523. *See Aerni,* 86 B.R. at 206. Moreover, 28 U.S.C. § 157(b)(2)(B) and (I) explicitly refer to proceedings involving the "allowance or disallowance of claims against the estate" and "determinations as to the dischargeability of particular debts" as core proceedings. 28 U.S.C. § 157(b)(2)(B), (I) (1988).

[FN173]. The counterclaim that sought a declaration as to the enforceability of the underlying debt would not have been "related to" the debtor's bankruptcy case if the debt were non-dischargeable and if the creditor sought to collect the obligation only against property that is not property of the estate. Under this limited circumstance, the result of the declaratory judgment action would have no conceivable effect on the estate. *See supra* notes 85-98 (discussing definition of "related to" jurisdiction).

[FN174]. *See* *Aerni*, 86 B.R. at 207.

[FN175]. *Id.*

[FN176]. 490 U.S. 545 (1989).

[FN177]. *Id.* at 552.

[FN178]. *Id.* (quoting Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 376-77).

[FN179]. 51 B.R. 913 (Bankr. E.D. Mich. 1985).

[FN180]. *See* *id.* at 925-26.

[FN181]. *See id.*

[FN182]. The court's discussion of its authority to exercise ancillary jurisdiction is probably dicta since it found an independent ground for subject matter jurisdiction:

> The district courts of the United States have "exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the Corporation [CCC] . . . " 15 U.S.C. § 714(b). Thus the federal district court for this district clearly has subject matter jurisdiction over the cross-claim. As stated earlier, the mere delegation of that authority to the bankruptcy court pursuant to 28 U.S.C. § 157(c) is proper, and therefore, the motion to dismiss for lack of subject matter jurisdiction would have been denied had summary judgment not been granted to the plaintiff.

*Earl Roggenbuck Farms*, 51 B.R. at 926.

[FN183]. *See* *id.* at 925.

[FN184]. *Id.*

[FN185]. *See id.*

[FN186]. *Id.* at 926.

[FN187]. *See id.*

[FN188]. *See id.* The court's conclusion that there existed a sufficient nexus between the title 11 case and the cross-claim is confusing because that nexus should have been sufficient to find that the cross-claim constituted a "related to" proceeding, making the discussion of supplemental jurisdiction irrelevant.

[FN189]. 52 B.R. 513 (Bankr. N.D. Ala. 1985).

[FN190]. *See* *id.* at 514. In this counterclaim, the trustee requested that the bankruptcy court "order the Commission to discharge the sureties of certain reclamation bonds so that these sureties will in turn release an escrow fund of approximately $100,000.00 which they hold to secure their obligations under the reclamation bonds." *Id.* He claimed that a portion of the escrow constituted property of the estate. *See id.*

[FN191]. *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN192]. *See id.* at 522.

[FN193]. *Id.* Presumably, the court found that the intervenors' actions were "related to" the debtor's chapter 7 case because their effect upon the debtor's partnership tax indebtedness would affect the administration of the estate and possibly distributions from the estate as well.

[FN194]. *See id.* at 523 ("Because of the partnership context of this dispute, the same aggregate of operative facts serves as the basis of both the claims of the Intervenors and of the Trustee.").

[FN195]. *Id.* at 524 (quoting Bankruptcy Court Reform Conference Report, 98th Cong. 2d Sess., 130 Cong. Rec. S8887 (June 29, 1984)(statement of Sen. Dole)). Senator Dole, however was probably referring to pendent, and not ancillary, jurisdiction.

[FN196]. Courts of appeals, at times, have relied upon the remarks of individual members of Congress to determine congressional intent. *See, e.g.*, Citibank, N.A. v. White Motor Corp. (*In re* White Motor Corp.), 761 F.2d 270, 271-73 (6th Cir. 1985) (relying on remarks of Sen. Dole to support conclusion that Congress impliedly incorporated discretionary abstention provision--29 U.S.C. § 133(c)(1)--as exception to requirement in 28 U.S.C. § 157(b)(5) that "personal injury tort and wrongful death claims [in pending bankruptcy case] shall be tried in the district court in which the bankruptcy case is pending, or in the district court in which the claim arose"). Most courts, however, have found the remarks of individual legislators unhelpful in construing a statute. *See infra* note 197 (reviewing this case law).

[FN197]. *See, e.g.*, Garcia v. United States, 469 U.S. 70, 76 (1984); *see also* Susan Block-Lieb, *Using Legislative History to Interpret Bankruptcy Statutes, in* Bankruptcy Practice and Strategy 2-1, ¶ 2.02[6], [7] (A. Resnick ed., 1987).

[FN198]. 141 B.R. 450 (Bankr. N.D. Ga. 1991).

[FN199]. *See id.* at 452. Because resolution of the third-party complaint would have had no conceivable effect on the administration of the estate, and thus was not "related to" the chapter 11 case, the court found that bankruptcy jurisdiction did not exist. *See id.* at 453.

[FN200]. *See id.* In *Feifer Industries*, the debtor granted Standard Chartered and First Georgia Bank a joint security interest in substantially all its assets. *See id.* at 451. The banks jointly filed a UCC-1 financing statement. Nearly a year later, First Union (First Georgia's successor in interest) filed a UCC-3 termination statement relating to this transaction. *See id.* The debtor's trustee brought a declaratory action in the bankruptcy court seeking a determination that Standard Chartered's security interest was terminated by First Union's filing. *See id.* In response, Standard Chartered not only answered the trustee's complaint, but also filed a third-party complaint against First Union alleging that First Union intentionally or negligently terminated the financing statement to its detriment. *See id.*

[FN201]. *See id.* at 453. The court stated that

> [t]he termination of the financing statement and its affect upon Standard Chartered's security interest are issues of fact common to the Trustee's adversary proceeding and Standard Chartered's third-party claim. However, the crux of Standard Chartered's claim is First Union's alleged liability for negligently or intentionally releasing Standard Chartered's security interest. Resolution of this issue will require consideration of evidence concerning the basis for First Union's actions, agreements between these parties, and applicable state law. The bulk of such evidence and applicable state law would not be relevant to the Trustee's adversary claims.

*Id.*

[FN202]. 91 B.R. 5 (Bankr. E.D. Pa. 1988).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN203]. *See id. at 6-7*. The decision provides no factual discussion. The only indication of the circumstances of the suit is a reference to the "primary claim in this proceeding [as] core, pursuant to 28 U.S.C. § 157(b)(2)(C)." *See id. at 6*. Title 28 U.S.C. § 157(b)(2)(C) provides that "counterclaims by the estate against persons filing claims against the estate" are "core proceedings." 28 U.S.C. § 157(b)(2)(C) (1988).

[FN204]. *See Direct Satellite,* 91 B.R. at 6.

[FN205]. *Id.* (quoting United Mineworkers v. Gibbs, 383 U.S. 715, 725 (1966)).

[FN206]. *Id.* at 7 (quoting *Gibbs,* 383 U.S. at 725).

[FN207]. *See id.;* Fed. R. Bankr. P. 7014 ("Rule 14 F[ed]. R. Civ. P. applies in adversary proceedings."); *see also* Fed. R. Civ. P. 14 (prescribing circumstances under which defendant and plaintiff may bring in third party).

[FN208]. Fed. R. Bankr. P. 7014 Advisory Committee's Note ("This rule does not purport to deal with questions of jurisdiction. The scope of the jurisdictional grant under 28 U.S.C. § [1334] and whether the doctrines of pendent or ancillary jurisdiction are applicable to adversary proceedings will be determined by the courts.").

[FN209]. *Direct Satellite,* 91 B.R. 5, 7 (Bankr. E.D. Pa. 1988) (citations omitted). The court found this exercise of discretion was appropriate because

> [t]he third-party defendants would be compelled to appear as witnesses and claims against them . . . would be an aspect of Decher's [sic] defense irrespective of whether they are joined as parties to this proceeding. Carpenter would be here as a party in any event, as he has not moved for dismissal. It appears grossly unfair to Dechert and to Carpenter to make them engage in litigation in a different forum which would be identical to that here if they do not wish to do so.

*Id.*

[FN210]. 79 B.R. 686 (Bankr. E.D. Mich. 1987).

[FN211]. *See id. at 692-95*. The claims of the debtor's principal and the corporation with which the debtor was to have merged were probably not "related to" the debtor's chapter 11 case because recovery from these nondebtors' suits would not have been property of the estate, but rather property of the principal and corporation. It is hard to conceive of any other relationship which these claims might have had upon administration of the debtor's estate.

[FN212]. 62 B.R. 699 (Bankr. S.D. Tex. 1986).

[FN213]. *See id. at 707-08*. In this case, the plaintiff, an oil producer, commenced an action seeking an injunction against one debtor-defendant from shipping oil to another debtor-defendant which it had purchased from a third debtor-defendant. *See id. at 700*. It later amended its complaint to add a non-debtor-defendant and seek either possession of the oil or payment for it. *See id.* The producer then settled its claims against the debtor-defendants. *See id. at 701*. Although the plaintiff originally brought the action in federal court on diversity grounds, the debtor-defendants' chapter 11 filings meant that bankruptcy jurisdiction also existed at least as to the claims against the debtor-defendants. *See id. at 700*.

[FN214]. *See id. at 702-03*.

[FN215]. *See id. at 708*. Decided in 1986, the bankruptcy court applied Aldinger v. Howard, 427 U.S. 1 (1976), as Finley v. United States, 490 U.S. 545 (1989), had not yet been decided. *See* 62 B.R. at 705-07.

[FN216]. *See id. at 708; see also* Berg v. TM Carlton House Partners, Ltd. (*In re* TM Carlton House Partners, Ltd.), Adv. No. 89-1088S, 1990 WL 179737 at *3 (Bankr. E.D. Pa. 1990) (declining to exercise supplemental jurisdiction over "controversy

between two non-debtors which promises to have negligible, if any, impact upon the Debtor[,]" although acknowledging "the presence of the concept of pendent jurisdiction which allows a federal bankruptcy court to hear non-federal claims raised in a proceeding before it [[[ ]]"; the court supported this exercise of discretion by noting that it is a court of limited jurisdiction "confined to adjudication of matters arising under the Bankruptcy Code or pertaining to the affairs of the debtors").

[FN217]. 142 B.R. 465 (M.D. Ala. 1992).

[FN218]. *See id.* at 470-71 (quoting Matter of Lemco Gypsum, Inc., 910 F.2d 784, 789 (11th Cir. 1990)).

[FN219]. The district court specifically stated it "need not address these difficult arguments because, assuming that bankruptcy courts have the supplemental authority to exercise ancillary and pendent jurisdiction, the bankruptcy court here still properly refused to exercise such jurisdiction over [the] two fraud claims." *Id.* at 471.

[FN220]. *Id.* (citations omitted).

[FN221]. The *Alpha Steel* analysis of 28 U.S.C. § 1367(a), however, applies only to an assertion of supplemental jurisdiction in a non-Article III bankruptcy court. *Id.*

[FN222]. 104 B.R. 976 (D. Minn. 1989).

[FN223]. *See id.* at 988.

[FN224]. *See id.* at 986 ("For the purposes of pendent jurisdiction, this is definitely a case of 'the tail wagging the dog.'").

[FN225]. 490 U.S. 545 (1989) (first alteration in original).

[FN226]. *Marine Iron,* 104 B.R. at 986 (quoting *Finley,* 490 U.S. at 549).

[FN227]. *See Marine Iron,* 104 B.R. at 986-87.

[FN228]. 135 B.R. 847 (Bankr. N.D. Ind. 1991).

[FN229]. *See id.* at 852. The adversary proceedings at issue in *Pettibone* had been brought by the Official Creditors' Committee of Products Liability and Personal Injury Claimants, claiming that several of the debtor's insurers violated the debtor's confirmed plan of reorganization by paying $3 million directly to personal injury claimants rather than to the estate for pro rata distribution to all personal injury claimants pursuant to the plan. *See id.* at 848. The excess insurer cross-claimed against the secondary insurer for failure to defend or settle personal injury litigation in good faith, breach of contract, reimbursement, and equitable contribution. *See id.* at 849.

[FN230]. *See id.* at 852. For a case that found jurisdiction supplemental to a dischargeabilty action, see Aerni v. Columbus Fed. Sav. (*In re* Aerni), 86 B.R. 203 (Bankr. D. Neb. 1988) and also *supra* notes 170-78 and accompanying text (discussing *Aerni*).

[FN231]. *Pettibone,* 135 B.R. at 852 (citation omitted).

[FN232]. *See infra* part III.A.1 (discussing these constitutional issues).

[FN233]. *See infra* part III.A.2 (discussing these distinct constitutional issues).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN234]. *See, e.g.,* Publicker Indus., Inc. v. United States (*In re* Cuyahoga Equip. Corp.), 980 F.2d 110, 115 (2d Cir. 1992) (asserting, without discussion, that district court had power to adjudicate jurisdictionally insufficient state law claims factually related to "related to" proceeding pursuant to 28 U.S.C. § 1367); Goger v. Merchants Bank (*In re* Feifer Indus.), 141 B.R. 450, 451 (Bankr. N.D. Ga. 1991) (same); Hawkins v. Eads (*In re* Eads), 135 B.R. 387 (Bankr. E.D. Cal. 1991) (same).

[FN235]. *See, e.g.,* Publicker Indus., 980 F.2d at 115 (concluding that exercise of supplemental bankruptcy jurisdiction was justified was dicta in that court went on to find alternate basis for federal jurisdiction over same claims under CERCLA); Wieboldt Stores, Inc. v. Schottenstein, 111 B.R. 162, 166-67 (N.D. Ill. 1990) (concluding that exercise of supplemental bankruptcy jurisdiction was justified was dicta in that court stated that it need not determine whether third-party claims were "related to" chapter 11 case); *Hawkins,* 135 B.R. at 393 (finding in the alternative that it had supplemental jurisdiction over third-party claims, and that it had "related to" jurisdiction over third-party claims because they "enhance[ ] the collectability of any judgment against the [non-debtor] defendants"); Jones v. Woody (*In re* W.J. Servs., Inc.), 139 B.R. 824, 826-27 (Bankr. S.D. Tex. 1992) (concluding first that it had supplemental bankruptcy jurisdiction over state law malpractice action brought by former chapter 11 debtors against former counsel; the bankruptcy court then held the action barred by res judicata without any discussion as to why action involving post-petition actions of professionals, hired by and compensated out of estate, did not "arise in" or "relate to" chapter 11 case); National Westminster Bancorp N.J. v. ICS Cybernetics, Inc. (*In re* ICS Cybernetics, Inc.), 123 B.R. 467, 472 (Bankr. N.D.N.Y. 1989) (inexplicably holding that cross-claims and counterclaims were core proceedings "under the doctrine of ancillary jurisdiction" without discussion of whether these cross-claims and counterclaims "related to" debtor's bankruptcy case, which they probably did); Cook v. United State (*In re* Earl Roggenbuck Farms, Inc.), 51 B.R. 913, 926 (Bankr. E.D. Mich. 1985) (concluding in the alternative that it had jurisdiction over state law cross-claim brought by Commodity Credit Corporation against debtor's principal pursuant to 15 U.S.C. § 714(b), which provides to district courts exclusive federal jurisdiction over "all suits brought by or against the [CCC]"); *In re* Wood, 52 B.R. 513, 522 (Bankr. N.D. Ala. 1985) (concluding in the alternative that state law claims raised by non-debtor intervenors were "related to" proceedings).

[FN236]. For example, in *Hawkins* the court held that third-party claims were "related to" the bankruptcy case, but noted that other courts had reached contrary conclusions. *See* Hawkins, 135 B.R. at 393 & n.9. It then went on to conclude in dicta that, even if it did not have "related to" jurisdiction over the third party claims, it had supplemental bankruptcy jurisdiction over them. *See* id. at 397; *see also supra* notes 153-58 and accompanying text (discussing *Hawkins*).

[FN237]. *See* 28 U.S.C. § 1367(a) (Supp. IV. 1992).

[FN238]. *See* 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992).

[FN239]. Implicit in this analysis is the notion that statutory ambiguity should be resolved to avoid a finding of constitutional infirmity. *See, e.g.,* United States v. Security Indus. Bank, 459 U.S. 70, 78 (1982) (referring to "cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided") (quoting Lorillard v. Pons, 434 U.S. 575, 577 (1978); Crowell v. Benson, 285 U.S. 22, 62 (1932)).

[FN240]. Finley v. United States, 490 U.S. 545, 548 (1989) (emphasis omitted) (citing The Mayor v. Cooper, 6 Wall. 247, 252 (1868)). Prior to *Finley,* this test applied to original jurisdiction. Finley extended the test to supplemental jurisdiction. *See id.* at 549-50.

[FN241]. *See* H.R. Rep. No. 734, 101st Cong., 2d Sess. 29 n.15 (1990) (explaining that § 1367 "codifies the scope of supplemental jurisdiction first articulated by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715 (1966)").

[FN242]. *Gibbs,* 383 U.S. at 725. *See supra* notes 116-18 and accompanying text (discussing *Gibbs*).

[FN243]. *Gibbs,* 383 U.S. at 725.

[FN244]. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN245]. For a discussion of the inapplicability of a *Gibbs*-type analysis to an "atypical federal case[] such as bankruptcy," see John T. Cross, *Congressional Power to Extend Federal Jurisdiction to Disputes Outside Article III: A Critical Analysis From the Perspective of Bankruptcy,* 87 N.W. U.L. Rev. 1188, 1242 (1993) ("Although the *Gibbs* test works quite well when the elements of a cause of action are facts, it is of little use when the elements are not facts. Therefore, an analysis that applies the *Gibbs* test to bankruptcy [jurisdiction] is doomed to failure.").

[FN246]. *See* 28 U.S.C. § 1367 (Supp. IV. 1992). For a discussion of the doctrine of pendent-claim jurisdiction, see *supra* notes 110-18 and accompanying text. For a discussion of the doctrine of pendent-party jurisdiction, see *supra* notes 119-36 and accompanying text. For a discussion of the doctrine of ancillary jurisdiction, see *supra* notes 103-09 and accompanying text.

[FN247]. *See supra* part II.A.

[FN248]. For a definition of the phrase "primary claim," see *supra* note 54.

[FN249]. The phrase "supplemental claims" is used to refer to those claims for which, but for some doctrine of supplemental jurisdiction, there exists no relevant grant of federal jurisdiction.

[FN250]. *See supra* notes 103-18 and accompanying text (discussing the standards for ancillary and pendent-claim jurisdiction).

[FN251]. 270 U.S. 593, 609-10 (1926).

[FN252]. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).

[FN253]. *See* 270 U.S. at 609-610.

[FN254]. The Federal Courts Study Committee had initially recommended that the supplemental jurisdiction provision codify *Moore's* "transaction or occurrence" test as the standard. *See* Federal Courts Study Committee, Report of the Federal Courts Study Committee 47 (1990). Congress ultimately determined to equate the statutory standard with Article III more explicitly. Legislative history, thus, refers to *Gibbs* as the controlling standard because it is the only Supreme Court precedent explicitly considering the *constitutional* dimensions of supplemental jurisdiction. *See* H.R. Rep. 734, 101st Cong., 2nd Sess. at 29 n.15 (1990).

[FN255]. *See* 270 U.S. at 609-610; *see also* McLaughlin, *supra* note 102, at 896 ("In establishing the transaction standard, however, the *Moore* court never indicated whether this standard was constitutionally based, and expressed no opinion whether the standard was intended to define the constitutional limit of ancillary jurisdiction.").

[FN256]. *See* Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 370 n.8 (1978) (declining to decide whether there exist "any 'principled' differences between pendent and ancillary jurisdiction; or, if there are, what effect *Gibbs* had on such differences"); Aldinger v. Howard, 427 U.S. 1, 13 (1976) (same); *see also infra* notes 261-62 and accompanying text (discussing cases interpreting "relatedness" standard applicable to § 1367).

[FN257]. *See* Freer, *Life After* Finley, *supra* note 102, at 473 (1991) ( "The drafters properly did not attempt to define the reach of the statute in section 1367(a) by anything other than reference to the Constitution. Although that limit has been defined in *Gibbs* to involve claims sharing a 'common nucleus of operative fact' with the jurisdiction-invoking claim, it probably was wise to eschew a statement of the constitutional limit, because that limit may evolve over time. The statute thus may avoid imposing an artificial restriction on the reach of supplemental jurisdiction.") (footnotes omitted); McLaughlin, *supra* note 102, at 897-98 ("Whatever distinctions were thought to exist between the 'transaction or occurrence' test of ancillary jurisdiction

62 FDMLR 721
62 Fordham L. Rev. 721

and the 'common nucleus of operative fact' test of pendent jurisdiction, however, should now be discarded. The statute's extension of supplemental jurisdiction to the full constitutional 'case' limit leaves but one relevant inquiry--whether the Constitution distinguishes among the various forms of supplemental jurisdiction and requires a different test of relatedness for the various claims. Certainly, the Constitution does not."); Siegel, *supra* note 102, at 65 ("By using the 'case or controversy' standard found in the Constitution's own statement of the outer limits of federal jurisdiction, Congress also indicates that it wants supplemental jurisdiction . . . to go the constitutional limit, to which it appeared to be carried in the *Gibbs* case."); Wolf, *supra* note 102, at 23 ("[Section 1367(a)] eliminates any gap that may exist between 'the same transaction or occurrence' formulation and the constitutional limits of Article III."); Ellen S. Mouchawar, Note, *The Congressional Resurrection of the Supplemental Jurisdiction in the Post-Finley Era, 42 Hastings L. J. 1611, 1613 (1991)* ("Thus, section 1367 establishes a uniform standard that allows a federal court to determine when it may adjudicate a nonfederal claim as an adjunct to its jurisdiction over the federal claim, regardless of whether the nonfederal claim comes within the doctrine of pendent or ancillary jurisdiction."). Prior to enactment of § 1367(a), commentators had argued there existed a single constitutional standard for the exercise of ancillary and pendent jurisdiction. *See, e.g.,* Matasar, *Jurisdiction Primer, supra* note 102, at 155 (1983) ("No justification exists for separate tests for ancillary and pendent jurisdiction at the constitutional level.") (footnote omitted).

[FN258]. McLaughlin, *supra* note 102, at 910; *see also* Matasar, *Jurisdiction Primer, supra* note 102, at 155-56 ("Since *Gibbs,* the trend in pendent cases has been toward a transactional test similar to that in ancillary jurisdiction. Both doctrines have edged toward a logical relationship test."); Mouchawar, *supra* note 257, at 1656 (stating that "[t]o alleviate confusion, the 'transaction or occurrence' language in the Federal Rules should be interpreted consistently with the 'logical relationship' approach") (footnotes omitted); *cf.* Cross, *supra* note 245, at 1233-50 (justifying "related to" bankruptcy jurisdiction as constitutional because it satisfies expanded view of ancillary jurisdiction; his expanded view of ancillary jurisdiction adopts a logical relationship, rather than factual relationship, test to define scope of ancillary jurisdiction).

[FN259]. McLaughlin, *supra* note 102, at 912 n.358 ("Although well-reasoned and presented within an historical framework, I do not share Professor Matasar's view. At any particular point in time, the Federal Rules can be either over or underinclusive in terms of the joinder of constitutionally permissible claims . . . . Further, because Congress has the ultimate power to enact the Federal Rules, . . . equating the constitutional 'case' limit of supplemental jurisdiction with the Federal Rules makes Congress the final arbiter of this constitutional limitation. Although Congress has the recognized right to establish the statutory limit of federal subject matter jurisdiction, . . . the determination of the constitutional limit is properly reserved for the Supreme Court."). For Professor Matasar's position, see Matasar, *One Constitutional Case, supra* note 102, at 1478.

[FN260]. Matasar, *One Constitutional Case, supra* note 102, at 1479.

[FN261]. *See supra* part II.A. (discussing cases exercising supplemental bankruptcy jurisdiction).

[FN262]. *See* Wolf, *supra* note 102, at 46. In surveying case law applying § 1367, Wolf notes that "district judges have typically relied on section 1367, with little or no analysis," and that those judges who have articulated their basis for exercising supplemental jurisdiction vary in that "[s]ome courts apply a three-factor *Gibbs* test[, while o]ther judges apply a two-factor [*Gibbs*] test. *Id.* Further, Wolf points out that

> [i]n one case, the court referred to these two *Gibbs* factors in interpreting section 1367, but applied only the common nucleus test to determine whether supplemental jurisdiction in fact existed. Finally, in another case, the court made reference only to the "common nucleus" factor to determine whether it had the power to entertain the supplemental claims.

*Id.* (citations omitted).

[FN263]. *See* United Mine Workers v. Gibbs, 383 U.S. 715 (1966).

[FN264]. The "federal claim" at issue in *Gibbs* involved an assertion of statutory federal question jurisdiction. *See id.* at 725; *see also* 28 U.S.C. § 1331 (1988 & Supp. IV 1992) (granting federal question jurisdiction). The grant of original jurisdiction over proceedings "arising under title 11" amounts to no more than a statutory grant of specialized federal question jurisdiction,

28 U.S.C. § 1334(b) (1988 & Supp. IV 1992), not dissimilar to other statutory grants of specialized federal question jurisdiction. *See, e.g.,* 28 U.S.C. § 1337 (commerce and antitrust regulations), 1338(a) (patent, plant variety protection, copyright, mask works, trademarks, and unfair competition); § 1339 (postal matters); § 1340 (1988) (internal revenue; custom duties). The grant of original jurisdiction over proceedings "arising in" and "related to" a title 11 case is distinct from the other statutory grants of bankruptcy jurisdiction.

[FN265]. "Arising in" or "related to" proceedings derive, not from federal bankruptcy law, but from federal non-bankruptcy or state law. *Cf., e.g.,* Butner v. U.S., 440 U.S. 48, 54-55 (1979) (looking to state law to determine rights of mortgagee claiming lien against rental income; decided under 1898 Bankruptcy Act, but proceeding would have been characterized as "arising in" title 11 case if decided under current Bankruptcy Code). Where the "arising in" or "related to" proceeding derives from non-bankruptcy federal law, 28 U.S.C. § 1331 may provide an alternative statutory grant of federal jurisdiction. *Cf.* National City Bank v. Coopers & Lybrand, 802 F.2d 990, 993-94 (8th Cir. 1986) (concluding that no bankruptcy jurisdiction existed over malpractice action removed to federal district court; the court of appeals declined to rule on whether federal question jurisdiction existed since review of remand order precluded by relevant statute).

[FN266]. Courts and commentators nearly uniformly agree that the third prong of the *Gibbs* test, the so-called "common expectations of trial test," not only is not a constitutional requirement, but also does not add anything to the other two prongs of the standard. *See* Matasar, *One Constitutional Case, supra* note 102, at 1455-56 and nn. 263-65 ("A review of the court decisions interpreting *Gibbs* does not resolve these problems [of interpretation of the 'ordinary expectation' test], since most cases ignore the 'ordinarily be expected to try' phrase, cite it without analysis, or subsume it under the more easily applied 'common nucleus' phrase.") (citations omitted); *see also id.* at 1455-56 (arguing that the "ordinarily expected to try" prong of *Gibbs* test is not constitutionally required); McLaughlin, *supra* note 102, at 914-18 (same); *see also* Joan Baker, *Toward a Relaxed View of Federal Ancillary and Pendent Jurisdiction,* 33 U. Pitt. L. Rev. 759, 765 (1972) (broadly interpreting *Gibbs's* "expected to try" standard: "[I]n general, *Gibbs* says that a court has jurisdiction (power) to hear a whole 'case'--a 'case' within the ordinary expectations of litigants as measured by the Federal Rules of Civil Procedure."); *but see* 13B C. Wright, et al. Federal Practice & Procedure § 3567.1, at 116 (1982) (contending that "ordinary expectation" test refers "to what res judicata would require if the claims were all federally created or all state created"); Matasar, *One Constitutional Case, supra* note 102, at 1455 & n.261 ("A few courts and influential commentators have suggested that the 'ordinarily be expected to try' test is an independent barrier to assertion of supplemental jurisdiction.") (citations omitted); *id.* at 1457 (criticizing Wright & Miller's contention as likely to "emasculate *Gibbs* and reinstate the *Hurn* test") (citation omitted).

[FN267]. *See* Matasar, *One Constitutional Case, supra* note 102, at 1417-1446 (arguing that "substantiality" test is not grounded in Constitution); McLaughlin, *supra* note 102, at 913-14 (same).

[FN268]. Dechert Price & Rhodes v. Direct Satellite Communications., (*In re* Direct Satellite Communications., Inc.), 91 B.R. 5, 6 (Bankr. E.D. Pa. 1988). This application of *Gibbs's* "substantiality test" to an assertion of supplemental bankruptcy jurisdiction was garbled somewhat by the district court in Laganella v. Braen (*In re* Braen), 1991 WL 7701 at *6 (D. N.J. 1991), when it stated that the *Direct Satellite* court would find that the "substantiality test" was satisfied "because it was a core proceeding [[[,]" implying that assertions of supplemental jurisdiction related to a "related to" proceeding can never satisfy this prong of *Gibbs.*

[FN269]. Does it require a determination that, for example, the proof of claim brought by a creditor is "substantial" so that analysis of the constitutionality of an assertion of jurisdiction supplemental to this "arising in" proceeding can next determine whether there exists a common nucleus of fact between the proof of claim and the supplemental claim? *Cf.* 28 U.S.C. § 1338(b) (1988) (limiting grant of supplemental jurisdiction to those claims of unfair competition "joined with a *substantial* and related claim under the copyright, patent, plant variety protection or trade-mark laws") (emphasis added).

[FN270]. For example, this type of "substantiality" analysis might consider whether the debtor is eligible for relief under title 11, 11 U.S.C. § 109 (1988), and whether the filing was made in good faith by the debtor, *see, e.g.,* Elmwood Dev. Co. v. General Elect. Pension Trust (*In re* Elmwood Dev. Co.), 964 F.2d 508, 513 (5th Cir. 1992) (dismissing chapter 11 petition as having been filed in bad faith), in determining whether the title 11 case is "substantial."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN271]. *See* Matasar, *One Constitutional Case, supra* note 102, at 1417-47 (articulating, on similar grounds, general criticism of characterization of first-prong of *Gibbs* test as constitutional).

[FN272]. In *Schumacher v. Beeler,* the Supreme Court opined in dicta that § 23(b) of the Bankruptcy Act of 1898 was constitutional stating that "[t] he Congress, by virtue of its constitutional authority over bankruptcies, could confer or withhold jurisdiction to entertain such suits and could prescribe the conditions upon which the federal courts should have jurisdiction." 293 U.S. 367, 374 (1934) (citing Shearman v. Bingham, 21 F. 1270 (C.C.D. Mass. 1872) (No. 12,762)). This language is confusing, however, for it appears to justify § 23(b) as constitutionally authorized by the Bankruptcy Clause of Article I of the United States Constitution, art. I, § 8, rather than Article III of the Constitution. Similarly, in *Taubel-Scott-Kitzmiller Co., Inc. v. Fox,* the Court indicated, again in dicta, that Congress had broad power to grant federal jurisdiction in "matters relating to bankruptcy," but went on to conclude that Congress had not enacted a provision to "confer generally such broad jurisdiction over claims by a trustee against third persons." 264 U.S. 426, 430-31 (1924) (footnote omitted). According to the court:

> Congress has, of course, power to confer upon the bankruptcy court jurisdiction to adjudicate the rights of trustees to property adversely claimed. In matters relating to bankruptcy its power is paramount. Hence, even if the property is not within the possession of the bankruptcy court, Congress can confer upon it, as upon any other lower federal court, jurisdiction of the controversy, by conferring jurisdiction over the person in whose possession the property is.

*Id.* at 430. As in *Beeler,* the Court in *Taubel-Scott* was vague as to the source of this constitutional power, citing cases which had interpreted the scope of the jurisdictional provisions of the 1898 Bankruptcy Act (without reference to their constitutionality). *See* Robertson v. Howard, 229 U.S. 254 (1913); *In re* Watts & Sachs, 190 U.S. 1, 27 (1903).       Although in *National Mutual Insurance Co. v. Tidewater Transfer Co.,* Justice Jackson, in his plurality opinion, described *Beeler* as a case "raising only questions of Ohio law concerning the validity under that law of a sheriff's levy and execution[,]" the trustee in *Beeler* sought to avoid an execution lien under §§ 60(b), 67(e), or 70(e) of the 1898 Act. *See* 337 U.S. 582, 595 (1949). Under the current bankruptcy jurisdictional provisions, the trustee's avoidance actions in *Beeler* would either "arise under" successor provisions of title 11, or "arise in" the title 11 case. *Accord* Cross, *supra* note 245, at 1207 (describing *Beeler* as involving federal question); *but see* Thomas Galligan, Jr., *Article III and The* *"Related To" Bankruptcy Jurisdiction: A Case Study in Protective Jurisdiction,* 11 U. Puget Sound L. Rev. 1, 23-24 (1987) (concluding that, if raised today, facts of *Beeler* would involve "related to" jurisdiction). The trustee in *Taubel-Scott* sought to avoid a lien under § 67(f) of the Bankruptcy Act of 1898. That section permitted the avoidance of certain liens "obtained through legal proceedings against a person who is insolvent, at any time within four months prior to the filing of a petition in bankruptcy[.]" 1898 Act, ch. 541 § 67(f), 30 Stat. 544, 565 (1988). Thus, the avoidance action in *Taubel-Scott,* if brought under the current Bankruptcy Code, also would have either "arisen under" successor provisions of title 11 or "arisen in" the title 11 case. *But see* Galligan, *supra,* at 25 n.83 (concluding that Taubel-Scott "would be a 'related to' case in today's vernacular").

[FN273]. In dicta, the Supreme Court has indicated on several occasions that a grant of jurisdiction as broad as the grant of "related to" jurisdiction in 28 U.S.C. § 1334(b) would pass constitutional muster, although it has been unclear on the source of this authority. In *Williams v. Austrian,* the Court interpreted § 102 of the Bankruptcy Act of 1898, as amended by the Chandler Act of 1938, to render § 23 of the Act inapplicable in Chapter X reorganization proceedings and, thus, to permit a Chapter X trustee to bring a plenary suit in a district court, even though the defendants did not consent to the exercise of jurisdiction and there existed no other basis for federal jurisdiction. *See* 331 U.S. 642, 657-58 (1947). The trustee's suit in *Williams,* if brought under the current bankruptcy jurisdictional provisions, would constitute a "related to" proceeding. *See id.* at 645 (suit against past and present officers and directors of debtor-corporation, and other affiliated person, alleging "a conspiracy to misappropriate corporate assets and asking an accounting and other relief"); *see also* Galligan, *supra* note 272, at 24. Notwithstanding Justice Frankfurter's dissent on the issue of statutory interpretation before the Court, 331 U.S. at 662-682, he had "[n]o doubt [[[that] Congress could authorize such a suit[,]" *id.* at 664, but merely cited *Schumacher v. Beeler,* 293 U.S. 367, 374 (1934), as the source of this authority. *See* Cross, *supra* note 245, at 1207 n.72 ("[*Williams v.*] *Austrian* therefore adds nothing to the constitutional debate.").

In *National Mutual Insurance Co. v. Tidewater Transfer Co.,* three Justices of the Supreme Court, again in dicta, assumed the grant of federal jurisdiction over suits brought by or against a trustee was constitutional, but on varying grounds. *See* 337 U.S. 582, 594-99 (1949). Justice Jackson concluded that, although these suits did not "arise under" federal law, Congress had

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the power to enact uniform bankruptcy laws in Article I of the Constitution and, thus, the power to confer jurisdiction over such cases irrespective of the limitations of Article III. *See id. at 594-99; but see* Galligan, *supra* note 272, at 26-27 (criticizing Jackson's analysis as confusing scope of statutory "arising under" with constitutional "arising under" jurisdiction). Justice Rutledge concluded that the grant fit within the scope of constitutional "arising under" jurisdiction, although clearly broader than statutory "arising under" jurisdiction. *See Tidewater,* 337 U.S. at 611-17. *Accord* Galligan, *supra* note 272, at 26-27. Finally, Justice Frankfurter, in his dissent in *Tidewater,* also recognized as constitutional Congress' broad grant of bankruptcy jurisdiction under the 1898 Act. He supported this conclusion with a melding of the arguments favored by Justice Jackson and Justice Rutledge. According to Frankfurter:

> Congress may deem it desirable that the federal courts be utilized for all the claims that pertain to the bankrupt estate . . . . The congeries of controversies thus brought into being by reason of bankruptcy may be lodged in the federal courts because they arise under "the Laws of the United States," to wit, laws concerning the "subject of bankruptcies."

337 U.S. at 652 n.3; *see also* Galligan, *supra* note 272, at 27-28 (pointing out inconsistencies in Frankfurter's position regarding bankruptcy jurisdiction, and his basis for dissent regarding jurisdiction over controversies between citizens of District of Columbia and citizen of one of the states).    In his dissent in *Textile Workers Union v. Lincoln Mills,* Frankfurter elaborated on this vision of bankruptcy jurisdiction by reference to ancillary and pendent jurisdiction. He stated that

> the bankruptcy decisions may be justified by the scope of the bankruptcy power, which may be deemed to sweep within its scope interests analytically outside the "federal question" category, but sufficiently related to the main purpose of bankruptcy to call for comprehensive treatment. Also, although a particular suit may be brought by a trustee in a district other than the one in which the principal proceedings are pending, if all the suits by the trustee, even though in many federal courts, are regarded as one litigation for the collection and apportionment of the bankrupt's property, a particular suit by the trustee under state law to recover a specific piece of property might be analogized to the ancillary or pendent jurisdiction cases in which, in the disposition of a cause of action, federal courts may pass on state grounds for recovery that are joined to federal grounds.

353 U.S. 448, 483 (1957) (citations omitted); *see also* Galligan, *supra* note 272, at 30; Cross, *supra* note 245, at 1208.    By the time the Court was asked to consider the constitutionality of the grant of "related to" bankruptcy jurisdiction under the Bankruptcy Reform Act of 1978, in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* Justice Brennan, for the plurality, assumed without much discussion that "[t]his [related to] claim may be adjudicated in federal court on the basis of its relationship to the petition for reorganization." *See* 458 U.S. 50, 72 n.26 (1982) (citing *Beeler, Austrian, Tidewater, Lincoln Mills,* and *Osborn*); *see also* Galligan, *supra* note 272, at 30.

[FN274]. *See, e.g.,* Sonnyco Coal, Inc. v. Bartley (*In re* Sonnyco Coal, Inc.), 89 B.R. 658, 665-668 (Bankr. S.D. Ohio 1988) (supporting constitutionality of exercise of "related to" jurisdiction by non-Article III bankruptcy with reference to doctrines of supplemental jurisdiction by analogy); *In re* Tidewater Group, Inc., 63 B.R. 670, 673-74 (Bankr. N.D. Ga. 1986) (relying on doctrine of ancillary jurisdiction to uphold constitutionality of grant of "related to" jurisdiction); Ram Construction Co. v. Port Authority, 49 B.R. 363, 366 (W.D. Pa. 1985) (drawing analogy to pendent jurisdiction to uphold constitutionality of assertion of bankruptcy jurisdiction over state law "related to" proceeding); Eisenberg v. Resource Dynamics, Inc. (*In re* Environmental Research & Dev., Inc.), 46 B.R. 774, 778 (S.D.N.Y. 1985) (relied on concept of pendent jurisdiction to uphold constitutionality of 28 U.S.C. § 1334(b)); Chemical Bank v. Grisby's World of Carpet, Inc. (*In re* WWG Indus., Inc.), 44 B.R. 287, 290 (N.D. Ga. 1984) (concluding that ancillary jurisdiction constituted "the only constitutional basis on which to explain Congress' grant of subject matter jurisdiction to this Court"); Michelman v. Minor (*In re* Bible Voice, Inc.), 34 B.R. 733, 736 (C.D. Cal. 1983) (relying on Supreme Court precedent decided under 1898 Act to uphold constitutionality of § 1334(b)).

[FN275]. *See* State Bank v. Chart House, Inc., 46 B.R. 468, 471-72 (Bankr. N.D. Ill. 1985); *In re* O.P.M. Leasing Servs., Inc., 28 B.R. 740, 748 n.3 (Bankr. S.D.N.Y. 1983) (dictum).

[FN276]. Galligan, *supra* note 272, at 5; *see also* John T. Cross, *Viewing Federal Jurisdiction Through the Looking Glass of Bankruptcy,* 23 Seton Hall L. Rev. 530, 541 & n.46 (1993) [hereinafter *Viewing Federal Jurisdiction*] (same); Cross, *supra* note 245, at 1204-29 (contending that "related to" jurisdiction fulfills requirements of Article III, but not because it constitutes valid grant of "protective jurisdiction").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN277]. Protective jurisdiction has been defined as federal jurisdiction over suits "where there is no diversity of citizenship and state law governs the decision of the case in that it not only creates plaintiff's cause of action but also governs any and all defenses that may be raised." Galligan, *supra* note 272, at 41 n.151. *See* Martin H. Redish, Federal Jurisdiction: Tensions in the Allocation of Judicial Power 90-91 (2d ed. 1990) (concluding that there exist two distinct arguments justifying "protective jurisdiction": (i) Wechsler's notion that "if Congress could . . . pass substantive legislation on a particular matter, then this 'greater' power logically includes within it the 'lesser' power to provide the federal courts with jurisdiction over cases in the area;" (ii) Mishkin's contention that "where there is an articulated and active federal policy regulating a field" there exists the power to provide jurisdiction protective of it) (citing Henry M. Hart, Jr. & Herbert Wechsler, The Federal Courts and the Federal System 744-47 (1953); Paul J. Mishkin, The *Federal "Question" in the District Courts,* 53 Colum. L. Rev. 157, 190-92 (1953); Herbert Wechsler, *Federal Jurisdiction and the Revision of the Judicial Code,* 13 Law & Contemp. Probs. 216, 224-25 (1948)). For additional distinctions among the various protective jurisdiction theories, see Carole E. Goldberg-Ambrose, *The Protective Jurisdiction of the Federal Courts,* 30 UCLA L. Rev. 542 (1983); Cross, *supra* note 245, at 1210-14; Galligan, *supra* note 272, at 43-54; Note, *The Theory of Protective Jurisdiction,* 57 N.Y.U. L. Rev. 933 (1982). The constitutionality of a grant of protective jurisdiction remains an open question in light of conflicting Supreme Court dicta. *Compare* Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 460 (1957) (Harlan, J. and Burton, J., concurring in the result) (rejecting view that § 301 of the Taft-Hartley Act, which grants jurisdiction of suits for violation of labor-management contracts in industries affecting interstate commerce, but does not otherwise establish federal law governing such suits, evinced congressional intent to create federal common law of labor-management contracts; concurring in judgment upholding § 301 on "protective jurisdiction" theory) *with id.* at 474-75 (Frank-furter, J., dissenting) (contending that theory of protective jurisdiction "cannot be justified under any view of the allowable scope to be given to Article III"); *see also* Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 491 n.17 (1983) ( "[W]e need not consider petitioner's . . . argument that the Act is constitutional as an aspect of so-called 'protective jurisdiction."'); Mesa v. California, 489 U.S. 121, 137 (1989) ("We have, in the past, not found the need to adopt a theory of 'protective jurisdiction' to support Art. III 'arising under' jurisdiction, and we do not see any need for doing so here because we do not recognize any federal interests that are not protected by limiting removal to situations in which a federal defense is alleged.") (citation omitted).

[FN278]. *See* Cross, *supra* note 245, at 1251 ("Because all the state claims are logically related to the federal cause of action in bankruptcy, they form part of a single federal bankruptcy 'case' for purposes of Article III. The doctrine of ancillary jurisdiction accordingly allows the entire case to be heard in a federal court--a result fully in keeping with the limits of Article III."); Cross, *Viewing Federal Jurisdiction, supra* note 276, at 541 n.46 (same); *but see* Galligan, *supra* note 272, at 36-41 (contending that supplemental jurisdiction fails to justify the constitutional exercise of "related to" jurisdiction, largely because he would apply a "common nucleus of operative fact" test as controlling the scope of supplemental jurisdiction).

[FN279]. In adopting a theory which justifies "related to" bankruptcy jurisdiction as constitutional because it is a variant of ancillary jurisdiction, Cross rejects any argument that "related to" jurisdiction is constitutional because (i) "[a]ll [c]laims in a [b]ankruptcy [c]ase [may] '[a] rise [u]nder' [f]ederal [l]aw," (ii) "[b]ankruptcy [may be] a [f]ederal [in [[r]em [p]roceeding," and (iii) claims in which the trustee in bankruptcy is a party may fit Article III's "arising under" jurisdiction in that the trustee constitutes a "federal party" or the trustee's capacity to sue and be sued constitutes an "original federal ingredient." *See* Cross, *supra* note 245, at 1225-33.

   As for all claims in a bankruptcy case "arising under" federal law, Cross suggests for purposes of this argument that "[e]ven though the prebankruptcy debtor-creditor relationship is established and defined by state law, federal law may supplant this state law once the debtor seeks bankruptcy relief." *Id.* at 1225. The federal law Cross has in mind is the sort of federal common law in which federal courts incorporate state law as federal law. *See id.* He rejects this characterization of bankruptcy jurisdiction, however, because "[t] here is nothing about the fact of bankruptcy that warrants the application of federal common law." *Id.* at 1226. Cross concludes that application of federal common law requires a finding of either constitutional or statutory authorization. *See id.* at 1226-27. Constitutional authorization is lacking because much of bankruptcy involves resolution of purely private disputes rather than disputes in which the "outcome of the dispute may affect some federal interest." *See id.* at 1226. Statutory authorization is lacking in both the plain language of the Bankruptcy Code and its legislative history. *See id.*

   Cross also considers whether "bankruptcy jurisdiction could be sustained as a form of in rem subject matter jurisdiction, under which a federal court could adjudicate all claims affecting the debtor's estate simply by taking control of that estate." *Id.*

62 FDMLR 721                                                                                                    Page 68
62 Fordham L. Rev. 721

at 1228-29 (citing *Baggs v. Martin,* 179 U.S. 206, 209 (1900), for this proposition). However, he finds in rem jurisdiction an insufficient basis for characterizing "related to" jurisdiction as consistent with the limits of Article III. *See id.* at 1229 ("*Baggs,* however, is too thin a reed to support the entire system of subject matter jurisdiction in bankruptcy. *Baggs* was decided in 1900, and the Court has not seen fit to use its rationale since."). *Baggs* is a case about ancillary, not simply in rem, jurisdiction. Not coincidentally ancillary jurisdiction finds its origins in the notion that a court of equity, having possession of a res, is entitled to adjudicate all claims "ancillary" to that property. *See supra* notes 103-09 and accompanying text (discussing origins of doctrine of ancillary jurisdiction).

Finally, Cross contends that neither an "original ingredient" nor "federal party" theory can justify "related to" jurisdiction as constitutional. *See* Cross, *supra* note 245, at 1229-33. The notion that bankruptcy jurisdiction may be supported by an "original ingredient" theory of the scope of Article III jurisdiction is addressed *infra* notes 321-34 and accompanying text.

Like Cross, Galligan rejects the "original ingredient" theory as the basis for "related to" bankruptcy jurisdiction. Galligan, *supra* note 272, at 32-36; *see also infra* notes 321-34 and accompanying text. In addition, Galligan contends that "justifying the federal court's 'related to' bankruptcy jurisdiction on grounds of pendent or ancillary jurisdiction strains those concepts as we know them." Galligan, *supra* note 272, at 5.

[FN280]. 22 U.S. 738 (1824).

[FN281]. The injunction was also sought against John L. Harper, J.M. Curry, and S. Sullivan. *See id.* at 741-42. According to the Bank, Harper "was employed by Osborn to collect the tax, and well knew that an injunction had been allowed, proceeded by violence to the office of the bank, at Chilicothe, and took therefrom $100,000, in specie and banknotes, belonging to, or on deposit with" the Bank of the United States. *Id.* at 741. Curry was the Treasurer of the State of Ohio at the time Harper seized assets of the Bank of the United States. *See id.* at 742. Sullivan succeeded Curry as Treasurer. *See id.*

[FN282]. *See id.* at 739-40. The Ohio statute recited that "the Bank of the United States pursued its operations contrary to a law of th[is] state." *See id.* at 740.

[FN283]. The Supreme Court raised the jurisdictional issue only after the initial oral argument had occurred, asking the parties to address the jurisdictional issue in a separate round of briefs. *See id.* at 816.

[FN284]. *See* 22 U.S. at 828. The statute at issue limited this grant of original jurisdiction to Circuit Courts. In 1911, Congress abolished the Circuit Courts. Judicial Code of 1911, ch. 231, § 289, 36 Stat. 1167, 1167 (1911). That same Act included a savings clause which conferred upon the district courts any power or duty of the circuit courts not otherwise expressly transferred within the Judicial Code. *See id.* at § 291.

[FN285]. *See id.* Moreover, in *Bank of the United States v. Deveaux,* the Supreme Court held that a prior federal statute chartering the Bank of the United States did not bestow federal jurisdiction but merely noted generally the Bank's capacity to sue and be sued. *See* 5 Cranch 61, 71, 85-86 (1809). Congressional action followed *Deveaux,* and the Bank of the United States was re-chartered. In this second charter, the language authorizing the Bank to sue and be sued differed from the language in the statute at issue in *Deveaux.* In *Osborn,* the Court considered this second federal charter and concluded that Congress' intent to confer federal jurisdiction in any suit brought by or against the Bank of the United States was clearer in the statute at issue in *Osborn* than in the more general language at issue in *Deveaux. See Osborn,* 22 U.S. at 817-18. For a more recent reconciliation of *Deveaux* and *Osborn,* see American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2469-70 (1992).

[FN286]. At the time *Osborn* was decided (in 1824), Congress had not yet enacted a statutory grant of federal question jurisdiction. Congress did not enact a statutory grant of federal question jurisdiction until 1879. Both Cross and Galligan view the *Osborn* Court's discussion of constitutionality of the jurisdiction granted in the charter of the Bank of the United States as dicta "[b]ecause the claim in *Osborn* was an Article III federal question." Cross, *supra* note 245, at 1231; *accord* Galligan, *supra* note 272, at 32. But their contention that the discussion of the scope of Article III "arising under" jurisdiction in *Osborn* is dicta is questionable. It depends upon the troubling notion that, because the constitutional objections raised in *Osborn* would have constituted a federal question within the meaning of the statutory grant of federal question jurisdiction enacted 55 years *after*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

that case was decided, the Court's Article III "arising under" discussion was unnecessary to its holding.

[FN287]. *Osborn,* 22 U.S. at 819.

[FN288]. *Id.* at 820.

[FN289]. *Id.*

[FN290]. *See id.* at 821-22.

[FN291]. *Id.* at 823 (emphasis added).

[FN292]. *Id.* at 823-24.

[FN293]. *See id.* at 824-25. The propriety of the injunction at issue involved important federal questions concerning whether the Bank of the United States was subject to the taxing power of the State of Ohio and, thus, whether the Ohio statute was constitutional. *See id.* at 867-68. Nonetheless, because Congress had not enacted a statutory grant of federal question jurisdiction, the federal issues involving the preemption of the Ohio statute could not have formed the basis for jurisdiction in the Circuit Court. *See id.* at 851-59. Moreover, it is unclear from the litigants' statement of the case whether the question of the constitutionality of Ohio statute was raised only in reply to the auditor's defense to the injunction. *See Osborn,* 22 U.S. at 900 (Johnson, J., dissenting). As Justice Johnson noted:

> It [is] well [known], that it was a case emphatically arising out of an act of the state of Ohio, operating upon the domicil of the Bank, which, although purchased in right of an existence metaphysically given it by congress, was acquired and held according to the laws of Ohio, acting upon its own territory.

*Id.* In statutory federal question cases, the presence of federal questions in a defense is irrelevant to the satisfaction of the requirements of § 1331. For example, as the Court stated in *Louisville & Nashville R.R. v. Mottley*   [i]t is not enough that the plaintiff alleges some anticipated defense to his cause of action and asserts that the defense is invalidated by some provision of the Constitution of the United States. Although such allegations show that very likely, in the course of the litigation, a question under the Constitution would arise, they do not show that the suit, that is, the plaintiff's original cause of action, arises under the Constitution.

211 U.S. 149, 152 (1908). The "well-pleaded complaint" rule applies only to statutory "arising under" cases, however. *See, e.g.,* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2473 (1992); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 494 (1983).
[FN294]. *Osborn,* 22 U.S. at 824. According to the Court,

> [t]he right of the plaintiff to sue, cannot depend on the defence which the defendant may choose to set up. His right to sue is anterior to that defence, and must depend on the state of things when the action is brought. The question which the case involves, then, must determine its character, whether those questions be made in the cause or not.

*Id.; see also* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2475-76 (1992) (concluding that constitutionality of grant of jurisdiction over actions involving federally chartered entities such as the Red Cross was long ago resolved by *Osborn* and its progeny).
[FN295]. *See* Bank of the United States v. Planters' Bank, 22 U.S. 904, 904 (1824) (federal courts have jurisdiction over suit by Bank of United States as endorsee or bearer of promissory note). Further, according to Justice Johnson dissenting in *Osborn v. Bank of the United States*

> [b]y possibility, a constitutional question may be raised, in any conceivable suit that may be instituted; but that would be a very insufficient ground for assuming universal jurisdiction; and yet, that a question has been made, as that, for instance, on the bank charter, and may again be made, seems still worse, as a ground for extending jurisdiction. For, the folly of raising it again in every suit instituted by the bank, is too great, to suppose it possible. Yet this supposition,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and this alone, would seem to justify vesting the bank with an unlimited right to sue in the federal courts. Indeed, I cannot perceive how, with ordinary correctness, a question can be said to be involved in a cause, which only may possibly be made, but which, in fact, is the very last question that there is any probability will be made; or rather, how that can any longer be denominated a question, which has been put out of existence by a solemn decision.

22 U.S. at 886-87 (Johnson, J., dissenting).

[FN296]. The dissent intimates that the majority is motivated by political considerations in reaching its decision. *See* 22 U.S. at 871-73. Additionally, Henry Shulman and Edward C. Jaegerman note:

Marshall was apparently anxious to establish the validity of a grant of federal jurisdiction in *any* suits by or against the Bank on ordinary commercial transactions. This concern is easily understandable. The Government was interested as an owner of the Bank and the Bank was performing governmental service. Moreover, the Bank was the object of great popular hatred and of measures of reprisal by many state legislatures. It was sadly in need of a federal haven for its litigation. The doctrinal channel leading to that haven was quite obvious, once discovered. Whatever the claim it made, a suit by the Bank raised a federal question.

Henry Shulman & Edward C. Jaegerman, *Some Jurisdictional Limitations on Federal Procedure,* 45 Yale L.J. 393, 404-05 (1936) (emphasis in original).

[FN297]. 22 U.S. at 874. According to the Dissent:

[w]hy then should [federal courts] be vested with jurisdiction, in a thousand causes, on a mere possibility of a question arising, which question, at last, does not occur in one of them? Indeed, I cannot perceive how such a reach of jurisdiction can be asserted, without changing the reading of the constitution on this subject altogether. The judicial power extends only to "cases arising," that is, actual, not potential, cases. The framers of the constitution knew better, than to trust such a *quo minus* fiction in the hands of any government.

*See id.* at 886.

[FN298]. *See, e.g.,* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2476 (1992) (citing *Osborn* and referring to it as "long-standing and settled rule, on which Congress has surely been entitled to rely"); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 492 (1983) (relying on *Osborn* to uphold jurisdictional grant in Foreign Sovereign Immunities Act).

[FN299]. *See* Cross, *supra* note 245, at 1242.

[FN300]. *See* 11 U.S.C. § 301.

[FN301]. An intuitive difficulty with this construction is that the federal ingredient involved in the filing of a bankruptcy petition may never be disputed. *See* Judge Robert E. DeMascio, et al., National Legal Center for the Public Interest, Fourteen Years or Life: The Bankruptcy Court Dilemma 1-2 (1983) (Judge DeMascio questions whether bankruptcy courts could be made Article III courts because a bankruptcy case may not be a "case or controversy" within the meaning of Article III); *see also* Galligan, *supra* note 272, at 39 & n.145 ("the bankruptcy proceeding itself is arguably not a case or controversy, and federal courts may only take jurisdiction over cases or controversies"). But whether a "title 11" case is sufficiently federal to allow the "case" to fulfill constitutional "arising under" jurisdiction is a question distinct from the justiciability of an undisputed bankruptcy case.

Most title 11 cases *are* undisputed. Although 11 U.S.C. § 301 enables an eligible debtor to file a bankruptcy petition commencing a "case," this authorization alone creates no "controversy." *See* Douglas G. Baird & Thomas H. Jackson, Cases, Problems, and Materials On Bankruptcy 1 (Little, Brown 2d ed. 1990) ("The legal proceeding [in a bankruptcy case] of the typical individual who asks for a discharge is an uncontested affair. Frequently, there are no nonexempt assets to turn over to the general creditors. There is nothing to fight over."). Section 301 provides that the commencement of a voluntary bankruptcy case by the filing of a petition "constitutes an order for relief," thus, the filing of a bankruptcy petition in all instances automatically commences a bankruptcy case. Objections to the filing must be made in a separate proceeding. For example, a party in interest could object to a bankruptcy petition on the grounds that the debtor is ineligible for relief under title 11, but such a proceeding would "arise under" 11 U.S.C. § 109, the provision of the Bankruptcy Code governing eligibility requirements. Moreover, the federal rights which flow from the commencement of a title 11 case also may never be controverted. *See* 11

U.S.C. §§ 523, 524, 727 (providing that debtor entitled to discharge under prescribed circumstances, but entitling individual debtor to discharge unless objection raised by party in interest). Thus, it should not be surprising to note that there is not case law interpreting the scope of the grant of exclusive federal jurisdiction over "cases under title 11" found in 28 U.S.C. § 1334(a).

The lack of an actual controversy in any given bankruptcy case should not alone render unconstitutional the grant of federal jurisdiction over bankruptcy cases, however. *See* Tutun v. United States, 270 U.S. 568, 577 (1926) (holding that grant of federal jurisdiction over naturalization cases fulfills requirements of Article III of Constitution although request for naturalization may never be controverted); *see also* Galligan, *supra* note 272, at 39 n.145 ("It is hard to imagine how a naturalization proceeding could be a case or controversy and a bankruptcy would not.").

[FN302]. *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987); *see also supra* notes 75-84 and accompanying text (discussing definition of "arising in" bankruptcy jurisdiction).

[FN303]. *See, e.g.*, 11 U.S.C. § 301 (permitting "entity that may be a debtor under such chapter" to commence bankruptcy case under a chapter of title 11 by filing a bankruptcy petition); Fed. R. Bankr. P., Official Form 1 (form for voluntary petition).

[FN304]. *See supra* notes 75-84 and accompanying text (discussing scope of "arising in" jurisdiction).

[FN305]. *See* 11 U.S.C. § 501(a) ("A creditor or an indenture trustee may file a proof of claim. An equity security holder may file a proof of interest."); *see also* Fed. R. Bankr. P., Official Form 10 (form for proof of claim).

[FN306]. *See* 11 U.S.C. § 721 ("The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate."); § 1108 ("Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business.").

[FN307]. *See* 11 U.S.C. § 1107 (authorizing debtor-in-possession to exercise most powers of trustee in chapter 11 case, including power to operate business).

[FN308]. *See* 28 U.S.C. § 959(a) ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury.").

[FN309]. For a definition of an official creditors' or equity security holders' committee, see 11 U.S.C. § 1102. Section 1102 requires the United States Trustee to "appoint a committee of creditors holding unsecured claims" and permits the U.S. Trustee to appoint "additional committees of creditors or of equity security holders" as it deems appropriate. *See* 11 U.S.C. § 1102(a)(1)-(2). The statute goes on to provide that these committees "shall ordinarily consist of the persons, willing to serve, that hold the seven largest claims against the debtor" or equity securities of the debtor, as relevant. *See* 11 U.S.C. § 1102(b)(1)-(2).

[FN310]. *See, e.g.*, American Nat'l Red Cross v. S.G, 112 S. Ct. 2465, 2476 (1992) (construing charter of American National Red Cross); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480 (1983) (construing Foreign Sovereign Immunities Act); Osborn v. Bank of United States, 22 U.S. 738 (1824) (construing charter of Bank of United States).

[FN311]. *See* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2469-72 (1992) (holding that a congressional charter's "sue and be sued" provision may be read to confer federal court jurisdiction if, but only if, it specifically mentions the federal courts).

[FN312]. *See* 28 U.S.C. § 959(a).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN313]. *See id.*

[FN314]. *See* 11 U.S.C. § 558 (enabling estate to raise any defense "available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses").

[FN315]. *Compare* Koch Refining v. Farmers Union Cent. Exch., Inc., 831 F.2d 1339, 1344-46 (7th Cir. 1987) (by virtue of appellate procedure followed in case, court presumed alter ego action to "arise in" title 11 case), *cert. denied,* 485 U.S. 906 (1988) *with In re* Ozark Restaurant Equip. Co., 816 F.2d 1222, 1226 (8th Cir.) (trustee had no standing under Bankruptcy Code to bring an alter ego action on behalf of debtor's creditors), *cert. denied,* 484 U.S. 848 (1987).

[FN316]. *Compare Koch Refining,* 831 F.2d at 1344-46 (construing Illinois and Indiana law) *with In re Ozark,* 816 F.2d at 1226 n.7 (construing Arkansas law); *but see* Williams v. California 1st Bank, 859 F.2d 664, 666 (9th Cir. 1988) (relying solely on Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972), court held that trustee is never entitled to assert general causes of action, such as an alter ego claim; irrelevant that 111 creditors had assigned their rights to trustee).

[FN317]. *See* 11 U.S.C. § 541(a) (1988 & Supp. IV 1992).

[FN318]. For an example of a "related to" proceeding brought by a debtor-in-possession, see *infra* text accompanying notes 550-52 (discussing *Marathon*-type cause of action). For an example of a "related to" proceeding involving only non-debtor third parties, see *supra* notes 28-37 and accompanying text (stating hypothetical reminiscent of *Xonics*).

[FN319]. *Osborn* has been very broadly construed by courts and commentators. *See* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2476 (1992) (upholding grant of federal jurisdiction in charter of Red Cross as constitutional); Matasar, *One Constitutional Case, supra* note 102, at 1445 n.206 (contending that "[a]t the very least, *Osborn* . . . indicate[s] that Congress ought to have the flexibility to protect an instrumentality of the United States from potential discrimination at the hands of hostile state judiciaries by providing for federal jurisdiction in cases involving those instrumentalities . . . . Moreover, as a corollary to the principle of protecting federal entities, federal jurisdiction would also extend to cases involving pure state law issues that have a federal question lurking in the background.").

[FN320]. *See supra* notes 85-98 and accompanying text (discussing case law interpreting scope of "related to" jurisdiction).

[FN321]. Galligan does not explicitly consider whether *Osborn* validates the grant of jurisdiction over "arising in" proceedings. *See* Galligan, *supra* note 272, at 1 n.2 ("For analysis, this article focuses on a 'related to' case in which the bankruptcy debtor or his estate is the plaintiff."). Cross seems to cover both "arising in" and "related to" proceedings in his analysis, although he focuses on "related to" jurisdiction when he criticizes the "original ingredient" theory is an insufficient ground for bankruptcy jurisdiction. *See* Cross, *supra* note 245, at 1233 (rejecting various theories, other than ancillary jurisdiction, as "neither broad nor flexible enough to support the full range of bankruptcy jurisdiction, especially the district courts' 'related to' jurisdiction over claims that do not involve the debtor").

[FN322]. *See* Galligan, *supra* note 272, at 33 ("One could argue that all litigation involving the trustee could be constitutionally based in federal court because questions concerning the propriety of the trustee's appointment or his capacity to sue or be sued might arise in any case."); Cross, *supra* note 245, at 1230-31 ("The trustee's status as a federal official arguably brings even state-law claims involving the trustee under Article III federal question jurisdiction through the judicially developed 'original ingredient' theory.").

[FN323]. *See* Galligan, *supra* note 272, at 34 ("However, the original ingredient theory does not go far enough, because a trustee is not the only 'entity' that might want to sue in federal court on a 'related to' claim."). Cross agrees that the original ingredient theory is insufficient to justify the constitutionality of bankruptcy jurisdiction because some "related to" proceedings exist between third parties. *See* Cross, *supra* note 245, at 1232 ("These third-party suits accordingly lack even the minimal federal ingredient required to fit within Article III."). Cross also contends that "there is considerable doubt whether the theory

retains any validity." *Id.* According to Cross:

> *Osborn* and *Planter's Bank* were in many ways children of necessity. The Court faced an important issue--namely, the relationship between the national bank and the states. In order to deal with this issue expeditiously, the Court had to find a basis for federal jurisdiction over the actions rather than wait for the cases to come to it on appeal from a state court. Some have accordingly argued that the broad language of *Osborn* was an attempt to deal with a crises and as such overstated the true reach of Article III federal question jurisdiction.

*Id.* Nonetheless, the Supreme Court cited *Osborn* with approval as recently as 1992. *See* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465 (1992).

[FN324]. *See* Galligan, *supra* note 272, at 33; Cross, *supra* note 245, at 1233.

[FN325]. Osborn v. Bank of the United States, 22 U.S. 738, 823 (1824).

[FN326]. Galligan, *supra* note 272, at 35; *see* Cross, *supra* note 245, at 1230 n.158.

[FN327]. 112 S. Ct. 2465 (1992).

[FN328]. *See* id. at 2475-76.

[FN329]. Cross distinguishes between an "original ingredient" and a "federal party" theory of Article III jurisdiction, but then views only the trustee's status as a federal official as the only relevant "original ingredient." *See* Cross, *supra* note 245, at 1231 n.161.

[FN330]. *See, e.g.,* Alan D. Hornstein, *Federalism, Judicial Power and the 'Arising Under' Jurisdiction of the Federal Courts: A Hierarchical Analysis,* 56 Ind. L.J. 563, 575-90 (1981) (examining the "federal ingredient" test that Chief Justice Marshall used to justify federal jurisdiction in *Osborn*); Note, *The Theory of Protective Jurisdiction,* 57 N.Y.U. L. Rev. 933, 968-74 (1982) (defining Chief Justice Marshall's "original ingredient" analysis in *Osborn* as a federal issue comprising a logical component of plaintiff's cause of action, and discussing the difficulties of using this analysis to invoke federal jurisdiction).

[FN331]. Galligan, *supra* note 272, at 33.

[FN332]. As Matasar notes, at some point a broad reading of *Osborn* leads to the conclusion that constitutional "arising under" jurisdiction permits Congress to grant to federal courts protective jurisdiction. *See* Matasar, *One Constitutional Case, supra* note 102, at 1445 n.206.

[FN333]. *See* Mishkin, *supra* note 277, at 192.

[FN334]. *Cf.* Cross, *supra* note 245, at 1243-51. According to Cross:

> [In bankruptcy cases] the federal remedy is contingent upon resolution of the related state-law claims. The logical relationship in these cases is the interdependence of the federal and state claims. Because the scope of bankruptcy relief is intimately tied to the outcome of the state-law claims, it certainly makes sense to try the state claims along with the federal.

*Id.* at 1243. Cross further notes that     Federal [bankruptcy] jurisdiction is [thus] limited to those state claims that must be resolved in order to define the shape of the eventual bankruptcy relief. Because all the state claims are logically related to the federal cause of action in bankruptcy, they form part of a single federal bankruptcy "case" for purposes of Article III.

*Id.* at 1251.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN335]. Cross seems to view "related to" jurisdiction as consistent with the precepts of Article III, but *only* because "[t]he theory of ancillary jurisdiction . . . provide[s] a means of sustaining bankruptcy jurisdiction." Cross, *supra* 245, at 1233. As Cross notes:

> [t]he theory of protective jurisdiction, although facially appealing, cannot be reconciled with Article III. Conversely, although the other theories are consistent with Article III, they are neither broad nor flexible enough to support the full range of bankruptcy jurisdiction, especially the district courts' "related to" jurisdiction over claims that do not involve the debtor.

Perhaps my difficulty with this conception of the constitutional sources of bankruptcy jurisdiction is merely semantic, but I am troubled by the argument that "related to" jurisdiction, standing alone, is inconsistent with Article III because it does not "arise under" federal bankruptcy law but that, considered in the context of a bankruptcy case, "related to" jurisdiction fits within the limitations of Article III because it can be described as a form of ancillary jurisdiction.     First, "related to" jurisdiction never stands alone and always only exists in the context of a bankruptcy case. *Cf. id.* at 1243 (describing "scope of bankruptcy relief [as] intimately tied to the outcome of the state-law claims" that presumably constitute "arising in" and "related to" proceedings within the bankruptcy case). Viewed from this perspective, "related to" proceedings "arise under" federal bankruptcy law precisely because they are so "logically related" to the case. *See supra* notes 318-34 and accompanying text (describing "related to" jurisdiction as "arising under" jurisdiction).

Second, the doctrine of supplemental jurisdiction exists because Congress has never utilized the full extent of power granted to it in Article III. *See infra* notes 378-85 and accompanying text (describing supplemental jurisdiction as closing the gap between the constitutional grant and the statutory exercise of federal court jurisdiction). Supplemental jurisdiction, thus, exists within, rather that expands upon, the limits of Article III jurisdiction. *See infra* note 386 and accompanying text (arguing that there is but one "case or controversy" within the meaning of Article III); *but see* Texas Employers Ins. Ass'n v. Felt, 150 F.2d 227, 234 & n.26 (5th Cir. 1945) (suggesting that Congress can give federal courts jurisdiction beyond scope of Article III when "a necessary incident to an effectual exercise of jurisdiction over the enumerated cases and controversies"). Cross's argument seems to make inferences to the contrary.

[FN336]. *See* Cross, *supra* note 245, at 1251.

[FN337]. *Id.*

[FN338]. *See* Reiter v. Sonotone Corp., 442 U.S. 330, 337 (1979) ("As is true in every case involving the construction of a statute, our starting point must be the language employed by Congress.").

Distinct from "related to" jurisdiction, jurisdiction over "arising under" proceedings resembles a grant of federal question jurisdiction. Section 1334(b)'s phrase proceedings "arising under title 11" closely resembles the general grant of federal question jurisdiction in 28 U.S.C. § 1331. *See* 28 U.S.C. § 1331 (1988 & Supp. IV 1992) ("The district courts shall have original jurisdiction of all civil actions *arising under* the Constitution, laws, or treaties of the United States.") (emphasis added). More specific grants of federal question jurisdiction are found in other federal statutes. *See* 28 U.S.C. § 1337(a) (1988) ("*arising under* any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies") (emphasis added); 28 U.S.C. § 1338(a) (1988) ("*arising under* any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks") (emphasis added); 28 U.S.C. § 1339 (1988) ("*arising under* any Act of Congress relating to the postal service") (emphasis added); 28 U.S.C. § 1340 (1988) ("*arising under* any Act of Congress providing for internal revenue, or revenue from imports or tonnage") (emphasis added).

Section 1334(b) also grants original jurisdiction over civil proceedings "arising in . . . cases under title 11." 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992). The phrase "arising in" does not appear in any other grant of federal jurisdiction. Courts have defined "arising in" proceedings as those civil proceedings which arise under non-bankruptcy law but which occur only in the context of a bankruptcy case. A review of case law indicates that "arising in" proceedings nearly always involve suits brought by or against the estate or a representative of the estate, and as such resemble the grants of federal jurisdiction over civil actions involving the United States as a plaintiff or defendant. *See, e.g.,* 28 U.S.C. § 1345 (1988) (United States as plaintiff); § 1346 (United States as defendant); § 1347 (partition action where United States is joint tenant); § 1348 (banking association as party); § 1349 (corporation organized under federal law as party). Alternatively, "arising in" proceedings can be said to be supplemental to the title 11 case in that, by definition, they arise only as a result of the title 11 case.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721                                                                                                              Page 75
62 Fordham L. Rev. 721

[FN339]. 28 U.S.C. § 1338(b) (1988) (emphasis added).

[FN340]. *See, e.g.,* Finley v. United States, 490 U.S. 545, 555 (1988) (referring to 28 U.S.C. § 1338(b) having been "accomplished by wording that could not be mistaken").

[FN341]. 28 U.S.C. § 1367(a) (Supp. IV 1992) (emphasis added).

[FN342]. *See, e.g.,* Dewsnup v. Timm, 112 S. Ct. 773, 780 (1992) (Scalia, J., dissenting) ("'identical words used in different parts of the same act are intended to have the same meaning'") (quoting Sullivan v. Stroop, 496 U.S. 478, 484 (1990)); *see also, e.g.,* United States v. Nordic Village, Inc., 112 S. Ct. 1011, 1015 (1992) ("[A] statute must, if possible, be construed in such fashion that every word has some operative effect.").

[FN343]. Generally, the Supreme Court has applied case law decided under prior bankruptcy acts when interpreting the Bankruptcy Code unless, by explicit language in either the statute or legislative history, Congress articulated an intent to alter the longstanding practice. *See, e.g.,* Dewsnup v. Timm, 112 S. Ct. 773, 778 (1992); Kelly v. Robinson, 479 U.S. 36, 46-47 (1986); Midlantic Nat'l Bank v. New Jersey Dep't. of Envtl. Protection, 474 U.S. 494, 501 (1986).

[FN344]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992); 28 U.S.C. § 1471(b) (repealed).

[FN345]. *See* H.R. Rep. 595, 95th Cong., 1st Sess. at 47 (1977) ("The jurisdictional grants to the court of bankruptcy by the Acts of 1841 and 1867 were almost as extensive [as that in H.R. 8200], and the Supreme Court gave the provisions of those Acts a generous construction and approval of their constitutionality.").

[FN346]. Section 2a(20) of the 1898 Act explicitly granted to district courts "ancillary jurisdiction over persons or property within [the] respective territorial limits [of a district court sitting in bankruptcy] in aid of a receiver or trustee appointed in any bankruptcy proceedings pending in any other [district court]." This provision was added to the 1898 Act in 1910, Amendment of June 25, 1910, ch. 412, 36 Stat. 838, 839; *see* Lazarus, Michel & Lazarus v. Prentice, 234 U.S. 263, 267 (1914) (interpreting 1910 amendment to § 2a(20) of the 1898 Act), to codify the result reached in Babbitt v. Dutcher, 216 U.S. 102 (1910) (concluding that where original court of bankruptcy is entitled to act summarily, another court of bankruptcy, sitting in another district, can also act in aid of court of original jurisdiction). *Accord* Elkus v. Madson Steele Co. (*In re* Madson Steele Co.), 216 U.S. 115 (1910) (same); *In re* Benedict, 140 F. 55 (E.D. Wis. 1905) (same); *In re* Peiser, 115 F. 199 (E.D. Pa. 1902) (same). In *Babbitt v. Dutcher,* the Court reviewed case law decided under the 1841 and 1867 Acts, such as Lathrop v. Drake, 91 U.S. 516 (1875), which had authorized a district court, other than that in which the bankruptcy petition had been filed, to issue injunctions and maintain suits in aid of the district court in which the petition had been filed. *See Babbitt,* 216 U.S. at 106-11 (1910). The Court concluded that the jurisdictional provisions of the 1898 Act did not alter this long-standing rule. *See id.* at 111-14. *Babbitt* thus rejected those decisions which had reached a contrary result under the 1898 Act, such as *In re* Von Hartz, 142 F. 726 (2d Cir. 1905); *In re* Williams, 123 F. 321 (W.D. Tenn. 1903); *In re* Williams, 120 F. 38 (E.D. Ark. 1903).

Section 2a(20)'s grant of ancillary jurisdiction was a limited one, however, and did not extend beyond "preserving such property and, where necessary, conducting the business of the bankrupt, and reducing the property to money, paying therefrom such liens as the court shall find valid and the expenses of ancillary administration, and transmitting the property or its proceeds to the court of primary jurisdiction." This limitation probably referred to the principle established in Freeman v. Howe, 65 U.S. 450 (1860), that ancillary jurisdiction exists to permit a court of equity to resolve claims against property in its possession. After enactment of § 2a(20), courts similarly interpreted the scope of ancillary jurisdiction. *See supra* notes 103-09 and accompanying text (discussing development of ancillary jurisdiction). Courts, thus, narrowly construed § 2a(20)'s statutory grant of ancillary jurisdiction. *See, e.g.,* Lazarus, Michel & Lazarus v. Prentice, 234 U.S. 263, 269 (1914) (noting that because seizure of property of debtor by ancillary receiver appointed pursuant to 1898 Act § 2a(20) is a summary proceeding, intervenor's claim for attorney's fees, which is a plenary action, must be brought in the district court in which bankruptcy petition was filed); Butler v. Ellis (*In re* Waldeck-Deal Dredging Co.), 45 F.2d 951, 952-53, 956 (4th Cir. 1930) (district court exercising ancillary jurisdiction entitled to resolve validity of liens asserted against property in its custody and order sale in satisfaction of valid

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

liens; ancillary court erred in permitting sale of property without compliance with provisions relating to notice and allowances); Fidelity Trust Co. v. Gaskell, 195 F. 865, 868-69 (8th Cir. 1912) (district court exercising ancillary jurisdiction under 1898 Act § 2a(20) obligated to determine validity of adverse claims asserted against property in custody of ancillary receiver, and depending upon result of that determination to send property to court of primary jurisdiction or apply proceeds in satisfaction of adverse claims); In re Rodgers & Garrett Timber Co., 22 F.2d 571, 574 (D. Md. 1927) (district court exercising ancillary jurisdiction entitled to resolve priority and lien claims asserted against property in its custody; distinguishes Lazarus, Michel & Lazarus v. Prentice, 234 U.S. 263 (1914), as precluding ancillary court from resolving claim against such property where claims arose after not before filing of bankruptcy petition); In re Meyer & Judd, 1 F.2d 513, 526 (W.D. Tenn. 1924) (district court exercising ancillary jurisdiction under § 2a(20) has jurisdiction to determine whether property seized by ancillary receiver is property of debtor); In re Einstein, 245 F. 189, 191 (N.D.N.Y. 1917) (district court exercising ancillary jurisdiction under § 2a(20) has jurisdiction to determine whether fund collected by ancillary receiver belongs to debtor or to adverse claimant, and to determine validity of liens asserted against such fund); In re Lipman, 201 F. 169, 172-73 (D.N.J. 1912) (where ancillary receiver obtained possession of goods alleged to have been fraudulently transferred by the debtor, district court exercising ancillary jurisdiction under § 2a(20) acquired jurisdiction to determine rights of debtor's transferee and grant complete relief relating to such property); In re Sutter Bros., 131 F. 654, 654 (S.D.N.Y. 1904) (district court exercising ancillary jurisdiction under § 2a(20) entitled to grant creditor's application for examination of witnesses. Courts also narrowly construed assertions of ancillary jurisdiction outside the scope of § 2a(20). See, e.g., In re Converse-Hough & Co., 27 F.2d 368, 370 (W.D.N.Y. 1928) (ancillary bankruptcy jurisdiction did not exist after confirmation of composition because confirmation divests court of possession of property of estate). Where the court no longer had possession of the property, ancillary jurisdiction was said not to exist.

[FN347]. Before the Supreme Court's expansion of the doctrine of pendent jurisdiction in Hurn v. Oursler, 289 U.S. 238 (1933), and United Mine Workers v. Gibbs, 383 U.S. 715 (1966), courts had uniformly declined to find pendent jurisdiction over state law claims joined with federal claims in a plenary bankruptcy action commenced by a trustee. See State Trust & Sav. Bank v. Dunn, 278 U.S. 582 (1929) (per curium) (reversing assertion of federal pendent-claim jurisdiction over state law claims asserted in plenary avoidance action); Lowenstein v. Reikes, 60 F.2d 933 (2d Cir. 1932), cert. denied, 287 U.S. 669 (1933) (pendent jurisdiction denied, in part, due to insufficient relationship between claims); Kaigler v. Gibson, 264 F. 240, 241 (N.D. Ga. 1920) (same). As the Court expanded the doctrine of pendent jurisdiction in the context of general civil litigation with its decisions in Hurn and Gibbs, however, courts divided on whether pendent bankruptcy jurisdiction was authorized under the 1898 Act.

In Bartle v. Markson, the Second Circuit held that the district court was empowered to assert pendent jurisdiction over state law claims joined by a trustee in bankruptcy with claims under § 70e of the 1898 Act. See 357 F.2d 517, 522-23 (2d Cir. 1966) (Friendly, J.). Because § 70e of the 1898 Act permitted a trustee to avoid transactions that would have been avoidable by actual unsecured creditors of the bankrupt under state law, the § 70e claims in Bartle actually derived from state law; federal bankruptcy jurisdiction existed as to the trustee's § 70e claim although the defendants had not consented to jurisdiction because § 23 explicitly excepts from the general rule that defendants must consent to federal bankruptcy jurisdiction actions brought under, among other things, § 70e. See id. at 522-23. Although decided in 1966, Bartle pre-dates Gibbs by several months and thus relied on Hurn. Nonetheless, the court found that the state law claims were but "the second act" to the § 70e claims. Id. at 523. Relying on Bartle, the Sixth Circuit, in Melamed v. Lake County Nat'l Bank, 727 F.2d 1399 (6th Cir. 1984), similarly affirmed the district court's assertion of pendent jurisdiction over the trustee's claim that the defendant had tortiously interfered with the debtor's business because it arose out of the same nucleus of facts as the trustee's fraudulent transfer action. See id. at 1403. Because it was decided in 1984, Melamed looked to Gibbs for the governing standard. See id. It also applied Zahn and Aldinger, but predated Finley. See id.

The court in Melamed distinguished an earlier district court decision, Creel v. Lawler, 462 F. Supp. 118, 122-23 (N.D. Tex. 1978), in which pendent jurisdiction was declined. See Melamed, 727 F.2d at 1403. In Creel, the court declined to exercise pendent jurisdiction over the trustee's alter ego action, although it admittedly arose out of a common nucleus of facts with the trustee's preference and fraudulent transfer suit, because it thought the state claims predominated over the federal ones and, thus, were likely to confuse the jury. See Creel, 462 F. Supp. at 122. In dicta, the court cast doubt upon the power of a district court to assert jurisdiction pendent to plenary actions brought pursuant to § 23 of the 1898 Act. See id. at 120. It noted that § 23's grant of federal bankruptcy jurisdiction was narrowly crafted by Congress, and that the doctrine of pendent jurisdiction, vastly expanded by courts since enactment of this section, could eviscerate these limitations. See id. at 121-22.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN348]. *See infra* note 499 (discussing jurisdictional provisions of 1841 Act in detail).

[FN349]. *See infra* note 500 (discussing jurisdictional provisions of 1867 Act in detail).

[FN350]. 91 U.S. 516 (1875).

[FN351]. In *Lathrop,* relying on the doctrine of ancillary jurisdiction, the Supreme Court held that an assignee in bankruptcy was entitled to bring a suit in a federal circuit court for the recovery of assets in a district other than that in which the bankruptcy petition had been filed although the citizenship of the parties was not diverse. *See id.* at 517-18. In reaching this conclusion, the Court relied on a combination of statutory construction and policy arguments. *See id.* at 518 ("Proceedings ancillary to and in aid of the proceedings in bankruptcy may be necessary in other districts where the principal court cannot exercise jurisdiction; and it may be necessary for the assignee to institute suits in other districts for the recovery of assets of the bankrupt . . . . The State courts may undoubtedly be resorted to in cases of ordinary suits for the possession of property or the collection of debts; and it is not to be presumed that embarrassments would be encountered in those courts in the way of a prompt and fair administration of justice. But a uniform system of bankruptcy, national in its character, ought to be capable of execution in the national tribunals, without dependence upon those of the States in which it is possible that embarrassments might arise.").

[FN352]. *See infra* notes 496-503 and accompanying text (discussing reference in legislative history to *Lathrop v. Drake*).

[FN353]. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).

[FN354]. *See, e.g.* McLaughlin, *supra* note 102, at 890-93.

[FN355]. *See id.* at 892.

[FN356]. *See supra* note 1 (quoting U.S. Const. art. III, § 2, cl. 1).

[FN357]. Because the constitutional "category" test focuses on the primary claim, it resembles the first prong of *Gibbs*--the "substantiality" test. For a discussion of the *Gibbs* "substantiality" test, see *supra* notes 267-79 and accompanying text.

[FN358]. McLaughlin notes that it is irrelevant under § 1367 that a supplemental claim satisfies constitutional "category" test. The example he provides is of a counterclaim between two diverse citizens (which satisfies constitutional "category" test) but for less than $50,000 (thus failing statutory requirements of 28 U.S.C. § 1332). Unless the primary claim and counterclaim "derive from a common nucleus of operative fact," the assertion of supplemental jurisdiction is not supported by 28 U.S.C. § 1367. *See* McLaughlin, *supra* note 102, at 904-07.

[FN359]. *See* McLaughlin, *supra* note 102, at 892.

[FN360]. Because the constitutional "case" test focuses on the supplemental claim, and especially the relationship between the primary and supplemental claims, it resembles the second prong of the *Gibbs* test--the "common nucleus of operative fact" test. For a discussion of the "common nucleus of operative fact" test, see *supra* notes 116-18, 246-62 and accompanying text.

[FN361]. U.S. Const. art. III, § 2.

[FN362]. For a discussion of just how related the primary claim must be to the supplemental claim to satisfy the constitutional "case," see *supra* notes 246-62 and accompanying text.

[FN363]. The Bankruptcy Clause of the United States Constitution, Article I, Section 8, Clause 4, like the Commerce Clause of

the United States Constitution, Article I, Section 8, Clause 3, constitutes merely an authorization for Congress to pass "Laws of the United States" on the subject of bankruptcy or commerce, but not a constitutional grant of power to Congress to confer federal jurisdiction. *See* U.S. Const. art. I, § 8, cl. 3-4.

[FN364]. *See* U.S. Const. art. III, § 2, cl. 1 (nine categories enumerated). Assertions of "related to" jurisdiction clearly satisfy the constitutional "category" test if between "[c]itizens of different States," or if it "arose under" some federal law other than the Bankruptcy Code. U.S. Const. art. III, § 2.

[FN365]. *See supra* notes 272-73 and accompanying text (discussing Supreme Court precedent).

[FN366]. *See supra* notes 267-352 and accompanying text (contending that "related to" jurisdiction can be characterized either as "arising under" jurisdiction or supplemental jurisdiction).

[FN367]. Because the Supreme Court has long recognized that constitutional federal question jurisdiction, *see Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 8-9 n.8 (1983)* (constitutional federal question jurisdiction under Article III "has long been recognized . . . [as] broader than federal-question jurisdiction under [28 U.S.C.] § 1331"), and constitutional diversity jurisdiction, *see State Farm Fire & Casualty Co. v. Tashire, 386 U.S. 523, 530-31 (1967)* (although Article III requires only minimal diversity, 28 U.S.C. § 1332 requires complete diversity of citizenship), exceeds that granted by statute, the Court's jurisdictional decisions are often limited to a discussion of the statute at issue. If the Court does explicitly discuss the scope of Article III, its discussion is all too often dicta. More frequently, however, the Court's jurisdictional decisions have been unclear as to whether they turn on an analysis of the statute or the Constitution.

[FN368]. *See supra* notes 280-334 and accompanying text. Under this interpretation, § 1334's grant of jurisdiction would be viewed as broader than § 1331's grant of jurisdiction, but both statutes would be viewed as a specie of "arising under" jurisdiction. At least two commentators have rejected a characterization of "related to" jurisdiction as a specie of constitutional "arising under" jurisdiction. *See* Cross, *supra* note 245, at 1251 ("[F]ederal bankruptcy jurisdiction does not fit readily within any of the Article III categories . . . . This does not mean that federal bankruptcy jurisdiction is invalid. Under the doctrine of ancillary jurisdiction, bankruptcy jurisdiction clearly falls within Article III."); Galligan, *supra* note 272, at 5 (agreeing that "related to" jurisdiction does not satisfy "arising under" jurisdiction, but concluding that it is a constitutional grant of protective jurisdiction).

[FN369]. *See* 22 U.S. 738, 819 ("The suit of *The Bank of the United States v. Osborn and others,* is a case, and the question is, whether it arises under a law of the United States?") (emphasis in original).

[FN370]. *See supra* notes 28-37 and accompanying text (setting forth hypothetical "related to" proceeding and supplemental claim).

[FN371]. U.S. Const. art. III, § 2.

[FN372]. *See* United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).

[FN373]. Quite clearly, all three cannot enjoy a "common nucleus of operative fact." Although *Gibbs* applied a narrower standard of relatedness-- "common nucleus of operative fact"--commentators have argued that the broader "logical relationship" test may be all that the constitution requires. *See supra* notes 246-62 and accompanying text. If the requirements of Article III are fulfilled only when the constitutional case shares a "common nucleus of operative fact," however, then "related to" bankruptcy jurisdiction cannot be characterized as a form of supplemental jurisdiction and assertions of jurisdiction over claims related to a "related to" proceeding are clearly unconstitutional. *Cf.* Galligan, *supra* note 272, at 37; Cross, *supra* note 245, at 1235-37.

[FN374]. Of course, this is the implication of all those cases that exercise jurisdiction supplemental to a "related to" proceeding

62 FDMLR 721                                                                                          Page 79
62 Fordham L. Rev. 721

without discussion. *See supra* part II.A.

[FN375]. Galligan questions whether the title 11 case and all proceedings "arising under" title 11, and "arising in" or "related to" the title 11 case, constitute a single constitutional "case," thus, rejecting the analogy of bankruptcy jurisdiction to supplemental jurisdiction. *See* Galligan, *supra* note 272, at 36-41. Although Cross argues that a title 11 case and all proceedings "related to" the title 11 case constitute a single constitutional "case," he would not agree that the constitutional "case" also includes all supplemental claims related to the "related to" proceedings. *See* Cross, *supra* note 245, at 1233-50,

[FN376]. Matasar contends that the Federal Rules of Civil Procedure define the limits of a constitutional "case" in the context of an assertion of jurisdiction supplemental to a non-bankruptcy federal claim. *See* Matasar, *One Constitutional Case, supra* note 102, at 1477-90. His argument boils down to the notion that a constitutional case is the largest potential litigation unit, which variously varies depending upon the breadth of the Federal Rules of Civil Procedure. His contention is controversial among commentators analyzing the scope of supplemental jurisdiction in ordinary civil litigation, *see* McLaughlin, *supra* note 102, at 912-13 n.358 (criticizing Matasar's proposal), but appealing in that context from historical and practical perspectives. Outside the bankruptcy context, "case," even a constitutional "case," is defined in the practical context of a "transaction or occurrence." Matasar, *Jurisdiction Primer, supra* note 102, at 155-56 ("Since *Gibbs*, the trend in pendent cases has been toward a transactional test similar to that in ancillary jurisdiction."). Nonetheless, Matasar's proposition that a constitutional "case" be defined by federal procedural rules falls apart when considered in the context of bankruptcy. A bankruptcy case does not exist to resolve a single "transaction or occurrence" between parties; instead it exists to resolve the debtor's estate.

    While most of the Federal Rules of Civil Procedure are adopted wholesale by the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 7001-7071, this broad cooption of the Federal Rules of Civil Procedure is limited to "adversary proceedings." *See supra* note 3 (defining "adversary proceedings). A more limited reference of the Federal Rules of Civil Procedure applies to "contested matters." *See supra* note 3 (defining "contested matters"). Moreover, nothing in the Federal Rules of Bankruptcy Procedure make the Rules of Civil Procedure generally applicable in a "title 11 case," and indeed many of the procedural rules applicable generally to the administration of a "title 11 case" bear no resemblance to the Federal Rules of Civil Procedure. *See, e.g.,* Fed. R. Bankr. P. 2004. In the context of bankruptcy appeals, moreover, the relevant "litigation unit" is substantially smaller than either the adversary proceeding or contested matter. *See* 6 Norton Bankruptcy Law and Practice § 148.28 at 148-100 (2d ed. 1993) ("[S]plits among the circuits [[[relating to the definition of a 'final order' of a bankruptcy court that is appealable, first to a district court, bankruptcy appellate panel and then, to a court of appeals] can be explained by courts' readiness to measure finality against smaller and smaller 'judicial units.'").

[FN377]. *Cf.* John Guare, Six Degrees of Separation 81 (Random House 1990) ("I read somewhere that everybody on this planet is separated by only six other people. Six degrees of separation. Between us and everybody else on this planet.").

[FN378]. *See* Matasar, *Jurisdiction Primer, supra* note 102, at 106-18 (arguing that limited federal jurisdiction justifies exercise of supplemental jurisdiction).

[FN379]. *See, e.g.,* Yakus v. United States, 321 U.S. 414, 429-30 (1944) (holding that since Article III authorizes Congress to create or not to create lower federal courts, it also entitles Congress to restrict jurisdiction of lower federal courts); Lockerty v. Phillips, 319 U.S. 182, 187-88 (1943) (same); Sheldon v. Sill, 49 U.S. 453, 461, 8 How. 441, 448 (1850) (same); *see also, e.g.,* Ex parte McCardle, 74 U.S. (7 Wall.) 506, 513 (1869) (upholding congressional regulation of appellate jurisdiction of Supreme Court); *see generally, e.g.,* Henry M. Hart, Jr., *The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic,* 66 Harv. L. Rev. 1362 (1953) (discussing congressional control of federal jurisdiction); Lawrence Gene Sager, *The Supreme Court, 1980 Term--Foreword: Constitutional Limitation on Congress' Authority to Regulate the Federal Courts,* 95 Harv. L. Rev. 17 (1981) (same); Wright, *supra* note 266, § 3561 (same).

[FN380]. *Compare* Osborn v. Bank of United States, 22 U.S. 738, 823 (1824) (construing scope of constitutional "arising under" jurisdiction, Chief Justice Marshall upheld constitutionality of grant of federal jurisdiction of suits by and against federally chartered bank irrespective of source of law, or subject matter, of suit) *with, e.g.,* American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260 (1916) (holding that § 1331 did not confer jurisdiction over suit for damages to business for defendant's statements that plaintiff was infringing defendant's patents; Justice Holmes stated that, for purposes of this statute,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"[a] suit arises under the law that creates the cause of action"); *see generally* Wright, *supra* note 266, § 3562 (discussing efforts by courts and commentators to explicate distinction between constitutional "arising under" jurisdiction and its statutory counterpart in 28 U.S.C. § 1331); *see also supra* notes 280-334 and accompanying text (discussing breadth of holding in *Osborn* as to scope of constitutional "arising under" jurisdiction).

[FN381]. Moreover, this practical problem may exist even though the statutory grant of federal jurisdiction is not 28 U.S.C. § 1331. In *Osborn v. Bank of United States,* the Supreme Court reached similar conclusions although it reconciled constitutional "arising under" jurisdiction with a statutory grant which pre-dated and far exceeded the scope of statutory "arising under" jurisdiction. *See* 22 U.S. at 823-28 (interpreting federal charter granting Bank of United States power to sue and be sued in federal courts as a grant of federal jurisdiction, and concluding that this statutory grant of jurisdiction fits within scope of constitutional "arising under" jurisdiction); *see also supra* notes 280-334 and accompanying text (discussing *Osborn*).

[FN382]. *See* Osborn v. Bank of United States, 22 U.S. 738 (1824).

[FN383]. *Id.* at 820.

[FN384]. *See* U.S. Const. art. III, § 2, cl. 1.

[FN385]. 22 U.S. at 820.

[FN386]. This view of the relationship between Article III of the Constitution and the statutory grants of federal jurisdiction could be illustrated as that of concentric balloons: one balloon (statutory grants of primary and supplemental jurisdiction) inside of another (constitutional authorization for grants of federal jurisdiction). An alternative view that I find more compelling, would analogize this relationship to a cup and its filling. Under this view, the reservoir of federal jurisdiction would be illustrated as a balloon (statutory grants of primary and supplemental jurisdiction) inside of a rigid sphere (constitutional authorization for such grants in Article III).

[FN387]. *See* Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 87 (1982).

[FN388]. *See infra* notes 398-415 and accompanying text (discussing these narrow exceptions).

[FN389]. *Marathon,* 458 U.S. at 84-85.

[FN390]. Cross raises a distinct constitutional issue related to bankruptcy courts' non-Article III status. He notes that "[t]he Supreme Court has held on a number of occasions that two of Article III's other restrictions--the judicial power and case or controversy requirements--do not apply to certain non-Article III courts. These cases suggest that Congress similarly should not be bound by the other main restriction of Article III--the nine categories--when assigning cases to the non-Article III courts." Cross, *supra* note 245, at 1202. He ultimately rejects this argument, "although appealing," as "not persuasive." *Id.*

[FN391]. *See* Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, § 2a(20) *in* App. 1 Collier on Bankruptcy 1 (Lawrence P. King ed., 15th ed. 1993), *repealed by* Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (codified at 11 U.S.C. § 101 et seq. and scattered provisions of 28 U.S.C.); 1 Collier on Bankruptcy ¶ 3.01[1][b][iv] (Lawrence P. King ed., 15th ed. 1993).

[FN392]. *See* 1 Collier on Bankruptcy ¶¶ 1.02-1.03[2] (Lawrence P. King ed., 15th ed. 1993).

[FN393]. *See* 1 Collier on Bankruptcy ¶ 3.01[1][b][iv] (Lawrence P. King ed., 15th ed. 1993).

[FN394]. *See, generally,* 1 *Collier on Bankruptcy* § 3.01, (Lawrence P. King ed., 15th ed. 1993) ("'Summary' versus 'plenary' actions, resulted in the primary battleground between trustees and defendants often being one of jurisdiction rather than the

merits.").

[FN395]. For a discussion of this legislative history, see *infra* notes 496-503 and accompanying text.

[FN396]. *See* 28 U.S.C. § 1471 (a), (b) and (c) (repealed). For a complete quotation of § 1471, see *supra* note 100 and accompanying text; *see also* 28 U.S.C. §§ 1480, 1481 (repealed) (reserving in district court power to enjoin another court, sanction certain criminal contempts and render appeals from bankruptcy court decisions).

[FN397]. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 153 (1978) ("This broad grant of jurisdiction will enable the bankruptcy courts, which are created as adjuncts of the district court for the purpose of exercising the jurisdiction, to dispose of controversies that arise in bankruptcy cases or under the bankruptcy code. Actions that formerly had to be tried in the State court or in the Federal district court, at great cost and delay to the estate, may now be tried in the bankruptcy court."); 124 Cong. Rec. 32,410 (1978) (statement of Rep. Edwards) (referring to bankruptcy jurisdiction as "pervasive jurisdiction over all proceedings arising in or relating to bankruptcy cases"); 124 Cong. Rec. 34,010 (1978) (statement of Sen. DeConcini) (same).

[FN398]. 458 U.S. 50 (1982).

[FN399]. 458 U.S. at 87. Article III of the Constitution provides that judges of courts vested with "judicial power of the United States" shall hold their offices "during good behavior and shall, at stated times, receive for their services a compensation, which shall not be diminished during their continuance in office." Article III, § 1.

[FN400]. 458 U.S. at 84-85.

[FN401]. *Marathon* involved no single opinion of the Court. The plurality opinion was endorsed by four Justices; then Associate Justices Rehnquist and O'Connor concurred only in the judgment, but provided only a terse paragraph to explain their distinct position; Chief Justice Burger and Justice White each filed their own dissenting opinions. *See Marathon,* 45 U.S. 50 (1982).

[FN402]. Despite the broad language of the plurality decision in *Marathon,* the Court subsequently limited the *Marathon* holding:

> The Court's holding in [*Marathon*] establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.

Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 584 (1985); *see also* Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833 (1986); *but see* Granfinanciera, S.A. v. Nordberg (*In re* Chase & Sanborn Corp.), 492 U.S. 33, 53 (1989) (holding that trustee's avoidance action against entity that had not filed proof of claim against chapter 11 estate did not involve "public rights" and, thus, defendant in such action was not precluded by that doctrine from asserting right to trial by jury before non-Article III bankruptcy court; Court stated that question "requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal").

[FN403]. *See Marathon,* 458 U.S. at 63-87. The concurring opinion did not fully join in the plurality's adjunct court and public rights analysis. A majority of the justices could only agree that the particular claim before it could not be adjudicated by the bankruptcy court as then constituted. *See id.* at 88.

[FN404]. 458 U.S. at 67-68.

[FN405]. *See id.* at 71-72.

[FN406]. 458 U.S. at 71.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN407]. 285 U.S. 22 (1932).

[FN408]. 447 U.S. 667 (1980).

[FN409]. *See Crowell*, 285 U.S. at 47-48.

[FN410]. *See Raddatz*, 447 U.S. at 683-84.

[FN411]. *See* Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 83-84 (1982).

[FN412]. *See id.* at 86.

[FN413]. *See id.* at 84-86.

[FN414]. *See id.* at 85.

[FN415]. Both the plurality and concurrence agreed that, because the grant of jurisdiction to bankruptcy courts over matters related to bankruptcy cases was made in the same statutory provision as the remaining grant of jurisdiction to bankruptcy courts, the Court could not simply remove jurisdiction of the bankruptcy court over state common law actions. *See* 458 U.S. at 71. Thus, the Supreme Court invalidated the jurisdiction granted to non-Article III bankruptcy courts in its entirety.

[FN416]. 28 U.S.C. § 157(a) (1988).

[FN417]. 28 U.S.C. § 157(b)(2) (1988).

[FN418]. *See* 28 U.S.C. § 157(b)(3) (1988).

[FN419]. *See id.*

[FN420]. *See* 28 U.S.C. § 157(b)(1) (1988).

[FN421]. *See* 28 U.S.C. § 157(c)(1) (1988).

[FN422]. *See* 28 U.S.C. § 157(b)(5) (1988).

[FN423]. *See* 28 U.S.C. § 157(c)(1)-(2) (1988). With the parties' consent, however, the bankruptcy court is entitled to hear and determine even matters only "related to" the bankruptcy case, subject only to ordinary appellate review. *See* 28 U.S.C. § 157(c)(2) (1988). *See, e.g.,* Mann v. Alexander Dawson, Inc. (*In re* Mann), 907 F.2d 923, 926 (9th Cir. 1990). Courts are divided as to whether consent to the bankruptcy court's exercise of "related to" jurisdiction may be implied. *Compare* Canal Corp. v. Finnman (*In re* Johnson), 960 F.2d 397, 400 (4th Cir. 1992) (implied consent sufficient to bind parties) *and* Cain Partnership, Ltd. v. Pioneer Inv. Servs. Co. (*In re* Pioneer Investment Services Co.), 946 F.2d 445, 450 (6th Cir. 1991) (same) *and In re* G.S.F. Corp., 938 F.2d 1467, 1477 (1st Cir. 1991) (same) *and In re* Mann, 907 F.2d 923, 926 (9th Cir. 1990) (same) *and In re* Rath Packing Co., 75 B.R. 137, 138 (N.D. Iowa 1987), *aff'd sub nom.* Rath Packing Co. v. United Food, 860 F.2d 1086 (8th Cir. 1988) (same) *and* Men's Sportswear, Inc. v. Sasson Jeans, Inc. (*In re* Men's Sportswear, Inc.), 834 F.2d 1134 (2d Cir. 1987) (same) *and In re* Daniels-Head & Assoc., 819 F.2d 914, 919 (9th Cir. 1987) (same) *and In re* Southern Ind. Banking Corp., 809 F.2d 329, 331 (6th Cir. 1987) (same) *with In re* Marill Alarm Sys. Inc., 81 B.R. 119, 122 (S.D. Fla. 1987), *aff'd sub nom.* Marill Alarm Sys., Inc. v. Equity Funding, 861 F.2d 725 (11th Cir. 1988) (bankruptcy court's entry of order invalidated by

failure to make core/non-core determination under § 157(b)(3); parties' failure to raise issue does not constitute waiver).

[FN424]. *See* 28 U.S.C. § 157(c)(1) (1988). Despite § 157(a)'s authorization of a general reference of proceedings and cases to bankruptcy courts, § 157 also authorizes district courts to withdraw the reference of case or proceeding on its own motion or on timely motion by party, "for cause shown." 28 U.S.C. § 157(d) (1988). *See* Parklane Hosiery Co., Inc. v. Parklane/Atlanta Venture (*In re* Parklane/Atlanta Joint Venture), 927 F.2d 532, 536 (11th Cir. 1991) ("Even though Congress provided no statutory definition of the word 'cause,' the courts have made it plain that this is not an empty requirement."); Oaks of Woodlake Phase III, Ltd. v. Hall Bayoutree Assocs., Ltd. (*In re* Hall Bayoutree Assocs., Ltd.), 939 F.2d 802, 805 (9th Cir. 1991) ("It is clear that, under § 157(d), a district court may withdraw reference at any time, for cause shown . . . . "); Appeal of Landmark Sav. Ass'n (*In re* Priutt), 910 F.2d 1160 (3d Cir. 1990) ("Although '[n]othing in the legislation or otherwise indicates what may constitute cause,' . . . one court of appeals has listed the following considerations: ['] The district court should consider the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditor's resources, and expediting the bankruptcy process. [[[']") (citations omitted). Moreover, a district court must withdraw reference of proceeding, on timely motion of party in interest, if resolution of proceeding requires consideration of "both" bankruptcy and other federal law "affecting interstate commerce." *See* 28 U.S.C. § 157(d) (1988). *Compare In re* White Motor Corp., 42 B.R. 693, 703-04 (N.D. Ohio 1984) (withdrawal required only when bankruptcy court litigation "cannot be resolved without substantial and material consideration" of non-bankruptcy federal law affecting interstate commerce) *with* City of New York v. Exxon Corp., 932 F.2d 1020, 1026 (2d Cir. 1991) (withdrawal required "of cases or issues that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes") *and* Shugrue v. Pension Benefit Guar. Corp. (*In re* Ionosphere Clubs, Inc.), 142 B.R. 645, 647 (S.D.N.Y. 1992) (same).

[FN425]. *See infra* notes 426-33 and accompanying text.

[FN426]. *See, e.g., In re* Stansbury Poplar Place, Inc., 62 U.S.L.W. 2449 (4th Cir. 1993) (bankruptcy court not authorized to conduct jury trials); *In re* Grabill, Corp., 967 F.2d 1152, 1158, *reh'g denied,* 976 F.2d 1126 (7th Cir. 1992) (same); Rafoth v. National Union Fire Ins. Co. (*In re* Baker & Getty Fin. Servs., Inc.), 954 F.2d 1169, 1172-74 (6th Cir. 1992) (explicitly avoiding constitutional issue); *In re* United Missouri Bank, N.A., 901 F.2d 1449, 1450 (8th Cir. 1990) (same); Kaiser Steel Corp. v. Frates (*In re* Kaiser Steel Corp.), 911 F.2d 380, 389-92 (10th Cir. 1990) (same). The Second Circuit and a number of district courts have held that bankruptcy courts can conduct jury trials in core proceedings, however. *See, e.g.,* Ben Cooper, Inc. v. Insurance Co. of Pennsylvania (*In re* Ben Cooper, Inc.), 896 F.2d 1394, 1404 (2d Cir.) *cert. granted,* 110 S. Ct. 3269, *vacated and remanded,* 111 S. Ct. 425 (1990), *reinstated,* 924 F.2d 36, 38 (2d Cir.), *cert. denied,* 111 S. Ct. 2041 (1991) (bankruptcy court has statutory and constitutional power to conduct jury trials); Walsh v. California Commerce Bank (*In re* Interbank Mortgage Corp.), 128 B.R. 269 (N.D. Cal. 1991) (same); Leonard v. Wessel (*In re* Jackson), 118 B.R. 243, 251 (E.D. Pa. 1990) (same).

[FN427]. *Compare* Mountain Am. Credit Union v. Skinner (*In re* Skinner), 917 F.2d 444, 447-50 (10th Cir. 1990) (bankruptcy courts vested with civil contempt power and exercise is constitutional) *and* Burd v. Walters (*In re* Walters), 868 F.2d 665, 669-70 (4th Cir. 1989) (same) *with* Griffith v. Oles (*In re* Hipp, Inc.), 895 F.2d 1503, 1511 (5th Cir. 1990) (bankruptcy courts do not have criminal contempt power) *and* Plastiras v. Idell (*In re* Sequoia Auto Brokers, Ltd.), 827 F.2d 1281, 1284 (9th Cir. 1987) (bankruptcy courts not vested with inherent civil contempt power by Constitution; must be explicitly authorized by statute); *cf.* Budget Serv. Co. v. Better Homes, Inc., 804 F.2d 289, 291 (4th Cir. 1986) (avoiding entirely issue of contempt powers of bankruptcy courts in case involving bankruptcy court power under § 362(h)).

[FN428]. *See* Parklane Hosiery Co. v. Parklane/Atlanta Venture (*In re* Parklane/Atlanta Joint Venture), 927 F.2d 532, 538 (11th Cir. 1991); Goerg v. Parungao (*In re* Goerg), 930 F.2d 1563 (11th Cir. 1991). Section 305 has since been amended to provide that an order under that "section . . . is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title." Judicial Improvements Act of 1990, Pub. L. No. 101-650, title III, § 309(a), 104 Stat. 5113 (codified as amended at 11 U.S.C. § 305(c) (Supp. IV 1992)) ("JIA"). And courts have interpreted this amendment to render a bankruptcy court's decision under this section reviewable by a district court, but the district court's review of the bankruptcy court decision not appealable to a court of appeals or the Supreme

Court. *See* Chemical Bank v. Togut (*In re* Axona Int'l Credit & Commerce Ltd.), 924 F.2d 31, 34-35 (2d Cir. 1991) (appeal from § 305 abstention order dismissed; 1990 amendment to this provision pursuant to JIA discussed).

[FN429]. *Compare* IRS v. Brickell Inv. Corp. (*In re* Brickell Inv. Corp.), 922 F.2d 696, 701 (11th Cir. 1991) (bankruptcy court not "court of United States" entitled to rule on debtor's motion to assess costs and attorney's fees against IRS pursuant to 26 U.S.C. § 7430) *and* Gower v. Farmers Home Admin. (*In re* Davis), 899 F.2d 1136, 1138-39 (11th Cir. 1990) (bankruptcy court not court of United States entitled to rule on trustee's request for attorney's fees under EAJA) *with* O'Connor v. United States Dep't of Energy, 942 F.2d 771, 774 (10th Cir. 1991) (bankruptcy court empowered to award attorneys' fees pursuant to EAJA because plain language of that statute does not limit that provision to adjudication by "courts of the United States").

[FN430]. For example, courts are divided as to whether bankruptcy courts can entertain a motion to change venue although the express language of 28 U.S.C. § 1412 refers to "a district court." *Compare* Hunt v. Bankers Trust Co., 799 F.2d 1060, 1070 (5th Cir. 1986) (determination whether to transfer venue of case "to be decided, at least in first instance, by the bankruptcy court") *and* Wells Fargo Credit Corp. v. Owens (*In re* Owens), 96 B.R. 215, 218 n.3 (Bankr. W.D. Mo. 1988) (motion to transfer venue case is core proceeding over which bankruptcy courts have jurisdiction) *and* Mann v. Michael Indus., Inc. (*In re* Island Shoe Mfg. Co.), 90 B.R. 981, 933 (Bankr. E.D. Mo. 1988) (same) *and In re* Texaco Inc., 89 B.R. 382, 387 (Bankr. S.D.N.Y. 1988) (same) *and* NBA Int'l Banking Corp. v. Kersting (*In re* Kersting), 85 B.R. 61, 63 (Bankr. S.D. Ohio 1988) (same) *and In re* Toxic Control Technologies, Inc., 84 B.R. 140, 142-43 (Bankr. N.D. Ind. 1988) (same) *and In re* Waits, 70 B.R. 591, 594 (Bankr. S.D.N.Y. 1987) (same) *and* F/S Airlease II, Inc. v. Aerothrust Corp. (*In re* F/S Airlease II, Inc.), 67 B.R. 428, 431-32 (Bankr. W.D. Pa. 1986) (same) *and* Burlingame v. Whilden (*In re* Whilden), 67 B.R. 40, 41-42 (Bankr. M.D. Fla. 1986) (same) *and* McLemore v. Thomasson (*In re* Thomasson), 60 B.R. 629, 630-32 (Bankr. M.D. Tenn. 1986) (same) *and In re* Oceanquest Feeder Serv., Inc. 56 B.R. 715, 718-19 (Bankr. D. Conn. 1986) (same) *and In re* Leonard, 55 B.R. 106, 109 (Bankr. D.D.C. 1985) (same) *with In re* HME Records, Inc., 62 B.R. 611, 612 (Bankr. M.D. Tenn. 1986) (original motion to transfer venue denied for lack of jurisdiction; second motion made in district court which referred back to bankruptcy court) *and* Moody v. Empire Life Ins. Co. (*In re* Moody), 46 B.R. 231, 234, (M.D.N.C. 1985) (in dicta, court assumed only district court empowered to rule on motion to transfer venue) *and* Armstrong v. Ranier Fin. Serv., Inc. (*In re* Greinier), 45 B.R. 715, 716 (Bankr. D.N.D. 1985); *see also* Williams v. Shaw (*In re* Roberts), 91 B.R. 71, 72 n.2 (Bankr. W.D. Mo. 1988) (court stated that motion to transfer venue of proceeding is itself a core proceeding only if proceeding sought to be transferred also is core); *In re* Retirement Inn at Forest Lane, Ltd., 83 B.R. 796, 796-800 (D. Utah 1988) (en banc) (adopting a middle-ground procedure for resolving venue transfer motions whereby motion treated as non-core proceeding as to which bankruptcy court makes recommendations of fact and law, subject to *de novo* review by district court); *see also, generally,* R. Lieb & J. Lewittes, *Correspondence: Some Thoughts on Jurisdiction and Venue,* Norton Bankr. L. Adv., Nov. 1985, at 7-11 (arguing for and against exercise of power by bankruptcy court to transfer venue).

[FN431]. *See* Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 84-85 (1982); Aerni v. Columbus Fed. Savs. (*In re* Aerni), 86 B.R. 203, 207 (Bankr. D. Neb. 1988) ("The absence of ancillary jurisdiction would make it virtually impossible for bankruptcy courts to implement a modern system of procedural rules.").

[FN432]. *See* Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 853 (1986).

[FN433]. *See* Southtrust Bank v. Alpha Steel Co. (*In re* Alpha Steel Co.), 142 B.R. 465, 471 (M.D. Ala. 1992) ("[T]he recent Congressional amendments codifying and merging the doctrines of ancillary and pendent jurisdiction expressly apply only to district courts.").

[FN434]. *See* Finley v. United States, 490 U.S. 545, 553 (1989).

[FN435]. *See, e.g.,* Community Coffee Co. v. M/S Kriti Amethyst, 715 F. Supp. 772, 773 (E.D. La. 1989) (holding that *Finley* undercuts viability of assertion of ancillary jurisdiction); *accord* Wright, *supra* note 266, § 1436, at 276 (same); *but see, e.g.,* Associated Dry Goods Corp. v. Towers Fin. Corp., 920 F.2d 1121, 1125-26 (2d Cir. 1990) (concluding that *Finley* did not undercut power of district court to exercise ancillary jurisdiction over compulsory counterclaim against third party); *see gen-*

*erally* Aetna Casualty & Surety Co. v. Spartan Mechanical Corp., 738 F.Supp. 664, 673-77 (E.D.N.Y. 1990) (reviewing conflicting district court decisions); *see also* H.R. 734, 101st Cong., 2d Sess. 28 (1990).

[FN436]. *See* 28 U.S.C. § 1367(a) (Supp. IV 1992). For a complete quotation of 28 U.S.C. § 1367, see *supra* note 39.

[FN437]. 28 U.S.C. § 1367(a) (Supp. IV 1992) ("Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute . . . . "). Section 1367(b) is irrelevant to an assertion of supplemental bankruptcy jurisdiction. *See supra* note 39 (quoting 28 U.S.C. § 1367(b)). Section 1367(c) authorizes a district court to decline to exercise supplemental jurisdiction under limited circumstances. *See supra* note 39 (quoting 28 U.S.C. § 1367(c)). The circumstances under which a court, applying this subsection (c), would decline to exercise supplemental bankruptcy jurisdiction are discussed *infra* in the text accompanying notes 568-78.

[FN438]. 28 U.S.C. § 1367(a) (Supp. IV 1992).

[FN439]. 28 U.S.C. § 1367(a) (Supp. IV 1992).

[FN440]. McLaughlin, *supra* note 102, at 934; *see also supra* notes 123-29 and accompanying text (discussing *Aldinger*). In *Aldinger,* the Supreme Court had held that supplemental jurisdiction could not be exercised if the exercise of supplemental jurisdiction was "expressly or *by implication* negated" by the jurisdictional statute. *See* Aldinger v. Howard, 427 U.S. 1, 18 (1976) (emphasis added) (concluding that "a fair reading of the language in [[28 U.S.C.] § 1343, together with the scope of [42 U.S.C.] § 1983" impliedly precludes assertion of pendent-party jurisdiction).

[FN441]. *See supra* note 39 (quoting 28 U.S.C. § 1367(b)).

[FN442]. *See supra* note 39 (quoting 28 U.S.C. § 1367(c)).

[FN443]. 28 U.S.C. § 1338(a) (1988). Section 1338(a) provides in its entirety:

> The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent, plant variety protection and copyright cases.

28 U.S.C. § 1338(a) (1988).

[FN444]. 28 U.S.C. § 1338(b) (1988) ("The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent, plant variety protection or trade-mark laws."); *see also* 28 U.S.C. § 1338(c) ("Subsections (a) and (b) apply to exclusive rights in mask works under chapter 9 of title 17 to the same extent as such subsections apply to copyrights.").

[FN445]. Legislative history is ambiguous as to congressional intent in this regard. In testimony during hearings before the Senate Judiciary Committee on S. 2648, the bill which ultimately was enacted as the Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089, it was suggested that 28 U.S.C. § 1338(b) be repealed in the context of enactment of 28 U.S.C. § 1367. *See Federal Courts Study Committee Implementation Act and Civil Reform Act: Hearing on H.R. 5381 and 3898* Before the Subcomm. on Courts, Intellectual Property, and the Administration of Justice of the Comm. on the Judiciary House of Representatives, 101st Cong., 2d Sess. 720 (1990) (letter dated Aug. 31, 1990 from Arthur D. Wolf, Professor of Law, Western New England College School of Law). Congress did not follow this advice and has not repealed § 1338(b), but its inaction does not provide an unequivocal indication of its intention. On one hand, Congress' failure to repeal § 1338(b) may be viewed as an indication of its understanding that it "provides otherwise" than the more generalized grant of supplemental jurisdiction found in § 1367(a). On the other hand, Congress' silence on the interrelationship between these two statutes might just as easily be construed as an indication of its intent that they act as alternative, rather than mutually exclusive, grants of supplemental jurisdiction.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721                                                                                   Page 86
62 Fordham L. Rev. 721

[FN446]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992). For a complete quotation of § 1334(b), see *supra* note 61.

[FN447]. *See* Cross, *supra* note 245, at 1233-50; *supra* notes 335-52 and accompanying text.

[FN448]. *See supra* part II.

[FN449]. *See* Gemco Ware Inc. v. E. Mishan & Sons, Inc., No. Civ. 5885, 1992 WL 281389 (S.D.N.Y. 1992) (district court reserved decision on whether to exercise supplemental jurisdiction, under 28 U.S.C. § 1367(a), over claim for tortious interference with business relations that was related to patent infringement action because interference action might not share common nucleus of fact with patent action; requirements of 28 U.S.C. § 1338(b) clearly not fulfilled); Relational Design & Technology, Inc. v. Data Team Corp., 1992 Copyright L. Dec. (CCH) ¶ 26,932 (D. Kan. 1992) (denying motion to dismiss various state law claims for misappropriation of trade secret, fraud and breach of contract, court exercised supplemental jurisdiction over these claims under § 1367(a) rather than § 1338(b)); Friedman v. Stacey Data Processing Services Inc., 22 U.S.P.Q.2d (BNA) 1528 at n.2 (N.D. Ill. 1991) (denying motion to dismiss unfair competition counterclaim, district court found supplemental jurisdiction under § 1338(b) and declined to reach "theoretical thicket" involving interplay of *Finley*, § 1367(a), and pendent-party jurisdiction); *see also, e.g.*, Lone Ranger Television, Inc. v. Program Radio Corp., 740 F.2d 718, 724 (9th Cir. 1984) (decided before enactment of 28 U.S.C. § 1367) (holding that district court entitled to exercise pendent jurisdiction over state law conversion claim related to copyright infringement action, although § 1338(b) mentions only claims of unfair competition joined with "substantial and related claim under the copyright" laws; "[w]e do not read [§ 1338(b)] to limit pendent jurisdiction in appropriate cases over other types of claims."); Schulman v. Huck Finn, Inc., 472 F.2d 864, 866 (8th Cir. 1973) (decided before enactment of 28 U.S.C. § 1367) ("[E]ven if plaintiff's second cause of action against the two moving defendants does not state a claim of 'unfair competition' and thus does not fall within § 1338(b), the Court nevertheless has the power to exercise jurisdiction over these State law claims by virtue of the more general doctrine of pendent jurisdiction.").

[FN450]. *See supra* part II.A (discussing, in detail, cases exercising supplemental bankruptcy jurisdiction).

[FN451]. *See* Publicker Indus., Inc. v. United States (*In re* Cuyahoga Equip. Corp.), 980 F.2d 110 (2d Cir. 1992) (although the court of appeals referred to primary claims as "related to" proceedings, they probably constituted "arising under" or "arising in" proceedings); Petrolia Corp. v. Elam (*In re* Petrolia Corp.), 79 B.R. 686 (Bankr. E.D. Mich. 1987) (bankruptcy court found supplemental jurisdiction over claims of debtor's principal and corporation with which debtor was to have merged since they arose out of "common nucleus of operative fact" with debtor's identical "related to" proceeding); Total Petroleum, Inc. v. Coral Petroleum, Inc. (*In re* Coral Petroleum, Inc.), 62 B.R. 699 (Bankr. S.D. Tex. 1986) (bankruptcy court exercised supplemental jurisdiction over claims against non-debtor-codefendant, despite settlement of "related to" proceeding against debtor-codefendant).

[FN452]. Pictorially, supplemental bankruptcy jurisdiction over claims related to a "related to" proceeding can be drawn as follows:
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLETABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLETABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLETABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Thus, if courts were to construe supplemental trademark jurisdiction equally as broad, it would exercise jurisdiction over claims related to unfair competition claims related to a trademark action. This broad exercise could be drawn as follows:TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLETABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLETABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLETABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN453]. *See* Fed. R. Bankr. P. 7002 (failing to incorporate Fed. R. Civ. P. 2 to bankruptcy procedure); *see also supra* note 3 (discussing irrelevance of term "civil action" to bankruptcy procedure).

[FN454]. For a definition of "title 11 case," see *supra* note 1.

[FN455]. For a definition of "adversary proceeding," see *supra* note 3.

[FN456]. For a definition of "contested matter," see *supra* note 3.

[FN457]. *See* Fed. R. Bankr. P. 7003 (incorporating Fed. R. Civ. P. to adversary proceedings; Rule 3 provides that "[a] civil action is commenced by filing a complaint with the court").

[FN458]. *See* Fed. R. Bankr. P. 9014 ("In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion . . . . ").

[FN459]. *See* 28 U.S.C. § 1367(a) (Supp. IV 1992) ("Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have *original jurisdiction,* the district courts shall have *supplemental jurisdiction* over all other claims that are so related to claims in the action within such *original jurisdiction* that they form part of the same case or controversy under Article III of the United States Constitution.") (emphasis added).

[FN460]. 28 U.S.C. § 1367(a) (Supp. IV 1992).

[FN461]. *Compare, e.g.,* 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992) ("[T]he district courts shall have *original* but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.") (emphasis added) *with, e.g.,* 28 U.S.C. § 158(a) (1988) ("The district courts of the United States shall have *jurisdiction to hear appeals* from final judgments, orders, and decrees, and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges . . . under section 157 of this title.") (emphasis added).

[FN462]. *See* U.S. Const. art. III, § 2, cl. 2 ("In all Cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the supreme Court shall have *original Jurisdiction.* In all the other Cases before mentioned, the supreme Court shall have *appellate Jurisdiction,* both as to Law and Fact, with such Exceptions, and under such Regulations as the Congress shall make.") (emphasis added).

[FN463]. *See* 28 U.S.C. §§ 1330-1340, 1343-1358, 1361-1365 (1988 & Supp. IV 1992); *but see* 28 U.S.C. §§ 1341, 1342, 1359 (1988) (limiting the exercise of federal jurisdiction rather than granting it). Section 1349 appears merely to limit federal jurisdiction, but by implication may be viewed as a grant of jurisdiction. *See* 28 U.S.C. § 1349 (1988) (providing that district courts do not have jurisdiction of civil actions by or against federally chartered corporations unless United States is owner of more than one-half of stock); Charles A. Wright, Handbook on the Law of Federal Courts § 17, at 65 & n.13 (3d ed. 1976) (explaining that Congress enacted 28 U.S.C. § 1349 in response to the Pacific Railroad Removal Cases, 115 U.S. 1, 11 (1885), which had held that there existed statutory "arising under" jurisdiction over state law tort actions against federally chartered railroad companies, and that this statutory grant of federal jurisdiction complied with the requirements of Article III of the Constitution); *see also* American Nat'l Red Cross v. S.G., 112 S. Ct. 2465, 2476 (1992) (relying on *Pacific Railroad Removal Cases* and others, to conclude that "Article III's 'arising under' jurisdiction is broad enough to authorize Congress to confer federal court jurisdiction over actions involving federally chartered corporations" like the Red Cross). By contrast, 28 U.S.C. § 1360(a) (1988) grants jurisdiction but not to the district courts, instead enumerating which States have jurisdiction over certain "civil causes of action between Indians or to which Indians are parties."

[FN464]. *See, e.g.,* 28 U.S.C. § 1330(a) (granting to district courts "original jurisdiction" of "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity"); § 1331 (granting to district courts "original jurisdiction" of "all civil actions arising under the Constitution, laws, or treaties of the

United States"); § 1332(a) (granting to district courts "original jurisdiction" of "all civil actions where the matter in controversy exceeds the sum or value of $50,000 . . . and is between--(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state . . . as plaintiff and citizens of a State or of different States"); § 1333 (granting to district courts "original jurisdiction" of "[a]ny civil case of admiralty or maritime jurisdiction"); § 1335(a) (granting to district courts "original jurisdiction" of "any civil action of interpleader or in the nature of interpleader" relating to "money or property of the value of $500 or more" if "[t]wo or more adverse claimants, of diverse citizenship . . . are claiming or may claim to be entitled to such money or property" and if "the plaintiff has deposited such money or property . . . into the registry of the court"); § 1337(a) (granting to district courts "original jurisdiction" of "any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies"); § 1338(a) (granting to district courts "original jurisdiction" of "any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trade-marks"); § 1339 (granting to district courts "original jurisdiction" of "any civil action arising under any Act of Congress relating to the postal service"); § 1340 (granting to district courts "original jurisdiction" of "any civil action arising under any Act of Congress providing for internal revenue"); § 1343(a) (granting to district courts "original jurisdiction" of "any civil action authorized by law to be commenced by any person" to recover damages or redress deprivation of various civil rights specified in federal statutes and the United States Constitution); § 1344 (granting to district courts "original jurisdiction" of "any civil action to recover possession of any office, . . . [with specified exceptions], authorized by law to be commenced, where in it appears that the sole question touching the title to office arises out of denial of the right to vote, to any citizen offering to vote, on account of race, color or previous condition of servitude"); § 1345 (granting to district court "original jurisdiction" of "all civil actions, suits or proceedings commenced by the United States"); § 1346(a) (granting to district courts "original jurisdiction" of specified civil actions against the United States); § 1347 (granting to district courts "original jurisdiction" of "any civil action commenced by any tenant in common or joint tenant for the partition of lands where the United States is one of the tenants in common or joint tenants"); § 1348 (granting to district courts "original jurisdiction" of "any civil action commenced by the United States . . . against any national banking association"); § 1349 (denying district courts jurisdiction of "any civil action by or against any corporation" simply because it was "incorporated by or under an Act of Congress, unless the United States is the owner" of greater than half of the capital stock); § 1351 (granting "original jurisdiction" to district courts in "all civil actions" against "consuls or vice consuls of foreign states," or members of a diplomatic "mission or members of their families"); § 1352 (granting original jurisdiction to the district courts, "concurrent with State courts, of any action on a bond executed under any law of the United States," excepting those matter which fall to the Court of International Trade).

[FN465]. *See* 28 U.S.C. § 158(a) (1988) (granting to district courts "jurisdiction to hear appeals from final judgments, orders, and decrees" of bankruptcy courts); § 636(c)(4) (1988) (granting to district courts appellate jurisdiction over judgment of magistrate courts under limited specified circumstances); § 1336(a) (1988) (granting to district courts "jurisdiction of any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission, and to enjoin or suspend, in whole or in part, any order of the Interstate Commerce Commission for the payment of money or the collection of fines, penalties, and forfeitures").

[FN466]. *See* 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992); *but see* 28 U.S.C. § 1334(a) (conferring "original *and* exclusive jurisdiction of all cases under title 11") (emphasis added).

[FN467]. *See supra* note 1 (quoting Article III, § 2, cl. 1). Article III, Section 2, Clause 1 of the Constitution does not itself refer to the nine categories as grants of "original jurisdiction," but Clause 2 of this section of the Constitution does refer to some of these categories as within the "original jurisdiction" of the Supreme Court and to others as within the Supreme Court's "appellate jurisdiction." *See* U.S. Const. art. III, § 2, cl. 2.

[FN468]. *See* U.S. Const. art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."); *see also, e.g.,* Osborn v. Bank of the United States, 22 U.S. 738, 820-21 (1824) (concluding that Article III's authorization to grant "appellate jurisdiction" and "original jurisdiction" to Supreme Court of the United States is co-extensive with authorization to grant "original jurisdiction" to inferior federal courts, and defining "original jurisdiction" as "non-appellate jurisdiction" in this context).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN469]. *See supra* notes 361-62 and accompanying text (discussing application of constitutional "category" test to "arising under" proceedings).

[FN470]. For a discussion of the constitutionality of such an assertion of supplemental jurisdiction, see *supra* part III.A.

[FN471]. *See supra* notes 463-70 and accompanying text (discussing definition of "original jurisdiction" with reference to statutory and constitutional sources).

[FN472]. Supplemental jurisdiction can only be defined in the context of an assessment of its purposes. For a fuller discussion of the purposes of supplemental jurisdiction, see *supra* notes 378-85, *infra* notes 553-56 and accompanying text (discussing inapplicability of policies generally supporting exercise of supplemental jurisdiction when applied to bankruptcy context).

[FN473]. *See supra* part II (discussing this case law in detail).

[FN474]. 28 U.S.C. § 1334(a) (1988 & Supp. IV 1992).

[FN475]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992).

[FN476]. *See supra* notes 302-17, 338 and accompanying text (discussing whether "arising in" jurisdiction constitutes grant of supplemental or non-supplemental jurisdiction).

[FN477]. *See supra* notes 318-34 and accompanying text (arguing that "related to" jurisdiction may constitute grant of "arising under" jurisdiction and noting difficulties with this contention).

[FN478]. *See, e.g.,* Akers v. Caperton, 998 F.2d 220 (4th Cir. 1993) (exercising pendent appellate jurisdiction).

[FN479]. *See generally* H.R. Rep. No. 734, 101st Cong., 2d Sess. (1990).

[FN480]. This is not to say that the Supreme Court has not construed the plain language of a statute to mean one thing in one provision and the very same plain language to mean something quite different in another related provision. *See, e.g.,* Dewsnup v. Timm, 112 S. Ct. 773, 778-79 (1992) (term "allowed secured claim" defined to mean different things in 11 U.S.C. § 506(a) and (d)).

[FN481]. *See* 28 U.S.C. § 1338(b) (1988).

[FN482]. *See* 28 U.S.C. § 1367(a) (Supp. IV 1992) ("in any civil action of which the *district courts* have original jurisdiction, the *district courts* shall have supplemental jurisdiction [as provided therein]") (emphasis added).

[FN483]. *See supra* part III.A.2 (discussing constitutional issues by exercise of supplemental jurisdiction by non-Article III bankruptcy courts).

[FN484]. *But see* Cook v. United States (*In re* Earl Roggenbuck Farms, Inc.), 51 B.R. 913, 925 (Bankr. E.D. Mich. 1985) (explaining that § 157(a) supports finding that non-Article III bankruptcy courts empowered to exercise supplemental bankruptcy jurisdiction because nothing in that statute excludes reference of such jurisdiction).

[FN485]. 28 U.S.C. § 157(a) (1988).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN486]. Moreover, nothing in the legislative history of the Judicial Improvements Act of 1990 indicates an intent to empower bankruptcy courts to exercise the supplemental jurisdiction granted in § 1367(a).

[FN487]. 28 U.S.C. § 157(c)(1) (1988).

[FN488]. See id. (providing that the bankruptcy court may "hear" such matters, but that the district court shall enter any final orders or judgments and conduct a de novo review of any findings of fact or law to which any party has specifically objected).

[FN489]. See 130 Cong. Rec. S8891 (daily ed. June 29, 1984) (remarks of Sen. Hatch), reprinted in 1984 U.S.C.C.A.N. 590, 591 (voicing concern that bankruptcy jurisdictional provisions may exceed limitations of Article III of the Constitution in permitting "purely State law claims which do not arise under the Bankruptcy Code . . . to be tried in [federal] courts."). Because of these and other constitutional concerns, courts have often said that they "should avoid characterizing a proceeding as 'core' if to do so would raise constitutional problems." In re Castlerock Properties, 781 F.2d 159, 162 (9th Cir. 1986); see also Pettibone Corp. v. Easley, 935 F.2d 120, 123 (7th Cir. 1991) (precluding bankruptcy court judges from resolving state law tort claims based on § 157); IRS v. Bricknell Inv. Corp. (In re Bricknell Inv. Corp.), 922 F.2d 696, 701 (11th Cir. 1991) (application for attorney's fees under 26 U.S.C. § 7430 is a "non-core" proceeding); Taxel v. Electronic Sports Research (In re Cinematronics, Inc.), 916 F.2d 1444, 1449-50 (9th Cir. 1990) (supporting limited power of bankruptcy court to hear "core" claims where constitutional problems would result); Gower v. Farmers Home Admin. (In re Davis), 899 F.2d 1136, 1140-42 (11th Cir.) (application for attorney's fees under 28 U.S.C. § 2412(d)(1)(A) is not a "core" proceeding), cert. denied, 111 S. Ct. 510 (1990).

[FN490]. See supra part III.A.2 (discussing these constitutional issues).

[FN491]. 28 U.S.C. § 157(c)(1) (1988).

[FN492]. Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics, Inc.), 813 F.2d 127, 131 (7th Cir. 1987) (defining scope of "related to" jurisdiction).

[FN493]. See infra part IV.A.

[FN494]. See id.

[FN495]. See infra part IV.B.

[FN496]. H.R. Rep. No. 595, 95th Cong., 1st Sess. 46 (1977); see also id. at 48-49 ("H.R. 8200 grants the bankruptcy courts broad and complete jurisdiction over all matters and proceedings that arise in connection with bankruptcy cases . . . . The forum shopping and jurisdictional litigation that have plagued the bankruptcy system, the unfairness to defendants from 'jurisdiction by ambush,' and the dissipation of assets and the expense associated with bifurcated jurisdiction will be eliminated by the jurisdiction proposed by this bill.").

[FN497]. See id. at 46 n.29 ("Litigation of jurisdictional issues would not be eliminated since the existence of jurisdiction is always questionable in a federal tribunal. As part of the federal government the bankruptcy courts would be courts of limited jurisdiction, and it would always be open to a party haled into such a court to object that there was not sufficient connection between the litigation and any legitimate federal concern to warrant the assumption of jurisdiction.").

[FN498]. See id. at 46 ("A comprehensive grant of jurisdiction to the bankruptcy courts over all controversies arising out of any bankruptcy or rehabilitation case would greatly diminish the basis for litigation of jurisdictional issues which consumes so much time, money, and energy of the bankruptcy system and of those involved in the administration of debtors' affairs. It would foster the development of a more uniform, cohesive body of substantive and procedural law which would be applicable

62 FDMLR 721                                                                                                                      Page 91
62 Fordham L. Rev. 721

*to the administration of estates* under the Bankruptcy Act."); at 47-48 ("There appears to be no reason why congress cannot in the exercise of its power under the Bankruptcy Clause of the Constitution confer jurisdiction over all litigation *having a significant connection with bankruptcy.*"); at 48 ("Congress may be said to have given comprehensive jurisdiction to the bankruptcy courts under the Act with respect to all litigation *arising from the administration of the estate of any eligible or amenable debtor . . . .*"); at 48 ("H.R. 8200 grants the bankruptcy courts broad and complete jurisdiction over all matters and proceedings that *arise in connection with bankruptcy cases.*") (emphasis added).

[FN499]. The 1841 Act broadly conferred upon district courts "jurisdiction in all matters and proceedings in bankruptcy arising under this act . . . the said jurisdiction to be exercised summarily, in the nature of summary proceedings in equity." Bankruptcy Act of 1841, ch. 9, sec. 6., 5 Stat. 440, 445 (repealed). It further provided that this jurisdiction extended "to all cases and controversies in bankruptcy" involving the estate. *Id.* Section 6 of the 1841 Act provided that

> the jurisdiction hereby conferred on the district court shall extend to all cases and controversies in bankruptcy arising between the bankrupt and any creditor or creditors who shall claim any debt or demand under the bankruptcy; to all cases and controversies between such creditor or creditors and the assignee of the estate, whether in office or removed; to all cases and controversies between such assignee and the bankrupt, and to all acts, matters, and things to be done under and in virtue of the bankruptcy, until the final distribution and settlement of the estate of the bankrupt, and the close of the proceedings in bankruptcy.

*Id.; see also Ex parte* Christy, 44 U.S. (3 How.) 292, 311-12 (1845) (Story, J.) (construing jurisdictional provisions of 1841 Bankruptcy Act to hold that federal district court, when sitting in bankruptcy, had jurisdiction to determine validity and extent of liens and mortgages against debtor's property, whether or not lienor or mortgagee had filed proof of claim against estate).
[FN500]. The jurisdictional provisions of the 1867 Act closely resembled those in the 1841 Act. It provided that the district courts are "courts of bankruptcy, and they shall have original jurisdiction in their respective districts in all matters and proceedings in bankruptcy," and that this grant extended to enumerated "cases and controversies" involving the bankruptcy estate. Bankruptcy Act of 1867, ch. 176, sec. 1, 14 Stat. 517, 517 (repealed). The 1867 Act specifically provided:

> the jurisdiction hereby conferred shall extend to all cases and controversies arising between the bankrupt and any creditor or creditors who shall claim any debt or demand under the bankruptcy; to the collection of all the assets of the bankrupt; to the ascertainment and liquidation of the liens and other specific claims thereon; to the adjustment of the various priorities and conflicting interests of all parties; and to the marshalling and disposition of the different funds and assets, so as to secure the rights of all parties and due distribution of the assets among all the creditors; and to all acts, matters, and things to be done under and in virtue of the bankruptcy, until the final distribution and settlement of the estate of the bankrupt, and the close of the proceedings in bankruptcy.

*Id.; see also* Phelps v. Sellick, 19 F. Cas. 463, 464 (C.C.E.D. Mich. 1873) (No. 11,079) (court had little difficulty in concluding "[t]hat all the creditors of the bankrupt, secured as well as unsecured, become and are at once, by virtue of the bankruptcy, parties to the proceedings, and they and their debts are thereby brought under and subject to the sole and exclusive jurisdiction and control of the bankruptcy court; and that such jurisdiction and control exist and may be enforced as well before as after proof of debt").
[FN501]. H.R. Rep. 595, 95th Cong., 1st Sess. 47 (1977). According to House Reports:

> The constitutionality of a grant of a jurisdiction in such comprehensive terms should not be subject to any serious doubt. The jurisdictional grants to the court of bankruptcy by the Acts of 1841 and 1867 were almost as extensive, and the Supreme Court gave the provisions of those Acts a generous construction and approval of their constitutionality. There appears to be no reason why Congress cannot in the exercise of its power under the Bankruptcy Clause of the Constitution confer jurisdiction *over all litigation having a significant connection with bankruptcy.* Indeed, it could not be contended otherwise without challenging the jurisdictional provisions of the present Bankruptcy Act [of 1898]. Section 2a(7) of the [1898] Act confers jurisdiction on the courts of bankruptcy over the determination of controversies "in relation to" the estates of bankrupts "except as herein otherwise provided." By clear implication § 23b [of the 1898 Act] recognizes that courts of bankruptcy have jurisdiction of any action brought there by a receiver or trustee "by consent of the defendant." Since consent of the parties cannot create jurisdiction of the subject matter in a court which has not been vested with it by a valid legislative act, Congress may be said to have given comprehensive jurisdiction to the bankruptcy courts under the Act with respect to all litigation arising from the administration of the estate of any

eligible or amenable debtor, while in certain situations limiting the exercise of this jurisdiction to accommodate the convenience of adversaries of a receiver or trustee.

*Id.* at 47-48 (emphasis added) (citations omitted).

[FN502]. *See Ex parte* Christy, 44 U.S. (3 How.) 292, 311-12 (1845) (1841 Act); Lathrop v. Drake, 91 U.S. 516, 518 (1875) (1867 Act); *see also supra* notes 272-73 (discussing cases in which the Supreme Court, in dicta, opined that broad grants of bankruptcy jurisdiction under 1898 Bankruptcy Act and 1978 Bankruptcy Reform Act were constitutional).

[FN503]. *Ex parte* Christy, 44 U.S. (3 How.) 292, 314-15 (1845). In reaching this conclusion the Court noted that a broad grant of federal jurisdiction was "indispensable" to the realization of this goal. *See id.* at 311-12 ("For this purpose it was indispensable that an entire system adequate to that end should be provided by Congress, capable of being worked out through the instrumentality of its own courts, independently of all aid and assistance from any other tribunals over which it could exercise no effectual control. . . . . [I]t is manifest that the purposes so essential to the just operation of the bankrupt system, could scarcely be accomplished except by clothing the courts of the United States sitting in bankruptcy with the most ample powers and jurisdiction to accomplish them; and it would be a matter of extreme surprise if, when Congress had thus required the end, they should at the same time have withheld the means by which alone it could be successfully reached."); *see also Lathrop,* 91 U.S. at 518 ("But a uniform system of bankruptcy, national in its character, ought to be capable of execution in the national tribunals, without dependence upon those of the States in which it is possible that embarrassments might arise."); Bailey v. Glover, 88 U.S. (21 Wall.) 342, 346 (1874) ("It is obviously one of the purposes of the Bankrupt law [of 1867], that there should be a speedy disposition of the bankrupt's assets.").

[FN504]. 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992).

[FN505]. *See supra* notes 496-503 and accompanying text (discussing policy of bankruptcy jurisdiction).

[FN506]. *See supra* notes 85-98 and accompanying text (discussing various definitions of "related to" jurisdiction).

[FN507]. Resolution of a supplemental claim, standing alone, is not likely to delay distributions to creditors, for if it were to have this effect it would constitute a "related to" proceeding. *See supra* notes 85-98 and accompanying text (defining "related to" jurisdiction). Nonetheless, the supplemental claim would be joined to an "arising under," "arising in" or "related to" proceeding which, by definition, will need to be resolved before distributions to creditors can be completed. Moreover, even though distributions to creditors are not directly held up pending resolution of the supplemental claim, they may be held up indirectly. The time which district and bankruptcy judges have is limited, and time spent resolving a supplemental claim likely means that some other proceeding will be delayed.

[FN508]. *See supra* notes 28-37 and accompanying text (detailing this hypothetical).

[FN509]. Because of the expansive definition of "related to" jurisdiction, the bankruptcy policies are, in some proceedings, only weakly furthered by the assertion of jurisdiction. *See* Elscint, Inc. v. First Wis. Fin. Corp. (*In re* Xonics, Inc.), 813 F.2d 127, 131 (7th Cir. 1987) ("There is jurisdiction under § 157(c)(1) only when the dispute is 'related to' the bankruptcy--meaning that it affects the amount of property available for distribution or the allocation of property among creditors . . . . The bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt's assets. It extends no farther than its purpose.").

[FN510]. *See* Official Creditors' Comm. of Prods. Liab. & Personal Injury Claimants v. International Ins. Co. (*In re* Pettibone Corp.), 135 B.R. 847, 852 (Bankr. N.D. Ill. 1992) (stating in dicta that "except to enter a dollar judgment in actions to bar dischargeability," it doubted it had general ancillary jurisdiction); *see also* Aerni v. Columbus Fed. Sav. (*In re* Aerni), 86 B.R. 203, 206 (Bankr. D. Neb. 1988) (exercising supplemental jurisdiction over claim "related to" objection to debtor's discharge).

[FN511]. *See* 11 U.S.C. § 727 (1988) (describing grounds on which chapter 7 debtor may be denied bankruptcy discharge).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN512]. *See* 11 U.S.C. § 523 (1988 & Supp. IV 1992) (describing specific debts from which individual debtor may not receive bankruptcy discharge).

[FN513]. The term "claim" is used here in the procedural sense to refer to a unit of litigation within an adversary proceeding. *See supra* note 3 (discussion definition of "claim" in greater detail).

[FN514]. In cases in which there is unencumbered, nonexempt property of the estate, there will be property available for distributions to creditors. *See* 11 U.S.C. §§ 725, 726 (1988) (establishing priority of distributions to creditors in chapter 7 liquidation).

[FN515]. In the chapter 13 context, courts are divided on whether non-dischargeable claims are entitled to distributions pursuant to the repayment plan. Some courts have held that chapter 13 plans proposing to pay non-dischargeable child support payments on a deferred basis are not proposed in good faith as required by 11 U.S.C. § 1325(a)(3) (1988). *See e.g., Pacana v. Pacana (In re Pacana)*, 125 B.R. 19, 25 (Bankr. 9th Cir. 1991) (absent written consent of recipient, bad faith to propose chapter 13 plan proposing deferred payment of back child support payments); *In re Harris*, 132 B.R. 166, 170 (Bankr. S.D. Iowa 1989) (same); *In re Santa Maria*, 128 B.R. 32, 37 (Bankr. N.D.N.Y. 1991) (same). In a distinct line of cases, other courts have not only permitted the holders of non-dischargeable claims to receive distributions pursuant to a chapter 13 plan, but have permitted the debtor to separately classify non-dischargeable claims from his or her other claims, notwithstanding the direction in 11 U.S.C. § 1322(b)(1) (1988) that a chapter 13 plan "may not discriminate unfairly against any class" of unsecured claims. *See, e.g.,* Mickelson v. Leser (*In re Leser*), 939 F.2d 669, 672 (8th Cir. 1991) (separate classification and disparate treatment justified because child support claims non-dischargeable in chapter 13 anyway); *In re Saulter*, 133 B.R. 148, 150 (Bankr. W.D. Mo. 1991) (separate classification justified because, after 1990 amendment to Code, student loan liability will typically survive discharge). Yet other decisions have held that the separate classification of non-dischargeable claims, other than non-dischargeable child support claims, is unauthorized by the Code. *See, e.g., In re Schieber*, 129 B.R. 604, 607 (Bankr. D. Minn. 1991) (separate classification of student loans not justified, notwithstanding 1990 amendment rendering most student loans non-dischargeable; court distinguished case in same district permitting separate classification of child support payments since basis for separate classification in that case was policy importance of ensuring support of children not non-dischargeability of support payments); *In re Lawson*, 93 B.R. 979, 982 (Bankr. N.D. Ill. 1988) (same, critical of four-factor test).

[FN516]. Litigation surrounding a proof of claim "arises in" a title 11 case for purposes of § 1334(b). *See supra* notes 75-84 and accompanying text (discussing "arising in" jurisdiction in greater detail). With this characterization, jurisdiction over the declaratory action may not be merely supplemental jurisdiction.

[FN517]. *See* Fed. R. Bankr. P. 2002(e) (defining a "no-asset" case as a "chapter 7 liquidation case [in which] . . . it appears from the schedules that there are no assets from which a dividend can be paid"). In "no-asset" cases, Rule 2002(e) permits the trustee to notify creditors of this fact and that it is unnecessary to file claims until further notice. *See* Fed. R. Bankr. P. 2002(e). As a result, the relationship between the creditors' declaratory action and resolution of the bankruptcy estate is much more attenuated.

[FN518]. *See* 11 U.S.C. § 727(d)(2), (e) (1988) (permitting trustee to request revocation of discharge, within later of close of case or one year after discharge, if "debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee").

[FN519]. *See* 11 U.S.C. § 350(b) (1988) ("A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."); *see also* Fed. R. Bankr. P. 5010 (setting forth procedure for reopening case).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721                                                                                      Page 94
62 Fordham L. Rev. 721

[FN520]. *See* Fed. R. Bankr. P. 2002(e) ("In a chapter 7 liquidation case, if it appears from the schedules that there are no assets from which a dividend can be paid, the notice of the meeting of creditors may include a statement to that effect; that is unnecessary to file claims; and that if sufficient assets become available for the payment of a dividend, further notice will be given for the filing of claims."); Fed. R. Bankr. P. 3002 (c)(5) (extending time for filing proofs of claim against chapter 7 estate "[i]f notice of insufficient assets to pay a dividend was given to creditors pursuant to Rule 2002(e), and subsequently the trustee notifies the court that payment of a dividend appears possible").

[FN521]. To some extent, characterization of the declaratory action as a proof of claim contingent upon a later reopening of the debtor's bankruptcy case may support the conclusion that jurisdiction over the declaratory action is "related to," not supplemental, jurisdiction in that the claim could have a "conceivable effect" on administration of the estate. *See supra* notes 85-98 and accompanying text (discussing "related to" jurisdiction in greater detail). Courts, however, have not uniformly defined "related to" jurisdiction this broadly.

[FN522]. *See* 11 U.S.C. § 501 (1988) (providing that creditors "may" file proof of claim).

[FN523]. The filing of a proof of claim may be viewed as consent to the exercise of jurisdiction by a non-Article III bankruptcy judge for purposes of 28 U.S.C. § 157(c)(2) (1988) (permitting bankruptcy judge to "hear and determine" even "related to" proceedings if litigants consent to such exercise). Although courts disagree as to whether this consent can be implied, *see supra* note 423, it is clear that the filing of a proof of claim constitutes consent to the exercise of bankruptcy court jurisdiction over related counterclaims. *See* 28 U.S.C. § 157(b)(2)(C) (1988) (defining "core proceedings" as including "counterclaims by the estate against persons filing claims against the estate"); *but see* Piombo Corp. v. Castlerock Properties (*In re* Castlerock Properties), 781 F.2d 159, 162-63 (9th Cir. 1986) (court of appeals declined to find that creditor consented to exercise of bankruptcy jurisdiction over counterclaims asserted by debtor to creditor's request for relief from automatic stay, notwithstanding creditor's subsequent filing of proof of claim); Northwestern Mut. Life Ins. Co. v. Axton (*In re* Axton), 641 F.2d 1262, 1268 (9th Cir. 1981) (decided under Bankruptcy Act of 1898) (court of appeals declined to find that lessor had consented to exercise of bankruptcy court jurisdiction although lessor had asserted entitlement to administrative expense for debtor's use and occupancy of premises). Determination by the bankruptcy court of a proof of claim filed against the estate may preclude subsequent claims under the doctrine of res judicata. *See* Bank of Lafayette v. Baudoin (*In re* Baudoin), 981 F.2d 736, 737 (5th Cir. 1993) (court of appeals dismissed lender liability action as barred by doctrine of res judicata; bankruptcy court previously had allowed proof of claim filed by defendant). Moreover, the filing of a proof of claim forecloses the exercise of important procedural rights by the claimant. *See* Langenkamp v. Culp, 498 U.S. 42, 44-45 (1990) (per curiam) (filing of proof of claim against estate precludes exercise of right to trial by jury by such claimant).

[FN524]. The debtor, rather than the bankruptcy trustee, is the proper defendant to both the objection to discharge and the related declaratory action. Therefore, one cannot argue that supplemental jurisdiction over the declaratory action assists in resolution of the bankruptcy case because it frees the trustee from the responsibility to litigate the declaratory action in a nonbankruptcy forum.

[FN525]. *See supra* note 524 (discussing these tactical considerations); *see also* 11 U.S.C. § 502(d) (1988) (disallowing claim of transferee in avoidable transfer unless transferee has disgorged benefit received from such transfer). Because in this hypothetical the defendant has not filed a proof of claim, it is not entitled to receive a dividend from the estate. *See* Fed. R. Bankr. P. 3002(a) (1988) (generally requiring holder of claim to file proof of claim to receive dividend in bankruptcy case) and Fed. R. Bankr. P. 3003(c)(2) (requiring holder of disputed claim to file proof of claim to receive dividend from chapter 11 estate). The counterclaim could affect the administration of the debtor's estate in another way; if the counterclaim is successful but the defense against the debtor's primary action is not, the defendant's liability to the estate will be reduced by the recovery in the counterclaim. In addition, failure to file a proof of claim will preclude the defendant from recovering any amount from the estate, even if recovery on the counterclaim exceeds recovery on the debtor's action.

[FN526]. *See supra* notes 85-98 (discussing "related to" jurisdiction); *see also* 28 U.S.C. § 157(b)(2)(C) (1988) (defining "core proceedings" to include "counterclaims by the estate against persons filing claims against the estate"). Courts differ as to the breadth of this provision. Some hold that a counterclaim based on a state law cause of action is not "core," even though a proof

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of claim was filed by the party against whom the claim was asserted, unless the state law claim itself constitutionally can be heard by the bankruptcy court. *See, e.g., Nanodata Computer Corp. v. Kollmorgen Corp. (In re Nanodata Computer Corp.), 52 B.R. 334, 338-43 (Bankr. W.D.N.Y. 1985)* (holding that state law issues are not "core" matters, and merit only "related to" jurisdiction as governed by § 157(c)); *see also Piombo Corp. v. Castlerock Properties (In re Castlerock Properties), 781 F.2d 159, 162-63 (9th Cir. 1986)* (debtor filed state law counterclaims to motion for relief from automatic stay to continue pending state court action; after bankruptcy court denied motion to dismiss counterclaims, state court plaintiff filed proof of claim; court of appeals held that bankruptcy court did not have jurisdiction over counterclaim when proof of claim was filed after court had asserted jurisdiction over counterclaims). Other courts read subsection (C) literally to find "core" status for counterclaims based on state law whenever the counterclaims are against a party who filed a proof of claim. Some, however, would limit this definition to counterclaims arising out of the same transaction as that which gave rise to the proof of claim. *See, e.g., Macon Prestressed Concrete Co. v. Duke, 46 B.R. 727, 731 (Bankr. M.D. Ga. 1985)* (finding jurisdiction for debtor's counterclaim because it was "intimately connected" with debtor's petition for reorganization).

[FN527]. *See* 11 U.S.C. § 522(f) (1988) (permitting debtor to avoid certain judicial liens, or non-possessory, non-purchase-money security interests, which impair an exemption to which debtor otherwise would have been entitled); § 522(h) (permitting debtor to bring avoidance actions if property to be recovered in such action otherwise could have been claimed as exempt by debtor under 11 U.S.C. § 522(g)(1) and trustee does not attempt to avoid such transfer).

[FN528]. *Cf.* Turner v. Ermiger (*In re Turner), 724 F.2d 338, 341 (2d Cir. 1983)* (cause of action, which was allocated to debtor as exempt property, was not "related to" bankruptcy case because suit was no longer property of estate, proceeds from recovery on suit would not enhance estate, and there was no other significant connection to bankruptcy case).

[FN529]. One might argue that the exercise of supplemental bankruptcy jurisdiction would assist the trustee in a speedy resolution of the estate because it provides the debtor the convenience of a single forum for resolution of both the avoidance action and the counterclaims. But this argument seems unconvincing because, if supplemental bankruptcy jurisdiction were not exercised, the defendant would be forced to choose between filing a proof of claim on grounds of breach of contract, requesting relief from the automatic stay in order to pursue the breach of contract action (to judgment) in a nonbankruptcy forum, or abandoning the claim. Only if there were a substantial likelihood that the defendant's request for relief from the automatic stay would be granted would this judicial economy argument hold any water, however, and courts are most reluctant, absent special comity concerns not likely to exist in a garden-variety contract action, to grant such a request and permit the litigation of unsecured claims in a nonbankruptcy forum. There would seem to be no judicial economy if the debtor's objections to the contract action are litigated in the context of the avoidance suit rather than as an objection to a proof of claim.

[FN530]. *See, e.g.,* Lopez-Stubbe v. Rodriguez-Estrada (*In re San Juan Hotel Corp.), 847 F.2d 931, 937 (1st Cir. 1988)* (upholding assessment of personal liability against former trustee of chapter 7 estate).

[FN531]. *See* 11 U.S.C. § 327(a) (1988) (permitting trustee, with court's approval, to employ attorneys "that do not hold or represent an interest adverse to the estate, and that are disinterested persons"); § 328(a) (permitting trustee to employ professional persons "on any reasonable terms and conditions of employment"); § 328(c) (permitting court to deny allowance of compensation for services rendered by such professional persons if "such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed"); *see also* 11 U.S.C. § 101(13) (defining "disinterested person").

[FN532]. One could argue that the trustee's counterclaims "arise in" the title 11 case if the alleged malpractice occurred post-petition because, but for the commencement of the bankruptcy case, the post-petition malpractice may not have occurred. *See supra* notes 75-84 (discussing scope of "arising in" jurisdiction as inclusive of most claims arising out of post-petition transactions).

[FN533]. *See* 11 U.S.C. § 558 (1988) (permitting "estate" to raise defenses available to debtor as against any entity other than the estate).

[FN534]. Assertions of supplemental jurisdiction "involv[ing] the joinder or intervention of additional parties," 28 U.S.C. § 1367(a) (Supp. IV 1992), were, prior to enactment of the supplemental jurisdictional provision, referred to as exercises of ancillary jurisdiction when the supplemental claim against a third party was brought by the defendant, *see supra* notes 103-09 and accompanying text (discussing ancillary jurisdiction), or as exercises of pendent-party jurisdiction when the supplemental claim against a third party was brought by the plaintiff, *see supra* notes 119-36 and accompanying text (discussing pendent-party jurisdiction). The distinction between supplemental jurisdiction "involv[ing] the joinder or intervention of additional parties" generally, and supplemental jurisdiction "involv[ing] the joinder or intervention of additional parties" which is asserted by plaintiffs, continues under the supplemental jurisdiction provision. *See* 28 U.S.C. § 1367(b) (Supp. IV 1992) (prohibiting the latter where "original jurisdiction founded solely on section 1332 of [title 28]").

[FN535]. *See supra* notes 12-18 and accompanying text (setting forth hypothetical in detail). Because the third-party action is brought by the defendants, it would be viewed as an assertion of ancillary jurisdiction, *see supra* notes 103-09 and accompanying text, rather than an assertion of pendent-party jurisdiction, *see supra* notes 119-36 and accompanying text. The distinction may have been rendered irrelevant by 28 U.S.C. § 1367 (Supp. IV 1992). That statute generally permits an exercise of supplemental jurisdiction even as to "claims that involve the joinder or intervention of additional parties." *See* 28 U.S.C. § 1367(a) (Supp. IV 1992). The only exception that § 1367 provides to an assertion of pendent-party jurisdiction is where the sole basis for jurisdiction over the primary claim is 28 U.S.C. § 1332 (diversity and alienage jurisdiction). *See* 28 U.S.C. § 1367(b) (Supp. IV 1992). Where jurisdiction of the primary claim is instead founded on 28 U.S.C. § 1334(b) (1988 & Supp. IV 1992), the bankruptcy jurisdictional provision, an exercise of pendent-party jurisdiction would seem to be authorized. *But see infra* note 570 (arguing, on policy grounds, that Congress should reconsider grant of supplemental bankruptcy jurisdiction involving joinder or intervention of additional parties by plaintiffs).

[FN536]. There undoubtedly exists substantial overlap between proceedings "related to" the title 11 case, and supplemental claims sufficiently related to an "arising under" or "arising in" proceeding. For example, reconsider the hypothetical involving the avoidance action and third-party malpractice suit. *See supra* notes 12-18 and accompanying text (setting forth this hypothetical). One could argue that the third-party action is a proceeding "related to" the title 11 case--one which might conceivably affect distributions from the estate or administration of the estate--in that the third-party plaintiff's success in this suit renders the trustee's action against him more collectable. Courts are divided as to whether such an extensive interpretation of the grant of "related to" jurisdiction is supportable, however. *Compare* Hawkins v. Eads (*In re* Eads), 135 B.R. 387, 393 (Bankr. E.D. Cal. 1991) (concluding that it had "related to" jurisdiction over third-party claims because "possibility of recovery on the third-party complaint enhances the collectability of any judgment against the [non-debtor] defendants") *with* Scott v. Equitable Fed. Savs. & Loan Ass'n (*In re* German), 97 B.R. 373, 375 (Bankr. S.D. Ohio 1989) (concluding that "related to" jurisdiction did not extend to third-party claims). In part this disagreement may be explained by the more general disagreement as to whether any "conceivable" relationship between the proceeding and the estate satisfies the standard of "related to" jurisdiction, or whether a direct, legal relationship is required. *See supra* notes 85-98 and accompanying text (discussing disagreement about standard of "related to" jurisdiction).

    Courts generally have held that suits between third party non-debtors do not involve "related to" jurisdiction unless resolution of the action would (1) result in automatic liability against the debtor; (2) bar the debtor from relitigating any issue determined by the suit under principles of res judicata or collateral estoppel; or (3) otherwise affect the debtor's rights, liabilities, options or freedom of action in any way that impacts upon the handling and administration of the bankruptcy estate. *Compare* Quattrone Accountants, Inc. v. IRS, 895 F.2d 921, 926-27 (3d Cir. 1990) (holding bankruptcy court has no "related to" jurisdiction over suit to determine non-debtor's liability as "responsible person" for failure to pay trust fund taxes) *and* Home Ins. Co. v. Cooper & Cooper, Ltd., 889 F.2d 746, 749-51 (7th Cir. 1989) (court of appeals remanded for determination as to whether action brought by debtor/law firm's insurer seeking declaration that "claims made" malpractice policy was invalid because of misrepresentations on application form, both as to misrepresenting sole shareholder of debtor and innocent associates of firm, was "related to" debtor's bankruptcy case) *and* Fietz v. Great Western Savings (*In re* Fietz), 852 F.2d 455, 458 (9th Cir. 1988) (cross-claim by debtor's former wife against mortgagee dismissed for lack of subject matter jurisdiction; "related to" jurisdiction did not exist over cross-claim because, even if cross-claim was community property and thus property of debtor's estate, resolution of cross-claim would have no conceivable effect on estate when debtor's plan had been confirmed and could not be modified by creditors, absent proof of fraud) *and* National City Bank v. Coopers & Lybrand, 802 F.2d 990, 993-94

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(8th Cir. 1986) (holding no bankruptcy jurisdiction over post-confirmation suit by class of note holders who had received less than full payment under debtors' reorganization plan against debtors' pre-petition accountants asserting that negligence, breach of contract and fraud by accountants caused devaluation of their claims and reduced dividends under plan) *and* Pacor, Inc. v. Higgins, 743 F.2d 984, 995 (3d Cir. 1984) (finding no bankruptcy jurisdiction over personal injury tort claim brought by Higgins (consumer), against Pacor, Inc. (supplier), although Pacor had filed third-party complaint against Manville (manufacturer), and third-party claim was stayed by Manville's chapter 11 filing; Higgins' claim was described as "a mere precursor to the potential third party claim for indemnification" by Pacor against Manville because Manville would not be barred by res judicata or collateral estoppel from relitigating any issue decided in suit between Higgins and Pacor, nor did Higgins' action create automatic liability against Manville) *with* Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (*In re* Wolverine Radio Co.), 930 F.2d 1132, 1143 (6th Cir. 1991) (distinguishing *Pacor* as involving merely commonlaw rather than contractual claim for indemnification, the court of appeals found "related to" jurisdiction over determination of tax liability of debtor's assignee because contractual indemnification provision might render debtor liable to assignee in event assignee held liable to debtor's former employees) *and* Robinson v. Michigan Consolidated Gas Co., 918 F.2d 579, 584 (6th Cir. 1990) (finding "related to" jurisdiction existed over tenants' suit against utility and bankruptcy trustee for wrongful termination of service since tenants sued trustee in his official capacity and thus sought recovery from debtor's estate) *and* Dogpatch Properties, Inc. v. Dogpatch U.S.A., Inc. (*In re* Dogpatch U.S.A., Inc.), 810 F.2d 782, 786 (8th Cir. 1987) (finding "related to" jurisdiction over counterclaim and third party claim in action brought by purchaser of property against debtor, mortgagee and Arkansas Real Estate Commission, because outcome of counterclaim brought by mortgagee against purchaser to foreclose and third party claim brought by mortgagee against alleged guarantors to collect on guarantee would affect estate in that purchaser's inability to pay mortgages would render debtor responsible to repay mortgaged amount) *and* DuVoisin v. Foster (*In re* Southern Indus. Banking Corp.), 809 F.2d 329, 331 (6th Cir. 1987) (holding action between assignee of note given to debtor and maker of note was "related to" debtor's bankruptcy case because suit arose as result of debtor's bankruptcy, single substantive claim concerning maker's setoff rights against assignee was based on bankruptcy law, and debt to be set off was debt owed to maker, not by assignee, but debtor) *and* Su-Ra Enterprises, Inc. v. Barnett Bank, N.A., 142 B.R. 502, 505 (S.D. Fla. 1992) (finding "related to" jurisdiction to exist over equitable action under Florida law brought by non-debtor/lessee against purchaser of leasehold from estate because defendant raised Bankruptcy Code as affirmative defense and both plaintiff and defendant had claimed that they would bring action against estate if unsuccessful in this suit).

[FN537]. The extent to which the primary and supplemental claims are related will affect whether the exercise of jurisdiction over the supplemental claim is consistent or inconsistent with an expeditious resolution of the bankruptcy case. Courts and commentators are not in complete agreement as to what this standard ought to be. *See supra* notes 246-62 and accompanying text (discussing application of *Gibbs*'s "relatedness" test to supplemental bankruptcy jurisdiction).

[FN538]. *See* Dechert Price & Rhoads v. Direct Satellite Communications, Inc. (*In re* Direct Satellite Communications, Inc.), 91 B.R. 5, 7 (Bankr. E.D. Pa. 1988) ("The third-party defendants would be compelled to appear as witnesses and claims against them . . . would be an aspect of Decher's [sic] defense irrespective of whether they are joined as parties to this proceeding. Carpenter would be here as a party in any event, as he has not moved for dismissal. It appears grossly unfair to Dechert and to Carpenter to make them engage in litigation in a different forum which would be identical to that here if they do not wish to do so.").

[FN539]. The facts of this hypothetical resemble Pacor, Inc. v. Higgins, 743 F.2d 984, 986, 994 (3d Cir. 1984).

[FN540]. *See* 28 U.S.C. § 1332 (1988 & Supp. IV 1992).

[FN541]. *See* 11 U.S.C. § 362(a)(1) (1988).

[FN542]. *See, e.g.,* Wedgeworth v. Fibreboard Corp., 706 F.2d 541, 544 (5th Cir. 1983) (automatic stay inapplicable to action against co-defendant of debtor); Pitts v. Unarco Indus., Inc., 698 F.2d 313, 314 (7th Cir. 1983) (same).

[FN543]. *See* 28 U.S.C. § 1452(a) (1988 & Supp. IV 1992) ("A party may remove any claim or cause of action in a civil action

. . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title.").

[FN544]. Procedurally this hypothetical is confusing because, in the nonbankruptcy forum, the suit between the plaintiff and the defendant is the primary claim and the third-party action is the supplemental claim. In the bankruptcy forum, however, the third-party action is the primary claim, in that it is "related to" the debtor's bankruptcy case, and the suit between the plaintiff and the defendant becomes the supplemental claim, in that it derives from "a common nucleus of operative fact" with the "related to" proceeding.

[FN545]. See 11 U.S.C. § 502(e)(1)(B) ("the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution"); § 502(e)(2) ("A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed . . . or disallowed . . . the same as if such claim had become fixed before the date of the filing of the petition.").

[FN546]. Here, the reference is to what used to be referred to as "pendent-party jurisdiction." See supra notes 119-36 and accompanying text (generally discussing pendent-party jurisdiction); see also supra notes 534-35 (discussing continuing relevance of pendent-party jurisdiction to supplemental bankruptcy jurisdiction).

[FN547]. See Restatement (Second) of Contracts § 164 (1981).

[FN548]. See supra notes 75-84 and accompanying text.

[FN549]. See supra notes 530-45 and accompanying text (discussing these practical benefits).

[FN550]. Cf. Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 56, 84 (1982) (involving suit by Northern Pipeline Co., chapter 11 debtor-in-possession, against Marathon Pipe Line Co., alleging breach of contract, warranty, misrepresentation, coercion and duress; Marathon had not filed a proof of claim against the estate; recovery in suit would have constituted property of estate under 11 U.S.C. § 541). For a more detailed discussion of Marathon, see supra notes 398-415 and accompanying text.

[FN551]. See 11 U.S.C. § 541(a)(1) (1988).

[FN552]. See supra part III.A.2 and accompanying text (discussing these constitutional concerns in detail).

[FN553]. Considerations of federalism both support and temper exercises of supplemental jurisdiction. Support is found in the notion that an exercise of supplemental jurisdiction may, as a practical matter, be necessary to effectuate a congressional grant of federal jurisdiction. See supra notes 378-85 and accompanying text. Limitation follows from the fact that, by definition, the supplemental claim derives from the state law claim, and that all exercises of supplemental jurisdiction encroach on the general jurisdiction of state courts. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).

[FN554]. See McLaughlin supra note 102, at 863 ("Based on notions of fairness and judicial economy, the doctrines of pendent and ancillary jurisdiction served an important function by allowing the court and litigants to effectively resolve all aspects of an entire controversy in a single proceeding.").

[FN555]. See U.S. Const. art. III.

[FN556]. See McLaughlin, supra note 102, at 864. As McLaughlin noted:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721

62 Fordham L. Rev. 721

> In addition to these considerations of judicial economy and fairness, the doctrines of pendent and ancillary juris-diction also complimented the liberal joinder policies of the Federal Rules of Civil Procedure and facilitated the avowed purpose of the Rules--to eliminate procedural barriers to the joinder of claims so that all claims related to a legal con-troversy could be adjudicated in a single lawsuit.

*Id.*

[FN557]. The supplemental claim will delay resolution of the estate because the relationship between the original proceeding and the supplemental proceeding is required only to have a common nexus of fact, not a perfect interrelationship of fact. The factual nexus will, by definition, be imperfect enough to preclude a finding that the supplemental proceeding is "related to" the title 11 case whereas the original proceeding is so related. This schism would widen if a logical relationship standard were preferred over a "common nucleus of operative fact" test.

[FN558]. *See infra* notes 559-63 and accompanying text.

[FN559]. *See, e.g.,* 130 Cong. Rec. S8891 (June 29, 1984) (statement of Sen. Hatch) ("I have only one regret as I reflect upon this conference product. . . . [With] the deletion of the Senate-passed mandatory abstention provision, . . . purely State law claims which do not arise under the Bankruptcy Code are allowed to be tried in State courts. This presents an important con-stitutional concern.").

[FN560]. *See* 28 U.S.C. § 1334(c)(2) (1988 & Supp. IV 1992). For a quotation of this provision, see *supra* note 61.

[FN561]. 28 U.S.C. § 1334(c)(1) (1988 & Supp. IV 1992). For a more complete quotation of this provision, see *supra* note 61.

[FN562]. *But see* 28 U.S.C. § 1367(c)(1) (Supp. IV 1992) (permitting district court to decline to exercise supplemental juris-diction if "claim raises a novel or complex issue of State law").

[FN563]. The differences between abstention doctrines that have developed outside a bankruptcy context, and the abstention doctrines applied in bankruptcy, is a fascinating topic which far exceeds the scope of this article.

[FN564]. *See* 28 U.S.C. 1334(b) (1988 & Supp. IV 1992).

[FN565]. *But see* Finley v. United States, 490 U.S. 545, 557-58 (1989) (Blackmun, J., dissenting) (noting that the *Aldinger* court suggested that "the appropriateness of pendent-party jurisdiction might turn on the 'alignmen[t] of parties and claims,' and that one significant factor is whether 'the grant of jurisdiction to [the] federal court is exclusive," but that the *Finley* court rejected the factor as irrelevant).

[FN566]. *See, e.g.,* Grogan v. Garner, 111 S. Ct. 654, 658 (1991) (principles of collateral estoppel apply to bankruptcy non-dischargeability proceedings).

[FN567]. Courts are divided as to whether the doctrine of res judicata bars litigation of previously unasserted claims merely "related to" the title 11 case. *Compare* Barnett v. Stern, 909 F.2d 973, 980-82 (7th Cir. 1990) (holding that previously unas-serted claims could be barred by res judicata only if these claims would have been core proceedings in the bankruptcy court) *and* Howell Hydrocarbons, Inc. v. Adams, 897 F.2d 183, 189-90 (5th Cir. 1990) (same) *and* I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1548 n.8 (11th Cir. 1986) (same) *with* Sanders Confectionery Prods., Inc. v. Heller Fin., Inc., 973 F.2d 474, 482-83 (6th Cir. 1992) (claim preclusion may in certain circumstances attach to non-core proceedings), *cert. denied,* 113 S. Ct. 1046 (1993) *and* Sure-Snap Corp. v. State Street Bank & Trust Co., 948 F.2d 869 (2d Cir. 1991) (same). *But see* In re Kroner, 953 F.2d 317 (7th Cir. 1992) (claim preclusion applicable to subsequent non-core proceedings as to which parties had consented to exercise of bankruptcy court jurisdiction).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[FN568]. *See supra* note 39 (quoting 28 U.S.C. § 1367 in its entirety).

[FN569]. 28 U.S.C. § 1367(c) (Supp. IV 1992).

[FN570]. In addition, Congress should give thought to whether it intended § 1367(b)'s limitation on pendent-party jurisdiction in diversity cases to apply in the bankruptcy context. The same arguments that support a limitation of pendent-party jurisdiction in diversity cases also support a limitation of jurisdiction over pendent-party claims related to a "related to" proceeding, since "related to" proceedings derive from state not federal law.

[FN571]. Finley v. United States, 490 U.S. 545 (1989).

[FN572]. *See* Mengler, *supra* note 102, at 248 (describing *Finley* as having "undermined the viability of pendent claim and ancillary jurisdiction"). Mengler then identifies three options available to Congress prior to its enactment of § 1367:

> First, Congress could abolish any vestiges of pendent and ancillary jurisdiction remaining after *Finley*. Second, Congress instead could take the position that the doctrines of pendent claim, pendent party, and ancillary jurisdiction are a beneficial feature of the federal procedural system. Believing that *Finley* really only eliminates pendent party jurisdiction, Congress could overrule the most obvious implication of *Finley* by codifying pendent party jurisdiction. Third, Congress could take the same favorable position on supplemental jurisdiction. Believing, however, that *Finley* seriously undermines all of supplemental jurisdiction, Congress could overrule *Finley* by codifying pendent claim, pendent party, and ancillary jurisdiction.

*Id.* at 267. Although courts were divided as to the implications of *Finley* on pendent claim and ancillary jurisdiction, *see supra* note 435, Congress followed Mengler's third option, either because it agreed with Mengler or more likely, simply out of an abundance of caution. Thus, a court could still conclude that § 1367 does not completely regulate supplemental jurisdiction--that courts continue to hold inherent equitable authority to decline to exercise supplemental jurisdiction--but this conclusion is made much more difficult by *Finley* and Congress' enactment of § 1367 in reaction to *Finley*.

[FN573]. *Compare* 28 U.S.C. § 1367(a) (Supp. IV 1992) ("supplemental jurisdiction shall *include* claims that involve the joinder or intervention of additional parties") (emphasis added) *with* § 1367(c) (Supp. IV 1992) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . . "). *Cf.* 11 U.S.C. § 102(3) (1988) (as applied to title 11, the terms "'includes' and 'including' are not limiting").

[FN574]. Section 1367(c)(1) ("the claim raises a novel or complex issue of State law"), by contrast, is generally phrased. With this discretionary factor, there remains an issue as to its interrelationship to 28 U.S.C. § 1334(c)(1) and (c)(2) (1988 & Supp. IV 1992). *See supra* note 61 (quoting 28 U.S.C. § 1334 in its entirety). It seems anomalous that district courts are required to abstain from certain "related to" proceedings, but are left discretion to exercise supplemental jurisdiction over claims sufficiently related to such a "related to" proceeding.

[FN575]. 28 U.S.C. § 1367(c)(2) (Supp. IV 1992).

[FN576]. 28 U.S.C. § 1367(c)(3) (Supp. IV 1992).

[FN577]. *Cf.* 11 U.S.C. § 362(c)(2) (1988) (providing that automatic stay continues until earliest of closing or dismissal of title 11 case, or grant or denial of discharge to certain debtors).

[FN578]. *See* 28 U.S.C. § 1367(c)(4) (Supp. IV 1992).

62 Fordham L. Rev. 721

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

62 FDMLR 721                                                                                     Page 101
62 Fordham L. Rev. 721

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.